**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| CENTRAL MAINE POWER COMPANY,<br><br>                     Plaintiff,<br><br>v.<br><br>MAINE COMMISSION ON GOVERNMENTAL ETHICS AND ELECTION PRACTICES, WILLIAM J. SCHNEIDER, in his official capacity as Chairman of the Maine Commission on Governmental Ethics and Election Practices, DAVID R. HASTINGS III, in his official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices, SARAH E. LECLAIRE, in her official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices, DENNIS MARBLE, in his official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices, STACEY D. NEUMANN, in her official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices, and AARON FREY, in his official capacity as Attorney General for the State of Maine,<br><br>                     Defendants. | Case No. _____<br><br>**DECLARATORY AND INJUNCTIVE RELIEF SOUGHT** |

**VERIFIED COMPLAINT**

NOW COMES the Plaintiff, Central Maine Power Company ("CMP"), by and through its undersigned attorneys, and complains against the Defendants Maine Commission on Governmental Ethics and Election Practices, William J. Schneider, David R. Hastings III, Sarah E. LeClaire, Dennis Marble, Stacey D. Neumann, and Aaron Frey, with each individual named in his or her capacity as an official of the State of Maine, as follows:

1

## INTRODUCTION

1.      CMP brings this action to obtain declaratory relief, preliminary and permanent injunctive relief, and attorneys' fees under 28 U.S.C. §§ 2201-2202 and 42 U.S.C. §§ 1983 and 1988(b) with respect to Defendants' imminent enforcement of "An Act to Prohibit Campaign Spending by Foreign Governments and Promote an Anticorruption Amendment to the United States Constitution," enacted as a citizen's initiative at Maine's November 2023 general election (the "Initiative").  A true and correct copy of the Initiative is attached hereto as **Exhibit A**.

2.      As the repeated target of proposed legislation and referenda hostile to its interests, CMP has frequently engaged in lawful and constitutionally protected public engagement and advocacy regarding important matters of public policy under consideration by the Governor, Legislature, and the people of Maine.  As a result of its political speech and advocacy, CMP has prevailed in defeating such legislation, including a recent referendum which, if enacted, would have required the Maine state government to expropriate CMP's assets and extinguish the company's existence.  The Initiative now seeks to criminalize CMP's ability to speak publicly on such matters and other matters of concern to the company, its employees, its customers, and the public at large.  Put simply, the Initiative compels the Ethics Commission, its members, and the Attorney General to treat CMP's political speech as criminal conduct, the violation of which constitutes a felony and carries with it the prospect of incarceration.  In so doing, the Initiative strikes at the heart of the protections afforded to free expression and political speech guaranteed by the United States Constitution and the Maine Constitution.

3.      The Court should declare Section 1 of the Initiative unconstitutional and permanently enjoin its enforcement.

## THE PARTIES

4.      Plaintiff CMP is a 124-year-old Maine company with its principal place of business in Augusta, Maine.  CMP is Maine's largest electric utility and delivers more than 9 billion kilowatt-hours of electricity yearly to more than 600,000 retail electric customers in central, western, and southern Maine.

5.      Defendant Maine Commission on Governmental Ethics and Election Practices (the "Ethics Commission") is an agency of the State of Maine.

6.      Defendant William J. Schneider serves as the Chairman of Ethics Commission. Defendants David R. Hastings III, Sarah E. LeClaire, Dennis Marble, and Stacey D. Neumann each serve as members of the Ethics Commission.

7.      Defendant Aaron Frey serves as Attorney General of the State of Maine.

8.      CMP brings this action against Defendants Schneider, Hastings, LeClaire, Marble, Neumann, and Frey in their respective official capacities, as Maine law charges each with authority to enforce election laws in Maine, including the Initiative.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 2201, and 2202, as well as under 42 U.S.C. § 1983, because this action concerns the deprivation of rights secured by the United States Constitution.

10.     This Court has jurisdiction over the claims asserted herein under the Constitution of the State of Maine pursuant to 28 U.S.C. § 1367 because this Court has original jurisdiction over the claims concerning the United States Constitution and federal law, and the state claims are so closely related to the federal claims so as to form part of the same case or controversy.

11.     This Court has personal jurisdiction over the Ethics Commission because it is an agency of the State of Maine, operating within the State of Maine.

12.     This Court has personal jurisdiction over Defendants William J. Schneider, David R. Hastings III, Sarah E. LeClaire, Dennis Marble, and Stacey D. Neumann because each resides within the State of Maine and serves as a member of the Ethics Commission.

13.     This Court has personal jurisdiction over Defendant Aaron Frey because he resides within the State of Maine and serves as the Attorney General for the State of Maine.

14.     Venue is proper in the United States District Court for the District of Maine under 28 U.S.C. § 1391 because Defendants are, or are representatives of, agencies of the State of Maine and thus reside in Maine for purposes of venue.

**FACTS**

CMP's History, Ownership, and Management

15.     CMP traces its origins to November 1899, when two Mainers bought a hydroelectric generator to provide street lighting and electrical service to approximately 100 customers living in Oakland, Maine.

16.     CMP ultimately incorporated as a Maine corporation in 1905 and has remained a Maine corporation, operating and deriving its revenue from Maine customers, ever since.  CMP has never incorporated in any state other than Maine.

17.     CMP is a Maine transmission and distribution utility regulated by the Maine Public Utilities Commission pursuant to Title 35-A of the Maine code, as well as a transmission utility regulated by the Federal Energy Regulatory Commission pursuant to Title 16 of the United States Code.

18.     Pursuant to Maine corporate law, its Articles of Incorporation, and its Bylaws, the only persons with authority under Maine law to govern and carry out the day-to-day affairs of CMP are its board of directors and executive officers.  Each of CMP's four board members is a United States citizen, and two are Maine residents.  Each of CMP's six executive officers is a United States citizen and a Maine resident.

19.     Like many other companies, the identity of the persons who hold an equity interest in CMP has changed over the course of its 124-year-old history, ranging from natural persons to other companies.

20.     CMP Group, Inc. ("CMP Group") currently holds 100% of CMP's shares of common stock.  CMP Group is a Maine corporation with its principal place of business in Augusta, Maine.

21.     Avangrid Networks, Inc. ("Avangrid Networks") currently holds 100% of the equity interests in CMP Group.  Avangrid Networks is a Maine corporation with its principal place of business in Portland, Maine.

22.     Avangrid, Inc. ("Avangrid") currently holds 100% of the equity interests in Avangrid Networks.  Avangrid is a New York corporation with its principal place of business in Orange, Connecticut.  Avangrid's shares of common stock are listed on the New York Stock Exchange ("NYSE") and are registered with the United States Securities and Exchange Commission under Section 12(b) of the federal Securities and Exchange Act of 1934 (the "Exchange Act").  As such, Avangrid is subject to and complies with all the reporting, disclosure controls, and other obligations imposed by the Exchange Act and the federal Securities Act of 1933, and the rules and regulations promulgated thereunder.  Avangrid is governed by a 14-member board of directors, eight of whom qualify as "independent" under the NYSE's corporate governance rules.  *See* NYSE Listed Company Manual Section 303A.02.

23.     As a publicly-traded corporation, shares of Avangrid can be purchased by anyone. Iberdrola, S.A. ("Iberdrola") currently owns approximately 81.6% of Avangrid's shares.  Iberdrola is a publicly traded corporation headquartered in Spain, whose shares are traded on the stock exchanges of Spain.  Iberdrola is not affiliated with the Spanish government.

24.     The Qatar Investment Authority ("QIA"), the State of Qatar's sovereign wealth fund, owns approximately 3.7% of the outstanding shares of Avangrid and 8.7% of the outstanding shares of Iberdrola.  Norges Bank, the central bank of the Kingdom of Norway, owns approximately 0.4% of the outstanding shares of Avangrid and 3.6% of the outstanding shares Iberdrola.  Neither QIA nor Norges Bank holds any special voting or governance rights with respect to Avangrid, Avangrid Networks, CMP Group, or CMP.

25.     No representative or designee of QIA or Norges Bank serves as an officer or director of Avangrid, Avangrid Networks, CMP Group, or CMP.  No officer or director of Avangrid, Avangrid Networks, CMP Group, or CMP is a Qatari or Norwegian national.

<u>CMP's Participation in Maine Public Affairs</u>

26.     As the largest investor-owned electric transmission and distribution utility company operating in the State of Maine, and one of only two such utilities of significant size operating in Maine, CMP is closely regulated under Title 35-A of the Maine code and its activities

are routinely the subject of proposed legislation initiated both by Maine legislators through the traditional lawmaking process, and by Maine's citizens through the referendum process.

27.     Indeed, at the same general election where voters adopted the Initiative, voters rejected a proposed initiative that would have required the State, through a new quasi-governmental entity, to expropriate all of CMP's assets and effectively extinguish the company's existence.   Also at the same general election, voters approved a measure barring quasi-governmental entities from taking on more than $1 billion in debt obligations, as would have been necessary to effectuate the expropriation of CMP's assets, without voter approval.   CMP engaged in political advocacy relating to both of these initiatives.

28.     Previously, in 2021, CMP was the target of a highly contentious initiative campaign regarding the New England Clean Energy Connect project ("NECEC"), a billion-dollar transmission line from the Canadian border to Lewiston, Maine, frequently referred to as the "CMP Corridor."   This initiative purported to retroactively ban completion of the project even though it was already partially constructed.   CMP engaged in political advocacy opposing this initiative also.

29.     Aside from proposed legislation of existential significance either to itself or major transmission projects in the State of Maine, CMP's activities are routinely impacted by legislation concerning a variety of policy areas, such as electric grid reliability and modernization, cost recovery and rate regulation, service quality, renewable generation development and interconnection, beneficial electrification, and Maine's greenhouse gas emission reduction policies.   CMP has a wealth of experience and knowledge regarding such issues and is responsible for carrying out its operations in a manner that effectuates state energy-related policy.

30.     Because of the intimate connection between its operations and proposed public policy, CMP long has participated actively in Maine's public affairs through a variety of means permitted by Maine law and protected by the First Amendment to the United States Constitution and analogous provisions of the Maine Constitution.   CMP regularly engages in political advocacy on energy-related issues; indeed, given its role as one of Maine's two major electric transmission and distribution utilities, policy makers frequently seek CMP's views on important matters.

#16622088v10

31.     CMP's political advocacy routinely includes making contributions, expenditures, independent expenditures, and electioneering communications to influence the nomination or election of candidates or the initiation or approval of a referendum.

32.     Specifically, CMP has expended funds in connection with the campaigns of individuals seeking public office in Maine, including by making contributions of funds, and/or in-kind contributions, to political action committees registered with the Ethics Commission for the purposes of supporting or opposing candidates for public office in Maine.  For instance, since 2013 CMP has contributed more than $25,000 to political action committees registered with the Ethics Commission for the purposes of supporting or opposing candidates for public office in Maine. CMP intends to continue making such contributions for these purposes in the future, including in the current election cycle.

33.     Similarly, CMP has expended funds in connection with referenda posed to Maine voters, including by making financial and in-kind contributions to political action committees and ballot question committees registered with the Ethics Commission for the purposes of supporting or opposing specific referenda.  For instance, since 2019 CMP contributed more than $7 million to political action committees and ballot question committees registered with the Ethics Commission for the purposes of supporting or opposing referenda.[1]  These contributions pertained not only to the Initiative, but also the initiatives concerning the NECEC project and voter approval of debt incurred by quasi-governmental entities.   CMP intends to continue making such contributions for these purposes in the future.

34.     Outside of specific candidate or referendum campaigns, CMP has expended funds to finance public communications concerning matters of public concern within the State of Maine, including specific legislation proposed to or by the Maine Legislature.  For instance, since 2021 CMP has expended more than $500,000 to finance public communications concerning matters of

---

[1] In addition, since 2019, Avangrid or entities owned by Avangrid have contributed more than $58 million to political action committees and ballot question committees registered with the Ethics Commission for the purposes of supporting or opposing specific referenda.

state policy within the State of Maine, apart from specific referenda or candidate campaigns. CMP intends to continue expending funds for these purposes in the future.

35. In addition to electioneering activities and the dissemination of public communications, CMP also engages in Maine's political process through direct advocacy before Maine's legislative and executive branches. CMP employs an internal team, led by a Vice President for Government Affairs, and retains the services of other public affairs professionals to monitor proposed legislation and provide testimony and other valuable insight concerning that legislation to members of Maine's Legislature and executive branch. CMP intends to continue engaging in these activities in the future.

36. All of CMP's political activities and expenditures, as described herein, have complied both with applicable Maine statutes and with relevant rules promulgated by the Ethics Commission.

37. All of CMP's political activities and expenditures, as described herein, have been devised, approved, and executed by CMP's board of directors and executive officers. No representative or designee of QIA or Norges Bank directs, dictates, or controls any of these activities, and no such person would be permitted to do so under the terms of Title 13-C of the Maine code or the Articles of Incorporation and Bylaws of CMP. All of the funds expended in connection with the activities described herein are generated from United States operations.

<u>The Initiative</u>

38. In 2021, long-time opponents of CMP proposed, and the 130th Legislature adopted, L.D. 194, titled "An Act To Prohibit Contributions, Expenditures and Participation by Foreign Government-owned Entities To Influence Referenda." L.D. 194, as amended, would have banned any "foreign government-owned entity," defined as any entity "with respect to which a foreign government holds, owns, controls or otherwise has direct or indirect beneficial ownership of 10% or more" of equity or other ownership interest, from making contributions or expenditures relating to referenda. The Presenter and prime sponsor of L.D. 194 was Maine State Senator Richard Bennett.

#16622088v10

39.　　Governor Mills vetoed L.D. 194, concluding that the legislation was "highly suspect as a constitutional matter" because "[g]overnment is rarely justified in restricting the kind of information to which the citizenry should have access in the context of an election, and particularly a ballot initiative." The Legislature sustained Governor Mills's veto.

40.　　Following the veto of L.D. 194, opponents of CMP began circulating petitions in support of the Initiative pursuant to the citizen's initiative process set forth in Article IV, Part Third, Sections 18 through 20 of the Maine Constitution. As described further below, the Initiative bans more speech by more speakers than L.D. 194.

41.　　The leading ballot question committee registered with the Ethics Commission in support of the Initiative was entitled Protect Maine Elections, and its registered Principal Officer was Maine State Senator Richard Bennett.

42.　　On December 1, 2022, the Maine Secretary of State certified that the proponents of the Initiative had gathered sufficient signatures to advance the Initiative to the Maine Legislature.

43.　　The Maine Legislature considered the Initiative as L.D. 1610 during the First Special Session of the 131st Maine Legislature and voted to adopt the legislation.

44.　　On July 19, 2023, Governor Mills vetoed the Legislature's adoption of L.D. 1610, again having determined that it violated the First Amendment to the United States Constitution. Governor Mills's veto message referred back to her message concerning L.D. 194 and stated: "My concerns about the Constitutionality of the bill remain."

45.　　Pursuant to Article IV, Part Third, Section 18, Clause 2 of the Maine Constitution, the failure of L.D. 1610 to become law during the First Special Session of the 131st Legislature required the Initiative to be submitted to the voters as a ballot question appearing on the November 2023 general election ballot. The voters approved the Initiative.

46.　　By operation of Maine law and following the execution of the ministerial duties assigned to the Secretary of State and the Governor in connection with the certification of the results of the November 2023 general election, the Initiative will take effect on January 5, 2024.

#16622088v10

47.    The terms of the Initiative offend the First Amendment of the United States Constitution and Maine's analogous guarantee of free speech.   Further, its enforcement will severely harm CMP, including by exposing the company and its leadership to civil and criminal penalties for exercising their free speech rights.

48.    The central provision of the Initiative is the subsection to be codified at 21-A M.R.S. § 1064(2), which provides that a "foreign government-influenced entity may not make, directly or indirectly, a contribution, expenditure, independent expenditure, electioneering communication or any other donation or disbursement of funds to influence" either (a) "the nomination or election of a candidate" or (b) "the initiation or approval of a referendum."

49.    The subsection to be codified at 21-A M.R.S. § 1064(1)(E) effectively provides three definitions of "foreign government-influenced entity":

   a.  The first definition of "foreign government-influenced entity" is a "foreign government."

   b.  The second definition of "foreign government-influenced entity" is a "firm partnership, corporation, association, organization or other entity with respect to which a foreign government or foreign government-owned entity … [h]olds, owns, controls or otherwise has direct or indirect beneficial ownership of 5% or more of the total equity, outstanding voting shares, membership units or other applicable ownership interests."

   c.  The third definition of "foreign government-influenced entity" is a "firm partnership, corporation, association, organization or other entity with respect to which a foreign government or foreign government-owned entity … [d]irects, dictates, controls or directly or indirectly participates in the decision-making process with regard to the activities of the firm, partnership, corporation, association, organization or other entity to influence the nomination or election of a candidate or the initiation or approval of a referendum, such as decisions

concerning the making of contributions, expenditures, independent expenditures, electioneering communications or disbursements."

50.     Each of the foregoing definitions includes the term "foreign government-owned entity," which the Initiative defines as "any entity in which a foreign government owns or controls more than 50% of its equity or voting shares."

51.     The Initiative includes numerous ancillary provisions intended to buttress the enforcement of the broad prohibition set forth in designated 21-A M.R.S. § 1064(2), including:

    a.  as set forth in designated 21-A M.R.S. § 1064(3), a prohibition on any person knowingly soliciting, accepting, or receiving a contribution or donation prohibited by 21-A M.R.S. § 1064(2);

    b.  as set forth in designated 21-A M.R.S. § 1064(4), a prohibition on knowingly or recklessly providing substantial assistance, with or without compensation, in "the making, solicitation, acceptance or receipt of a contribution or donation prohibited by" designated 21-A M.R.S. § 1064(2) or in "the making of an expenditure, independent expenditure, electioneering communication or disbursement prohibited by" designated 21-A M.R.S. § 1064(2);

    c.  as set forth in designated 21-A M.R.S. § 1064(5), a prohibition on structuring a "solicitation, contribution, expenditure, independent expenditure, electioneering communication, donation, disbursement or other transaction to evade the prohibitions and requirements" of the Initiative;

    d.  as set forth in designated 21-A M.R.S. § 1064(7), a so-called "due diligence" requirement imposed on media and Internet outlets concerning the publication of electioneering communications purchased by any "foreign government-influenced entity";

    e.  as set forth in designated 21-A M.R.S. § 1064(8), the imposition of civil penalties by the Ethics Commission for violations of the Initiative;

#16622088v10

    f.   as set forth in designated 21-A M.R.S. § 1064(9), the imposition of criminal penalties, with violations of the provisions of designated 21-A M.R.S. §§ 1064(2) through 1064(5) treated as a Class C crime under Maine law; and

    g.   as set forth in designated 21-A M.R.S. § 1064(10), the grant of rulemaking authority to the Ethics Commission to "adopt rules to administer the provisions" of the Initiative.

52.    In addition to the broad prohibition set forth in designated 21-A M.R.S. § 1064(2) and the foregoing provisions intended to support it, the Initiative also includes a so-called disclaimer requirement concerning public communications unrelated to specific election campaigns.  Specifically, in designated 21-A M.R.S. § 1064(6), the Initiative provides:

> Whenever a foreign government-influenced entity disburses funds to finance a public communication not otherwise prohibited by this section to influence the public or any state, county or local official or agency regarding the formulation, adoption or amendment of any state or local government policy or regarding the political or public interest of or government relations with a foreign country or a foreign political party, the public communication must clearly and conspicuously contain the words "Sponsored by" immediately followed by the name of the foreign government-influenced entity that made the disbursement and a statement identifying that foreign government-influenced entity as a "foreign government" or a "foreign government-influenced entity."

53.    Existing Maine law grants the Attorney General of the State of Maine authority to enforce violations of Title 21-A, including those provisions of the Initiative.  *See* 21-A M.R.S. § 33 (2023).

54.    Existing Maine law similarly grants the Ethics Commission authority to enforce violations of Title 21-A concerning campaign financing, including those provisions of the Initiative.  *See* 1 M.R.S. § 1008(2) (2023).

<u>The Initiative's Impact on CMP</u>

55.    In connection with the campaign waged in favor of the Initiative, both before the Legislature and to the voters, proponents of the Initiative made clear they developed the legislation specifically to target CMP and for the purpose of preventing CMP from speaking on matters of

concern to it and the public, such as the 2021 initiative seeking to ban the construction of the NECEC transmission line (which ban a Maine court later found to violate the United States and Maine Constitutions) and the 2023 initiative seeking to extinguish CMP as a going operation.

56.     For instance, Maine State Senator Richard Bennett provided testimony to the Legislature in support of L.D. 194, the previous version of the Initiative, wherein he stated: "I urge this bill's immediate enactment as an emergency measure.  We all know that the dangers this bill would address are real and present.  Already millions have been spent by foreign entities in the looming fight to stop the appalling CMP Corridor which threatens to change forever the character of western Maine.  This abuse must be halted in its tracks."

57.     When the Legislature considered the Initiative in the form of L.D. 1610, Maine citizens who testified in favor of the Initiative made clear their understanding of its purpose:  to stop CMP from speaking on matters of public concern.  As one Maine citizen put it:  "I know the current bill is aimed at thwarting CMP … ."

58.     A September 19, 2023, article in the online media outlet News from the States provided further evidence of the intent of those backing the Initiative.  The article noted that proponents of referenda targeting CMP had "made much of" the fact that "CMP's parent company, Avangrid, is owned by Spanish company Iberdrola."  Bennett stated: "CMP and Versant spend more time working for their owners—the governments of Calgary, Qatar, and Norway—than the people of Maine."  He added: "They've been raising rates, threatening our energy security, allowing countless outages and trying to divide us with expensive ad campaigns … all so that they can take hundreds of millions in profit each year from our communities."

59.     An October 18, 2023, article in the Portland Press Herald identified that the Initiative "was a response to record spending in 2021 [on a referendum question] intended to stop construction of a power transmission corridor in western Maine" pursued by CMP and its affiliates. In the same article, supporters of the Initiative stated that CMP's opposition to efforts to expropriate its assets also motivated the Initiative: "[F]ormer Democratic state representative Seth Berry … supports both ballot measures [the Initiative and 2023 Question 3], and his calculation of

foreign ownership demonstrates that CMP has outsized influence in Maine."  Berry added: "The last thing [CMP or Versant] want is for Mainers to see that oil-rich governments like Qatar and Calgary are pocketing our hard-earned cash."

60.     The provisions of the Initiative prohibiting spending on referenda campaigns and candidate campaigns and imposing a disclaimer requirement on public communications disconnected from such campaigns, prohibit First Amendment-protected activity of a kind in which CMP traditionally has engaged and intends to continue engaging.

61.     Under the definition imposed by the Initiative, and although the definition is unconstitutionally vague as discussed in Count IV below, those charged with enforcing the Initiative may deem CMP to be a "foreign government-influenced entity" because a "foreign government-owned entity," QIA, "[h]olds, owns, controls or otherwise has direct or indirect beneficial ownership of 5% or more of the total equity" of CMP by virtue of QIA's 8.7% investment in Iberdrola, whether or not the Initiative would be interpreted by those enforcing it as adding QIA's 3.7% investment in Avangrid to this figure.

62.     CMP also may qualify as a "foreign government-influenced entity" under the definition imposed by the Initiative because, by virtue of QIA's equity ownership in Iberdrola, S.A., those charged with enforcing the Initiative may deem QIA to "directly or indirectly participate[] in the decision-making process" of CMP with regard to referenda or candidate campaigns.

63.     Since the adoption of the Initiative at the November 2023 general election, numerous political action committees registered with the Ethics Commission for the purposes of supporting or opposing candidates for public office in Maine have solicited contributions from CMP.  As these solicitations reflect, electioneering efforts for the 2024 election cycle are well underway.  Although the Initiative is not scheduled to take effect until early January, CMP nevertheless has declined these solicitations and, once the Initiative takes effort, will be required to decline these solicitations.

64.     CMP does not challenge designated 21-A M.R.S. § 1064(7) which imposes a so-called "due diligence" requirement on media outlets and Internet companies that accept political advertising, except insofar as that provision cannot be severed from those offending provisions of Section 1 of the Initiative, as discussed in Count VI below.

65.     CMP does not challenge Section 2 of the Initiative, which exhorts Maine's federal congressional delegation to "support and promote an effective anticorruption amendment to the United States Constitution."

### COUNT I
### The Initiative's Ban on Spending on Referenda Violates the First Amendment

66.     CMP incorporates all of the foregoing allegations as if set forth fully herein.

67.     The First Amendment to the United States Constitution guarantees the right of United States companies to engage in political speech by making campaign contributions and expenditures in support of or in opposition to referenda.

68.     "The First Amendment affords the broadest protection to . . . political expression in order to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995).

69.     The provision of the Initiative, set forth in designated section 21-A M.R.S. § 1604(2), that prohibits making "directly or indirectly, a contribution, expenditure, independent expenditure, electioneering communication or any other donation or disbursement of funds to influence … the initiation or approval of a referendum" violates the First Amendment to the United States Constitution because the prohibition does not advance a compelling state interest and because, even if it did, the prohibition is not narrowly tailored to the advancement of that interest.

70.     CMP will suffer immediate and irreparable harm by the enforcement of the foregoing provision of the Initiative, including not only the loss of its First Amendment rights but also the risk that CMP or its directors or officers will be subject to criminal penalties for speaking on issues of public concern.

#16622088v10

71.     CMP brings this count pursuant to 42 U.S.C. §§ 1983 and 1988(b) and 28 U.S.C. §§ 2201-2202, which, together, authorize the Court to grant declaratory and injunctive relief, as well as to award attorneys' fees, to persons aggrieved by a state's violations of the United States Constitution.

## COUNT II
### The Initiative's Ban on Spending for Candidate Campaigns Violates the First Amendment

72.     CMP incorporates all of the foregoing allegations as if set forth fully herein.

73.     "If the First Amendment has any force, it prohibits [the state] from fining or jailing citizens, or associations of citizens, for simply engaging in political speech." *Citizens United v. FEC*, 558 U.S. 310, 349 (2010).

74.     The provision of the Initiative, set forth in designated section 21-A M.R.S. § 1604(2), that prohibits making "directly or indirectly, a contribution, expenditure, independent expenditure, electioneering communication or any other donation or disbursement of funds to influence the nomination or election of a candidate" violates the First Amendment to the United States Constitution because the prohibition does not advance a compelling state interest and because, even if it did, the prohibition is not narrowly tailored to the advancement of that interest.

75.     CMP will suffer immediate and irreparable harm by the enforcement of the foregoing provision of the Initiative, including not only the loss of its First Amendment rights but also the risk that CMP or its directors or officers will be subject to criminal penalties for speaking on issues of public concern.

76.     CMP brings this count pursuant to 42 U.S.C. §§ 1983 and 1988(b) and 28 U.S.C. §§ 2201-2202, which, together, authorize the Court to grant declaratory and injunctive relief, as well as to award attorneys' fees, to persons aggrieved by a state's violations of the United States Constitution.

#16622088v10

## COUNT III
### The Initiative's Disclaimer Requirement Violates the First Amendment

77.     CMP incorporates all of the foregoing allegations as if set forth fully herein.

78.     The First Amendment to the United States Constitution guarantees the right of United States companies to disseminate public communications concerning matters of public interest, disconnected from any particular candidate campaign or referendum, without appending a disclaimer carrying a government-compelled message concerning the nature of the speaker.  *See Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018).

79.     The provision of the Initiative, set forth in designated section 21-A M.R.S. § 1604(6), requiring any "foreign government-influenced entity" which disseminates a communication concerning matters of public interest, although disconnected from any particular candidate campaign or referendum, to append a disclaimer to the communication that identifies the so-called "foreign government-influenced entity," and compels the entity to identify itself as such, violates the First Amendment to the United States Constitution because it is unduly burdensome, fails to serve a compelling or substantial state interest, and, even if it did serve a sufficient state interest, is not narrowly tailored to that interest.

80.     CMP will suffer immediate and irreparable harm by the enforcement of the foregoing provision of the Initiative, including the loss of its First Amendment rights.

81.     CMP brings this count pursuant to 42 U.S.C. §§ 1983 and 1988(b) and 28 U.S.C. §§ 2201-2202, which, together, authorize the Court to grant declaratory and injunctive relief, as well as to award attorneys' fees, to persons aggrieved by a state's violations of the United States Constitution.

## COUNT IV
### The Initiative Violates the Due Process Clause of the Fourteenth Amendment by Employing a Vague Definition of "Foreign Government-Influenced Entity"

82.     CMP incorporates all of the foregoing allegations as if set forth fully herein.

83.     A state statute violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution if it "fails to provide a person of ordinary intelligence fair notice of

17

what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008).

84.     The Initiative's definition of "foreign government-influenced entity," set forth in designated 21-A M.R.S. § 1604(1)(E)(2)(a), is unconstitutionally vague under the Fourteenth Amendment because it is unclear on a crucial point: whether (a) a company is a "foreign government-influenced entity" when there are multiple foreign governments or foreign-government owned entities each holding less than a 5% ownership interest but, in the aggregate, hold more than a 5% ownership interest, or, alternatively, (b) whether a company is a "foreign government-influenced entity" only if a single foreign government or foreign government-owned entity owns more than a 5% ownership interest.

85.     The Initiative's definition of "foreign government-influenced entity," set forth in designated 21-A M.R.S. § 1604(1)(E)(2)(a), also is unconstitutionally vague under the Fourteenth Amendment because it fails to provide sufficient guidance concerning the activities that constitute "direct[] or indirect[] participat[ion]" in a corporation's decision-making process concerning electioneering activities.

86.     CMP brings this count pursuant to 42 U.S.C. §§ 1983 and 1988(b) and 28 U.S.C. §§ 2201-2202, which, together, authorize the Court to grant declaratory and injunctive relief, as well as to award attorneys' fees, to persons aggrieved by a state's violations of the United States Constitution.

## COUNT V
### The Initiative Violates the Free Speech Rights Guaranteed by the Maine Constitution

87.     CMP incorporates all of the foregoing allegations as if set forth fully herein.

88.     Article I, Section 4 of the Maine Constitution guarantees every citizen the right to "freely speak, write and publish sentiments on any subject."

89.     The guarantee of free speech provided by the Maine Constitution is independent of the U.S. Constitution. *State v. Reeves*, 2022 ME 10, ¶ 41, 268 A.3d 281. The guarantee of free

speech provided by the Maine Constitution may be broader than that provided in the U.S. Constitution, *see City of Portland v. Jacobsky*, 496 A.2d 646, 649 (Me. 1985), but in any event "is no less restrictive than" than that guaranteed by the U.S. Constitution, *City of Bangor v. Diva's, Inc.*, 2003 ME 51, ¶ 11, 830 A.2d 898.

90.     The referenda spending prohibition, the candidate campaign spending prohibition, and the disclaimer requirement, as identified in Counts I through III above each violate the independent guarantee of free speech in Article I, Section 4 of the Maine Constitution for the same reasons each provision violates the First Amendment to the United States Constitution.

91.     CMP will suffer immediate and irreparable harm as a consequence of the enforcement of the foregoing provision of the Initiative, including not only the loss of its First Amendment rights but also the risk that CMP or its directors or officers will be subject to criminal penalties for speaking on issues of public concern.

### COUNT VI
### The Ancillary Provisions of Section 1 of the Initiative Cannot be Severed from its Offending Provisions

92.     CMP incorporates all of the foregoing allegations as if set forth fully herein.

93.     Where a statute contains multiple provisions, some of which violate constitutional requirements and some of which independently do not, Maine state law controls whether those non-offending provisions may be severed from the offending provisions, and thus survive, or may not be severed, and thus must fall.

94.     All of the provisions of Section 1 of the Initiative other than those challenged under Counts I through V are integral to Section 1 of the Initiative such that they cannot function absent the invalid provisions of Section 1.  Accordingly, all of the provisions of Section 1 of the Initiative must fall upon a judgment by the Court in favor of CMP on Counts 1 through V.

95.     CMP brings this Count pursuant to 42 U.S.C. §§ 1983 and 1988(b) and 28 U.S.C. §§ 2201-2202, which, together, authorize the Court to grant declaratory and injunctive relief, as

well as to award attorneys' fees, to persons aggrieved by a state's violations of the United State Constitution.

WHEREFORE, Plaintiff Central Maine Power Company prays the Court:

a.  enter judgment for CMP under Count I, and declare the Initiative's prohibition on referenda campaign spending to violate the First Amendment to the United States Constitution and permanently enjoin Defendants from applying or enforcing said prohibition;

b.  enter judgment for CMP under Count II, and declare the Initiative's prohibition on candidate campaign spending to violate the First Amendment to the United States Constitution and permanently enjoin Defendants from applying or enforcing said prohibition;

c.  enter judgment for CMP under Count III, and declare the Initiative's disclaimer requirement to violate the First Amendment to the United States Constitution and permanently enjoin Defendants from applying or enforcing said prohibition;

d.  enter judgment for CMP under Count IV, and declare the Initiative's definition of "foreign government-influenced entity" to be so vague as to violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution and permanently enjoin Defendants from applying or enforcing any provision of the Initiative that employs or relies on said definition;

e.  enter judgment for CMP under Count V, and declare the Initiative's prohibitions on referenda spending and candidate spending, as well as its disclosure requirement, to violate Article I, Section 4 of the Maine Constitution and permanently enjoin Defendants from applying or enforcing said provisions;

f.  enter judgment for CMP under Count VI, and, as a consequence of granting judgment to CMP under Counts I through V, declare all of the provisions of Section 1 of the Initiative, other than those challenged under Counts I through V,

to be non-severable and permanently enjoin Defendants from applying or enforcing any provision of Section 1 of the Initiative;

g. award CMP its reasonable attorneys' fees, in accordance with 42 U.S.C. §§ 1983 and 1988(b); and

h. award CMP any such other relief the Court deems just and appropriate.

Dated:  December 12, 2023

*/s/ Joshua D. Dunlap*
Joshua D. Dunlap

*/s/ Nolan L. Reichl*
Nolan L. Reichl

*/s/ Katherine E. Cleary*
Katherine E. Cleary
PIERCE ATWOOD LLP
Merrill's Wharf
254 Commercial Street
Portland, ME 04101
Tel: (207) 791-1100
Fax: (207) 791-1350
nreichl@pierceatwood.com
jdunlap@pierceatwood.com
kcleary@pierceatwood.com

*Attorneys for Plaintiff*
*Central Maine Power Company*

I, R. Scott Mahoney, declare under penalty of perjury that the factual allegations of the foregoing Verified Complaint are personally known to me and are true and correct, and to the extent they are not personally known to me, I believe them on information to be true and correct.

Executed on December 8, 2023 at Portland, Maine

By: */s/  R. Scott Mahoney*

## CERTIFICATE OF SERVICE

I hereby certify that on December 12, 2023, I electronically filed the foregoing document, via e-mail to the United States District Court for the District of Maine, with a copy to counsel for Defendants and will serve the same upon Defendants.

Dated:  December 12, 2023

/s/ Joshua D. Dunlap
Joshua D. Dunlap
PIERCE ATWOOD LLP
Merrill's Wharf
254 Commercial Street
Portland, ME 04101
Tel: (207) 791-1100
Fax: (207) 791-1350
jdunlap@pierceatwood.com

*Attorneys for Plaintiff*
*Central Maine Power Company*

#16622088v10