**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

| | |
|---|---|
| CENTRAL MAINE POWER COMPANY,<br><br>                Plaintiff,<br><br>v.<br><br>MAINE COMMISSION ON<br>GOVERNMENTAL ETHICS AND<br>ELECTION PRACTICES, *et al.*<br><br>                Defendants. | Civil Action No. _____ |

## PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION WITH INCORPORATED MEMORANDUM OF LAW

NOW COMES Plaintiff Central Maine Power Company ("CMP") and hereby moves this

Court on an emergency basis, pursuant to Fed. R. Civ. P. 65, for the entry of a temporary restraining

order and/or preliminary injunction preventing Defendants Maine Commission on Governmental

Ethics and Election Practices (the "Commission"); William J. Schneider, David R. Hastings III,

Sarah E. LeClaire, Dennis Marble, Stacey D. Neumann, in their official capacities as members of

the Commission; and Aaron Frey, in his official capacity as Attorney General for the State of

Maine, from implementing "An Act to Prohibit Campaign Spending by Foreign Governments and

Promote an Anticorruption Amendment to the United States Constitution" (the "Initiative"). The

Initiative serves one undeniable purpose: to silence political speech by CMP, a 124-year-old Maine

company that has been repeatedly targeted by proposed legislation and referenda hostile to its

interests, including a ballot initiative that posed an existential threat to its continued operation. The

proposal failed after CMP engaged in the arena of public debate; but that advocacy is now banned

by the Initiative. The Initiative strikes at the heart of the First Amendment by imposing a gag on

#16623884v10

CMP, forbidding it from engaging in political speech on penalty of imprisonment of its executives. Given the Initiative's egregious burden on speech, the Court should enjoin its enforcement.

## FACTUAL BACKGROUND[1]

### I.    The Initiative.

Federal law already prohibits foreign nationals, *i.e.*, non-U.S. citizens, including foreign governments and foreign corporations, from making campaign expenditures and contributions in federal, state, and local elections. 52 U.S.C. § 30121. The Initiative goes much further, banning certain U.S. companies from participating in candidate and referendum elections in Maine.

Specifically, the Initiative prohibits "foreign government-influenced entit[ies]" from making, "directly or indirectly, a contribution, expenditure, independent expenditure, electioneering communication or any other donation or disbursement of funds to influence" two election activities: (1) "the nomination or election of a candidate," or (2) "the initiation or approval of a referendum." 21-A M.R.S.A. § 1064(2).[2] The Initiative defines "foreign government-influenced entity" (FGIE) broadly, to include not only a "foreign government" but also any "firm, partnership, corporation, association, organization or other entity with respect to which a foreign government or foreign government-owned entity" either (1) "[h]olds, owns, controls or otherwise has direct or indirect beneficial ownership of 5% or more of the total equity" or "other applicable ownership interests," or (2) "[d]irects, dictates, controls or directly or indirectly participates in the decision-making process with regard to the activities of the … entity to influence the nomination or election of a candidate or the initiation or approval of a referendum." *Id.* § 1064(1)(E).

To promote this ban on campaign spending and electioneering communications, the Initiative includes other related prohibitions. It makes it unlawful to solicit, accept, or receive a

---

[1] The facts stated herein are drawn from the Verified Complaint filed contemporaneously with this Motion.
[2] For ease, Plaintiff adopts the section numbering identified in the Initiative, which is yet to be codified.

#16623884v10

prohibited contribution or donation. *Id.* § 1064(3). It makes it unlawful to knowingly or recklessly provide substantial assistance in the making, solicitation, acceptance, or receipt of a prohibited contribution, expenditure, or electioneering communication. *Id.* § 1064(4). And it further makes it unlawful to "structure" a transaction to evade any of the preceding prohibitions. *Id.* § 1064(5).

The Initiative also imposes a content-based disclaimer requirement. If an FGIE "disburses funds to finance a public communication not otherwise prohibited . . . to influence the public or any state, county or local official or agency regarding the formulation, adoption or amendment of any state or local government policy or regarding the political or public interest of or governmental relations with a foreign country or foreign political party," then that communication must "clearly and conspicuously" disclose that it is sponsored by and name the FGIE making the communication, and must further describe the speaker as a "foreign government-influenced entity," *i.e.*, an actor under the aegis of a foreign state. *Id.* § 1064(6).

A violation of the Initiative is punishable by a fine of up to $5,000 or double the amount of the relevant contribution, expenditure, electioneering communication, donation, or disbursement, whichever is greater. *Id.* § 1064(8). Additionally, the Initiative makes knowing violations of the Initiative's prohibitions Class C felonies punishable by up to five years of incarceration and a fine of up to $20,000. *Id.* § 1064(9); *see* 17-A M.R.S. §§ 1604, 1704, 1705.

## II. Central Maine Power Company.

CMP, Maine's largest electric utility company, incorporated as a Maine company in 1905 and has remained a Maine corporation ever since. Compl. ¶¶ 15-17, 26. It delivers electricity to more than 600,000 retail customers in central, western, and southern Maine. *Id.* ¶ 4. By operation of Maine law, CMP's daily operations are directed by its board of directors and executive officers, most of whom are Maine residents and all of whom are U.S. citizens. *Id.* ¶ 18.

#16623884v10

As with many other companies, the persons holding an equity interest in CMP has changed over time. *Id.* ¶ 19. Currently, its common stock is 100% owned by CMP Group, Inc., which in turn is wholly owned by Avangrid Networks, Inc., both Maine corporations. *Id.* ¶¶ 20-21. Avangrid Networks is wholly owned by Avangrid, Inc., a New York corporation and a publicly traded company. *Id.* ¶¶ 22-23. Iberdrola, S.A., a corporation based in but not owned by Spain, owns 81.6% of Avangrid's shares. *Id.* ¶ 23. Two government entities—the Qatar Investment Authority ("QIA"), a sovereign wealth fund, and Norges Bank, the central bank of Norway—own shares of Iberdrola: the QIA owns 8.7% and Norges Bank owns 3.6% of its shares. *Id.* ¶ 24. No representative of the QIA or Norges Bank serves as an officer or director of any of the CMP or Avangrid companies. *Id.* ¶ 25. By virtue of their investments, however, these entities will likely be deemed to indirectly possess more than 5% of CMP's ownership interests. *Id.* ¶ 61.

As a major utility, CMP is closely regulated under Maine law and is routinely the subject of proposed legislation. *Id.* ¶ 26. Indeed, at the same election in which the Initiative was approved, voters rejected another initiative that would have effectively liquidated CMP by creating a new quasi-governmental entity to seize CMP's assets while approving an initiative that would have required voter approval for any such entity to borrow more than $1 billion in order take CMP's assets. *Id.* ¶ 27. Further, in 2021, CMP was the target of an initiative attempting to ban completion of the New England Clean Energy Connect transmission line (often referred to as the "CMP Corridor"). *Id.* ¶ 28. CMP engaged in political advocacy regarding these initiatives. *Id.* ¶¶ 27-28.

In addition to these major referenda, CMP's activities are routinely impacted by legislation addressing energy issues such as electric grid reliability and modernization, renewable generation development and interconnection, beneficial electrification, and greenhouse gas emission reduction. *Id.* ¶ 29. CMP has a wealth of experience and knowledge in these areas, and therefore

regularly engages in political advocacy on energy-related issues—including at the request of policy-makers—before Maine's legislative and executive branches. *Id.* ¶¶ 29-30, 35.

Given the legislative issues it confronts, CMP routinely makes contributions and expenditures relating to candidates and referenda. *Id.* ¶ 31. CMP has contributed more than $25,000 to political action committees supporting candidates for public office since 2013. *Id.* ¶ 32. CMP has contributed more than $7 million to ballot question committees supporting or opposing referenda since 2019. *Id.* ¶ 33. CMP has also expended more than $500,000 on public communications regarding matters of state policy, apart from specific campaigns. *Id.* ¶ 34. CMP intends to continue expending funds for these purposes, including during the current election cycle, and has received solicitations for contributions since the Initiative's passage. *Id.* ¶¶ 32-34, 60, 63.

The Initiative, however, bars such election advocacy. *Id.* ¶ 60. Indeed, this was a central purpose of the Initiative, whose sponsors made clear that they developed the legislation to target CMP and silence it on matters of concern to it and the public. *Id.* ¶ 55. CMP's opponents specifically cited CMP's advocacy in opposition to referenda targeting its business as a justification for the Initiative. *Id.* ¶¶ 41, 56-59. In both design and effect, therefore, the Initiative silences domestic companies from engaging in political speech on issues directly affecting them.

## DISCUSSION

CMP seeks declaratory and injunctive relief under the Civil Rights Act, 42 U.S.C. § 1983, precluding enforcement of the Initiative as violating the First and Fourteenth Amendments of the U.S. Constitution.[3] In determining whether to grant Plaintiff's requested preliminary injunctive relief, the Court examines (1) the plaintiff's likelihood of success on the merits; (2) the potential irreparable harm to the plaintiff if the injunction is denied; (3) the balance of that harm against any

---

[3] Plaintiff does not separately address Article I, section 4 of the Maine Constitution in this Motion, but expressly reserves the argument that the state constitution guarantees broader speech rights.

#16623884v10

hardship to the defendant; and (4) the public interest. *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 10 (1st Cir. 2012). Each prong favors entry of preliminary injunctive relief.

## I. Plaintiff Has an Overwhelming Likelihood of Success on the Merits.

Likelihood of success is the "linchpin of the preliminary injunction analysis" in First Amendment cases. *Id.* Plaintiff is highly likely to succeed on its claims. The First Amendment protects the right of U.S. companies to engage in political speech by making campaign contributions and expenditures. *Citizens United v. FEC*, 558 U.S. 310, 336-62 (2010). Accordingly, Maine law has explicitly recognized that corporations may participate in campaigns by engaging in campaign-related spending. *See generally* 21-A M.R.S. §§ 1015, 1015-A. "If the First Amendment has any force, it prohibits [the state] from fining or jailing citizens, or associations of citizens, for simply engaging in political speech." *Citizens United*, 558 U.S. at 349.

> When Government seeks to use its full power, including the criminal law, to command where a person may get his or her information or what distrusted source he or she may not hear, it uses censorship to control thought. This is unlawful. The First Amendment confirms the freedom to think for ourselves.

*Fortuno*, 699 F.3d at 11 (quoting *Citizens United*, 558 U.S. at 356). The Initiative is fatally flawed.

### A. Plaintiff likely will succeed on its First Amendment claims.

"When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *McCutcheon v. FEC*, 572 U.S. 185, 210 (2014). Laws that burden political speech by forbidding speakers from presenting facts and opinions to the public "are subject to strict scrutiny, requiring the government to prove that any restriction 'furthers a compelling interest and is narrowly tailored to achieve that interest.'" *Fortuno*, 699 F.3d at 11 (quoting *Citizens United*, 558 U.S. at 340); *see id.* at 12. Only laws imposing lesser burdens, such as disclosure requirements, are subject to lesser "exacting scrutiny," *id.* at 12—a standard requiring the state to show the law is "narrowly tailored to serve a sufficiently important governmental

interest," *Gaspee Project v. Mederos*, 13 F.4th 79, 85 (1st Cir. 2021) (citing *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383 (2021)). To carry its burden, the Government "must do more than simply posit the existence of the disease sought to be cured" but "must instead point to record evidence or legislative findings demonstrating the need to address a special problem." *FEC v. Cruz*, 596 U.S. 289, 307 (2022). Defendants cannot make the necessary showing.

### 1. The ban on campaign spending for referenda is unconstitutional.

By banning political speech in the form of contributions, expenditures, and electioneering communications regarding referenda, the Initiative strikes at the "essence of First Amendment expression." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995). "The First Amendment affords the broadest protection to . . . political expression in order to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Id.* at 346 (alterations and quotation marks omitted); *see Mills v. Alabama*, 384 U.S. 214, 218 (1966). The ban serves no compelling interest, nor is it narrowly tailored.

### a. There is no compelling justification for the onerous burden on the public's right to unfettered speech about referenda.

Defendants cannot establish a compelling justification for banning speech by certain U.S. companies regarding referenda. "Whatever may be the state interest or degree of that interest in regulating and limiting contributions to or expenditures of a candidate . . . there is no significant state or public interest in curtailing debate and discussion of a ballot measure." *Citizens Against Rent Control/Coal. for Fair Hous. v. City of Berkeley*, 454 U.S. 290, 299 (1981) (striking down $250 limit on contributions to ballot question committees). On the other hand, limiting speech about referenda impedes the public interest in the free flow of information regarding ballot issues.

Referenda do not implicate any state interest in avoiding the appearance of improper influence and political *quid pro quos*. Because referenda are "held on issues, not candidates for

public office," it follows that "[t]he risk of corruption perceived in cases involving candidate elections simply is not present in a popular vote on a public issue." *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 790 (1978). It is true, of course, that speech in the context of referenda "may influence the outcome of the vote; this would be its purpose. But the fact that advocacy may persuade the electorate is hardly a reason to suppress it." *Id.* Thus, any state interest in preserving the "integrity of the electoral process" cannot support a ban on campaign spending in the context of referenda campaigns. *Id.* at 788-91 (striking down ban on corporate spending on referenda).[4]

Nor does an interest in "protecting democratic self-government" justify the ban. The Supreme Court has sharply limited the interests which may be recognized as "compelling," holding that the "only" acceptable justification is prevention of *quid pro quo* corruption or its appearance. *Cruz*, 596 U.S. at 305; *see McCutcheon*, 572 U.S. at 192. Any other justification for restricting speech turns on disfavor toward certain speakers—a result the First Amendment prohibits. *See McCutcheon*, 572 U.S. at 192; *Citizens United*, 558 U.S. at 341. Thus, any "claimed interest in protecting democratic self-government does not constitute a compelling interest justifying interference with political speech" on referenda. *SD Voice v. Noem*, 380 F. Supp. 3d 939, 948-49 (D.S.D. 2019) (striking down ban on out-of-state contributions to ballot question committees).[5]

While the State lacks a compelling interest in banning speech relating to referenda, the public has a strong interest in receiving all information potentially relevant to referenda. *See*

---

[4] *See, e.g.*, *Mich. State Chamber of Com. v. Austin*, 832 F.2d 947, 949 (6th Cir. 1987); *Let's Help Fla. v. McCrary*, 621 F.2d 195, 199-200 (5th Cir. 1980); *Mont. Chamber of Com. v. Argenbright*, 28 F. Supp. 2d 593, 600 (D. Mont. 1998), *aff'd*, 226 F.3d 1049 (9th Cir. 2000).

[5] *Bluman v. FEC* supports this conclusion. 800 F. Supp. 2d 281 (D.D.C. 2011). In that case, the court recognized an interest in protecting democratic self-government by preventing "foreign influence over the U.S. political process." *Id.* at 288. The law in *Bluman* targeted only foreign nationals, however, as discussed below; moreover, it addressed only candidate elections. *Id.* at 284. The court carefully distinguished between candidate and referenda campaigns, observing that any "risk of undue foreign influence" may well be "greater in the context of candidate elections than it is in the case of ballot initiatives." *Id.* at 291. As the court noted, it is "sensible" to conclude that the electorate is less susceptible to foreign influence. *Id.*

#16623884v10

*Citizens United*, 558 U.S. at 339 (citizens' right "to hear" is a "precondition to enlightened self-government"). In *Bellotti*, the Supreme Court struck down Massachusetts' ban on corporate contributions and expenditures regarding referenda. 435 U.S. at 767. The Court noted that political speech is "indispensable to decisionmaking in a democracy," regardless of its source, because "[t]he inherent worth of the speech in terms of its capacity for informing the public" does not depend on the identity of the speaker. *Id.* at 776-77. Accordingly, the Court rejected the state's asserted interest in ensuring that corporations did not have undue influence in referendum elections. "[T]he direct participation of the people in a referendum . . . increases the need for the widest possible dissemination of information from diverse and antagonistic sources." *Id.* at 790 n.29 (quotation marks omitted). The First Amendment leaves "the responsibility for judging and evaluating the relative merits of conflicting arguments" to "the people in our democracy." *Id.* at 791. "[I]f there be any danger that the people cannot evaluate the information and arguments advanced . . ., it is a danger contemplated by the Framers of the First Amendment." *Id.* at 792.

There is no justification that would allow the government to silence political speech in the context of referenda campaigns. The people of Maine have a right to hear a wide variety of information from a wide variety of sources, and to weigh it based on its persuasive value.

**b. The ban is not narrowly tailored to any possible state interest.**

Even if Defendants could establish a compelling interest in protecting democratic self-governance in the context of referenda campaigns, it cannot show that the law fits that purpose. A law, like the Initiative, that bans speech must be narrowly tailored—*i.e.*, it must be the least restrictive means to accomplish the state interest. *Rideout v. Gardner*, 838 F.3d 65, 71 (1st Cir. 2016). Further, the necessary fit between the state's ends and means is lacking if a law is underinclusive. *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 87 (1st Cir. 2004). Far from being

#16623884v10

the least restrictive means to achieving a valid state interest, the Initiative is so overinclusive that it prohibits the speech of Maine corporations relating to Maine referenda affecting their operations in Maine—enforced by the threat of a criminal conviction and jail time for Maine executives. Compl. ¶¶ 15-18, 26-28, 47. And the law is underinclusive in that it leaves FGIEs free to engage in substantial political activities. The Initiative is shockingly ill-tailored to any valid purpose.

If the asserted state interest is protecting democratic self-governance, a narrowly tailored law would "target[] and eliminate[] no more than the exact source of the 'evil' it seeks to remedy," *Frisby v. Schultz*, 487 U.S. 474, 485 (1988), by focusing on speech by foreign governments. But the Initiative does no such thing. Instead, it sweeps in U.S. companies—like CMP—that are incorporated in Maine, governed by board directors and officers who are U.S. citizens, and which make independent decisions concerning their political spending. Compl. ¶¶ 16-18, 37. The law considered in *Bluman v. FEC* stands as a useful contrast. The federal law that was upheld in that case targeted only campaign spending by *foreign nationals*, and expressly excluded domestic subsidiaries of foreign corporations whose contributions and expenditures were derived from funds generated by U.S. operations and whose decisions regarding political spending were made by U.S. citizens. 800 F. Supp. 2d at 284; *see* 52 U.S.C. § 30121 (formerly codified at 2 U.S.C. § 441e); FEC Advisory Op. No. 2006-15, at *2 (May 19, 2006). By contrast, the Initiative bans speech by many U.S. corporations, including those with indirect foreign government ownership interests as low as 5%. 21-A M.R.S. § 1064(1)(E)(2)(a). As such, the law turns on the vicissitudes of the stock market and the daily purchase and sale of equity interests by, among others, sovereign pension funds investing the retirement funds of state employees. It also includes those with *no* ownership by foreign governments or foreign government-owned entities, if a foreign entity "indirectly participates" in the U.S. company's decisionmaking on campaign activities—such as where a U.S.

10

company merely communicates with a foreign-owned company because their interests coincide. *Id.* § 1064(1)(E)(2)(b). Accordingly, the Initiative, rather than introducing a targeted prohibition on foreign government spending, bans political speech by a wide swath of U.S. companies.

In addition, the Initiative's ban is meaningfully underinclusive to any state interest in protecting the legislative process from foreign participation because it does not restrict the most prevalent forms of influencing the democratic process, including lobbying. "[A] law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction on truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited." *Reed v. Town of Gilbert*, 576 U.S. 155, 172 (2015) (quotation marks omitted); *see Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2376 (2018) (*NIFLA*) ("[U]nderinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker."). Only a few pieces of legislation are adopted via initiative in Maine; the vast majority are adopted through regular legislative process. Yet the Initiative does not preclude FGIEs from participating in that legislative process by engaging in speech supporting or opposing bills in the halls of the Maine state house or the Governor's mansion, as CMP does. Compl. ¶ 35. As such, the terms of the Initiative shield only one small part of the legislative process from "participation"—such as it is—by foreign governments, but not the most substantial.

A law that is both overinclusive and underinclusive violates the First Amendment. *See Citizens United*, 558 U.S. at 362 (finding lack of fit between asserted interest in avoiding foreign influence in elections and the scope of the law, which banned speech by U.S. companies); *Bellotti*, 435 U.S. at 790-94 (finding lack of fit between the governmental interest asserted and the law's scope). The ban on spending by FGIEs on referenda is therefore unconstitutional.

#16623884v10

2. **The ban on campaign spending for candidate campaigns is unconstitutional because, even if there is a compelling reason for limiting foreign participation in candidate elections, it is not narrowly tailored.**

As with the ban on speech relating to referenda campaigns, the prohibition on contributions, expenditures, or electioneering communications regarding candidate campaigns also strikes at the "essence of First Amendment expression"—"it can hardly be doubted that the [First Amendment] has its fullest and most urgent application precisely to the conduct of campaigns for political office." *McIntyre*, 514 U.S. at 346-47 (quotation marks omitted). The candidate spending prohibition simply does not fit any possibly relevant state interest.

Because a ban on political speech cannot be premised on the corporate nature of a speaker, *Citizens United*, 558 U.S. at 342, Defendants must—but cannot—point to something more to justify the Initiative. Based on Supreme Court precedent recognizing the limited rights and privileges of foreign citizens, *Bluman* recognized a compelling interest in "limiting the participation of *non-Americans* in the activities of democratic self-government." 800 F. Supp. 2d at 290; *see id.* at 287-88. The conclusion in *Bluman* hinged on the notion that foreign nationals could be prohibited from participating in U.S. elections because they have no "long-term stake in the flourishing of American society"—a rationale that does not apply to those who do share such a stake. *Id.* at 291; *see id.* at 290-92 (distinguishing lawful permanent residents). *Bluman*'s rationale is therefore inapplicable to U.S. companies, like Plaintiff, that have long-standing interests relating to a host of issues that have been and will continue to be the subject of legislative efforts. CMP has been a Maine company for over a hundred years, is led by U.S. citizens, and is not only a participant in Maine society, but it is in fact one of two major electric transmission and distribution utilities in the state. Compl. ¶¶ 4, 15-18, 26. As such, CMP is frequently confronted by serious policy questions which require political engagement by the company both because of

its expertise and because it must directly participate in the execution of the State's energy policy. *Id.* ¶¶ 26, 29-30. There is no adequate justification for the Initiative's broad sweep.

Further, the ban on spending in the context of candidate elections is not narrowly tailored to any interest in preventing foreign governments from influencing the political process. In *Citizens United*, the Supreme Court declined to determine whether the state "has a compelling interest in preventing foreign individuals or associations from influencing our Nation's political process" because the ban on candidate spending by U.S. corporations was "not limited to corporations . . . that were created in foreign countries or funded predominately by foreign shareholders." 558 U.S. at 362. As discussed above, that is precisely the problem with the Initiative: it shuts U.S. companies out of the political process by banning speech by U.S. companies with as little as 5% foreign government ownership interests, as well as U.S. companies with no foreign government ownership interests if there is some "direct or indirect" participation by a foreign government in relation to campaign activities. 21-A M.R.S. § 1064(1)(E)(2)(a)-(b). The scope of the Initiative thus turns on happenings in the stock market (decisions beyond a company's control) and the nature of the issue at stake (namely, whether the issue at hand might generate discussion between a U.S. company and a similarly affected foreign government-owned company), rather than any real link to foreign meddling. The mismatch between any purported end and the means employed to achieve that end shows that the candidate spending ban is fatally overinclusive. *See McIntyre*, 514 U.S. at 350-52 (lack of fit between state law and any state interest in false or misleading statements showed that the statute was overinclusive, and thus infirm).

### 3. The disclaimer provision is unconstitutional because it imposes a severe burden that is not narrowly tailored to serve a sufficient state interest.

The requirement that U.S. companies qualifying as FGIEs place disclaimers on public communications influencing the formulation of state or local government policy is also

13

unconstitutional. This requirement is fatally flawed, whether the Court applies strict or exacting scrutiny, because it imposes a severe burden that does not fit a sufficient state justification.

The disclaimer requirement imposes a severe burden that necessitates strict scrutiny. To be sure, disclaimer requirements that simply require the speaker to include basic factual information (such as its name) on the communication are subject to exacting scrutiny because they are minimally burdensome and are justified by the state interest in promoting an informed electorate. *Gaspee Project*, 13 F.4th at 83, 90-92, 95 (applying exacting scrutiny to disclaimer requirement that did not compel speech because it was factual in nature and did not impose a requirement to state a message contrary to the speaker's beliefs); *see Citizens United*, 558 U.S. at 366-71. The Initiative imposes no ordinary factual disclaimer requirement, however. Rather, it requires U.S. companies qualifying as FGIEs—including, as discussed above, those with little or no foreign government ownership—to characterize themselves as "foreign government-influenced entities." 21-A M.R.S. § 1064(6). This characterization is potentially damaging to the company's reputation because it implies a level of foreign control that may be misleading or even false (as is the case with CMP). Because the Initiative compels U.S. companies to convey a government message— namely, that the company is suspect because it has some relation to a foreign government, no matter how attenuated and no matter whether that government has any real influence—it is a content-based regulation subject to strict scrutiny. *NIFLA*, 138 S. Ct. at 2371 (applying strict scrutiny and striking down law compelling speakers to convey a substantive government script).

Nevertheless, the Initiative fails any applicable scrutiny.  First, it fails strict scrutiny because it does not serve a compelling state interest. Content-based regulations of political speech must be justified only by anti-corruption interests, *see Citizens United*, 558 U.S. at 356-61, but the simple transmission of public-policy related communications does not pose the threat of *quid pro*

*quo* corruption. Speech relating to public policy is just that—speech. The people of Maine are fully capable of listening to speech, assessing the persuasive value of that speech, and shaping their opinions based on their informed judgment. That is precisely what the First Amendment protects. *Bellotti*, 435 U.S. at 790-91. Second, the Initiative fails under exacting scrutiny because it does not serve a substantial state interest. The primary justification for disclaimers is ensuring an informed electorate. *Gaspee Project*, 13 F.4th at 86-88. While this interest may ordinarily suffice for purposes of exacting scrutiny, *id.*, it does not justify the Initiative's disclaimer requirement. The requirement does not even apply to electioneering communications, which are completely prohibited by the Initiative, 21-A M.R.S. § 1064(2); instead, it applies only to public communications regarding public policy issues generally, outside the election context, *id.* § 1064(6); *cf. Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 40, 41-44 (1st Cir. 2011) (upholding disclosure and disclaimer laws applicable to "election-related advocacy"). Stated simply, the requirement does not aim at any electorate, much less inform that electorate. The Initiative's disclaimer requirement thus compels speech, including even false speech, for no valid reason.

Further, even assuming the Interest serves a sufficiently substantial state interest, the Initiative fails both strict scrutiny and exacting scrutiny because the disclaimer requirement does not fit any asserted interest. As noted above, to satisfy strict scrutiny, the law must be the least restrictive means to achieving the state's interest. *Bonta*, 141 S. Ct. at 2383. To satisfy exacting scrutiny, the law must have not only a "substantial relation" to the state interest, but also "fit" the state interest in a manner that "represents not necessarily the single best disposition but one whose scope is in proportion to the interest served, that employs not necessarily the least restrictive means but a means narrowly tailored to achieve the desired objective." *Id.* at 2384 (quotation marks omitted); *see Gaspee Project*, 13 F.4th at 85. The disclaimer standard fails under either standard.

#16623884v10

The disclaimer requirement is substantially overinclusive. *See Bonta*, 141 S. Ct. at 2385-87 (finding a "dramatic mismatch" between the disclosure requirement and the purported state interest). The Initiative does not target just those companies that potentially present the threat the Initiative purports to address, namely, those that reflect actual foreign control. The ownership threshold in the definition of FGIE is so minimal, at an "indirect" 5%, that it includes many companies that are not controlled by foreign governments at all. 21-A M.R.S. § 1064(1)(E)(2).[6] Nevertheless, the Initiative slaps these companies with a pejorative label that the affected companies themselves must convey, regardless of their disagreement with that message or its accuracy. Moreover, the topics to which the disclaimer requirement applies have no relation to the identity of the speaker as a "foreign government influenced entity," even if that term is taken at face value. Communications regarding "*any* state or local government policy," not just those affecting foreign interests, are subject to the disclaimer requirement. *Id.* § 1064(6) (emphasis added). This means that a U.S. company that happens to have investments by foreign sovereign pension funds is prohibited from speaking on *any* matter of public policy absent a disclaimer that has no relation to either the speaker or the topic at hand—and which may be false. Accordingly, the disclosure requirement is constitutionally infirm.

**B.  Plaintiff is likely to succeed on its due process claim.**

The Initiative's flaws are compounded by its unconstitutionally vague definition of what constitutes an FGIE.  A law is impermissibly vague under the Fourteenth Amendment if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*,

---

[6] The default standard of Maine corporate law requires a corporation to be governed by its board of directors, the members of which owe the corporation fiduciary duties, and thus a Maine corporation cannot as a matter of law blindly follow the interests of its shareholders, foreign or domestic. *See* 13-C M.R.S. §§ 801, 831.

553 U.S. 285, 304 (2008); *see McKee*, 649 F.3d at 62. "To prevent the chilling of constitutionally protected speech, we apply a heightened standard in cases involving the First Amendment and require a greater degree of specificity in a statute that restricts speech," particularly when criminal penalties may be imposed. *Frese v. Formella*, 53 F.4th 1, 6 (1st Cir. 2022) (alterations and quotation marks omitted); *see Local 8027 v. Edelblut*, 651 F. Supp. 3d 444, 460 (D.N.H. 2023).

The Initiative fails to provide adequate notice regarding its scope, and further fails to provide sufficient guidance for enforcement. *See Local 8027*, 651 F. Supp. 3d at 462-63; *Fayetteville Pub. Libr. v. Crawford Cnty*, 2023 WL 4845636, at *17 (W.D. Ark. 2023). The Initiative defines an FGIE as a business entity "with respect to which a foreign government or foreign government-owned entity" holds an ownership interest of 5% or more. 21-A M.R.S. § 1604(1)(E)(2)(a). But this definition is entirely unclear on a crucial point: whether a company is an FGIE when there are multiple foreign governments or foreign-government owned entities each holding less than a 5% ownership interest but, in the aggregate, more than a 5% ownership interest, or, alternatively, whether a company is an FGIE only if a single foreign government or foreign government-owned entity owns more than a 5% ownership interest.[7] The Initiative also defines an FGIE as an entity "with respect to which a foreign government or foreign government owned entity . . . directly or indirectly participates in the decision-making" regarding campaign spending. *Id.* § 1604(1)(E)(2)(b). What this means is open-ended: for example, does it sweep in mere expressions of opinion by an executive of a domestic, but foreign-owned, corporation to an executive of a domestic, and U.S.-owned, corporation on a political matter of mutual interest?

---

[7] This ambiguity highlights the Initiative's overinclusive and underinclusive nature. If the Initiative does not require more than a 5% ownership interest by a single foreign entity, then it would ban speech by companies that have small interests held by various foreign entities, none of which have any say in the company's operations. If, however, the law requires more than a 5% ownership interest by a single foreign entity, it means that the law would not foreclose speech by companies that, in the aggregate, have foreign interests exceeding 5% and that therefore present a greater chance of foreign influence on campaigns.

#16623884v10

Given the lack of clarity regarding the scope of the Initiative, the Initiative fails to adequately identify those potentially subject to the law. This, in turn, will result in the chilling of protected speech. For the same reason, the Initiative leaves open the possibility of discriminatory enforcement, the risks of which are highlighted by the fact that the Initiative was targeted at Plaintiff. Compl. ¶¶ 55-59. The law is therefore unconstitutionally vague.

### C. The Initiative must fall in its entirety as facially unconstitutional.[8]

In the context of a First Amendment challenge, a law is facially unconstitutional "if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Bonta*, 141 S. Ct. at 2387 (quotation marks omitted). As discussed above, subsections 2 and 6 impose unconstitutional burdens on U.S. companies with minimal or nonexistent ownership by foreign governments. The Initiative is thus overbroad. *Id.*

Moreover, given the fatal flaws of subsections 2 and 6, the remainder of the Initiative must fall as well. *See N.H. Right to Life Pol. Action Comm. v. Gardner*, 99 F.3d 8, 19 (1st Cir. 1996). Under Maine law, which controls whether the Initiative's provisions are severable, *see R.I. Med. Soc. v. Whitehouse*, 239 F.3d 104, 106 (1st Cir. 2001), the entire Initiative must be invalidated if (1) the invalid provisions are "integral to the initiated bill," and (2) the remaining provisions cannot "function and be given effect absent the invalid provisions," *Op. of the Justices*, 2004 ME 54, ¶ 24, 850 A.2d 1145. The provisions of the Initiative entirely revolve around the ban on campaign spending and disclaimer requirements. Absent subsections 2 and 6, the Initiative's other provisions relating to solicitations, substantial assistance, structuring, due diligence, and penalties make no sense. 21-A M.R.S. § 1064(3)-(5), (7)-(9). Thus, except as to its hortatory provision regarding an anticorruption constitutional amendment, the Initiative's provisions are not severable.

---

[8] Plaintiff expressly reserves the right to assert as-applied First and Fourteenth Amendment challenges.

#16623884v10

## II. Enforcement of the Initiative Will Cause CMP Irreparable Harm.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see Fortuno*, 699 F.3d at 10–11; *Maceira v. Pagan*, 649 F.2d 8, 18 (1st Cir. 1981) ("It is well established that the loss of first amendment freedoms constitutes irreparable injury."). Thus, "irreparable injury is presumed upon a determination that [Plaintiff is] likely to prevail upon [its] First Amendment claim," *Fortuno*, 699 F.3d at 11, and it is reversible error to find that deprivation of First Amendment rights is not irreparable, *id.* at 15. That presumption is fully justified in this case, where the Initiative imposes criminal penalties. Compl. ¶ 47. Absent the Initiative, CMP would otherwise engage in the now-prohibited political activities. *Id.* ¶¶ 26-34, 60, 63. Thus, unless granted the relief sought here, CMP executives will face a choice between foregoing the company's First Amendment rights or risking jail. CMP would have no adequate remedy for its injury.

## III. The Balance of Hardships Favors an Injunction.

The State has no real argument that the balance of hardship weighs in its favor. "First Amendment freedoms must always be protected; that is why they have a special, separate place in the Constitution." *Firecross Ministries v. Mun. of Ponce*, 204 F. Supp. 2d 244, 251 (D.P.R. 2002). On the other hand, the State "is in no way harmed by issuance of an injunction that prevents the state from enforcing unconstitutional restrictions." *Legend Night Club v. Miller*, 637 F.3d 291, 302-03 (4th Cir. 2011); *see Cutting v. City of Portland*, 2014 WL 580155, at *10 (D. Me. Feb. 12, 2014), *aff'd*, 802 F.3d 79 (1st Cir. 2015). Accordingly, "the balance weighs heavily against Defendant[]" in a First Amendment case. *Firecross Ministries*, 204 F. Supp. 2d at 251.

There is no extraordinary concern that would tip the scale in favor of Defendants in this case. An injunction would simply restore the *status quo ante* and would not require Defendants to

take any action. *See Faraone v. City of E. Providence*, 935 F. Supp. 82, 90 (D.R.I. 1996). Therefore, the only real consequence of an injunction would be that Plaintiff, which would otherwise be unlawfully prevented from exercising its free speech rights, would be able to continue participating in the political process as it has for decades. *Fortuno*, 699 F.3d at 16 (injunction is appropriate where it simply allows the plaintiff to exercise its First Amendment rights).

## IV. The Public Interest Would Be Served by an Injunction.

"It is hard to conceive of a situation where the public interest would be served by enforcement of an unconstitutional law or regulation." *Condon v. Andino, Inc.*, 961 F. Supp. 323, 331 (D. Me. 1997). To the contrary, "[w]hen a constitutional violation is likely . . . the public interest militates in favor of injunctive relief because it is always in the public interest to prevent violation of a party's constitutional rights.'" *Magriz v. Union de Tronquista de P.R., Local 901*, 765 F. Supp. 2d 143, 157 (D.P.R. 2011) (quotation marks omitted).

That is particularly true here. Because freedom of speech is one of the cornerstones of our Republic, suppressing First Amendment rights "innately harms the public interest as a whole." *Firecross Ministries*, 204 F. Supp. 2d at 251. "[S]uppression of political speech harms not only the speaker, but also the public to whom the speech would be directed: 'The right of citizens to inquire to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it.'" *Fortuno*, 699 F.3d at 15 (quoting *Citizens United*, 558 U.S. at 339). The public good will thus be served by an injunction.

## CONCLUSION

Plaintiff respectfully requests that the Court preliminarily enjoin Defendants from enforcing the Initiative until the Court has issued a final judgment in this matter.

Dated at Portland, Maine this 12th day of December, 2023.

Respectfully submitted,

/s/ Joshua D. Dunlap
Joshua D. Dunlap
Nolan L. Reichl
Katherine E. Cleary
PIERCE ATWOOD LLP
Merrill's Wharf
254 Commercial St.
Portland, ME 04101
Phone: 207-791-1100
Email: jdunlap@pierceatwood.com
Email: nreichl@pierceatwood.com
Email: kcleary@pierceatwood.com

*Attorneys for Plaintiff Central Maine Power Co.*

#16623884v10

**CERTIFICATE OF SERVICE**

I hereby certify that on December 12, 2023, I electronically filed the foregoing document, via e-mail to the United States District Court for the District of Maine, with a copy to counsel for Defendants and will serve the same upon Defendants.


DATED: December 12, 2023

*/s/ Joshua D. Dunlap*
Joshua D. Dunlap
PIERCE ATWOOD LLP
Merrill's Wharf
254 Commercial St.
Portland, ME 04101
Phone: 207-791-1100
Email: jdunlap@pierceatwood.com

*Attorneys for Plaintiff*
*Central Maine Power Co.*

.

#16623884v10