UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| Central Maine Power Company, *et al.*,<br><br>        Plaintiffs,<br><br>v.<br><br>Maine Commission on Governmental Ethics and Election Practices, *et al.*,<br><br>        Defendants. | No. 1:23-cv-00450-NT |

*Amicus Curiae* **Brief Of Free Speech For People In Support Of Defendants' Opposition To Plaintiffs' Motions For Preliminary Injunction And Temporary Restraining Orders**

## INTEREST OF *AMICUS CURIAE*

Free Speech For People (FSFP) files this brief in support of Defendants' consolidated Opposition to Plaintiffs' Motions for Preliminary Injunction and Temporary Restraining Order (ECF No. 4, 22, 25, 27). As explained in greater detail in the accompanying unopposed motion to participate as *amicus* curiae, FSFP is a national, non-partisan, nonprofit, public interest organization that litigates and advocates on democracy issues, including voting rights, constitutional accountability, and protecting elections from unlawful foreign influence.[1]

## ARGUMENT

**A. The law advances a compelling government interest.**

    **1. Protecting democratic self-governance from foreign influence is a compelling government interest.**

The challenged statute, 21-A M.R.S. § 1064, protects Maine's democratic self-governance. As then-Judge (now Justice) Kavanaugh wrote in *Bluman v. Federal Election Comm'n* and the Supreme Court affirmed, the government has a compelling interest in "limiting the participation of foreign citizens in activities of American democratic self-government, and in thereby preventing foreign influence over the U.S. political process." 800 F. Supp. 2d 281, 288 (D.D.C. 2011) (Kavanaugh, J.), *aff'd*, 565 U.S. 1104 (2012).

Because political contributions and independent expenditures "are an integral aspect of the process by which Americans elect officials to federal, state, and local government offices," they "are part of the overall process of democratic self-government." *Id.* at 288. To ensure that process

---

[1] No party or party's counsel authored or contributed money to fund this brief in whole or part, and no person or entity other than amicus or its counsel contributed monetarily to the preparation or submission of this brief.

promotes self-government by and for the American people, the government has a compelling interest in limiting foreign money entering U.S. elections. This interest justifies laws prohibiting *any* money from foreign nationals entering U.S. elections, even indirectly.

That question came before the Supreme Court in 2011, after it decided *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010). Benjamin Bluman was a Canadian citizen who had lived lawfully in the United States for five years when he sought to contribute $100 to three candidate campaigns, and to pay to print political flyers to distribute in New York City. *See Bluman*, 800 F. Supp. 2d at 285; Decl. of Benjamin Bluman, ECF 19-2, *Bluman v. Federal Election Comm'n*, No. 10-1766 (D.D.C. Jan. 10, 2011), *available at* https://www.courtlistener.com/docket/4904395/19/2/bluman-v-federal-election-commission/. He and other plaintiffs challenged 52 U.S.C. § 30121(a), which prohibits foreign nationals from "directly or indirectly" spending money in U.S. elections. *Id.* at 284. But a three-judge district court found the total ban on foreign nationals' election spending was constitutional. *Id.* at 286. The Supreme Court affirmed. *See* 565 U.S. at 1104 (2012); *see Hicks v. Miranda*, 422 U.S. 332, 343–45 (1975) (*quoting Ohio ex rel. Eaton v. Price*, 360 U.S. 246, 247 (1959) (per curiam) (statement of Brennan, J.) (Supreme Court "[v]otes to affirm summarily. . . it hardly needs comment, are votes on the merits of the case.")).

Judge Kavanaugh noted a long line of Supreme Court cases holding that the government may exclude foreign citizens from activities "intimately related to the process of self-government." *Bernal v. Fainter*, 467 U.S. 216, 220 (1984); *Bluman*, 800 F. Supp. 2d at 287 (collecting cases). As *Bluman* explained:

> We read these cases to set forth a straightforward principle: it is fundamental to the definition of our national political community that foreign citizens do not have a constitutional right to participate in, and thus may be excluded from, activities of democratic self-government. **It follows, therefore, that the United States has a**

2

> **compelling interest for purposes of First Amendment analysis in limiting the participation of foreign citizens in activities of American democratic self-government,** and in thereby preventing foreign influence over the U.S. political process.

*Id*. at 288 (emphasis added).

To evade the clear public interest at stake here, Plaintiffs attempt to paint this law as one that merely seeks to silence political speech. That is incorrect. Instead, the law protects Maine's democratic self-government from foreign influence. Political spending by foreign entities, especially foreign *governments*, either directly or indirectly, goes to the heart of our democratic self-government—and the public has an undisputed interest in prohibiting such spending. *Id.* at 288-89. Indeed, the threat to democratic self-government presented by foreign government funding of political spending dwarfs any such threat posed by the political spending of most individual foreign citizens, such as Benjamin Bluman. If that threat justifies a complete ban on political spending by all individual foreign citizens, as upheld in *Bluman,* it follows *a fortiori* that it justifies restriction on foreign government corporate spending at issue here.

Maine's new law applies to a particular vector of foreign government influence: corporate political spending by corporations that are partly owned by foreign governments. These corporations may also have U.S. investors. But the public's interest in protecting Maine's democratic self-government does not vanish merely because a foreign government has commingled with U.S. citizens as fellow investors in the corporation. Affiliation with U.S. investors does not "cure" foreign investors of the limited rights afforded to them in the United States, nor render inapplicable the government's interest in preserving core functions of self-governance for U.S. citizens and permanent residents. In *Agency for International Development v. Alliance for Open Society Int'l, Inc*., the Supreme Court explained that U.S. entities "cannot export their own First Amendment rights" to the foreign entities with which they associate. 140 S. Ct.

3

2082, 2088-89 (2020) (rejecting constitutional challenge to statute that imposed speech-related funding conditions on foreign entities that were affiliated with American organizations).[2]

The United States has long regulated foreign ownership in multiple sectors, like shipping and telecommunications. *See, e.g.,* 46 U.S.C. §§ 55102-03 (vessels transporting cargo between two points in the United States must be U.S.-built and owned and crewed by U.S. citizens); Communications Act of 1934 § 310(b)(3), codified as amended at 47 U.S.C. § 310(b)(3) (limiting foreign ownership of broadcast and telephone companies); *see also* Federal Communications Comm'n, *In the Matter of Review of International Section 214 Authorization to Assess Evolving National Security, Law Enforcement, Foreign Policy, and Trade Policy Risks*, IB Dkt. 23-119, FCC 23-28 (Apr. 20, 2023) (seeking public comment on proposal to lower ownership reporting threshold from 10% to 5%). As for Section 310(b)'s foreign ownership limit, amicus is only aware of one constitutional challenge in its nearly 90-year history.[3]

This interest in preserving a self-run democracy is even more heightened where a foreign government is at play. Whether friend or foe, a foreign government will necessarily seek to advance its own interests, not those of the United States or its citizens. Recognizing this danger,

---

[2] The Court did not reach the question of whether the government had a compelling interest in restricting the speech of foreign organizations operating abroad because it determined that, despite those organizations' close affiliation with U.S.-based institutions, they had no First Amendment rights to assert. 140 S. Ct. at 2089.

[3] In *Moving Phones P'ship LP v. FCC*, the challenge to Section 310(b) concerned a slightly different point than the one argued here. 998 F.2d 1051, 1056 (D.C. Cir. 1993) (applying rational basis review because "[t]he opportunity to own a broadcast or common carrier radio station is hardly a prerequisite to existence in a community"). But the D.C. Circuit still upheld the provision. *Id*. Other courts have upheld related provisions of the same act that are even more restrictive than Section 310. *See, e.g., Campos v. FCC*, 650 F.2d 890, 891 (7th Cir. 1981) (upholding against constitutional challenge a Communications Act provision barring even permanent residents from holding radio operator licenses).

legislatures monitor and limit the risk of foreign *government* interference accordingly. *See, e.g.,* 48 C.F.R. § 252.209-7002 (defense contracting); 7 U.S.C. §§ 3501 *et seq*. (agricultural land interests); 2023 Fla. Laws Ch. 2023-33 (C.S.C.S.S.B. 264) (land ownership).

This is not a case about limiting spending in elections, but rather Maine's compelling interest in protecting its democratic self-government from foreign influence.

Furthermore, Maine has a compelling interest to act because foreign government-influenced corporations, even at ownership thresholds below 5%, have taken swift and extraordinary measures to influence state and local elections. Maine has every reason to prevent foreign government-influenced corporations from similarly influencing its own elections. *See Brnovich v. Democratic National Committee*, 141 S. Ct. 2321, 2348 (2021) (noting that when a state has evidence of fraud occurring in another state, it is "not obligated to wait for something similar to happen closer to home."). Uber, for example, spent some $58 million on Proposition 22 in California, which overturned worker protections for Uber drivers.[4] Uber is, as of January 2024, 3.5% owned by the Public Investment Fund of Saudi Arabia—a foreign sovereign-wealth fund.[5]

---

[4] Ryan Menezes *et al*., "*Billions have been spent on California's ballot measure battles. But this year is unlike any other*," L.A. TIMES, Nov. 13, 2020, https://lat.ms/3gRct8d.

[5] CNBC, Uber Technologies Inc., https://www.cnbc.com/quotes/UBER?tab=ownership (visited Jan. 12, 2024); Simon Clark, *Saudi Wealth Fund May Be the World's Least Transparent*, WALL STREET JOURNAL, Nov. 1, 2016, https://www.wsj.com/articles/saudi-wealth-fund-may-be-worlds-least-transparent-1477997912. The Saudi government's Uber stake would not trigger Maine's 5% threshold. The point here is simply that even at that *lower* investment, the Saudi government, through a major corporation it can influence, would have the opportunity to influence and potentially alter the course of Maine elections.

5

### 2. The governmental interest in protecting democratic self-government from foreign influence is distinct from the corruption interest at issue in *Citizens United*.

As *Bluman* recognized, the Supreme Court's *Citizens United* decision "is entirely consistent with a ban on foreign contributions and expenditures." *Bluman*, 800 F. Supp. 2d at 289.[6] This is because the government has a compelling interest to preserve democratic self-government against encroachment of foreign interests and money—an interest at issue in *Bluman* and here, but not in *Citizens United*. And while the Supreme Court occasionally makes pronouncements like "[t]his Court has identified only one legitimate governmental interest for restricting campaign finances: preventing corruption or the appearance of corruption," *McCutcheon v. FEC*, 572 U.S. 185, 206 (2014), those statements have always been in the context of generally applicable restrictions—not restrictions targeted at foreign spending. The Supreme Court affirmed *Bluman*, which explicitly rested on the distinct interest in "limiting the participation of foreign citizens in activities of American democratic self-government, and in thereby preventing foreign influence over the U.S. political process." 800 F. Supp. 2d at 288.[7]

---

[6] Judge Kavanaugh also concluded that Justice Stevens' comments in his dissent in *Citizens United* on the subject of the law's ban on foreign contributions and expenditures is "a telling and accurate indicator of where the Supreme Court's jurisprudence stands." *Id*. at 289. Justice Stevens noted that the Court had "never cast doubt on laws that place special restrictions on campaign spending by foreign nationals…. The notion that Congress might lack the authority to distinguish foreigners from citizens in the regulation of electioneering would certainly have surprised the Framers, whose 'obsession with foreign influence derived from a fear that foreign powers and individuals had no basic investment in the well-being of the country.'" *Citizens United*, 558 U.S. at 424 n.51 (Stevens, J., dissenting in part and concurring in part) (citation omitted). Judge Kavanaugh was clearly correct in his assessment, as the Supreme Court affirmed the *Bluman* ruling.

[7] *Bluman* cannot be explained as relying on the interest in preventing quid pro quo corruption. Bluman's prohibited expenditures included independent expenditures (printing flyers), which, per the Supreme Court, "do not give rise to corruption or the appearance of corruption." *Citizens United*, 558 U.S. at 357.

The corporations subject to Maine's law do not fall within the class protected by *Citizens United*. In three separate places, *Citizens United* defined that class of corporations as "associations of citizens." *Citizens United v. FEC*, 558 U.S. at 349, 354, 356. Corporations with substantial foreign government investment are not "associations of citizens." They are, at most, mixed associations of (1) citizens and (2) foreign governments. Such a combination is not an "association of citizens"; U.S. entities "cannot export their own First Amendment rights" to the foreign entities with which they associate. *Alliance for Open Soc'y Int'l*, 140 S. Ct. at 2088-89. In short, *Citizens United* defined (thrice) the class of corporations to which it applies as "associations of citizens," but the corporations prohibited by Maine's statute definitionally *are not* "associations of citizens." They are not protected by *Citizens United*.

### B. The statute is narrowly tailored to corporations subject to influence by foreign governments.

#### 1. Five percent ownership exceeds the level at which foreign investors may influence a corporate entity.

Under § 1064, a foreign government-influenced entity that is 5% or more owned by a foreign government or foreign government-owned entity (that itself is owned 50% by a foreign government), is prohibited from spending money in Maine elections. The statute is narrowly tailored to keep foreign government-influenced money out of Maine elections because it reflects a reasonable understanding of how investors holding 5% stock can significantly influence corporate decision-making, including the decision to expend money on U.S. elections.[8]

---

[8] Ltr. from Professor John Coates to California Assemb. Lee at 11-12 (Apr. 21, 2022), *available at* https://freespeechforpeople.org/wp-content/uploads/2022/04/coates-california-ab1819-written-testimony-20220419.pdf.

Under federal securities law, 5% is the threshold that Congress has already chosen as the level at which a single investor can have such significant influence that the law requires disclosure of the stake, the residence and citizenship of the investors, the source of the funds, and even in some cases information about the investors' associates.[9] *See* 15 U.S.C. §§ 78m(d)(1)-(3). The Securities Exchange Act of 1934 thus requires beneficial owners to file with the SEC their name, address, and numbers of shares if they own more than 5% of any class. *See* 15 U.S.C. § 78m(d); 17 C.F.R. §§ 240.13d-1, 240.13d-101 (filing must be done within 10 days of acquisition). This information is available on SEC's online database known as EDGAR, which is then promulgated on various websites based on SEC's public filings.

Furthermore, a corporation where one in 20 investors is a foreign government is not an "association of citizens" within the meaning of *Citizens United*, any more than a congery of 19 chickens and one German shepherd constitutes a "flock of chickens." And just as the farmer presumptively manages his farm differently in light of its canine member, corporate executives responsible to global investors (especially foreign *government* investors) presumptively think and act differently than those without such substantial foreign investment. As Lee Raymond, then CEO of U.S.-based ExxonMobil Corp., once stated, "I'm not a U.S. company and I don't make decisions based on what's good for the U.S." *See* Michael Sozan, Ctr. for Am. Progress, *Ending Foreign-*

---

[9] While foreign investors with 5% ownership can exert influence over corporate decision-making in a manner inconsistent with democratic self-government, the same is true of an investor with as low as 1% of ownership. For example, the federal threshold for presenting a shareholder proposal at a publicly-traded company requires either $2,000 or 1% of company shares, which the SEC later deemed *too high* a threshold because influential shareholders do not often hold such *large* stakes. 17 C.F.R. 240.14a-8(b) (2019), *available at* https://www.govinfo.gov/app/collection/cfr/2019/. *See also* SEC, *Procedural Requirements and Resubmission Thresholds under Exchange Act Rule 14a-8*, 84 Fed. Reg. 66,458 (Dec. 4, 2019), codified in 2020 at 17 C.F.R. § 240.14a-8. Investors with this level of ownership can exert substantial leverage over boards of directors.

*Influenced Corporate Spending in U.S. Elections* (Nov. 21, 2019), at 19, https://ampr.gs/2QIiNQT (*quoting* Steve Coll, *Private Empire: ExxonMobil and American Power* 71 (2012)). Plaintiffs have provided no evidence that their political spending is exempt from this general principle.

Not every foreign government or foreign government-influenced entity will engage in active ownership of a corporation, nor need it do so to influence corporate decision making. Corporations are responsive to the stated and inferred goals of investors with an influential level of ownership.[10]

And as then-Judge Kavanaugh held in *Bluman*, the government has a compelling interest in excluding *all* foreign contributions or expenditures in U.S. elections, either direct or indirect. Bluman himself—a legal resident who as an attorney had taken an oath to uphold the U.S. Constitution—had significantly greater connection to the United States than foreign governments that own influential stakes in U.S. corporations. And the money he sought to spend is paltry compared to the vast sums that foreign-government-influenced corporations can afford to, and do, spend on U.S. elections. But neither the *Bluman* plaintiffs' close connection to the United States nor their limited spending plans could undermine the government's compelling interest in prohibiting *all* foreign spending in United States elections, both direct and indirect. If that is true, then it is at least equally true that Maine is justified in setting a threshold to exclude corporations with significant foreign ownership from contributing to Maine elections.

---

[10] The shareholder-centric theory of corporate governance suggests that corporations prioritize the maximization of investor profits before considering the interests of others, such as management, employees, or social responsibility initiatives. Rhee, Robert J., *A Legal Theory of Shareholder Primacy*, 102 Minn. L. Rev. 1951 (2017), *available at* https://ssrn.com/abstract=2938806. Over the past 30 years, U.S. corporations have shifted from being management-driven to shareholder-driven, leaving "substantial reason to believe that managers and directors today largely 'think like shareholders.'" Edward B. Rock, *Adapting to the New Shareholder-Centric Reality*, 161 U. Pa. L. Rev. 1907, 1910 (2013).

**C.     The Plaintiffs' interest in receiving foreign-influenced communications do not nullify the state's compelling interest to preserve Maine's self-democratic government.**

In *Pringle v. Frey,* Plaintiffs frame § 1064 as an infringement on the First Amendment right to receive speech from 'Foreign Entities' during Maine's referenda process.[11] While courts have acknowledged a general 'listener's right' to receive information and ideas, *see, e.g., Va. Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 757 (1976), a listener's desire to hear speech does not nullify all other First Amendment principles of when speech is unprotected or must yield to compelling public interests. *See, e.g., Kleindienst v. Mandel*, 408 U.S. 753 (1972) (upholding government's denial of visa to foreign academic invited by U.S. scholars).

For any given category of speech—e.g., incitement, obscenity, defamation, or political communications by foreign governments and the entities where they own substantially influential stakes—there is undoubtedly *someone* who would like to hear it. But a listener's interest in receiving speech extends no further than the speaker's interest in spreading it—here, zero.

In *Bluman*, the Supreme Court *could have* held that U.S. citizens have an unlimited right to receive information from foreign entities. It could have acknowledged the likely reality that some had wished to hear from Benjamin Bluman, in the same way that Plaintiffs now wish to hear paid-for political speech by barred foreign-influenced entities, and thus permit Bluman to commission posters around New York.[12] But the Court instead affirmed *Bluman*, and held that the

---

[11] Pls. Mot. for TRO and Prelim. Inj., at 21, ECF 27.

[12] The FEC raised and disposed of a potential listener's claim in its *Bluman* briefing. *See* Motion to Dismiss at 14, *Bluman v. Federal Election Comm'n*, No. 10-1766 (D.D.C. Jan. 10, 2021). Even if not extensively discussed, it is reasonable to assume that the Supreme Court was aware of and considered foundational First Amendment concepts, such as any listener's interest in receiving information, when it decided to summarily affirm the *Bluman* decision. And as held in *Hicks v. Miranda*, a summary affirmance is also a "vote[] on the merits of the [lower] case." 422 U.S. at 343.

10

state has a clear and compelling interest to "limit[] the participation of foreign citizens in activities of American democratic self-government." 800 F. Supp. 2d at 288. Plaintiffs' generalized First Amendment right to receive information does not provide a clever workaround to defeat *Bluman* and nullify the public interest in preserving self-democratic government.

Plaintiffs further cite *Lamont v. Postmaster General,* 381 U.S. 301 (1965), in support of a protection of information and ideas from foreign speakers. Their reliance is misplaced. In *Lamont*, the Supreme Court upheld the right to hear foreign speech and struck down a statute permitting the government to withhold mail sent by communist foreign governments unless the addressee affirmatively requested it. The *Lamont* Court declined to address whether the law itself passed constitutional muster, and found *narrowly* that the official act of having to request delivery of foreign government mail imposed a burden too great on the recipient's First Amendment right. *Id*. at 305, 307 (emphasis added). Maine statute § 1064 does not impose an affirmative burden on Plaintiffs to seek out speech, nor do Plaintiffs provide evidence of a physical obstacle that now stands in the way of their rights as voters, which is solely what the *Lamont* Court reviewed and accordingly admonished. *Id*. at 306 ("We rest on the narrow ground that the addressee in order to receive his mail must request in writing that it be delivered.").

Instead, Plaintiffs' claim more closely resembles the scholars in *Kleindienst v. Mandel* who challenged the government's denied waiver of an invited foreign academic. 408 U.S. 753 (1972).[13] The Supreme Court upheld Congress' power to deny the academic entry into the country, resisting the idea that "government power to withhold a [visa] waiver must yield whenever a bona fide claim is made that American citizens wish to meet and talk with an alien excludable" under

---

[13] Here, the Supreme Court declined to take the narrow approach it had in *Lamont*. "[W]e cannot realistically say that the problem facing us disappears entirely or is nonexistent because the mode of regulation bears directly on physical movement." *Mandel*, 408 U.S. 753 at 765.

11

immigration law. *Id*. at 767. And just as the government has a firmly established right to regulate immigration, it too has an interest—of the highest bar—to regulate foreign political spending to preserve democratic self-government. *Bluman*, 800 F. Supp. 2d at 288. Given the state's clear public interest, this Court should "neither look behind the exercise of [the government's] discretion nor test it by balancing its justification against the First Amendment interests of those who seek personal communication with the applicant." *Mandel*, 408 U.S. at 770.

If the listener's rights doctrine meant that U.S. citizens had an unlimited right to receive information from foreign entities, then the U.S. Supreme Court would have reversed Judge Kavanaugh's *Bluman* decision. It did not. Plaintiffs' listener's rights argument is simply an attempt to circumvent *Bluman*. Maine's compelling interest in preserving democratic self-government justifies Maine's new law prohibiting foreign-government-influenced corporate spending in state elections.

## CONCLUSION

Proposed *Amicus Curiae* Free Speech For People respectfully requests that the Court deny the Plaintiffs' motions for preliminary injunction or temporary restraining order.

Dated: January 12, 2024

Respectfully submitted,

/s/Peter J. Brann
Peter J. Brann
Brann & Isaacson
113 Lisbon St., P.O. Box 3070
Lewiston, ME  04243-3070
(207) 786-3566
pbrann@brannlaw.com

Amira Mattar (*pro hac vice* forthcoming)
John Bonifaz (*pro hac vice* forthcoming)
Ben Clements (*pro hac vice* forthcoming)
Ronald Fein (*pro hac vice* forthcoming)
Courtney Hostetler (*pro hac vice* forthcoming)
FREE SPEECH FOR PEOPLE
1320 Centre St. #405
Newton, MA 02459
(617) 249-3015
amattar@freespeechforpeople.org
chostetler@freespeechforpeople.org
rfein@freespeechforpeople.org
jbonifaz@freespeechforpeople.org
bclements@freespeechforpeople.org

*Attorneys for Amicus Curiae*
*Free Speech For People*