**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE**

| | |
|---|---|
| CENTRAL MAINE POWER COMPANY,<br>*Plaintiff,*<br>v.<br>MAINE COMMISSION ON GOVERNMENTAL ETHICS AND ELECTION PRACTICES, *et al.*,<br>*Defendants.* | Civil No. 1:23-cv-00450-NT |
| VERSANT POWER, and ENMAX CORP.,<br>*Plaintiffs,*<br>v.<br>WILLIAM J. SCHNEIDER, et al.,<br>*Defendants.* | Civil No. 1:23-cv-00451-NT |
| MAINE PRESS ASSOCIATION, and MAINE ASSOCIATION OF BROADCASTERS,<br>*Plaintiffs,*<br>v.<br>MAINE COMMISSION ON GOVERNMENTAL ETHICS AND ELECTION PRACTICES, *et al.*,<br>*Defendants.* | Civil No. 1:23-cv-00452-NT |
| PRINGLE, *et al.*,<br>*Plaintiffs,*<br>v.<br>FREY, *et al.*,<br>*Defendants.* | Civil No. 1:23-cv-00453-NT |

**BRIEF OF AMICUS CURIAE PROTECT MAINE ELECTIONS
IN SUPPORT OF DEFENDANTS**

Tara Malloy*
Megan P. McAllen*
CAMPAIGN LEGAL CENTER
1101 14th Street NW, Ste. 400
Washington, DC 20005
(202) 736-2200
tmalloy@campaignlegalcenter.org
mmcallen@campaignlegalcenter.org

*motions for admission pro hac vice pending

Peter L. Murray
Sean R. Turley
MURRAY PLUMB & MURRAY
75 Pearl Street
P.O. Box 9785
Portland, Maine 04104-5085
(207) 773-5651
pmurray@mpmlaw.com
sturley@mpmlaw.com

*Counsel for Amicus Curiae Protect Maine Elections*

# TABLE OF CONTENTS

Page

**INTERESTS OF AMICUS CURIAE** ...................................................................1

**SUMMARY OF ARGUMENT** .............................................................................1

**BACKGROUND** ....................................................................................................4

    A. History of Question 2 .......................................................................................4

    B. Federal law ......................................................................................................7

    C. Maine's Act .....................................................................................................9

**ARGUMENT** .........................................................................................................11

I.  Plaintiffs' Request for Broad Preliminary Relief Is Not Justified by a Showing of Irreparable Harm and Would Impede the Full Adjudication of Their Legal Arguments ........11

II.  Plaintiffs Fail to Show a Likelihood of Success on the Merits ...............................15

    A. Plaintiffs fail to meet the standard for a facial challenge ..............................15

    B. Maine's foreign corporate money ban comports with the First Amendment ...................16

        1. The governmental interest in protecting democratic self-governance from foreign influence is "compelling." ........................................................17

        2. Plaintiffs ignore Maine's compelling interest in limiting spending by foreign-influenced corporations in referenda ........................................................20

        3. The ban is narrowly tailored to advance Maine's compelling interests ...................23

    C. Maine's Disclaimer Requirement for Foreign Government-Influenced Entities Furthers First Amendment Values ...................................................27

        1. The government's informational interest in political disclosure is heightened with respect to foreign influence ........................................27

        *2.* Disclaimer requirements are reviewed under exacting scrutiny ...............................30

    D. Maine's due diligence requirements are a constitutional means to support enforcement of the foreign corporate money ban ...................................31

    **CONCLUSION** ...............................................................................................35

## TABLE OF AUTHORITIES

**Page**

**Cases:**

*Alexander v. United States*, 509 U.S. 544 (1993) ........................................................34

*Ambach v. Norwick*, 441 U.S. 68 (1979).....................................................................18

*Americans for Prosperity Foundation v. Bonta*, 141 S. Ct. 2373 (2021).....................................30

*Attorney General of the United States v. Irish People, Inc.*, 684 F.2d 928 (D.C. Cir. 1982),........29

*Attorney General v. Irish N. Aid Committee*, 346 F. Supp. 1384 (S.D.N.Y. 1972)......................29

*Auburn Police Union v. Carpenter*, 8 F.3d 886 (1st Cir. 1993) ....................................17

*Blum v. Holder*, 744 F.3d 790, 798-99 (1st Cir. 2014) .............................................13

*Bluman v. FEC*, 800 F. Supp. 2d 281 (D.D.C. 2011)............................................ *passim*

*Buckley v. Valeo*, 424 U.S. 1 (1976)..................................................................26, 29

*Citizens United v. FEC*, 558 U.S. 310 (2010).................................................. *passim*

*John Doe No. 1 v. Reed*, 561 U.S. 186 (2010) ....................................................21

*Edgar v. MITE Corporation*, 457 U.S. 624 (1982)..................................................24

*EMC Corp. v. Chevedden*, 4 F. Supp. 3d 330 (D. Mass. 2014) ...............................13, 14

*FCC v. League of Women Voters of Cal.*, 468 U.S. 364 (1984) ...................................26

*FEC v. Beaumont*, 539 U.S. 146 (2003) ...........................................................17

*Florida League of Professional Lobbyists, Inc. v. Meggs*, 87 F.3d 457 (11th Cir. 1996) .............28

*Foley v. Connelie*, 435 U.S. 291 (1978)..............................................................18

*Gaspee Project v. Mederos*, 13 F.4th 79 (1st Cir. 2021) ........................................27, 30

*Gonzalez-Droz v. Gonzalez-Colon*, 573 F.3d 75 (1st Cir. 2009)....................................11

*Indiana National Corporation v. Rich*, 712 F.2d 1180 (7th Cir. 1983)...........................24

*Initiative & Referendum Institute v. Walker*, 450 F.3d 1082 (10th Cir. 2006) ..............14

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992).............................................14

*McConnell v. FEC*, 540 U.S. 93 (2003).................................................2, 28, 32, 33, 35

*Meese v. Keene*, 481 U.S. 465 (1987) ...............................................................30

*Minnesota Chamber of Commerce v. Choi*, No. 23-cv-2015, 2023 WL 8803357 (D. Minn. Dec. 20, 2023) ........................................................................................2, 25, 26

*Minnesota State Ethical Practices Board v. National Rifle Association*,
  761 F.2d 509 (8th Cir. 1985)..................................................................................28

*National Association of Broadcasters v. FCC*, 39 F.4th 817 (D.C. Cir. 2022) ............................32

*National Organization for Marriage v. McKee ("NOM I")*,
  649 F.3d 34 (1st Cir. 2011)......................................................................13, 23, 27, 28

*New York State Club Association v. City of New York*, 487 U.S. 1 (1988) ...................................16

*OneAmerica Votes v. State*, 518 P.3d 230 (Wash. Ct. App. 2022)...................................................18

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations.*, 413 U.S. 376 (1973)............34

*Project Veritas Action Fund v. Conley*, 270 F. Supp. 3d 337 (D. Mass. 2017) .............................14

*Reddy v. Foster*, 845 F.3d 493 (1st Cir. 2017) .............................................................................12

*Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975) .................................................34

*Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1 (1st Cir. 2012).....................14

*Surplec, Inc. v. Maine Pub. Serv. Co.,* 495 F. Supp. 2d 147 (D. Me. 2007) .................................12

*United States v. Harriss*, 347 U.S. 612 (1954)............................................................................28

*United States v. Singh*, 979 F.3d 697 (9th Cir. 2020) ..................................................................17

*United States v. Stevens*, 559 U.S. 460 (2010)......................................................................15, 23

*Washington State Grange v. Washington State Republican Party*, 552 U.S. 442 (2008) .............15

*Washington Post v. McManus*, 944 F.3d 506 (4th Cir. 2019).......................................................33

*Williams-Yulee v. Florida Bar*, 575 U.S. 433 (2015)............................................................26, 27

*Winter v. Nat. Res. Def. Council, Inc.* 555 U.S. 7 (2008) ...........................................................12

**Statutes and Rules:**

15 U.S.C. § 78m(d)......................................................................................................................24

22 U.S.C. § 611(b)(3).....................................................................................................................7

22 U.S.C. § 612(a) .......................................................................................................................29

22 U.S.C. § 612(b).......................................................................................................................29

22 U.S.C. § 614(b) ........................................................................................................3, 10, 27, 29

47 U.S.C. § 315(e)(1)...................................................................................................................32

47 U.S.C. § 317(a)(1)...................................................................................................................32

52 U.S.C. § 30118(a) .....................................................................................................................8

iv

52 U.S.C. § 30121(a)(1) ..............................................................................................7

52 U.S.C. § 30121(b)(1) ..............................................................................................7

52 U.S.C. § 30121(b)(2) ..............................................................................................7

11 C.F.R. § 110.20(a)(4) ...........................................................................................31

11 C.F.R. § 110.20(a)(5) ...........................................................................................31

11 C.F.R. § 110.20(a)(7) .............................................................................................5

11 C.F.R. § 110.20(g) ...............................................................................................31

11 C.F.R. § 110.20(h) ...............................................................................................31

11 C.F.R. § 110.20(i) ...................................................................................................9

17 C.F.R. § 240.13d-1 ..............................................................................................24

17 C.F.R. § 240.13d-101 ..........................................................................................24

47 C.F.R. § 73.1212(a) .............................................................................................32

47 C.F.R. § 73.1212(b) .............................................................................................32

47 C.F.R. § 73.1212(j)(2) .........................................................................................32

47 C.F.R. § 73.1212(j)(3) .........................................................................................32

47 C.F.R. § 73.1212(j)(3)(ii) .....................................................................................32

47 C.F.R. § 73.1212(j)(3)(vi) ....................................................................................32

**State Regulations and Statutes:**

21-A Me. Rev. Stat. § 1064 .........................................................................................1

21-A Me. Rev. Stat. § 1064(1) .....................................................................................2

21-A Me. Rev. Stat. § 1064(1)(E) .........................................................................3, 9, 10

21-A Me. Rev. Stat. § 1064(2) .............................................................................2, 9. 13

21-A Me. Rev. Stat. § 1064(3) ...................................................................................13

21-A Me. Rev. Stat. § 1064(6) .........................................................................2, 10, 27

21-A Me. Rev. Stat. § 1064(7) ...............................................................2. 10, 11, 31, 34

Cal. Gov't Code § 85320 ...........................................................................................19

Colo. Rev. Stat. § 1-45-107.5 ....................................................................................19

Fla. Stat. § 106.08(12)(b) ..........................................................................................19

Idaho Code Ann. § 67-6610d ...................................................................................... 19

Md. Code, Elec. Law § 13-236.1 ............................................................................... 19

Minn. Stat. § 211B.15(4)(a) ........................................................................................ 25

Minn. Stat. § 211B.15(4)(b) ........................................................................................ 25

Neb. Rev. Stat. § 49-1479.03 ...................................................................................... 19

Nev. Rev. Stat. § 294A.325 ......................................................................................... 19

N.D. Cent. Code § 16.1-08.1-03.15 ............................................................................ 19

S.D. Codified Laws § 12-27-21 .................................................................................. 19

Wash. Rev Code § 42.17A.417 ................................................................................... 19

**Other Authorities:**

*Actions for LD 194*, https://perma.cc/WF9V-CNFW .................................................. 5

*Summary of LD 479*, https://perma.cc/P3E4-DZZ2 .................................................... 5

*Summary of LD 641*, https://perma.cc/994G-P28S ..................................................... 5

Anna Massoglia, *Foreign company's subsidiary poured millions into influencing Maine ballot referendum*, Ctr. For Responsive Politics (Nov. 3, 2021), https://perma.cc/85RX-J4RY ......... 4

Ballotpedia, *Maine Question 1 (2021), Campaign Finance*, https://perma.cc/DFJ6-8264 ............ 4

Ballotpedia.com, *Maine Question 3 (2023)*, https://perma.cc/4SEE-PFJB .................................. 5

FEC, Corporations and Labor Organizations, https://perma.cc/KC4B-CQJK ............................... 8

Ellen Weintraub, *Taking On Citizens United*, N.Y. Times (Mar. 30, 2016), https://www.nytimes.com/2016/03/30/opinion/taking-n-citizens-united.html ...................... 23

FEC Adv. Op. 1984-62 (Mar. 21, 1985), https://perma.cc/4TLU-TWCD ................................... 8

FEC Adv. Op. 1989-20 (Oct. 27, 1989), https://perma.cc/ZPR3-MZCZ ...................................... 9

FEC Adv. Op. 1989-32 (Jul. 2, 1992), https://perma.cc/DLP9-SLQT ............................................ 8

FEC Adv. Op. 2006-15 (May 19, 2006), https://perma.cc/J5EV-3DBA ........................................ 9

FEC, *Draft Legislative Recommendations 2023* (Dec. 7. 2023), https://perma.cc/FGM9-W2C9 ...................................................................................... 8

John C. Coates, et al., *Quantifying Foreign Institutional Block Ownership at Publicly Traded U.S. Corporations*, Harvard University (2016), https://perma.cc/MRX4-UZEU .................... 25

Stmt. of Reasons of Chair Broussard, MURs 7523 & 7512 (Nov. 2, 2021),
    https://perma.cc/8V2X-92N7 ...................................................................................8

Stmt. of Reasons of Vice Chairman Petersen and Comm'rs Hunter & Goodman, MUR 6678
    (Apr. 20, 2015), https://perma.cc/SJB4-TPAH ...............................................................8

Testimony of Alison P. Smith, Portland, https://perma.cc/J335-6FVE..........................................20

Testimony of Charlene Cummings, Phippsburg, https://perma.cc/X8DC-FVYA ........................20

Testimony of Elizabeth Caruso First Selectman, Town of Caratunk,
    https://perma.cc/X76E-JESB .................................................................................6, 20

Testimony of FEC Chair Weintraub, Committee on Oversight and Reform, U.S. House of
    Representatives (May 22, 2019), https://perma.cc/KU52-S6F6 ..............................................22

Testimony of Linda Woods, Waterville, https://perma.cc/CR7E-YZWD........................................6

Testimony of Pete Didisheim, Natural Resources Council of Maine,
    https://perma.cc/R38E-388P ................................................................................6

Testimony of Senator Richard Bennett re: LD 194 (March 15, 2021), https://perma.cc/T6GJ-
    3ZTK...................................................................................................21

Testimony of Ron Fein re: LD 479, 194, 641, https://perma.cc/PQ97-W9EY ...............................6

## INTERESTS OF AMICUS CURIAE

Protect Maine Elections ("PME") is a nonpartisan campaign organization launched by Maine citizens for the purpose of passing Question 2, "Prohibit Foreign Spending in Elections Initiative" (2023), a citizen's initiative to restrict foreign influence in Maine elections, which is now codified at 21-A Me. Rev. Stat. § 1064 (the "Act").

Amicus led the referendum campaign, helping draft the Act, obtaining voter signatures to place the Act on the ballot, and educating the public about the measure. PME thus has a unique interest in defending the Act and specialized knowledge about the design of the Act and the constitutional issues raised by the plaintiffs in these four actions. *See Central Maine Power Co. ("CMP") v. Maine Comm'n on Governmental Ethics and Election Practices*, No. 1:23-cv-00450; *Versant Power and ENMAX Corp. v. Schneider*, No. 1:23-cv-00451; *Maine Press Ass'n & Maine Ass'n of Broadcasters ("Broadcasters") v. Maine Comm'n on Governmental Ethics and Election Practices*, No. 1:23-cv-00452; *Pringle, et al. v. Frey, et al*., No. 1:23-cv-00453.

## SUMMARY OF ARGUMENT

On November 7, 2023, 86% of the Maine electorate voted to pass Question 2, the largest margin of approval in the 115-year history of state ballot questions. In so voting, Mainers sought to correct loopholes in federal and state law that had allowed foreign government-owned domestic corporations to spend tens of millions of dollars in state referenda and candidate elections, undermining Maine's commitment to local democratic self-governance.

Five weeks after Question 2 passed with historic margins, the plaintiffs here filed the four different lawsuits currently under consideration. All requested the extraordinary relief of a temporary restraining order, although no plaintiff identified any concrete plan to imminently engage in campaign activity that would be prohibited by the Act, nor explained why it waited over a month to demand immediate relief.

PME files this amicus submission to make two principal arguments. First, it opposes plaintiffs' motions for preliminary relief on grounds that the expedited process they seek will both short-circuit a comprehensive briefing of their merit arguments and deprive the court of a fully developed record crucial to the adjudication of First Amendment campaign finance cases. *See, e.g.*, *McConnell v. FEC*, 540 U.S. 93, 132 (2003). This rushed consideration of plaintiffs' four actions is particularly unwarranted because none of the plaintiffs have shown the irreparable injury required for preliminary relief, and some have failed to even establish Article III standing.

Second, PME seeks to provide key background history to the Act—including Maine's experience in recent elections—to contextualize plaintiffs' First Amendment challenges to the law. PME argues that plaintiffs fail to show any likelihood of success on the merits of their claims pertaining to the Act's ban on campaign spending by foreign government-influenced entities, *see* 21-A Me. Rev. Stat. § 1064(1)-(2); its disclaimer requirement for covered entities' political communications, *see id.* § 1064(6); and its related due diligence requirements for media platforms, *see id.* § 1064(7). Given space constraints, PME does not address Versant/ENMAX's preemption claims, *see* Versant Compl., No. 1:23-cv-00451, ECF No. 1, ¶¶ 104-113, but these claims fail for the reasons set forth in the recent district court decision in *Minnesota Chamber of Commerce v. Choi*, No. 23-cv-2015, 2023 WL 8803357, at *11-*13 (D. Minn. Dec. 20, 2023).

The chief target of plaintiffs' First Amendment challenge is Maine's foreign government money ban. But plaintiffs' many filings all but ignore the governing precedent in this area, *Bluman v. FEC*, 800 F. Supp. 2d 281 (D.D.C. 2011) (three-judge court), *summ. aff'd*, 565 U.S. 1104 (2012), wherein the Supreme Court summarily affirmed that the federal foreign money ban was justified by the government's compelling interest in "preventing foreign influence over the U.S. political process." *Id.* at 288. Much of plaintiffs' effort here amounts to nothing more than an oblique

attempt to relitigate this holding. But the government's compelling interest "in limiting the participation of foreign citizens in activities of American democratic self-government," *id*. at 288, justified the federal ban and likewise justifies the Act here.

Plaintiffs also attempt to attack the Act's tailoring, and in particular, the ban's application to domestic corporations in which "a foreign government or foreign government-owned entity. . . [h]olds . . . 5% or more of the total equity." 21-A Me. Rev. Stat. § 1064(1)(E)(2). But this 5% threshold reflects a well-recognized, widely used benchmark for corporate control already incorporated into existing federal securities law and targets only a narrow subset of domestic entities controlled or influenced by foreign governments.

CMP and Versant's attacks on the Act's disclaimer provision fare no better. Both the Supreme Court and the First Circuit have routinely upheld disclaimer requirements because they enable citizens to "make informed decisions and give proper weight to different speakers and messages." *Citizens United v. FEC*, 558 U.S. 310, 370-71 (2010). And the state's informational interests are particularly acute in connection to political advocacy conducted by foreign interests, as evinced by longstanding federal laws such as the Foreign Agents Registration Act ("FARA"), which also requires disclaimers on "informational materials" for "foreign principals." 22 U.S.C. § 614(b).

Finally, the Broadcasters' objections to the Act's due diligence provisions also fail. Because these requirements are key to enforcement of Maine's foreign-government-money ban, they are justified by the same compelling interests that justify the ban itself. They are neither onerous nor vague; to the contrary, they prescribe no particular due diligence process and instead allow covered media, at their own discretion, to develop internal procedures for "reasonably" determining whether their advertisers are foreign government-influenced entities.

For these reasons, plaintiffs' motions for a temporary restraining order or preliminary injunction should be denied.

## BACKGROUND

### A. History of Question 2

The passage of Question 2 with over 86% of the vote concluded a multi-year endeavor involving both legislative efforts and a citizen-led campaign to stop campaign spending by foreign-government influenced corporations in Maine elections.

Concerns about foreign-government influence were not hypothetical: foreign-government-owned companies had already made massive expenditures in Maine in successive election cycles. In 2020, a Quebec government-owned public utility, HydroQuebec, and its affiliates, dwarfed all other spenders that year in Maine by pouring more than $20 million into an effort to defeat Question 1, a measure aimed at blocking a transmission line to wheel HydroQuebec power to customers in Massachusetts. Anna Massoglia, *Foreign company's subsidiary poured millions into influencing Maine ballot referendum*, Ctr. For Responsive Politics (Nov. 3, 2021), https://perma.cc/85RX-J4RY. CMP, owned in substantial part by the Spain-based company Iberdrola, S.A., contributed another $7.5 million to oppose the measure. Question 1 ultimately attracted more than $89 million in expenditures, more than any other referendum in Maine's history.[1]

In 2023, ENMAX, a corporation owned by the City of Calgary, contributed over $15 million for a political committee to spend against Maine Question 3, a measure that would have created an electric utility governed by an elected board to acquire and operate Maine's utilities. Avangrid Management Company, a corporation also owned by Iberdrola, which is in turn partly

---

[1] Ballotpedia, *Maine Question 1 (2021), Campaign Finance*, https://perma.cc/DFJ6-826.

owned by a Qatar sovereign wealth fund, contributed another $24 million. These foreign government-owned companies outspent Maine-based groups supporting Question 3 by almost $40 million to $1 million.[2] In fact, some 84% of all spending on the Question 3 campaign was by entities owned or influenced by foreign governments. This spending supported a massive advertising campaign on radio, television and social media that was ultimately successful in convincing Maine's voters to forego the potential of public power and leave most of the state in the hands of the plaintiff private power companies.

Both Maine citizens and their lawmakers were alarmed by this influx of political money from entities owned by foreign governments. In 2021, the Maine Legislature banned foreign-government spending in referendum campaigns, but the legislation was vetoed by the Governor.[3] PME was founded to take on the task of pursuing this reform by citizen initiative instead.

In 2022, over 400 PME volunteers collected more than 80,000 signatures from Maine voters, and in December of that year the Secretary of State certified 67,550 signatures as valid. As is permitted with any initiated bill, the Legislature had the opportunity to pass the bill or send it directly to the 2023 ballot. The 131st Legislature enacted the bill with broad bipartisan support, but it was vetoed by the Governor once again. The measure was then submitted to the voters at the November 7, 2023 general election as Question 2 and was passed with overwhelming support. It received a majority vote in all but one Maine municipality.

In the course of debating legislation to restrict foreign government-influenced election spending, the Legislature heard hours of public testimony from almost 100 individuals both

---

[2]  Ballotpedia.com, *Maine Question 3 (2023)*, https://perma.cc/4SEE-PFJB.

[3]  Information about the bills considered by the 130th Legislature can be found at *Actions for LD 194*, https://perma.cc/WF9V-CNFW; *Summary of LD 479*, at https://perma.cc/P3E4-DZZ2; and *Summary of LD 641*, at https://perma.cc/994G-P28S.

supporting and opposing these restrictions.[4] Many citizens expressed concern about the large expenditures made by foreign government-owned companies in past Maine elections, noting, for instance, that Hydro-Quebec had spent "$10 million over the past 16 months in an effort to meddle in Maine's elections,"[5] that it had "spent $23 million on advertising trying to influence Maine people that New England Clean Energy Connect is a good idea for Maine,"[6] and that the company could "flood Maine with false advertising in order to change the perceptions of Maine voters."[7]

The Legislature also heard from legal experts who addressed both constitutional and structural questions related to the Act, including various criteria for determining when a corporation is controlled or influenced by a foreign government. Ron Fein, representing the nonprofit organization Free Speech for People, submitted testimony on these subjects, including a letter from Professor John Coates of Harvard Law School ("Coates Ltr."). Testimony of Ron Fein re: LD 479, 194, 641, https://perma.cc/PQ97-W9EY. Professor Coates discussed at length how minority shareholders with ownership levels between 1% and 5% can wield significant influence—both formal and informal—over corporate management and decision-making. *See* Coates Ltr. at 6-9.

The Act became effective by its terms on January 6, 2024. In advance of this date, before any regulations implementing the requirements of the Act could be proposed or adopted, and in

---

[4] To see public testimony in connection to legislation in the 130th and 131st Legislatures, see https://www.mainelegislature.org/legis/bills/display_ps.asp?ld=194&PID=1456&snum=130&sec3#, and https://www.mainelegislature.org/legis/bills/display_ps.asp?PID=1456&snum=131&paper=&paperld=l&ld=1610#.

[5] Testimony of Pete Didisheim, Natural Resources Council of Maine, https://perma.cc/R38E-388P.

[6] Testimony of Linda Woods, Waterville, https://perma.cc/CR7E-YZWD.

[7] Testimony of Elizabeth Caruso First Selectman, Town of Caratunk, https://perma.cc/X76E-JESB.

the absence of any imminent candidate or referendum campaign, plaintiffs here filed suit seeking to enjoin the enforcement of the Act.

### B. Federal Law

Until passage of Question 2, Maine elections were protected from foreign government spending only by the foreign money prohibitions in the Federal Election Campaign Act (FECA). The deficiencies of federal law—in particular, FECA's silence on campaign spending by foreign-owned domestic corporations—are what allowed foreign government-influenced corporations to flood Maine referenda with multimillion dollar expenditures and necessitated passage of the Act.

FECA bars "foreign nationals" from "directly or indirectly" making contributions or expenditures "in connection with a Federal, State, or local election." 52 U.S.C. § 30121(a)(1). Section 30121 defines "foreign nationals" to include "an individual who is not a citizen of the United States," *id*. § 30121(b)(2); and a "foreign principal as such term is defined by section 611(b) of Title 22," *id*. § 30121(b)(1). In turn, Section 611(b) defines "foreign principal" to include, inter alia, "a partnership, association, corporation, organization, or other combination of persons organized under the laws of or having its principal place of business in a foreign country." 22 U.S.C. § 611(b)(3). Neither FECA nor section 611(b) of FARA thus address the status of domestic corporations that are organized and operating in the United States, but that are owned in whole or part by foreign nationals.

The federal foreign money ban is marked by two significant limitations. First, Section 30121 has been construed to apply only to candidate elections, leaving state and local referenda vulnerable to foreign spending. In the last decade, the Federal Election Commission (FEC) has twice declined to find that FECA governed spending in state ballot measure elections, explaining that the Commission was "sensitive to the unique balance of power between the federal

government and the states" and therefore would not extend the statute beyond its explicit terms.[8] *See* Stmt. of Reasons of Chair Broussard, MURs 7523 & 7512 (Nov. 2, 2021), at 3, https://perma.cc/8V2X-92N7. *See also* Stmt. of Reasons of Vice Chairman Petersen and Comm'rs Hunter & Goodman, at 2, MUR 6678 (Apr. 20, 2015), https://perma.cc/SJB4-TPAH. Notably, however, the FEC based these decisions on its interpretation of FECA, not on any constitutional concerns about prohibiting foreign money in state referenda. Indeed, the FEC has frequently urged Congress to amend Section 30121 to explicitly cover ballot measure elections—including as recently as December of last year. *See* FEC, *Draft Legislative Recommendations 2023* (Dec. 7, 2023), at 9, https://perma.cc/FGM9-W2C9.

Second, the federal foreign money ban does not apply to corporations incorporated in the U.S., even those wholly owned by foreign nationals or foreign governments. This limitation of federal law was only brought into relief by *Citizens United*, because up until that 2010 decision, no corporation—regardless of its foreign ownership—was permitted to make contributions or expenditures from its treasury funds to influence federal elections. *See* 52 U.S.C. § 30118(a). Instead, corporations were required to make any contributions and expenditures through "separate segregated funds," *i.e.*, political action committees ("PACs") limited to soliciting funds from a restricted class of employees and officers, none of whom could be foreign nationals. *See, e.g.*, FEC, Corporations and Labor Organizations (2018), at 32, https://perma.cc/KC4B-CQJK.

Thus prior to *Citizens United*, federal elections did not face the specter of foreign-owned corporations directly spending their treasury funds without the failsafe of the PAC structure. The

---

[8]   *See also* FEC Adv. Op. 1989-32 (Jul. 2, 1992) at 3, https://perma.cc/DLP9-SLQT ("The Commission has stated that contributions or expenditures relating only or exclusively to ballot referenda issues, and not to elections to any political office, do not fall within the purview of the [FECA]."); FEC Adv. Op. 1984-62 (Mar. 21, 1985) at 1 n.2, h https://perma.cc/4TLU-TWCD (same).

only outlet for this type of foreign-influenced corporate spending occurred in states that did not likewise ban corporate expenditures in state elections prior to 2010. Even though the potential abuses allowed by this FECA loophole were thus relatively limited, the FEC nonetheless took steps at the agency level to limit foreign influence over campaign activities undertaken by U.S. subsidiaries of foreign parents. Its regulations, for instance, bar foreign nationals from participating in decisions by U.S. corporations or political committees regarding their campaign spending. 11 C.F.R. § 110.20(i). Through case-by-case guidance, the FEC also ruled that if a PAC was established by a domestic subsidiary of a foreign corporation, their foreign parent could not finance the PAC's administration, nor could foreign nationals participate in the operation of the PAC or in its decisions regarding campaign contributions or expenditures.[9]

## C. Maine's Act

Question 2 was passed to address these loopholes in federal law. The Act's central provision prohibits a "foreign government-influenced entity" from "mak[ing], directly or indirectly, a contribution, expenditure, . . . or any other donation or disbursement of funds" in order "to influence" either "the nomination or election of a candidate" or "the initiation or approval of a referendum." 21-A Me. Rev. Stat. § 1064(2). A "foreign government-influenced entity" (hereinafter, a "covered entity") is defined as a foreign government or an entity in which a foreign government or foreign government-owned entity either "(a) [h]olds, owns, controls or otherwise has direct or indirect beneficial ownership of 5% or more of the total . . . ownership interests; or

---

[9]  *See, e.g.,* FEC Adv. Op. 2006-15 (May 19, 2006), https://perma.cc/J5EV-3DBA (allowing two U.S. subsidiaries of a foreign corporation to make contributions and expenditures in state elections so long as the funds used were generated by the subsidiary's operations in the U.S. and all political spending decisions were made by U.S. citizens); FEC Adv. Op. 1989-20 (Oct. 27, 1989), https://perma.cc/ZPR3-MZCZ (declining to approve donations by U.S. company to state and local candidates because its PAC was primarily funded by donations from its foreign parent).

(b) [d]irects, dictates, controls or directly or indirectly participates in the decision-making process with regard to the activities of the . . . entity to influence the nomination or election of a candidate or the initiation or approval of a referendum." *Id*. § 1064(1)(E). Notably, the Act does not regulate corporations simply because they have foreign investors—but instead more narrowly focuses on those with significant ownership by foreign governments.

To prevent circumvention of the foreign government money ban, the Act also directs media entities that accept foreign-sponsored advertising to "establish due diligence policies, procedures and controls that are reasonably designed to ensure that [they] do[] not broadcast, distribute, or otherwise make available to the public a public communication for which a foreign government-influenced entity has made an expenditure." *Id*. § 1064(7). The Act does not impose liability on media for publishing communications prohibited by the Act; their obligation is only to "*establish due diligence policies*" and, in the case of internet platforms, for failing to "remove the communication[s]" upon "discover[ing]" their distribution. 21-A Me. Rev. Stat. § 1064(7) (emphasis added).

Finally, complementing FARA requirements at the federal level, *see* 22 U.S.C. § 614(b), the Act requires foreign government-influenced entities to include a brief disclaimer identifying themselves as a "foreign government" or a "foreign government-influenced entity" on any public communication "to influence the public or any state, county or local official or agency regarding the formulation, adoption or amendment of any state or local government policy or regarding the political or public interest of or government relations with a foreign country or a foreign political party" 21-A Me. Rev. Stat. § 1064(6).

10

**ARGUMENT**

## I. Plaintiffs' Request for Broad Preliminary Relief Is Not Justified by a Showing of Irreparable Harm and Would Impede the Full Adjudication of Their Legal Arguments.

Plaintiffs in all four actions here have requested preliminary relief in the form of a temporary restraining order or preliminary injunction, but no plaintiff has identified any concrete plan to imminently engage in activity that would be prohibited by the Act. No plaintiff has met its burden to show a likelihood of irreparable harm, nor that the balance of equities tips in its favor. *Gonzalez-Droz v. Gonzalez-Colon*, 573 F.3d 75, 79 (1st Cir. 2009).

Between the four actions, the various plaintiffs have submitted over 100 pages of pleadings and briefs, challenging all major provisions of the Act, and asserting claims under FECA, the First and Fourteenth Amendments, the "dormant" Foreign Commerce Clause, and the Maine Constitution. CMP and Versant/ENMAX have made numerous factual allegations about their ownership and corporate governance, their decision-making process for political spending, and their plans for future campaign activity, *see* CMP Compl., No. 23-cv-00450, ¶¶ 26-37; Versant Compl. ¶¶ 58–65, 66-88, 91–103. Many of these allegations are material to their legal claims, which in the case of Versant, include as-applied claims, Versant Mot., No. 23-cv-00451, ECF No. 4, at 26-28, but none have been backed with evidence or tested in discovery.

Despite the volume of these filings, plaintiffs have wholly failed to meet their burden to show a likelihood of imminent harm, much less irreparable harm. With the possible exception of the *Broadcasters* plaintiffs,[10] no party has identified, in a concrete and particularized manner, any

---

[10] Media outlets covered by the Act will likely need to begin developing due diligence processes as required by 21-A Me. Rev. Stat. § 1064(7) when the Act goes into effect. But the development of internal company processes does not work an irreparable injury. In any event, even if the Broadcasters plaintiffs are found to have shown injury, considering only their action would drastically narrow the provisions of the Act under consideration here.

activity they intend to undertake in the immediate future that is subject to the Act's prohibitions. *Surplec, Inc. v. Me. Pub. Serv. Co.,* 495 F. Supp. 2d 147, 150 (D. Me. 2007). The mere "possibility" of harm is simply insufficient to justify the entry of a preliminary injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

CMP has identified no specific contributions or expenditures it wishes to make in the immediate future that would be prohibited by the Act, alleging only generally that it has been solicited for contributions by candidate committees in past months and may be solicited for contributions in the future. CMP Compl. ¶¶ 60, 63. Nor does CMP allege a timeframe in which it intends to make contributions or a committee to whom it wishes to contribute; any CMP contributions instead appear to be entirely contingent upon its possible receipt of solicitations by third parties.

Versant and ENMAX are yet more vague in describing the activity they believe will be imminently prohibited by the Act. ENMAX avers that it "intends, in the future, to engage in political speech within the State of Maine with respect to referenda that affect the operations of its subsidiary Versant and/or Versant's customer ratepayers." Versant Compl. ¶ 100. Versant repeats the same boilerplate, stating that it "intends in the future, to engage in political speech within the State of Maine with respect to candidate elections as well as referenda that affect its management, operations, and ability to serve its customer ratepayers." *Id.* ¶ 102. They do not identify any specific contribution or expenditure they wish to make, a timeframe in which they intend to engage in such activity, or even a referendum or election in which they intend to participate. Indeed, it will likely be years before there is a measure on the ballot that "affects [Versant's] management, operations, and ability to serve its customer ratepayers." *Id.* Given that their case does not even appear to be ripe, these plaintiffs fail to allege an irreparable injury. *Reddy v. Foster*, 845 F.3d 493, 501 (1st Cir.

2017) ("Even a facial challenge to a statute is constitutionally unripe until a plaintiff can show that federal court adjudication would redress some sort of imminent injury that he or she faces.").

The *Pringle* plaintiffs have not alleged with particularity *any* speech or activities they plan to engage in that are directly impacted by the Act. These plaintiffs reiterate that they "intend to seek, acquire, consider, and, at their discretion, share Foreign Entity Information, including, in particular, information covered by Section 1064(2) of the Initiative, publicly and privately, including with persons elected to the Legislature and to the Office of Governor." Pringle Compl., No. 23-cv-00453, ECF No. 1, ¶¶ 93, 94, 97, 104, 111, 117. This is not activity proscribed by the Act, nor are the Pringle plaintiffs "within the class of persons" regulated by the Act. *See Nat'l Org. for Marriage v. McKee ("NOM I")*, 649 F.3d 34, 47-48 (1st Cir. 2011) (finding that advocacy organization lacked standing to challenge PAC registration statute because it had "no objectively reasonable apprehension of being regulated" under the law). The Act simply does not prohibit receipt of what they term "Foreign Entity Information," but instead bars contributions and expenditures *by* "foreign governments-influenced entities" and the solicitation of such contributions. 21-A Me. Rev. Stat. § 1064(2), (3).

These plaintiffs therefore allege a purely derivative injury based on the novel theory that a campaign finance law that applies to *other* persons will harm them by potentially depriving them of information in the future. This " speculative" harm does not constitute a cognizable injury, *Blum v. Holder*, 744 F.3d 790, 798-99 (1st Cir. 2014); but even if it did, these plaintiffs also fail to describe their desired information with any particularity, or to articulate a personal interest therein that distinguishes them from the general public. *Id*. The *Pringle* plaintiffs have not alleged an injury-in-fact for the purposes of Article III, much less shown an irreparable injury. *EMC Corp. v.*

*Chevedden*, 4 F. Supp. 3d 330, 341 (D. Mass. 2014) ("[T]he absence of an 'injury in fact' for standing purposes necessarily forecloses injunctive relief.").

All plaintiffs have thus failed to show the irreparable injury necessary to justify preliminary relief. To be sure, in the First Amendment context, an irreparable injury sometimes can be presumed upon a determination that the movants are likely to prevail on their constitutional claims. *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 10-11 (1st Cir. 2012). But here, the question is not simply the *magnitude of* plaintiffs' alleged injury, but whether plaintiffs have even pled an injury-in-fact that meets the standards of Article III. *See Project Veritas Action Fund v. Conley*, 270 F. Supp. 3d 337 (D. Mass. 2017) (finding organization's action seeking to preliminarily enjoin enforcement of wiretap statute was not ripe because organization had failed to allege any concrete plans or expenditure of funds to show present intent to violate the statute). "'[S]ome day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 564 (1992).

Finally, denying plaintiffs' motions at this stage for want of an irreparable, imminent injury would not preclude further proceedings in these actions. Plaintiffs would not be prevented from attempting to establish their standing with a more concrete and particularized showing of injury, including by submitting supporting evidence, as is typically deemed necessary. *See Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1106 n.2 (10th Cir. 2006). Nor, if jurisdiction were shown, would such a denial preclude them from pressing their First Amendment arguments in a full merits briefing at a later point. And denying the motions will provide the time needed to conduct discovery and fully develop the record, which the Supreme Court has emphasized is critical to the adjudication of First Amendment campaign finance cases. *See*, *e.g.*, *Citizens United*

*v. FEC*, 558 U.S. 310, 331 (2010) (noting that *McConnell*'s review of "facial validity" of Bipartisan Campaign Reform Act "was facilitated by the extensive record, which was 'over 100,000 pages' long") (quoting *McConnell v. FEC*, 251 F. Supp. 2d 176, 209 (D.D.C. 2003)).

**II.  Plaintiffs Fail to Show a Likelihood of Success on the Merits.**

**A.  Plaintiffs fail to meet the standard for a facial challenge.**

Facial challenges like plaintiffs' are disfavored because they rely on premature interpretations of statutes and speculation about hypothetical situations. *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449-50 (2008). Thus, even in the First Amendment context, a plaintiff must show that "a substantial number of [the challenged statute's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (internal quotation marks omitted).

Plaintiffs fail to make this showing with respect to any of the Act's provisions, and this failure is particularly evident in their First Amendment challenge to the foreign government money ban. Versant is a domestic corporation that is wholly owned by ENMAX, the sole shareholder of which is the City of Calgary, Canada. Versant Compl. ¶¶ 5, 58. CMP is a domestic corporation in which foreign investors hold ownership shares that greatly exceed the Act's 5% threshold. *See* CMP Compl. ¶¶ 20, 22, 23 (alleging that Iberdrola, a Spanish corporation, holds 81.6% of Avangrid, Inc. which indirectly holds 100% of CMP's stock); *id*. ¶¶ 23, 24 (alleging that Qatar Investment Authority owns 3.7% of the shares of Avangrid, Inc. and 8.7% of the shares of Iberdrola, effectively a 10%+ share of CMP). Thus, plaintiffs' tailoring argument is necessarily a facial overbreadth claim, relying on the Act's hypothetical application to unidentified entities wherein a foreign government holds a share substantially below the foreign ownership shares implicated here.

But there has been no showing that "a substantial number of instances exist in which the [ban] cannot be applied constitutionally." *N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 14 (1988). And controlling precedent dictates there are at least *some* constitutional applications of the Act: as both *Citizens United* and *Bluman* noted, a "foreign corporation" *can* be barred from spending in U.S. elections, even if "the circumstances under which a corporation may be considered a foreign corporation" have not yet been determined by the courts. *Bluman*, 800 F. Supp. 2d at 292 n.4; *see also Citizens United*, 558 U.S. at 362.

Similarly, both CMP and Versant challenge the disclaimer provision in part because they believe that including a statement that they are "foreign government-influenced entities" on their *own* communications is inaccurate, but they accede that there may be some corporations with foreign ownership that results in "actual foreign control." CMP Mot., No. 23-cv-00450, ECF No. 4, at 16. *See also infra*, Part II.C. But they have attempted no showing that there is a substantial number of unconstitutional applications of this disclaimer requirement, even accepting arguendo their theory that the disclaimer is permissible only as applied to foreign government *controlled* corporations.

**B. Maine's foreign corporate money ban comports with the First Amendment.**

Restrictions on the participation of foreign nationals in American democratic institutions have typically been held only to rational basis review. *Bluman*, 800 F. Supp. 2d at 285. Acknowledging this precedent, the three-judge court in *Bluman* notably declined to decide the standard of scrutiny applicable to the federal foreign money ban, because it found that Section 30121 survived strict scrutiny review. *Id*. The appropriate standard of scrutiny is thus an open question.[11] *Amicus* assesses the Act's foreign corporate money ban under a strict scrutiny standard

---

[11]  Further, only those provisions of the Act that restrict foreign corporate *expenditures* could even theoretically justify strict scrutiny. It is well-settled that challenges to contribution limits—and

here purely because this was the default standard applied in *Bluman*, and like the federal law reviewed in *Bluman*, Maine's ban also clearly passes muster under this standard. *Id.* at 285-86.[12]

### 1. The governmental interest in protecting democratic self-governance from foreign influence is "compelling."

The three-judge court opinion in *Bluman*, summarily affirmed by the Supreme Court, guides this Court's analysis of the Act.[13]

*Bluman* rejected a challenge to FECA's foreign money ban by two foreign citizens living in New York on temporary work visas who sought to make small expenditures and contributions in connection to state and federal elections. Then-Judge Kavanaugh explained that foreign nationals have no "constitutional right" to make campaign contributions or expenditures or otherwise participate in "activities of democratic self-government." 800 F. Supp. 2d at 288. The Court went on to hold that the government has "a compelling interest for purposes of First Amendment analysis in limiting the participation of foreign citizens in activities of American democratic self-government, and in thereby preventing foreign influence over the U.S. political process." *Id. See also United States v. Singh*, 979 F.3d 697, 710-11 (9th Cir. 2020) (holding that federal foreign money ban represents legislative "judgment" that "barring foreign nationals from

---

even contribution bans—draw only intermediate scrutiny. *See FEC v. Beaumont*, 539 U.S. 146, 162 (2003) (ruling that "the time to consider" the difference between contribution ban and a limit "is when applying scrutiny at the level selected, not in selecting the standard of review itself").

[12] Plaintiffs suggest that the Maine state constitution "may" provide a "broader" "guarantee" for their proposed campaign spending, CMP Compl. ¶ 89, but offer no authority for this proposition. Insofar as they cite any relevant cases, they suggest merely that the First Amendment and Article I, Section 4 of the Maine Constitution are coextensive. *See id.* (citing *City of Portland v. Jacobsky*, 496 A.2d 646, 653 (Me. 1985) (state constitution is "no less restrictive of government control than is the federal First Amendment") (internal quotation marks omitted)).

[13] "The Supreme Court's summary disposition of an appeal to it is an adjudication on the merits that must be followed by lower courts." *Auburn Police Union v. Carpenter*, 8 F.3d 886, 894 (1st Cir. 1993) (citing *Hicks v. Miranda*, 422 U.S. 332, 344–45(1975)).

17

contributing to our election processes" was necessary to "protect the country's political processes after recognizing the susceptibility of the elections process to foreign interference").

*Bluman* also highlighted that the Supreme Court had long upheld the exclusion of foreign nationals from "activities of democratic self-government," even those "unrelated to the electoral process." 800 F. Supp. 2d at 288. Such exclusions are a "necessary consequence of the community's process of political self-definition." *See Cabell v. Chavez–Salido*, 454 U.S. 432, 439-40 (1982) (upholding state requirement that peace officers be U.S. citizens); *Ambach v. Norwick*, 441 U.S. 68 (1979) (upholding state provision that prohibited noncitizens from being certified as public-school teachers); *Foley v. Connelie*, 435 U.S. 291 (1978) *(*upholding state statute requiring police officers to be U.S. citizens). In these cases, the Court applied rational basis review in recognition of the "'[s]tate's historical power to exclude aliens from participation in its democratic political institutions' as part of the sovereign's obligation 'to preserve the basic conception of a political community.'" *Foley*, 435 U.S. at 295–96.

Although *Bluman* upheld the federal foreign money ban, its reasoning applies all the more strongly to efforts by *states* to prevent foreign nationals from spending in local elections, and, in particular, in referenda where voters participate in direct democracy to enact their own laws. So concluded a Washington state court of appeals that held that it was bound by *Bluman* to uphold Washington state's law prohibiting foreign spending in both candidate and ballot measure campaigns. *See OneAmerica Votes v. State*, 518 P.3d 230, 247 (Wash. Ct. App. 2022) ("[Washington] State's interest in prohibiting foreign nationals from making political contributions and the corresponding interest in prohibiting citizens or domestic organizations from using money from foreign nationals to make such contributions is a compelling one."). Maine citizens likewise

18

have a "compelling" interest in protecting their state candidate elections—and ballot referenda—from the influence of foreign government money.

The voters of Maine—and Washington—are not alone in their concerns. Nine other states have also enacted laws prohibiting foreign nationals from spending to influence their citizen-initiated ballot measure processes. Cal. Gov't Code § 85320; Colo. Rev. Stat. § 1-45-107.5; Md. Code, Elec. Law § 13-236.1; Nev. Rev. Stat. § 294A.325; N.D. Cent. Code § 16.1-08.1-03.15; S.D. Codified Laws § 12-27-21; Fla. Stat. § 106.08(12)(b); Idaho Code Ann. § 67-6610d; Neb. Rev. Stat. § 49-1479.03. *See also* Wash. Rev. Code § 42.17A.417.

These eleven states' interest in limiting foreign influence in their elections does not hinge on any claims that foreign nationals or foreign governments are hostile to the U.S. or are trying to sabotage state elections. Instead, as Professor Coates explained in his letter submitted to the Maine Legislature, this interest "rest[s] on the observation that foreign nationals (even those in countries that are staunch U.S. allies) are simply not part of the U.S. polity." Coates Ltr. at 2. "Foreign nationals have a different set of interests than their U.S. counterparts, as regards a range of policies, such as defense, environmental regulation, and infrastructure," he noted, but "[d]emocratic self-governance presumes a coherent and defined population to engage in that activity." *Id*. at 2-3.

This concern about meaningful local self-government is reflected in the legislative history connected to the Act. Citizens submitted testimony expressing concerns about foreign influence in Maine politics, and in particular about the multimillion-dollar expenditures by U.S. affiliates of foreign government-owned corporations, such as Hydro-Quebec, in past Maine referenda, *see* Background, at 4 *supra*. More broadly, citizens testified about their fears that unchecked foreign spending would undermine state self-governance, explaining that "[o]ur elections and referenda

should be decided by those who vote and are closest to the issues to be decided."[14] As aptly expressed by a citizen from Portland:

> I do not argue that other countries are not relevant to our people, our economy, and our environment . . . . Rather I say that it is Maine people who must make and live with the big decisions that shape our state and affect our lives . . . . [O]ur democracy is different. We can and should decide the limits of foreign influence within it.[15]

As *Bluman* explained, these Mainers' interest in "distinguishing citizens from non-citizens in this context is hardly unusual or deserving of scorn." 800 F. Supp. 2d at 292. "[R]ather, it is part of a common . . . understanding of the meaning of sovereignty and shared concern about foreign influence over elections." *Id.*

### 2. Plaintiffs ignore Maine's compelling interest in limiting spending by foreign-influenced corporations in referenda.

Plaintiffs attempt to muddle the governmental interests supporting Maine's law, suggesting that "protecting democratic self-government" is not a compelling interest and that only the interest in preventing corruption will justify restrictions like the Act. CMP Mot. at 8. This entirely misreads *Bluman*. There, the three-judge court upheld the federal foreign money ban based exclusively on the government's interest "in preventing foreign influence over U.S. elections." 800 F. Supp. 2d at 288 n.3. *Bluman* did not even reference the anti-corruption interest except to note that it was "*not* the governmental interest at stake in this case." *Id.* (emphasis added). While a state may *also* pursue anti-corruption interests through a foreign spending ban, *Bluman* recognized that the interest "in limiting the participation of foreign citizens in activities of American democratic self-government"

---

[14]   Testimony of Charlene Cummings, Phippsburg, https://perma.cc/X8DC-FVYA. *See also* Testimony of Elizabeth Caruso, First Selectman, Town of Caratunk, https://perma.cc/X76E-JESB ("[f]oreign involvement in U.S. elections and policymaking constitutes a threat to our sovereignty and to our democratic process.").

[15]   Testimony of Alison P. Smith, Portland, https://perma.cc/J335-6FVE.

alone was sufficient to justify Section 30121. 800 F. Supp. 2d at 288. The same interest likewise justifies the Act here.

Plaintiffs also speculate that the interest in "preventing foreign influence" applies only to candidate elections, claiming that *Bluman* declined to find this interest particularly compelling with respect to "referenda campaigns." *See* CMP Mot. at 8 n.5. But *Bluman* discussed the distinction between candidate elections and referenda only to reject the plaintiffs' claim there that FECA was underinclusive because it *failed* to cover ballot measure elections. It was permissible for Congress to "proceed piecemeal in [this] area" and "reasonable" to focus first on candidate elections, the three-judge court held, *Bluman*, 800 F. Supp. 2d at 291, but it in no way suggested this focus was constitutionally compelled.

Further, this argument overlooks that *Bluman* instead had highlighted that foreign nationals could be constitutionally excluded from a wide range of "activities of democratic self-government"—regardless of their connection to a formal "electoral process." 800 F. Supp. 2d at 288. If exclusion is permissible with respect to employment as a public-school teacher, it is all the more urgent in connection to the state's actual processes of self-governance. Indeed, referenda may represent the zenith of both direct democracy and state concerns about the "integrity of the electoral process," given that citizens are exercising delegated legislative authority to enact state laws directly for their polity. *John Doe No. 1 v. Reed*, 561 U.S. 186, 199 (2010). As state Senator Richard Bennett, explained in introducing LD 194, the predecessor bill to the Act:

> As foreign interests cannot contribute money to the elections of lawmakers, they ought not to be able to contribute money to the elections to make laws. Why would we prohibit the indirect interference in policymaking by banning contributions by foreigners to candidates, but not close the staggering loophole of direct interference when our statutes are being changed?[16]

---

[16] Testimony of Senator Richard Bennett re: LD 194 (March 15, 2021), https://perma.cc/T6GJ-3ZTK.

Finally, plaintiffs also ignore that *Bluman* made clear that the interest in preventing foreign influence extends to spending by "foreign corporations" in U.S. elections as well; the only question is "the circumstances under which a corporation may be considered a foreign corporation for purposes of First Amendment analysis" in the first place. 800 F. Supp. 2d at 292 n.4. The Act reflects the reasonable conclusion that electoral spending by domestic corporations controlled or influenced by foreign governmental owners poses the same threat to Maine's self-governance as does spending by "foreign" corporations organized under foreign law.

The federal foreign money ban does not cover foreign-owned domestic corporations, but the risks posed by the campaign spending of such entities only became manifest after the Supreme Court decided *Citizens United*, overturning a century-long ban on spending by U.S. corporations in federal elections. *See* Background at 8–9 *supra*. Nor has FECA been found to regulate state ballot measure elections. *Id*. Although the FEC has taken some limited steps to require U.S. subsidiaries of foreign corporations to make political spending decisions without the involvement of their foreign parent, this guidance is limited and piecemeal. Commissioner Ellen Weintraub has noted that these corporations likely will "spend company resources in a way that best serves the interests of the foreign owners," even if the foreign investor does not explicitly or formally make its preferences known. Testimony of FEC Chair Weintraub, Committee on Oversight and Reform, U.S. House of Rep. at 2 (May 22, 2019), https://perma.cc/KU52-S6F6. As she points out, "Until we address, by statute or regulation, the various ways that foreigners may route money through corporate entities, our political system remains at risk of being influenced by foreign corporate or governmental interests." *Id*.

Maine has suffered the real-world consequences of these loopholes in FECA, enduring multiple election cycles with multimillion-dollar spending campaigns by foreign government-

owned corporations—spending campaigns that have often overwhelmed Maine-based advocacy efforts. *See* Background at 4-5 *supra*. Its interest in "preventing foreign influence over . . . [its] political process" extends to those domestic corporations controlled or influenced by foreign governments. *Bluman*, 800 F. Supp. 2d at 288.

### 3. The ban is narrowly tailored to advance Maine's compelling interests.

Plaintiffs' chief complaint as to tailoring is that the Act is overbroad because it restricts campaign activity by U.S. corporations "with indirect foreign government ownership interests as low as 5%." CMP Mot. at 10. Yet both CMP and Versant are held by foreign government investors with ownership shares that greatly exceed 5%. *See* Part I.A *supra*. Thus, plaintiffs' challenge to the Act on this ground is purely a facial claim: this threshold has little relevance to their own circumstances or to any as-applied claims. Yet plaintiffs largely disregard the standards for pleading a facial challenge, failing to make any effort to show that "a substantial number of [the Act's] applications are unconstitutional." *See Stevens,* 559 U.S. at 473; *see also NOM I,* 649 F.3d at 52.

Indeed, plaintiffs fail to show *any* unconstitutional applications of the Act. *Bluman* can be read to permit restrictions on election spending by corporations with *any* equity held by foreign investors.[17] Maine's 5% ownership threshold thus represents a targeted approach to the problem

---

[17]   This reading of *Bluman* reflects the reasoning of *Citizens United*, which understood U.S. corporations to derive their First Amendment rights from the fact that they are "associations of *citizens*." *Citizens United*, 558 U.S. at 349 (emphasis added). Because a corporation's right to participate in elections is premised on rights of its individual shareholders to participate in elections, the corporation cannot assert any derivative First Amendment rights on the basis of its *non*-citizen shareholders. As FEC Commissioner Weintraub has reasoned, "[i]ndividual foreigners are barred from spending to sway elections" so it would "def[y] logic to allow groups of foreigners, or foreigners in combination with American citizens, to fund political spending through corporations." Ellen Weintraub, *Taking On Citizens United*, N.Y. Times (Mar. 30, 2016), https://www.nytimes.com/2016/03/30/opinion/taking-n-citizens-united.html. The reasoning of

of foreign influence, relying on a well-recognized, widely used benchmark for corporate control already incorporated into existing federal laws.

The 5% threshold reflects a provision of the Securities Exchange Act of 1934, which requires beneficial owners to file with the SEC their name, address, and numbers of shares if they obtain more than 5% of any class of stock. *See* 15 U.S.C. § 78m(d); 17 C.F.R. §§ 240.13d-1, 240.13d-101. The law evinces Congress' determination that it is crucial for shareholders and the public to be aware of investors acquiring this level of influence in a company—precisely because such acquisitions often signal a bid for control. *See, e.g., Edgar v. MITE Corp.*, 457 U.S. 624, 633-34 (1982) (White, J.) (plurality decision) (noting that reporting requirement was meant to "to protect investors" by providing them "adequate information" to make "informed choice" in any takeover attempt); *Indiana Nat'l Corp. v. Rich*, 712 F.2d 1180, 1183 (7th Cir. 1983) (noting "Section 13(d) was to help fill the gap by requiring persons who acquired substantial interests in the equity securities of a company and (thus might be attempting to acquire control) to file a statement with the S.E.C."). The Act's incorporation of the SEC threshold for reporting draws on longstanding Congressional and agency expertise regarding what level of ownership exerts a significant influence over a corporation's management and policy.

Importantly, this reporting requires disclosure of the purchaser's citizenship, *see* 17 C.F.R. § 240.13d-101 (item #6), and this information is publicly available on commonly used websites such as MSN Finance, as well as through the SEC's EDGAR online database, Coates Ltr. at 12. As Professor Coates and others have noted, "Pragmatically, [a 5% threshold] means that five percent blockholders can (presuming compliance) be readily ascertained from publicly available

---

*Citizens United* thus supports the proposition that a corporation with *any* foreign shareholders may be barred from making expenditures of treasury funds in U.S. elections.

sources that draw their data from legally mandated SEC filings." John C. Coates, et al., *Quantifying Foreign Institutional Block Ownership at Publicly Traded U.S. Corporations*, Harvard University (2016), at 6, https://perma.cc/MRX4-UZEU.

This threshold's narrow tailoring is also evident in the limited subset of domestic corporations that it covers. Even among publicly traded corporations in the S&P 500, only about 9% have a foreign investor that owns more than 5% of the company's voting shares. *Id*. at 8; *see also* Coates Ltr. at 6. Even fewer will have a foreign *governmental* investor with this level of ownership. Versant complains that it will nonetheless be burdensome for companies to ascertain whether they have foreign governmental investors, claiming that they will have to cross-reference a "list of major foreign official institutions" at the Department of the Treasury that "spans nearly forty pages" Versant Mot. at 23. But even accepting arguendo that such an inquiry is necessary or onerous, it is one that covered entities will only need to conduct with respect to those few shareholders who meet the 5% threshold and have already reported their ownership to the SEC.

Notably, other jurisdictions that regulate foreign corporate campaign spending have cast a broader net. For example, Minnesota's foreign corporate money prohibition employs a significantly lower ownership threshold, prohibiting campaign spending by corporations in which a foreign national owns 1% or more of voting shares. Minn. Stat. § 211B.15(4)(a), (b). Although this law was recently preliminarily enjoined based on concerns about its tailoring, the court acknowledged the government's "compelling interest" in "preventing foreign nationals— including foreign shareholders of domestic corporations—from controlling or exercising influence over a corporation's election-expenditures." *Minn. Chamber*, 2023 WL 8803357, at *6. But while allowing for the *possibility* that a 1% owner could exercise influence over a corporation's political spending, the court found that Minnesota had failed to show any instances of minority shareholders

actually doing so or even "any examples of foreign influence in Minnesota elections" at all. *Id*. at
*8. The ruling, while merely preliminary, underscores the narrowness of Maine's approach. As the
district court there found, Minnesota's law "covers 98% of S&P 500 companies and 28% of smaller
publicly traded companies," *id*.; Maine's law likely covers less than a *tenth* of those companies.
Minnesota regulates corporations owned by any foreign nationals; Maine focuses only on foreign
government owners. Finally, the court questioned whether Minnesota had any record of foreign-
influenced corporate spending in its state elections; Maine has experienced multiple elections in
which foreign-government-owned domestic corporations like Versant spent millions of dollars to
impact Mainers' votes, *see* Background at 4-5 *supra*.

  Plaintiffs also take the opposite tack and argue that Maine's law is *under*inclusive, because
it does not regulate covered entities' expenditures for lobbying. CMP Mot. at 11. But "the First
Amendment imposes no freestanding underinclusiveness limitation," *Williams-Yulee v. Florida
Bar,* 575 U.S. 433, 449 (2015) (internal quotation marks omitted). The bar for demonstrating
underinclusiveness is accordingly high: plaintiffs must show that the Act cannot "fairly be said"
to advance the government's compelling interest in shielding "activities of . . . democratic self
government" from foreign influence, *Bluman*, 800 F. Supp. 2d at 288, or provides only "ineffective
or remote" support for this goal, *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 396 (1984).

  Plaintiffs have not even attempted such a showing. Maine has "address[ed]" "the phase of
the problem which seems most acute," *Buckley v. Valeo*, 424 U.S. 1, 105 (1976), namely the flow
of foreign government-influenced money through vehicles unregulated by federal law into the
most central mechanism of state self-governance: Maine elections. Plaintiffs also ignore that by
allowing covered foreign entities to make expenditures to lobby government, Maine "leave[s] open
more, rather than fewer, avenues of expression," *Williams-Yulee*, 575 U.S. at 452, ensuring that the

law is the least restrictive means to advance the state's objectives. The Act's narrow focus and measured approach thus denote narrow tailoring, not a constitutional infirmity.

### C. Maine's Disclaimer Requirement for Foreign Government-Influenced Entities Furthers First Amendment Values.

The Act requires covered entities to add a disclaimer disclosing their name and status as a "foreign government" or "foreign government-influenced entity" on any "public communication[s]" designed to "influence the public or any state, county or local official or agency" regarding "government policy" or "government relations with a foreign country or a foreign political party." 21-A Me. Rev. Stat. § 1064(6). Political disclaimer requirements are well-established methods for promoting the government's important interest in informing citizens of the interests financing electoral and lobbying campaigns. *Citizens United*, 558 U.S. at 366–67; *NOM I*, 649 F.3d at 41. And Maine's requirement, modeled on federal disclaimers required for political communications by foreign principals, 22 U.S.C. § 614(b), is further supported by the state's heightened interest in ensuring that citizens are appraised of attempts by foreign governments to influence local policy.

### 1. The government's informational interest in political disclosure is heightened with respect to foreign influence.

The Supreme Court has repeatedly made clear that the interest in ensuring that the public is "fully informed" about political messaging and its sources "alone is sufficient" to justify reporting and disclaimer rules under exacting scrutiny. *Citizens United*, 558 U.S. at 368–69. The courts have also described how on-ad contributor disclaimers facilitate citizens' instantaneous appraisal of election or lobbying communications, thereby making them "a more efficient tool" for public education than mere disclosure reports. *Gaspee Project v. Mederos*, 13 F.4th 79, 91 (1st Cir. 2021). *See also NOM I*, 649 F.3d at 57 (noting that voters are "flooded with a profusion of

information and political messages" and "rely ever more on a message's source as a proxy for reliability and a barometer of political spin").

The disclaimer requirement here advances the same governmental interests as disclaimers in candidate elections and referenda; contrary to plaintiffs' claims, the Supreme Court has not cabined these informational interests to the electoral context. Not only has the Court made clear that there is no "constitutionally mandated line between express advocacy and so-called issue advocacy" in the area of disclosure, *McConnell*, 540 U.S. at 190, but it has also upheld the constitutionality of the federal lobbying disclosure law—which required disclosure as to both lobbying in Congress and grassroots lobbying of the public.[18] *United States v. Harris*, 347 U.S. 612 (1954). In so holding, the court found that "full realization of the American ideal of government" depends on the "ability to properly evaluate [the] pressures" posed by those who engage in or fund lobbying campaigns. *Id.* at 625-26. Just like electoral or lobbying disclosure laws, Maine's disclaimer requirements "promote[s] the dissemination of information about those who deliver and finance political speech, thereby encouraging efficient operation of the marketplace of ideas." *NOM I*, 649 F.3d at 41.

Furthermore, the state's informational interests are particularly acute in connection to political advocacy conducted by foreign interests or foreign governments, as evinced by longstanding federal laws such as FARA. Since its enactment in 1938, FARA has required "agents" representing a "foreign principal"—a term that includes foreign governments and foreign corporations—to register with the Department of Justice and file regular reports disclosing their

---

[18]  *See also Fla. League of Prof'l Lobbyists, Inc. v. Meggs*, 87 F.3d 457, 460-61 (11th Cir. 1996) (upholding Florida law that required disclosure of both direct lobbying and indirect lobbying which did not involve contact with governmental officials); *Minn. State Ethical Practices Bd. v. Nat'l Rifle Ass'n*, 761 F.2d 509, 512 (8th Cir. 1985) (noting that *Harris* "applied" to "communication[s] with lawmakers through an artificially stimulated letter campaign").

activities, receipts, and disbursements on behalf of the foreign principal. 22 U.S.C. §§ 612(a), (b). FARA also requires "conspicuous" disclaimers on any "informational material" distributed on behalf of a foreign principal identifying both the foreign principal and its registered agent. *Id*. § 614(b). These provisions ensure "public disclosure" from persons engaging in activities for or on behalf of foreign governments "so that the Government and the people of the United States may be informed of the identity of such persons and may appraise their statements and actions in the light of their associations and activities." *Att'y Gen. of U.S. v. Irish People, Inc*., 684 F.2d 928, 939-40 (D.C. Cir. 1982), *cert. denied sub nom*., *Irish People Inc. v. Smith*, 459 U.S. 1172 (1983); *see also id*. at 935 & 935 n.23 (holding that "it is well settled that FARA is constitutional" and collecting cases).

Plaintiffs elide this crucial background information: that Maine's disclaimer requirement functions as a state counterpart to FARA's disclosure requirements and is thus further justified by the unique informational interests animating FARA. *See, e.g., Att'y Gen. v. Irish N. Aid Comm*., 346 F. Supp. 1384, 1390 (S.D.N.Y.), *aff'd*, 465 F.2d 1405 (2d Cir. 1972) (explaining that "purpose of [FARA] is to protect the interests of the United States by requiring complete public disclosure by persons acting for . . . foreign principals" thereby "enabl[ing] [citizens] to understand the purposes for which they act"). Maine's informational interest is sharpened when foreign government-influenced entities spend money to lobby the public and Maine lawmakers, necessitating the Act's responsive disclosure requirements. And Maine does not create appreciably greater burdens on covered entities than those already imposed under FARA on agents of foreign governments. Like FARA, Maine's disclaimer requirement offers a "reasonable and minimally restrictive method of furthering First Amendment values." *Buckley*, 424 U.S. at 82.

### 2. Disclaimer requirements are reviewed under exacting scrutiny.

Because disclosure laws promote First Amendment values but "impose no ceiling on campaign-related activities," *Citizens United*, 558 U.S. at 366 (internal quotation marks omitted), the Supreme Court held that they are subject to a less stringent "exacting scrutiny" standard of review, *id.* at 366–67. *See also Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383–84 (2021). But in a bid for strict scrutiny, plaintiffs argue that the term "foreign government-influenced" is pejorative, CMP Mot. at 14, or inaccurate, Versant Mot. at 28, and that a disclaimer requiring this term therefore amounts to unconstitutional compelled speech. Yet political disclaimers like Maine's have consistently been held not to impermissibly compel speech. *Citizens United*, 558 U.S. at 339; *Gaspee Project*, 13 F.4th at 95 (holding that Rhode Island's top five donor disclaimer "does not unconstitutionally require compelled speech").

As plaintiffs acknowledge, disclaimers that "require the speaker to include basic factual information" and do not impose a message contrary to the speaker's beliefs are evaluated under exacting scrutiny. CMP Mot. at 4. *See also Gaspee Project*, 13 F.4th at 90-92, 95. Here, the label "foreign government-influenced" is a factual description that refers to covered entities' *own* shareholders—hardly information inimical to their purpose or public profile. And this disclaimer advances a purely informational interest: Mainers' interest in knowing when foreign government-influenced entities are advocating for policy outcomes in their state.

Further, the Supreme Court has set a high bar for what disclaimers will be deemed inaccurate or "pejorative" in terms of describing foreign sources. In *Meese v. Keene*, 481 U.S. 465 (1987), the Court upheld FARA's disclaimer requirement that communications on behalf of foreign principles be labeled "foreign propaganda," even though it acknowledged that the term hardly had a positive connotation in colloquial usage. It nevertheless approved the disclaimer because the

statutory definition of "propaganda" was a "broad, neutral one rather than a pejorative one." *Id.* at 483. Here, Maine's definition of "foreign government-influenced entity" is similarly objective, even as the term itself is far more neutral and factual in tone. There is no basis for applying strict scrutiny to Maine's disclaimer requirement.

### D. Maine's due diligence requirements are a constitutional means to support enforcement of the foreign corporate money ban.

To ensure compliance with the law, the Act requires broadcasters, news outlets, and internet platforms to "establish due diligence policies, procedures and controls" that are "reasonably designed" to prevent distribution of "a public communication for which a foreign government-influenced entity has made an expenditure." 21-A Me. Rev. Stat. § 1064(7). Referring to Internet platforms, the Act further provides that if they "discover[] that [they have] distributed a public communication for which a foreign government-influenced entity has made an expenditure," they shall "immediately remove the communication and notify the commission." *Id.* Because these requirements are key to enforcement of Maine's foreign corporate money ban, they are justified by the same compelling interest in self-governance that justifies the ban itself.

Plaintiffs ignore that Maine's due diligence requirements mirror federal regulations that courts have deemed consistent with the First Amendment. For example, FEC regulations implementing the federal foreign money ban require the exercise of due diligence to avoid "knowingly" taking contributions from foreign nationals or providing "substantial assistance" in the making of a contribution or expenditure by foreign nationals. 11 C.F.R. §§ 110.20(g), (h). In particular, they require an inquiry if a person becomes aware of "facts that would lead a reasonable person to inquire whether the source of the funds" is a foreign national, for instance, when a contributor "provides a foreign address" or "makes a contribution or donation by means of a check or other written instrument drawn on a foreign bank." *Id.* § 110.20(a)(4)-(5).

31

Maine's due diligence requirements also closely resemble the FCC's sponsorship identification rules for paid advertising, which require broadcasters to "exercise reasonable diligence" to ascertain the sponsor of the material, and to "announce" this sponsorship information upon broadcasting the material. 47 C.F.R. § 73.1212(a), (b); *see also* 47 U.S.C. § 317(a)(1). The rule also requires broadcasters to "exercise reasonable diligence to ascertain whether foreign sponsorship disclosure requirements" apply to each sponsor—using FARA's definitions for "foreign government" and "foreign agents." 47 C.F.R. § 73.1212(j)(2), (3). Reasonable diligence includes "inquiring" of the advertiser whether the advertiser or anyone involved in the ad's production or distribution "qualifies as a foreign governmental entity," and maintaining records "to track compliance" and "respond to any" FCC inquiries. 47 C.F.R. § 73.1212(j)(3)(ii), (vi).

These requirements have been largely upheld, although the D.C. Circuit questioned *one* of the FCC's five prescribed steps for verifying whether sponsors were foreign governmental entities, namely a requirement that broadcasters check two specific federal sources. *Nat'l Ass'n of Broadcasters v. FCC*, 39 F.4th 817, 819-20 (D.C. Cir. 2022). But this ruling was based on an interpretation of the Communications Act, not the First Amendment, and it also recognized that broadcasters remained obligated under the statute to be "diligent in their efforts to obtain sponsorship information from employees and sponsors." *Id*. at 819–20.

Courts have also upheld laws imposing far more extensive "public interest obligations" on broadcasters. In *McConnell*, 540 U.S. at 246, the Supreme Court sustained a federal law requiring broadcasters to compile and make public a "political file" containing records of all requests for advertising that "communicates a message related to any political matter of national importance," including all ads about candidates, federal elections, or "national legislative issues of public importance." 47 U.S.C. § 315(e)(1). The Court approved these requirements, concluding that they

advance "compliance with the disclosure requirements and source limitations" of federal campaign finance law. *McConnell*, 540 U.S. at 237.

Plaintiffs disregard these federal analogues, focusing instead on Maryland's inapposite digital database law, which was invalidated in *Washington Post v. McManus*, 944 F.3d 506 (4th Cir. 2019). *See* Broadcasters' Mot., No. 23-cv-00452, ECF No. 3, at 16–17. The Maryland law required digital platforms to archive all political ads purchased on their platform, include information about ad sponsors and audiences, and host these archives on their own websites for a year following the relevant election. *McManus*, 944 F.3d at 512. The Fourth Circuit considered this database "hosting" requirement a form of compelled speech that "intru[des] into the function of editors and forces news publishers to speak in a way they would not otherwise." *Id.* at 518 (quotation marks omitted). Maine's law by contrast includes no such "hosting" requirement; it merely requires internal procedures for determining whether media outlets' advertisers are covered entities under the Act.

Maine's due diligence requirements are no more burdensome than the well-established federal laws they mirror. Plaintiffs attempt to characterize the Act as "vague," but the law's regulatory flexibility redounds to their benefit: covered media entities retain discretion to establish those internal processes that they believe most effective and efficient at identifying illegal foreign advertising. And the Act makes plain that broadcasters incur no liability for publishing communications prohibited by the Act in error or ignorance: media outlets are only obligated to "*establish* due diligence policies" that "are *reasonably designed* to ensure that [they] do[

] not broadcast, distribute, or otherwise make available" public communications from covered entities. 21-A Me. Rev. Stat. § 1064(7) (emphasis added).[19]

The Act is also far narrower than the FCC's sponsorship requirements, which require both inquiry into, and disclosure of, *all* sponsors of paid programming, not just foreign government-influenced sponsors. Plaintiffs must resort to speculation to conjure up any "burden" arising from the Act. They wonder, for instance, whether they may be required to "hire investigators," Broadcasters' Mot. at 3, "retain outside . . . attorneys," *id*. at 5, or "conduct global investigations," *id*. at 17, to satisfy Section 1064(7), but this is pure fantasy. A basic inquiry with potential advertisers would meet their burden, as the D.C. Circuit suggested would suffice in *National Association of Broadcasters*, and could be routinized by simply adding a check-box on existing forms for advertising sponsors.

The inherently speculative nature of plaintiffs' objections is all the more problematic because they bring a pre-enforcement facial challenge prior to any regulatory implementation of the Act by the Commission on Governmental Ethics and Election Practices. Just as the FCC has provided regulatory guidance to media outlets regarding analogous federal advertising

---

[19]  For this reason, plaintiffs' characterization of the due diligence requirements as a "prior restraint" also fails. The Supreme Court explained that a prior restraint "*forbid[s]* certain communications . . . before the communications occur." *Alexander v. United States*, 509 U.S. 544, 544 (1993) (emphasis added). But the Act does not forbid media platforms from running advertising by covered entities: media platforms are not liable for distributing such advertising, but only for failing to establish due diligence procedures. 21-A Me. Rev. Stat. § 1064(7).

 Furthermore, even if the due diligence requirements in fact *prohibited* media outlets *ex ante* for running ads from covered entities—which they do not—they are not an impermissible prior restraint because the spending they regulate is not constitutionally protected. *See S.E. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 557 (1975) (explaining that where speech is unprotected, there is no prior restraint); *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 390 (1973) (same). Here, paid advertising by covered foreign entities is not protected because foreign nationals have no constitutional right to make political contributions or expenditures, *Bluman*, 800 F. Supp. 2d at 288.

requirements, the Commission is similarly positioned to interpret and implement Maine's due diligence requirements. Indeed, in part for this reason, the Supreme Court in *McConnell* rejected comparably hyperbolic claims by broadcasters about FECA's public file obligations, counseling them to wait until the FCC implemented the law and noting the agency could "write regulations that may limit, and make more specific, the provision's potential linguistic reach." *McConnell*, 540 U.S. at 242. At the least, the Supreme Court held, it was not prepared to find the political file requirement unduly burdensome without "additional information" about "how the FCC interprets and applies this provision." *McConnell*, 540 U.S. at 242. Here too it is premature to review the due diligence requirements without "information" about their regulatory implementation.

## CONCLUSION

For these reasons, plaintiffs' motions for a temporary restraining order or preliminary injunction should be denied.

Dated: January 12, 2024

Respectfully submitted,

/s/ Peter L. Murray
Peter L. Murray
  pmurray@mpmlaw.com
Sean R. Turley
  sturley@mpmlaw.com
MURRAY PLUMB & MURRAY
75 Pearl Street
P.O. Box 9785
Portland, Maine 04104-5085
(207) 773-5651

Tara Malloy*
  tmalloy@campaignlegalcenter.org
Megan P. McAllen*
  mmcallen@campaignlegalcenter.org
CAMPAIGN LEGAL CENTER
1101 14th Street NW, Ste. 400
Washington, DC 20005
(202) 736-2200

*motions for admission pro hac vice
pending

*Counsel for Amicus Curiae*