UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| CENTRAL MAINE POWER CO., et al., <br><br> Plaintiffs, <br><br> v. <br><br> MAINE COMMISSION ON GOVERNMENTAL ETHICS AND ELECTIONS PRACTICES, et al., <br><br> Defendants. | Docket No. 1:23-cv-00450-NT |

**STATE DEFENDANTS' COMBINED OPPOSITION TO
THE MOTIONS FOR PRELIMINARY RELIEF**

# TABLE OF CONTENTS

Introduction ................................................................................................................... 1

Facts ............................................................................................................................... 3

    Impetus for Question 2 ............................................................................................ 3

    Proposal of Question 2 ............................................................................................ 6

    Statutory Framework ............................................................................................... 8

    Other Foreign-Government Influence in Recent Elections ............................... 10

Argument ..................................................................................................................... 12

I.    The Challengers Are Unlikely to Succeed on their Facial First Amendment Claims. ......... 12

    A.  Maine has compelling interests in preventing foreign-government influence and the appearance of such influence in its elections. ...................................................................... 15

    B.  The Act is narrowly tailored ....................................................................... 24

        1.  The Act is not overinclusive. ........................................................... 24

        2.  The Act is not underinclusive. ......................................................... 29

    C.  The Electors' additional arguments do not alter the analysis ......................... 29

    D.  Even if some applications of the Act were unconstitutional, the Challengers could not satisfy the high standard for facial invalidation. ................................................................... 32

    E.  The disclaimer provision is constitutional ..................................................... 36

II.    Versant's As-Applied Challenge to the Act Is Unlikely to Succeed. ................... 39

III.    Media Plaintiffs Are Unlikely to Prevail on Their First Amendment Claims. ................. 41

    A.  Subsection 7's modest requirements comply with the First Amendment ...................... 42

    B.  Subsection 7 is narrowly tailored to survive any level of scrutiny. .............................. 45

    C.  Subsection 7 does not constitute an unconstitutional prior restraint. .............................. 48

    D.  Subsection 8 does not impose unconstitutional "liability without fault." ...................... 49

IV.    The Act Is Not Preempted by Federal Law. ....................................................... 52

A.  FECA does not expressly preempt the Act. ...................................................... 52

B.  The Act is not conflict-preempted by FECA. .................................................. 54

V.   The Challengers Are Unlikely to Succeed on their Vagueness Challenges. ........................ 59

A.  The Challengers' overbreadth arguments will not succeed. ........................................... 59

B.  The terms highlighted by Challengers are not unconstitutionally vague. ........................ 61

VI.   Versant Is Unlikely to Prevail on Its Claim that the Act Violates the Dormant Foreign Commerce Clause. ............................................................................................................. 65

VII.   The Electors' Separation of Powers Claim Is Barred by Sovereign Immunity. ................ 67

VIII.   The Remaining Injunction Factors Likewise Tip Against Issuing Preliminary Relief .. 68

IX.   If the Court Issues an Injunction It Should Be Limited in Scope ...................................... 69

Conclusion ........................................................................................................................... 71

Defendants William J. Schneider, David R. Hastings III, Sarah E. LeClaire, Stacey D. Neumann, and Dennis Marble, in their official capacities as Members of the Maine Commission on Governmental Ethics and Election Practices; the Maine Commission on Governmental Ethics and Election Practices (the "Commission"); and Aaron Frey, in his official capacity as Attorney General, file this combined opposition to the motions for preliminary relief by Central Maine Power Company ("CMP") (ECF No. 4), Versant Power and ENMAX ("Versant") (ECF No. 22), the Maine Press Association and the Maine Association of Broadcasters ("Media Plaintiffs") (ECF No. 25), and Jane Pringle, Kenneth Fletcher, Bonnie Gould, Brenda Garrand, and Lawrence Wold ("Electors") (ECF No. 27) (collectively, "Challengers").

**Memorandum of Law**

In 2020 and 2021, Maine voters were subjected to a tsunami of advertising to convince them to oppose ballot questions to shut down a massive and controversial infrastructure project to transmit electricity from Canada to Massachusetts. One of the largest spenders in this advertising blitz—indeed the third-largest contributor of the last decade across all Maine elections—was a hydropower company 100% beneficially owned by a foreign government. Political leaders from both parties, incensed by this foreign-government interference in a Maine election, began pursuing legislation to prevent such interference from ever happening again.

Those efforts coalesced into a citizen's initiative, which was placed on the November 2023 ballot as Question 2. The initiated law (the "Act") amends Maine's campaign-finance laws to bar foreign governments, and entities that they control or influence, from spending money to influence Maine's candidate and referendum elections. Maine voters approved Question 2 by a 6-to-1 margin—the most lopsided vote in favor of a citizen's initiative in Maine history.

Three companies that meet the Act's definition of a "foreign government–influenced entity," two associations of media companies, and a handful of Maine voters filed these four actions seeking to enjoin the Attorney General and the Commission from enforcing the Act. All claim that the Act violates the First Amendment. They also raise other objections to the Act. Based on these objections they seek a preliminary injunction barring any enforcement of the Act.

The Challengers' motions should be denied. No Challenger can show a likelihood of success on their claims. The Act is fully consistent with the First Amendment. It seeks to address a governmental interest that binding Supreme Court precedent holds is compelling: preventing foreign influence in U.S. elections. Moreover, it does so in a way that is narrowly tailored, focusing not on all foreigners, but only the most pernicious source of foreign influence in elections: foreign governments and the entities they control or influence. The Act properly recognizes that such influence can be wielded not just through a foreign government's controlling ownership stake in a company—although a foreign government has just such a controlling stake in two of the three corporate Challengers—but also through lesser but still significant ownership stakes of between 5% and 50%. These lesser stakes still give the foreign-government owner substantial practical leverage over the affairs of the company while obligating the company's managers as a matter of fiduciary duty to take the stockholder's interests into account. Because the Act is narrowly tailored to further a compelling government interest in preventing foreign-government influence in Maine elections, the Challengers are unlikely to prevail on the merits of their First Amendment claims.

The Challengers fare no better with their various other claims. The Act is not preempted by federal campaign-finance laws because the Act does not apply to federal elections. Nor does the Act violate the First Amendment rights of the media entities. Compliance with the Act's

minimal requirements is nearly costless, and it does not restrict the media's right to publish anything other than the unprotected speech of foreign government–influenced entities.  The Act is not facially void for vagueness because it provides people of ordinary intelligence fair notice of what activity it prohibits.  It does not run afoul of the foreign dormant Commerce Clause because it does not regulate commerce or seek to influence public policy beyond Maine's borders.  And the Electors' cursory separation of powers claim under the Maine Constitution is, among other fatal problems, beyond the power of a federal court to resolve.

Because the Challengers lack a likelihood of success and because they do not meet the other requirements for injunctive relief, their motions should be denied.

## Facts

### Impetus for Question 2

Prior to enactment of Question 2, Maine law did not restrict spending by foreign governments to influence elections.  Rather, Maine relied upon a provision of the Federal Election Campaign Act (FECA), which bars a "foreign national" from making "a contribution or donation of money or other thing of value . . . in connection with a Federal, State, or local election."  52 U.S.C.A. § 30121(1)(A).  FECA's definition of "foreign national" includes, among other entities, "a government of a foreign country."  *Id.* § 30121(b)(1) & 22 U.S.C.A. § 611(b)(1).

Maine is a direct-democracy State.  It allows citizens to directly enact legislation by popular vote (a citizens' initiative), and to veto legislation enacted by the Legislature (a People's veto).  *See* Me. Const. art. IV, pt. 3, §§ 17, 18.  Successful petitions to place such matters on the

ballot are frequent; since 2018, Maine voters have considered six citizen initiatives and two People's vetoes, including four initiatives in the 2023 November election.[1]

It recently became clear that federal-law protection of Maine's elections from foreign-government interference was more limited than may have been assumed.  A 2021 ruling of the Federal Election Commission concluded that the federal prohibition on foreign contributions does not extend to contributions to influence state and local ballot campaigns and referenda.  *See* Factual and Legal Analysis, *In re Stop I-186 to Protect Mining and Jobs et al.*, MUR 7523 (FEC Oct. 4, 2021).[2]  Under the FEC's holding, Maine has no protections under FECA against foreign governments seeking to influence its frequent referendum elections.

Maine has seen foreign government–owned companies spend enormous sums to influence two recent Maine elections: citizen's initiatives in 2020[3] and 2021 that would have blocked construction of the New England Clean Energy Connect project (better known as the "CMP Corridor").  The third-largest spender in those campaigns was a ballot question committee ("BQC")[4] called the Hydro-Québec Maine Partnership ("HQMP").  Declaration of Jonathan Wayne, dated Jan. 12, 2024 ("Wayne Decl.") ¶ 14.  All of the funding for HQMP (excluding bank interest) was provided by H.Q. Energy Services (U.S.) Inc. ("HQUS").  *Id.*  HQUS is

---

[1]  *See* Maine State Legislature, Legislative History Collection, *Citizen Initiated Legislation, 1911–Present*, at https://www.maine.gov/legis/lawlib/lldl/citizeninitiated/ (last updated Nov. 2023); Maine State Legislature, Legislative History Collection, *Maine Laws Suspended by People's Veto* (last updated Sept. 2022), at https://www.maine.gov/legis/lawlib/lldl/peoplesveto/.

[2]  Available at https://www.fec.gov/files/legal/murs/7523/7523_22.pdf.

[3]  The 2020 ballot question was removed from the ballot due to a court challenge.  *See Avangrid Networks, Inc. v. Sec'y of State*, 2020 ME 109, ¶ 38, 237 A.3d 882.

[4]  A BQC, as defined in Maine law, is an entity that receives contributions or makes expenditures of more than $5,000 to initiate or influence a referendum campaign.  *See* 21-A M.R.S. § 1052(2-A) (Westlaw Jan. 11, 2024).  BQCs are regulated similarly to political action committees ("PACs").

wholly owned by Hydro-Québec via a subsidiary.  Bolton Decl. Ex. A at 15 (Hydro-Québec

Form 18-K, Ex. 99.1 at 9).  Hydro-Québec describes itself as "an agent of Québec"; all of its

capital stock "is held by the Minister of Finance on behalf of the Government of Québec."  *Id.* at

14 (Ex. 99.1 at 8).

 The CMP Corridor, a high-impact electric transmission line that is being built through

Maine, was integral to Hydro-Québec's plans to "sell 9.45 TWh of energy to electricity

distributors in Massachusetts over a 20-year period."  *Id.* at 77 (Ex. 99.1 at 71).  Cancellation of

the project, according to Hydro-Québec's SEC filings, would have had significant financial

consequences for the government-owned utility.  *Id.* at 78 (Ex. 99.1 at 72).

 To stop these referenda, HQUS contributed $22.4 million to HQMP.  Wayne Decl. ¶ 13.

These contributions make HQUS the third-largest commercial-source contributor to influence

Maine elections in the last decade, behind only two CMP-affiliated entities.  *Id.* ¶ 15.  HQMP

spent all of those contributions to oppose the two ballot questions.  *Id.* ¶ 14.  During this

campaign, HQMP ran afoul of Maine's campaign-finance laws, paying a fine of almost $35,000

for failing to timely disclose election spending.  *Id.* ¶ 16.

 HQUS was not the only company linked to a foreign government that spent substantial

sums to influence the CMP Corridor referenda.  Two BQCs established by CMP and its affiliates

spent roughly $45 million to influence the two referenda.  Wayne Decl. ¶ 22.  CMP is wholly

owned (through two intermediaries) by Avangrid, Inc., which is 3.7% owned by the Qatar

Investment Fund, the State of Qatar's sovereign wealth fund.  CMP Compl. ¶¶ 21–24.  Avangrid,

Inc., in turn, is 81.6% owned by the Spanish company Iberdrola, which itself is 8.7% owned by

the Qatar Investment Fund.  *Id.*  Qatar's total indirect ownership of CMP is thus 10.8%.

Overall, HQMP and the two CMP BQCs were three of the four biggest spenders among PACs and BQCs to influence the referenda on the CMP Corridor.  Wayne Decl. ¶ 22.

*Proposal of Question 2*

The effort by HQUS to influence the CMP Corridor referenda through massive election spending was deeply controversial in Maine.  During the 2020 campaign, a bipartisan group of 25 current and former Maine lawmakers sent a letter to the Premier of Québec and the CEO of Hydro-Québec demanding that Hydro-Québec "cease all further campaign activities in Maine and let the people of Maine vote without further meddling in our elections."  Bolton Decl., Ex. B (Letter to Fancois Leggault *et al.* from Rep. Kent Ackley *et al.* (July 29, 2020)).  Following the referendum campaign, elected leaders from both major parties denounced the spending of HQUS to influence Mainers to approve a project that would have produced billions of dollars in revenue for a foreign government–owned company.  Jared Golden and Rick Bennett, *American voters, not foreign interests, should decide American elections*, Piscataquis Observer (Jun. 5, 2022), http://tinyurl.com/bpa9xwkh (Democratic Congressman and Republican State Senator)); Ken Fredette, *We need to protect Maine elections from foreign influence*, Bangor Daily News (Feb. 6, 2022), http://tinyurl.com/yc4wf2y7 (former Maine House Republican Leader)); Bolton Decl., Ex. C (Joe Baldacci, *Bill will prevent foreign influence on our elections*, Kennebec Journal (Jun. 5, 2021) (Democratic State Senator), Charlotte Warren and Patrick Corey, *Safeguard referendums against foreign intrusion*, Portland Press Herald (Dec. 7, 2021) (Democratic and Republican State Representatives), Billy Bob Faulkingham, *Protecting Maine's elections is not a partisan issue*, Ellsworth American (Jan. 20, 2022) (Republican State Representative), Nicole Grohoski, *Protect Maine elections*, Ellsworth American (Jan. 27, 2022) (Democratic State Representative)).

The foreign government influence seen in the 2020 and 2021 referenda also provoked a legislative response. In January 2021, a bipartisan group of eight legislators introduced L.D. 194, "An Act To Prohibit Contributions, Expenditures and Participation by Foreign Government-owned Entities To Influence Referenda," a bill with provisions similar to the Act. *See* L.D. 194 (130th Legis. 2009). At the public hearing on L.D. 194, legislators, many individuals and organizations testified in favor of the law. Bolton Decl., Ex. D, 11–117. Participants criticized Hydro-Québec's "ability to flood Maine with false advertising in order to change the perceptions of Maine voters." *Id.* at 26 (Testimony of Elizabeth Caruso). They noted that HQUS was supporting "a highly lucrative contract with Massachusetts" that would "benefit enormously" the government, communities, and taxpayers of Québec. *Id.* at 28 (NRCM testimony). They denounced "[f]oreign money flowing into our democratic processes." *Id.* at 49 (Clifford Krolick testimony). L.D. 194 was passed by significant margins but was vetoed by the Governor.[5]

Following the Governor's veto, initiators gathered enough signatures to seek enactment of a similar law—the Act—under the direct-democracy provisions of the Maine Constitution. As required by Me. Const. art. IV, pt. 3, § 18, that measure was presented to the Legislature for enactment, prompting additional public proceedings in which many testified in favor of the Act. *See* Bolton Decl., Ex. E, 15–80. As with L.D. 194, the Legislature passed the Act, but the Governor vetoed it.[6] As a result, per Article IV, part third, § 18(3) of the Maine Constitution, it was placed on the November 2023 ballot as Question 2. Maine voters enacted it by a vote of

---

[5]    *See* Maine Legislature Bill Tracking, 130th Legislature, SP 82, L.D. 194, at https://legislature.maine.gov/billtracker/#Paper/SP0082?legislature=130 (showing House vote of 87-54 in favor and Senate vote of 22-12 in favor).

[6]    *See* Maine Legislature Bill Tracking, 130th Legislature, IB 1, L.D. 1610, at https://legislature.maine.gov/billtracker/#Paper/1610?legislature=131 (showing Senate vote of 19-13, House vote to override veto of 73-50).

348,781 to 55,226—the largest margin of victory for a citizens' initiative in either percentage or absolute terms in Maine history.  Bolton Decl., Ex. F (Proclamation); Maine State Legislature, Legislative History Collection, *Citizen Initiated Legislation, 1911–Present*, at https://www.maine.gov/legis/lawlib/lldl/citizeninitiated/.

The Governor proclaimed the results of the election on December 6, 2023.  Bolton Decl., Ex. F.  Under the Maine Constitution, the law took effect 30 days later, on January 5, 2024.  Me. Const. art. IV, pt. 3, § 19.  To allow fuller presentation of the issues to this Court, the Attorney General and the Commission agreed not to enforce the law through February 29, 2024.

*Statutory Framework*

The Act would bar the type of influence by foreign governments seen in the 2020 and 2021 election.  It also builds on federal law to ensure that entities that are influenced by foreign governments cannot spend money to influence either candidate or referenda elections in Maine.

Subsection 2 is the heart of the Act.  It prohibits any "foreign government–influenced entity" (FGIE) from making, directly or indirectly, "a contribution, expenditure, independent expenditure, electioneering communication or any other donation or disbursement of funds to influence the nomination or election of a candidate or the initiation or approval of a referendum." 21-A M.R.S. § 1064(2).[7]

"Foreign government–influenced entity" is meticulously defined.  It includes three classes of entities:

- *Foreign Governments*:  The Act applies to any national government outside the United States and any political subdivisions of such a government.  *Id.* § 1064(1)(D) & (1)(E)(1).

---

[7]  Because the Act has not yet been published in the Maine Revised Statutes, it is reproduced at Bolton Decl., Ex. G.  Citations to the M.R.S. are based on the codification instructions in the Act.

- *Entities Partly Owned by a Foreign Government.*  The Act applies to any entity in which a foreign government or foreign-government owned entity (FGOE) has a direct or indirect ownership stake of 5% or more of the entity.  *Id.* § 1064(1)(E)(2)(a).  An FGOE is defined as an entity in which a foreign government owns or controls more than 50% of its equity or voting shares.  *Id.* § 1064(1)(F).

- *Entities Influenced in their Political Decision-making by Foreign Governments.*  Also covered by the Act are entities in which a foreign government or FGOE "[d]irects, dictates, controls or directly or indirectly participates in the decision-making process" of the entity regarding activities "to influence the nomination or election of a candidate or the initiation or approval of a referendum."  *Id.* § 1064(1)(E)(2)(b).

The Act also contains several secondary provisions designed to increase the effectiveness of the prohibition in subsection 2.  It prohibits solicitation, acceptance, or receiving of contributions or donations prohibited by subsection 2.  *Id.* § 1064(3).  It prohibits knowing or reckless "substantial assistance" in committing violations of subsection 2.  *Id.* § 1064(4).  And it prohibits "structur[ing]" or "attempt[ing] to structure" a transaction to evade the prohibitions of the Act.  *Id.* § 1064(5).

Subsection 6 of the Act requires FGIEs to include a disclaimer when making certain "public communications" to influence the public or a government agency regarding "the formulation, adoption or amendment of any state or local government policy or regarding the political or public interest of or government relations with a foreign country or a foreign political party."  *Id.* § 1064(6).  "Public communication" is defined by the Act to mean "a communication to the public through broadcasting stations, cable television systems, satellite, newspapers, magazines, campaign signs or other outdoor advertising facilities, Internet or digital methods, direct mail or other types of general public political advertising, regardless of medium."  *Id.* § 1064(1)(H).  A public communication within this scope of this provision must contain an on-ad disclaimer that the communication is "sponsored by" the entity and that the entity is either a foreign government or a foreign government–influenced entity.  *Id.* § 1064(6).

9

Finally, the Act includes modest requirements for certain media entities.  Under subsection 7, media outlets and Internet platforms must establish "due diligence policies, procedures and controls that are reasonably designed to ensure that [they] do[] not broadcast, distribute or otherwise make available to the public a public communication for which a foreign government-influenced entity has made an expenditure, independent expenditure, electioneering communication or disbursement in violation of this section." *Id.* § 1064(7).  Subsection 7 contains a further requirement for Internet platforms only, requiring that they remove any communications that they discover to be in violation of the Act and notify the Commission on Governmental Ethics and Election Practices.  *Id.*

*Other Foreign-Government Influence in Recent Elections*

In addition to Hydro-Québec's and CMP's efforts to influence the referenda on the CMP Corridor, there have been other notable recent efforts by FGIEs to influence Maine elections.

Plaintiffs Versant Power and its parent company, ENMAX Power, have spent substantial funds to influence Maine elections.  ENMAX is 100% owned by the City of Calgary in Alberta, Canada.  Versant Compl. ¶ 58.  In 2020, ENMAX Power acquired 100% of Versant Power, an electric transmission and distribution utility that operates in portions of Maine.  *Id.* ¶ 63.  Versant is therefore also 100% owned, indirectly, by the City of Calgary.

ENMAX and Versant have worked to influence Maine elections since ENMAX's acquisition of Versant.  ENMAX's aggregate contributions of $15.9 million to influence Maine elections are the fifth-most from any commercial source in the last decade.  Wayne Decl. ¶ 19.  Versant has made $85,500 in contributions to various PACs that support state legislative candidates of both parties.  *Id.* ¶ 18.  Versant and ENMAX combined contributed $16.3 million to their BQC opposing the 2023 Pine Tree Power referendum.  *Id.* ¶ 17.

CMP and its affiliates have also spent vast sums to influence recent Maine elections.  In the last decade, these entities have spent a combined total of $73 million in Maine elections, with the vast majority of that spending occurring since 2019.  *Id.* ¶ 20.  Two CMP affiliates alone spent approximately $32 million and $24 million respectively, making them the #1 and #2 biggest commercial-source election spenders in Maine in the past decade.  *Id.* ¶ 21.

Overall, FGIEs account for four of the five largest commercial-source contributors in Maine elections in the past decade.  *Id.* ¶¶ 19, 21.

In addition to these public efforts by foreign governments and FGIEs to influence Maine elections, reports from government and media sources have documented efforts by foreign governments to influence Untied States elections.  The Mueller Report detailed operations conducted by the GRU, an arm of the Russian government, in which hacked documents were disclosed on the Internet in order to sway the 2016 presidential election.  Robert S. Mueller, *Report on the Investigation into Russian Interference in the 2016 Presidential Election*, Vol. 1, at 36–48 (Mar. 2019) ("Mueller Report"), *available at* https://www.justice.gov/archives/sco/file/1373816/download.  The Report also details "social media operations" by a Russian entity overseen by a Russian oligarch with ties to Vladimir Putin that were "targeted at large U.S. audiences with the goal of sowing discord in the U.S. Political system."  Mueller Report at 14, 17.  U.S. officials and others have reported stepped-up efforts by the Chinese government to influence U.S. elections.[8]  And the Department of Justice in 2021 indicted two Iranian nationals

---

[8] *See, e.g.*, Rohan Goswami, *Chinese social media campaigns are successfully impersonating U.S. voters, Microsoft warns*, CNBC (Sept. 7, 2023) at https://www.cnbc.com/2023/09/07/china-campaigns-target-us-elections-on-social-media-microsoft-report.html; Eric Tucker and Nomaan Merchant, *U.S. warns about foreign efforts to sway American voters*, AP News (Oct. 3, 2022) ("An unclassified intelligence advisory . . . says China is probably seeking to influence select races to 'hinder candidates perceived to be particularly adversarial to Beijing.'"), at https://apnews.com/article/2022-midterm-elections-russia-ukraine-campaigns-presidential-ea913f2b3b818651a9db1327adaa330a; Tim

working for a company with ties to Iranian government for a "cyber-enabled campaign to intimidate and influence American voters, and otherwise undermine voter confidence and sow discord, in connection with the 2020 U.S. presidential election."[9]

## Argument

To establish that they are entitled to a preliminary injunction, the Challengers have the burden to establish that four factors weigh collectively in their favor: (1) the likelihood of success on the merits; (2) the potential for irreparable harm to the movant; (3) the balance of the hardships, and (4) the effect of the court's ruling on the public interest. *See Bruns v. Mayhew*, 931 F. Supp. 2d 260, 266 (D. Me. 2013). "The *sine qua non* of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Servs., Inc., v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002). Here, the Challengers fail to demonstrate that they are likely to succeed on the merits, the only factor to which their motions give significant attention. The Court should therefore deny their motions.

## I.    The Challengers Are Unlikely to Succeed on their Facial First Amendment Claims.

CMP, Versant, and the Electors all contend that subsection 2 of the Act is facially unconstitutional because it violates the First Amendment. Because Maine has a compelling state interest in regulating foreign-government influence and the appearance of such influence in its

---

Starks, *China strives to ramp up election influence this year*, Washington Post (Oct. 27, 2022), at https://www.washingtonpost.com/politics/2022/10/27/china-strives-ramp-up-election-influence-this-year/.

[9] Press Release, *Two Iranian Nationals Charged for Cyber-Enabled Disinformation and Threat Campaign Designed to Influence the 2020 U.S. Presidential Election*, Department of Justice (Nov. 18, 2021), at https://www.justice.gov/opa/pr/two-iranian-nationals-charged-cyber-enabled-disinformation-and-threat-campaign-designed.

elections and public affairs, and because the Act is narrowly tailored to achieve those ends, the Court should conclude the Act is likely to survive the Challengers' facial challenge.

The First Circuit has recognized that facial challenges "are disfavored because they often rest on speculation, run contrary to the fundamental principle of judicial restraint, and threaten to short circuit the democratic process." *Frese v. Formella*, 53 F.4th 1, 7 (1st Cir. 2022) (cleaned up). Generally, a facial challenge to a law cannot succeed if "the challenged regulation has any legitimate application." *Gaspee Project v. Mederos*, 13 F.4th 79, 92 (1st Cir. 2021). The standard is only slightly more forgiving in a facial challenge under the First Amendment alleging overbreadth, where the law may be struck down only if it "prohibits a substantial amount of protected speech." *Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 51 (1st Cir. 2011) (quoting *United States v. Williams*, 553 U.S. 285, 292, (2008)). To balance the "obvious harmful effects" of enjoining a law with constitutional applications with the chilling effect on speech from unconstitutional applications, the Supreme Court has "vigorously enforced the requirement that a statute's overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *Williams*, 553 U.S. at 292.

Subsection 2 of the Act—the primary target of most of the Challengers—contains restrictions on both candidate contributions and expenditures. These restrictions are typically subject to different levels of scrutiny. As the Supreme Court has recognized, "restrictions on political contributions have been treated as merely 'marginal' speech restrictions subject to relatively complaisant review under the First Amendment, because contributions lie closer to the edges than to the core of political expression." *F.E.C. v. Beaumont*, 539 U.S. 146, 161 (2003); *see also Randall v. Sorrell*, 548 U.S. 230, 241 (2006). Under this more deferential standard, contribution limits must be "'closely drawn' to match a 'sufficiently important interest." *Daggett*

*v. Comm'n on Govtl. Ethics & Election Pracs.*, 205 F.3d 445, 454 (1st Cir. 2000) (quoting *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 385 (2000)).

Expenditure restrictions are normally subject to strict scrutiny.  Under strict scrutiny, the government must show that the challenged law "furthers a compelling interest and is narrowly tailored to achieve that interest."  *Citizens United v. F.E.C.*, 558 U.S. 310, 340 (2010).  However, classifications involving aliens may be subject to more relaxed scrutiny where the law involves "participation in [a state's] democratic political institutions" or "substantially affects members of the political community."  *Foley v. Connelie*, 435 U.S. 291, 295–96 (1978).  Here, the Act regulates foreign entities and U.S.-based entities that are controlled or influenced by those foreign entities.  Moreover, it squarely regulates their ability to influence Maine's "democratic political institutions."  The Court should therefore apply "closely drawn" scrutiny to the expenditure restrictions in the Act as well as the contribution restrictions.  *Cf. Bluman v. F.E.C.*, 800 F. Supp. 2d 281, 288 n.3 (D.D.C. 2011), *aff'd*, 565 U.S. 1104 (2012) (noting that the "constitutional distinction between contributions and expenditures is based on the government's anti-corruption interest," not its interest in "preventing foreign influence over U.S. elections").

Versant argues that strict scrutiny should be applied even to the Act's contribution restrictions because the Act "outright prohibits all campaign contributions" rather than merely capping them.  Versant Mem. at 15.  But the Supreme Court rejected that exact argument in *Beaumont*.  That case challenged FECA's outright ban on corporate contributions to federal candidates.  539 U.S. at 149–50.  The plaintiff made the same argument as Versant that strict scrutiny should apply because the law was a ban rather than a limit.  *Id.* at 161.  In holding that more deferential "closely drawn" scrutiny was appropriate, the Court explained that the "degree

of scrutiny turns on the nature of the activity regulated," not on whether the regulation can be characterized as a ban or a limit.  *Id.* at 162.  Versant's argument is foreclosed by *Beaumont.*

### A.   Maine has compelling interests in preventing foreign-government influence and the appearance of such influence in its elections.

Whichever standard of scrutiny applies, Maine's strong interests in preventing foreign government influence, and the appearance of such influence, in its elections is sufficiently compelling to satisfy that standard.

The Challengers argue that the Act is not sufficiently tethered to the compelling governmental interest in preventing *quid pro quo* corruption or the appearance thereof.  Versant Mem. at 17–20; CMP Mem. at 8.  In fact, portions of the Act, including the ban on contributions by FGIEs to candidates, directly further Maine's interest in preventing the appearance and actuality of *quid pro quo* corruption.  *See Beaumont*, 539 U.S. at 155 (holding that FECA's ban on corporate contributions to candidates furthered state's interest in preventing corruption).  But the main compelling interest furthered by the Act is not policing corruption among Maine's elected officials; it is protecting Maine's electoral process from influence and the appearance of influence by foreign-government actors who have no rightful place in Maine's political community.  That is an entirely distinct state interest.

The Supreme Court recognized that preventing such foreign influence in elections is the rare exception to its otherwise steadfast rule, *see McCutcheon v. F.E.C.*, 572 U.S. 185, 192 (2014), that election spending restrictions must target *quid pro quo* corruption when it summarily affirmed the decision of the three-judge panel in *Bluman.  See* 565 U.S. 1104 (2012).  The plaintiffs in *Bluman* challenged on First Amendment grounds FECA's bans on contributions and expenditures by foreign nationals.  800 F. Supp. 2d at 282.  Plaintiffs were Canadian and Israeli citizens temporarily living in the U.S. on work visas who wished to make contributions and

expenditures to support various federal candidates.  In a decision authored by then-Judge Kavanaugh, a three-judge panel affirmed the statute's constitutionality, even if strict scrutiny applied (which the court assumed without deciding).

In reaching that conclusion, the panel took pains to distinguish the constitutional issue in *Bluman* from the "great debates" that played out in cases like *Buckley* and *Citizens United*.  *Id.* at 286.  Unlike those cases, FECA's foreign-national ban raised a "preliminary and foundational question about the definition of the American political community and, in particular, the role of foreign citizens in the U.S. electoral process."  *Id.*  The panel went on to discuss Supreme Court decisions involving the constitutional rights of foreign citizens residing in the United States, synthesizing them as drawing "a fairly clear line:  The government may exclude foreign citizens from activities 'intimately related to the process of democratic self-government.'"  *Id.* at 287 (quoting *Bernal v. Fainter*, 467 U.S. 216, 220 (1984)).

Applying these legal principles, the panel held it to be "straightforward" that making contributions and expenditures to influence elections "constitute part of the process of democratic self-government."  *Id.* at 288.  As the Court observed, contributions and expenditures "are an integral aspect of the process by which Americans elect officials to federal, state, and local government offices."  *Id.*  It reasoned that barring foreign citizens from election spending followed from the established principle that the government may bar foreign nationals from voting and holding office, since, unlike other kinds of expressive activities, election spending is "closely tied to the voting process."  *Id.* at 290 Limitations on foreign nationals participating in that process are "part of the sovereign's obligation to preserve the basic conception of a political community."  *Id.* at 287.  (quoting *Foley*, 435 U.S. at 295–96).

*Bluman* thus teaches that the Act need not target *quid pro quo* corruption to survive First Amendment scrutiny.  It recognizes that the government has an entirely separate compelling interest in "preventing foreign influence over U.S. elections."  *Id*. at 288 n.3.

Versant attempts to minimize the import of *Bluman* by asserting that its recognition of a compelling interest in preventing foreign election interference is mere "dictum" of a lower court and that the question has never been addressed by the U.S. Supreme Court.  Versant Mem. at 16.  Both these assertions are wrong.  Because recognition of a compelling interest in preventing foreign influence was essential to the Court's judgment upholding the law, it is a holding of the case, not dictum.  *Arcam Pharm. Corp. v. Faria*, 513 F.3d 1, 3 (1st Cir. 2007).  And, because that holding was then summarily affirmed by the Supreme Court, it is nationwide precedent binding on the lower federal courts.  *United States v. Singh*, 979 F.3d 697, 711 (9th Cir. 2020) (recognizing *Bluman* as authoritative precedent).

Like the federal law upheld in *Bluman*, the Act is an effort by the people of Maine to "preserve the basic conception of a political community."  *Bluman*, 800 F. Supp. 2d at 288 (quoting *Foley*, 435 U.S. at 295–96).  Indeed, the Act targets a more invidious threat to that political community than contributions by mere foreign nationals.  It is concerned with efforts (and the appearance of efforts) by foreign *governments* to influence Maine's electoral process.  While foreign nationals residing and working within the United States for years, like the unsuccessful *Bluman* plaintiffs, might reasonably be expected in many cases to engage in electioneering activities out of some sense of loyalty or civic duty to the country in which they reside, the same cannot be said about foreign governments.  Foreign governments exist to protect and further their own national interests, which may not align with those of Maine or the United States.  Thus, when foreign governments seek to influence U.S. elections, they may be assumed

17

to be acting based on *realpolitik* considerations of national interest, and not out of any sort of

concern for the best interests of members of Maine's political community.  At best, a foreign

government should be expected to be indifferent to whether a particular electoral outcome

benefits Maine citizens.  At worst, hostile foreign governments may seek to influence Maine

elections precisely because they believe that a particular outcome would harm the United States,

to the foreign government's advantage.  *See generally* Mueller Report at 14–17.

Indeed, the recognition of curbing foreign-government influence over the political affairs

of the United States as a compelling state interest long predates *Bluman.*  The Founders

themselves had an "obsession with foreign influence derived from a fear that foreign powers and

individuals had no basic investment in the well-being of the country."  Zephyr Teachout, *The

Anti-Corruption Principle*, 94 Cornell L. Rev. 341, 393 n.245 (2009).  John Adams wrote to

Thomas Jefferson in 1787, "You are apprehensive of foreign Interference, Intrigue, Influence.

So am I.—But, as often as Elections happen, the danger of foreign Influence recurs."  Letter to

Thomas Jefferson from John Adams (Dec. 6, 1787).[10]  The Founders' deep concern about

foreign-government influence is enshrined in Article I of the Constitution, which prohibits U.S.

officials from accepting "any present, Emolument, Office, or Title, of any kind whatever, from

any King, Prince, or foreign State."  U.S. Const. art I, § 9, cl. 8.  The clause was "directed against

every kind of influence by foreign governments upon officers of the United States." Op. O.L.C.

96 (June 3, 1986)[11] (quoting prior opinions).  Like the emoluments clause, the Act is aimed to

limit the ability of foreign governments to influence Maine's internal affairs, whether through

---

[10]  Available at https://founders.archives.gov/documents/Jefferson/01-12-02-0405.

[11]  Available at https://www.justice.gov/d9/olc/opinions/1986/06/31/op-olc-v010-p0096_0.pdf.

potentially corrupting campaign contributions or by drowning out domestic voices with massive independent expenditures.

The factual record confirms that the problem of foreign-government influence in Maine elections is "not an illusory one." *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 391 (2000) (quoting *Buckley v. Valeo*, 424 U.S. 1, 27 (1976)). Most notably, the record shows that a corporation 100% beneficially owned by a foreign government (HQUS) spent more than $22 million to influence the outcome of Maine's 2020 and 2021 referendums involving the CMP Corridor, a project that involved construction of transmission lines through Maine so that a foreign government could sell electricity to Massachusetts. Wayne Decl. ¶¶ 13–15; Bolton Decl. Ex. A at 77–78 (Ex. 99.1 at 71–72). The record further shows that ENMAX, a company directly owned by the municipal government of Calgary, spent nearly $16 million to seek to defeat last year's referendum to reorganize how Maine transmits and distributes electricity within its borders. Wayne Decl. ¶¶ 17, 19. And the record shows that CMP and its affiliates—companies owned indirectly by a parent whose largest investor is the sovereign wealth fund of Qatar[12]— spent over $70 million on influencing Maine elections in the last decade. *Id.* ¶ 20. The amounts spent by these FGIEs in Maine are staggering; only one other commercial source, NextEra Energy, spent a comparable amount ($20.8 million) in the last decade. *Id.* ¶ 19 & Ex. B. And this spending was not limited to referenda questions; both Versant and the CMP companies have spent to influence candidate elections in Maine as well. Wayne Decl. ¶ 18; CMP Compl. ¶ 32.

Maine's recent experience with overwhelming election spending by entities such as HQUS that are necessarily pursuing the interests of their foreign-government owners

---

[12]   *See* Iberdrola, *Holdings of significant shareholders and the Board of Directors*, at https://www.iberdrola.com/shareholders-investors/share/share-capital/shares (last visited Jan. 12, 2024).

distinguishes this case from *Minnesota Chamber of Commerce v. Choi*, 2023 WL 8803357 (D. Minn. Dec. 20, 2023). In that case, the court enjoined a law far broader than the Act—it covered companies in which any foreigner owned as little as 1% of the company's stock—in part because the state did not offer sufficient evidence of actual foreign interference in Minnesota elections. *Id.* at *8 ("Nor has the [defendant] identified any examples of foreign influence in Minnesota elections"). In contrast, the record here contains stark examples of massive influence campaigns by companies that are as much as 100% owned and controlled by foreign governments.

Moreover, Maine's compelling interest is not limited to preventing actual foreign-government influence in its elections. Maine has an equally compelling interest in preventing the *appearance* of such foreign-government influence. The rationale for recognizing this interest as compelling is the same as the long-recognized rationale that supports laws preventing the appearance of corruption. The Supreme Court has explained that "[a]voiding the appearance of improper influence "is also critical . . . if confidence in the system of representative Government is not to be eroded to a disastrous extent." *Buckley*, 424 U.S. at 27. "Leave the perception of impropriety unanswered, and the cynical assumption that large donors call the tune could jeopardize the willingness of voters to take part in democratic governance." *Shrink Mo.*, 528 U.S. at 390.

Like laws that prevent the appearance of corruption, the Act will prevent voters' confidence in Maine's democratic institutions from being "eroded to a disastrous extent." *Buckley*, 424 U.S. at 27. If foreign governments can lawfully spend tens of millions of dollars to influence Maine's elections (or on advertising to sway the public on other matters of public concern without disclosure of their role), voters may well develop a similar "cynical assumption" that Maine elections—and thus democratic outcomes—are being manipulated by foreign

governments and their U.S. proxies, with Mainers and other non-governmental voices drowned out.  Such assumptions could lead to disillusionment and disengagement with Maine's electoral processes, just as assumptions of rampant corruption bred by unregulated contributions—whether or not those assumptions are accurate in every case—would lead to such results.

The fact that the Act was approved by voters by an overwhelming—indeed, historic—margin is strong evidence of Mainers' perception that foreign-government interference in their elections is a real and alarming problem.  *See* Bolton Decl., Ex. F.  Courts have recognized far less than the 86% support given to the Act as evidence supporting a state interest in avoiding the appearance of corruption.  *See Shrink Mo.*, 528 U.S. at 394 (citing 74% approval of contribution-limits referendum as "attest[ing] to the perception" by voters of corruption); *Daggett*, 205 F.3d at 458 (citing referendum that passed by 56% of voters[13] as "indicative of [Maine voters'] perception of corruption").

As further proof that Mainers perceive foreign-government influence in their elections to be a substantial problem, the record shows a high level of bipartisan concern in Maine over foreign-government influence.  Bolton Decl. Exs. B–E.  Moreover, contrary to Versant's assertion that there is "no legislative record supporting the Act," Versant Mem. at 19; *see also* Electors Mem. at 18,[14] there is legislative history underlying both the Act—when it was presented to the Legislature as required by the Maine Constitution—and a predecessor act considered by the 130th Legislature.  *See* Bolton Decl., Exs. D & E.  The legislative history for

---

[13] *See* LD 1823, IB 5, *at* https://www.maine.gov/legis/lawlib/lldl/citizeninitiated/.

[14] The Electors criticize in particular the lack of legislative "findings."  And *Choi* also found the lack of such findings "noteworthy" in enjoining Minnesota's much broader law.  2023 WL 8803357, at *8.  But Maine law prohibits citizens' initiatives from containing findings.  21-A M.R.S.A. § 901(3-A)(4).  The lack of such findings thus cannot be understood as some sort of telling omission.

those L.D.s shows strong bipartisan legislative and public support.  Both L.D.s passed the House and Senate by near-veto-proof majorities.  *See* n.5 & n.6, *supra*.  Testimony in support of both L.D.s show widespread concern about foreign-government influence in elections.  Bolton Decl. Exs. D & E.  Such evidence of public concern may be properly considered in assessing the State's interest in curbing such influence.  *Daggett*, 205 F.3d at 457 (relying on "an abundant file of press clippings" as supporting Mainers' perception of corruption).

The Challengers' argument that the Act is unconstitutional under Supreme Court decisions rejecting spending bans in the context of referendum campaigns should be rejected. CMP Mem. at 7–8 (citing *Citizens Against Rent Control/Coal. For Fair Hous. v. Berkeley*, 454 U.S. 290, 299 (1981), and *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 790 (1978)); Electors Mem. at 20–21 (same).  Putting aside that the Act applies to candidate elections as well as referenda elections, there is no indication in those decisions that the government asserted, or the Supreme Court considered, the state's compelling interest in preventing foreign (or foreign-government) influence in elections.  Indeed, in *Bellotti* the Court's reasoning was based in large measure on the lack of any risk of *quid pro quo* corruption in a referendum, 435 U.S. at 790, a different interest than the one primarily at issue here.  Therefore, some of the more sweeping dicta in those cases about the lack of government interests, *e.g.*, *Citizens Against Rent Control*, 454 U.S. at 299, must be cabined in light of the Supreme Court's subsequent recognition in *Bluman* of a compelling state interest in preventing foreign influence in elections.  565 U.S. 1104.  Referenda elections are as much a "democratic political institution," in which Maine has an obligation to "preserve the basic conception of a political community," *Foley*, 435 U.S. at 296, as are candidate elections.  Thus, although *Bluman* does not address referenda other than to observe their exclusion from the challenged law did not render it underinclusive, 800 F. Supp. 2d

at 291, this Court should find that Maine has an equally weighty interest in preventing foreign-government influence in its referenda elections as it does in its candidate elections.

Finally, the Challengers argue against Maine's compelling interest in preventing foreign-government influence by appealing to Mainers' alleged "right" to be subjected to messages and advertising by foreign governments and FGIEs.  CMP Mem. at 8–9; Electors Mem. at 21.  The lopsided margin of victory of the Act at the ballot box suggests that the vast majority of Mainers have no interest in any "right" to hear foreign-government messaging telling them how to vote.  Moreover, none of the caselaw cited by the Challengers suggests that the right to hear—an interest that is always present in First Amendment speech contexts—could somehow negate an otherwise compelling interest by the government in disallowing that speech.  After all, a citizen's interest in hearing a television commercial produced by a foreign government praising Joe Biden or Donald Trump is presumably no different than in hearing a television commercial by the same foreign government praising the CMP Corridor.  Both could potentially "inform[] the public" and provide information from "diverse and antagonistic sources."  CMP Mem. at 9 (quoting *Bellotti*, 435 U.S. at 776–77, 790).  *Bluman* establishes that the government's compelling interest in preventing foreign influence in elections allows the government to bar its citizens from hearing the former.  The same should go for the latter.

In short, because Maine, as recognized in *Bluman*, has a compelling interest in limiting foreign-government influence in its elections, and has a further compelling interest in limiting the appearance of such influence, the Corporate Challengers' arguments that the Act is unconstitutional because it is does not narrowly focus on preventing *quid pro quo* exchanges between foreign governments and elected leaders is inapposite.

**B.      The Act is narrowly tailored.**

The Challengers also assert that the Act is facially unconstitutional for lack of narrow tailoring. In fact, the Act is neither overinclusive nor underinclusive in its scope.

1.      *The Act is not overinclusive.*

In arguing the Act is overinclusive, the Challengers devote most of their attention to the middle prong of the three-prong definition of a "foreign government–influenced entity"—an entity with respect to which a foreign government or entity majority-owned by a foreign government "[h]olds, owns, controls or otherwise has direct or indirect beneficial ownership of 5% or more of the total equity, outstanding voting shares, membership units or other applicable ownership interests." 21-A M.R.S. § 1064(1)(E)(2)(a). The Challengers assert that, even if Maine has a compelling interest in regulating foreign-government influence in elections, this ownership threshold is too low. CMP Mem. at 10; Versant Mem. at 20–22.

The 5% ownership threshold is appropriate because it directly furthers Maine's compelling interest in limiting foreign-government influence in its elections. This 5% threshold is not arbitrary; it is the amount of ownership that federal securities law recognizes as so significant as to require a special disclosure if it occurs in a publicly traded company. Under the Securities Exchange Act of 1934, as amended by the Williams Act, "[a]ny person" who acquires "directly or indirectly the beneficial ownership . . . of more than 5 per centum" of any equity security subject to registration, must file a statement with the SEC. 15 U.S.C.A. § 78m(d). That statement must include, among other things, the "identity, residence, and *citizenship*" of the beneficial owner. *Id.* (emphasis added). As one court has explained, "[t]he purpose of the Williams Act was to protect the investors in target corporations from takeover bidders who up to that point had been able to operate in secrecy." *Fla. Commercial Banks v. Culverhouse*, 772 F.2d 1513, 1515 (11th Cir. 1985). This provision allows shareholders to "obtain adequate

information about the qualifications and intentions of the offering party before responding to the offer." *Gearhart Indus., Inc. v. Smith Int'l, Inc.*, 741 F.2d 707, 713 (5th Cir. 1984). The 5% disclosure threshold is thus based on a recognition by Congress that shareholders with that magnitude of ownership wield real power in the affairs of the corporation, to the point of taking over a company in its entirety.

The Williams Act is not the only federal law recognizing that an investor can have significant influence over a corporation without having a majority ownership stake. Federal law prohibits the Federal Communications Commission from issuing broadcast licenses to corporations partly owned by foreign nationals or governments, including "any corporation of which more than one-fifth of the capital stock is owned of record or voted by aliens or their representatives or by a foreign government or representative thereof or by any corporation organized under the laws of a foreign country." 47 U.S.C.A. § 310(b)(3). These provisions "reflect a long-standing determination to 'safeguard the United States from foreign influence' in broadcasting." *Moving Phones P'ship L.P. v. FCC.*, 998 F.2d 1051, 1055 (D.C. Cir. 1993) (quoting *Kansas City Broadcasting Co.*, 5 Rad. Reg. (P & F) 1057, 1093 (1952)). While Congress happened to have chosen a different ownership threshold than the one established by the Act, the broadcasting license restriction, which has remained in place without apparent legal challenge since 1934, 48 Stat. 1086, demonstrates Congress's policy judgment that allowing U.S. companies with minority foreign-government ownership stakes to speak over U.S. airwaves poses unacceptable risks of foreign influence within the United States. The Act addresses these same concerns about foreign influence by a minority foreign-government owner of a corporation.

CMP protests that the 5% threshold "sweeps in U.S. companies . . . that are incorporated in Maine, governed by boards of directors and officers who are U.S. citizens, and which make

25

independent decisions concerning their political spending."  CMP Mem. at 10.  But this argument ignores that such U.S. managers are inextricably linked to their foreign-government investors by the duty of loyalty that corporate directors owe to their shareholders.  *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 634 (3d Cir. 2007); *Abrams v. McGuireWoods LLP*, 518 B.R. 491, 501 (N.D. Ind. 2014); 3 *Fletcher Cyc. Corp.* § 837.60.  "Corporations have a legal responsibility to manage their business for the benefit of their shareholders."  *Abrams*, 518 B.R. at 501.  "[T]here is authority that a director is a trustee for an individual shareholder and that the directors and officers of a corporation stand in a fiduciary relationship to the individual shareholders."  3 *Fletcher Cyc. Corp.* § 848 (citing caselaw in many jurisdictions).

*Bluman* notes that the government's compelling interest in barring temporary residents from election spending was based in part on the fact that such residents "have primary loyalty to other national political communities, many of which have interests that compete with those of the United States."  800 F. Supp. 2d at 291.  Those same loyalty concerns exist when U.S. companies with significant foreign-government ownership make decisions about election spending. The managers of such corporations are not just free to consider the interests of their foreign-government owners and investors; they are *obligated* to do so based on their fiduciary responsibilities.  As Justice Stevens observed in *Citizen's United*, "when corporations use general treasury funds to praise or attack a particular candidate for office, it is the shareholders, as the residual claimants, who are effectively footing the bill."  558 U.S. 310, 475 (Stevens, J., concurring in part).

Indeed, as Versant concedes, the failure of managers to adequately consider the interests of their large investors could expose corporate officers to shareholder derivative actions by their foreign-government investors.  Versant Mem. at 21.  For example, had CMP managers done

26

nothing to oppose cancellation by referendum of its Corridor project, shareholders of one of its parents could assert breach of fiduciary duty due to lost returns on that project. Even if, as Versant speculates, foreign government shareholders would have an uphill battle, *id.*, the fact remains that corporate managers bound by a duty of loyalty can be expected to take into account the interests of its largest shareholders when making decisions about corporate election spending.

Nor is it correct, as Versant argues, that a five-percent owner of a corporation has an "insignificant" voice in corporate affairs or that such an ownership stake is "de minimis." Versant Mem. at 20. A 5% ownership stake in a large publicly traded corporation is exceptional. Iberdrola, CMP's ultimate parent company, has only two such investors, with the largest being the foreign government–owned Qatar Investment Authority.[15] Given Iberdrola's market capitalization,[16] Qatar's 8.7% ownership amounts to 6.8 *billion* euros in equity. A decision by such a large investor to sell its shares due to dissatisfaction with corporate management would be a major event for Iberdrola. It is simply not plausible that corporate managers would be inattentive to preferences and interests of such large investors.

Courts have recognized that investors who own stakes of well below 50% in corporations—so called "blockholders"—can wield significant, even overwhelming, power at shareholder meetings.[17] As the Delaware Court of Chancery has explained, a 40% block holder will have a controlling vote at a typical shareholder meeting, in which about 80% of eligible

---

[15] Iberdrola, *Holdings of significant shareholders and the Board of Directors*, at https://www.iberdrola.com/shareholders-investors/share/share-capital/shares (last visited Jan. 10, 2024).

[16] *See* Iberdrola, *Fact Sheet*, at https://www.iberdrola.com/shareholders-investors/fact-sheet (last visited Jan. 10, 2024).

[17] Federal law sets ownership thresholds as low as $2,000—well below 5% for a corporation of any size—for an investor to place a shareholder proposal on the company's proxy statement. *See* 17 C.F.R. § 240.14a-8.

voting shares are present.  *See Voigt v. Metcalf*, No. CV 2018-0828-JTL, 2020 WL 614999, at

\*18 (Del. Ch. Feb. 10, 2020).  Blockholders with substantially lower ownership also enjoy

substantial voting power, since unaffiliated shares typically need to split decisively against the

blockholder—something that rarely happens—to overcome the blockholder's mathematical

advantage in a plurality election in which some voting shares are not present.  *Id.*  What is more,

"[a] large block also gives its owner additional rhetorical cards to play in the boardroom,

particularly if the owner can claim to have the most at stake."  *Id.* at \*19.

　　Real-world examples of blockholders exercising significant influence abound.  *See, e.g.*,

*Third Point LLC v. Ruprecht*, No. CIV.A. 9469-VCP, 2014 WL 1922029, at \*\*3–15 (Del. Ch.

May 2, 2014) (describing efforts by blockholders to influence Sotheby's); *EBay, Carl Icahn*

*settle proxy fight*, Associated Press (Apr. 10, 2014) (describing settlement of dispute between

eBay management and 2% blockholder).[18]  Indeed, news reports indicate that the Qatar

Investment Authority—CMP's foreign-government part owner—has aggressively used a

minority ownership stake to influence corporate affairs.  *See* Dinesh Nair, *Qatar flexes muscle in*

*shock Glencore move*, Reuters (June 27, 2012) (describing Qatar as "a potential kingmaker" in a

takeover bid due to 11% ownership stake).[19]  An academic review of hedge-fund blockholders

recounts examples of funds with 5.8% and 7.9% stakes in companies influencing the companies

to, in one case, sell off a portion of its business and, in another, alter its board and corporate

governance.  Alon Brav, et al., *Hedge Fund Activism, Corporate Governance, and Firm*

*Performance*, 63 J. Fin. 1729, 1739–40 (2008).  Another such review lists numerous cases in

---

　　[18]　Available at https://apnews.com/ebay-carl-icahn-settle-proxy-fight-eb41697300ca4485ba
738d3f30b31e64.

　　[19]　Available at https://www.reuters.com/article/us-qatar-glencore-fund-idUSBRE85Q
09F20120627/.

which funds with ownership stakes of less than 10% used their influence to obtain board seats or secure other corporate changes.  Thomas W. Briggs, *Corporate Governance and the New Hedge Fund Activism: An Empirical Analysis*, 32 J. Corp. L. 681, 724–37 (2007).  These examples show that blockholders with relatively small ownership stakes hold substantial power to influence the actions of corporate management and that the Act is not overinclusive in regulating entities in which foreign governments own such stakes.

### 2.   *The Act is not underinclusive.*

Versant and CMP also offer underdeveloped arguments that the Act is underinclusive because it fails to ban lobbying by FGIEs.  Versant Mem. at 22; CMP Mem. at 11.  *Bluman* rejected a similar argument that the FECA ban on foreign-national election spending was underinclusive because it failed to include lawful permanent residents.  Citing *Buckley*, *Bluman* notes that "Congress may proceed piecemeal in an area such as this involving distinctions between citizens and aliens."  800 F. Supp. 2d at 291.  And *Buckley* itself recognizes that "a legislature need not strike at all evils at the same time, and that reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind."  *Buckley*, 424 U.S. at 105 (cleaned up).  Here, there is no record evidence that Maine has a problem with foreign-government influence among its lobbyists—and Versant and CMP have not identified any such problem.  In contrast, there is substantial record evidence of massive and unprecedented spending by FGIEs in Maine's recent referendum elections.  That the Act limits itself to address that specific concern makes it *more* narrowly tailored, not less.

### C.   The Electors' additional arguments do not alter the analysis.

The Electors—who challenge only the Act's application to referenda, Electors Mem. at 13—make certain additional arguments under the First Amendment.  None of these arguments change the First Amendment analysis set forth above.

*Right to Petition.*  The Electors argue that the Act violates their right to "petition the Government for a redress of grievances."  U.S. Const. amend. I.  The Electors argue that, because they act as the "Government" when they vote on referenda, they "not only have the right to petition one another, they have the right to be petitioned by one another."  Elector Mem. at 14. From this dubious premise they assert that the Act somehow violates their right to petition because foreign governments and FGIEs cannot seek to influence them in their "capacities as Electors" and they, in turn, cannot consider those "petitions."  Electors Mem. at 16.

It is far from clear that the right to petition is implicated by the Act.  The "Government" has no rights under the Petition Clause.  *See Lee v. Driscoll*, 871 F.3d 581, 586 n.2 (8th Cir. 2017) ("an elected official has no First Amendment petition or free-speech right to participate in non-public government meetings in her official capacity").  It follows that electors acquire no additional rights beyond what they already possess as citizens merely because they are in some sense acting as the "Government" in a referendum election.  Nor do the Electors cite any authority for the proposition that an FGIE is somehow petitioning the Government for a redress of grievances within the meaning of the Petition Clause when it contributes to a BQC or PAC.

None of this matters, however, since the Electors seem to ultimately agree that the well-worn constitutional standards applicable to other campaign-finance laws should apply here. Electors Mem. at 18; *see Duryea v. Guarnieri*, 564 U.S. 379, 398 (2011) (holding that same legal test applies to First Amendment claims by public employees whether brought under the Speech or Petition Clause).  Because the Act furthers a compelling government interest in a narrowly tailored manner, *see* Part I above, whether it may implicate the Electors' right to petition is irrelevant.

*Freedom of Association*.  The Electors also assert that the Act infringes on their freedom of association.  But the fact that contribution restrictions affect free association is already baked into the standard constitutional analyses discussed in Part II.  *See McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 136 (2003).  There is no reason for the Court to separately consider it.

*Freedom of Speech*.  The Electors claim that the Act restricts their "right to receive speech."  Electors Mem. at 21.  This argument, too, adds nothing.  While the Electors are correct that they have a right to receive protected speech, that right is "entirely derivative" of "whatever rights [the speaker] may have to engage in the prohibited speech and political activity."  *Spargo v. N.Y. State Comm'n on Jud. Conduct*, 351 F.3d 65, 83–84 (2d Cir. 2003); *see also Frissell v. Rizzo*, 597 F.2d 840, 848 (3d Cir. 1979) ("the right to hear flows from and depends upon the right to speak").  If the Act's restrictions are constitutional as applied to FGIEs, they are constitutional as applied to the small minority of Mainers who voted to hear such speech.

*Freedom of the Press*.  The Electors make a cursory argument that the Act's regulation of the media violate their right to freedom of press.  Electors Mem. at 22.  As with their speech claim, any right held by consumers of media is derivative of whatever right the media might have to publish such advertisements.  *See United States v. Any & All Radio Station Transmission Equip.*, 204 F.3d 658, 666 (6th Cir. 2000) ("nobody has a First Amendment right to hear radio broadcasts from a station that does not have a First Amendment right to broadcast them").  Because the media has no such right, *see* Part III, below, the Voters' claim also fails.

*Freedom of Assembly*.  The Electors make a similarly cursory argument that the Act violates their freedom of assembly, reasoning that the right encompasses "the right to discuss and inform people."  *Id.* at 22.  Even if that is so, the Electors do not explain how or why a freedom

of assembly claim based on a supposed right to "discuss and inform people" should be analyzed differently than a freedom of speech claim.  This argument, too, adds nothing.

> **D.  Even if some applications of the Act were unconstitutional, the Challengers could not satisfy the high standard for facial invalidation.**

In considering an overbreadth challenge, courts should "vigorously enforce[] the requirement that a statute's overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep."  *Williams*, 553 U.S. at 292.  Here, even if the Challengers convince the Court that the 5% ownership threshold is too low, the Act would not be facially invalid because the potentially unconstitutional applications are dwarfed by its "plainly legitimate sweep."  Specifically, the Act could still be constitutionally applied to (a) foreign governments themselves, (b) entities controlled (as opposed to just influenced) by foreign governments, and (c) entities that allow foreign governments or foreign government–controlled entities to direct, dictate, control or directly or indirectly participate in their decision-making process with regard to election spending, and (d) FGIE contributions to candidates.

*Foreign governments*.  First, there can be no doubt that the Act is constitutional as applied to the first category of FGIE, actual foreign governments.  *See* 21-A M.R.S. § 1064(1)(E)(a).  As the Supreme Court has recently held, "foreign organizations operating abroad have no First Amendment rights."  *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 140 S. Ct. 2082, 2088 (2020).  It necessarily follows that foreign governments, which are a type of "organization" that, by definition, "operat[es] abroad," are also outside of the protection of the First Amendment.  Moreover, even if those governments could somehow assert First Amendment rights, *Bluman* confirms that the state's compelling interest in preventing foreign influence in elections would permit restricting their speech in candidate elections.  800 F. Supp. 2d at 292.  The same interest applies with equal force to referenda elections.  *See* Part I.A.

That enforcement of violations against foreign governments may prove challenging or impossible in some cases does not alter that the Act's regulation of foreign government electoral activity within Maine is within its plainly legitimate sweep. Even if enforcement against foreign governments would be difficult, the Act could still be enforced against persons providing substantial assistance to such activities by foreign governments or those who accept contributions offered by foreign governments. 21-A M.R.S. § 1064(2)–(3).

*Entities Controlled by Foreign Governments*. The Act's "plainly legitimate sweep"—regardless of the constitutionality of the 5% threshold—also encompasses entities in which a foreign government or FGOE has legal control over an entity. Under principles of corporate law, a stockholder may be considered to have such control in two ways: if it "(1) owns more than 50% of the voting power of a corporation or (2) owns less than 50% of the voting power of the corporation but '*exercises control* over the business affairs of the corporation.'" *In re KKR Fin. Holdings LLC S'holder Litig.*, 101 A.3d 980, 991 (Del. Ch. 2014) (quoting *Kahn v. Lynch Commc'ns Sys., Inc.*, 638 A.2d 1110, 1113–14 (Del. 1994)). Such entities—which would include HQUS, ENMAX, and Versant[20] based on their 100% beneficial ownership by foreign governments—differ from other FGIEs in that the ability of the government to direct the corporation's affairs is significantly greater. As the Chancery Court has noted, a controlling stockholder is an "800-pound gorilla . . . able to exert coercive influence over the board and unaffiliated stockholders." *Tornetta v. Musk*, 250 A.3d 793, 800 (Del. Ch. 2019). The concern is thus not just foreign-government influence, but full-blown control over the entity's affairs.

---

[20]   Versant's argument that its PUC stipulation renders it free from foreign government control, Versant Br. at 26, is addressed in Part II below.

The Supreme Court has suggested that such corporate entities might be properly excluded from election spending in U.S. elections.  In striking down the ban on independent expenditures by corporations, *Citizens United* observed that the overbreadth of the law made it unnecessary to decide whether the law might be constitutional as applied "to corporations or associations that were created in foreign countries *or funded predominately by foreign shareholders*."  *Citizens United*, 558 U.S. at 362 (emphasis added).  The Supreme Court's phrasing of this observation suggests it saw little distinction between a corporation created in a foreign country and a corporation funded predominately by foreign shareholders.

That makes sense.  A controlling shareholder has the right to direct the affairs of the corporation, subject only to any duties that it might owe to minority shareholders.  And, in the case of 100% foreign-government owned corporations, like Versant, ENMAX, and HQUS, the duty of loyalty owed by corporate managers makes the interests of the U.S. subsidiary and the foreign-government owner one and the same.  As one court has explained:

> In the wholly-owned subsidiary context . . . there is only one shareholder—the parent corporation. The manager of the wholly-owned subsidiary, then, is obligated to act for the good of the parent company. There's no reason to consider the subsidiary's interest apart from the parent's, as, by definition, what's good for the parent is good for the subsidiary.  Or, putting it another way, wholly-owned subsidiaries are expected to operate for the benefit of their parent corporations; that is why they are created.

*Abrams*, 518 B.R. at 501 (internal citations omitted).  Thus, when HQUS or Versant acts, they can be assumed to be acting to further the interests of their ultimate owners—the governments of Québec and Calgary respectively.  This assumption holds regardless of whether they are receiving explicit direction from those governments on Maine election spending.

Moreover, if states were without the power to regulate such U.S. entities, they effectively could not regulate foreign-government interference in their elections at all.  Foreign governments

would be free to direct their U.S. subsidiaries to spend in particular ways.  And, in the case of referenda elections, where FECA's prohibitions on use of foreign money do not apply, a foreign government could even set up a U.S. shell company—which could hold no assets and engage in no activities other than funneling money from the foreign government into referendum elections—and thereby immunize itself from any law restricting the foreign government's ability to participate in elections.  The First Amendment cannot possibly compel such a result.

*Entities Actually Influenced by Foreign Governments*.  The Act also has a plainly legitimate sweep in regulating entities in which foreign governments or FGOEs direct, dictate, control, or directly or indirectly participate in their decision-making process concerning election spending.  Since companies (unless they are actually controlled by foreign governments) can choose whether to allow such participation in their internal decision making, this requirement is not really a speaker-based distinction at all.  Rather, it operates as a prohibition on foreign governments and FGOEs seeking to influence elections through active efforts to control or influence the decision-making process of other entities.  Even if Maine does not have a compelling interest in regulating the election spending of U.S. companies that are only passively influenced by their foreign-government shareholders, it surely has a compelling governmental interest in prohibiting such active foreign-government influence efforts directed at U.S. companies.  *Choi*, 2023 WL 8803357 at *6 (recognizing state's compelling interest in preventing "foreign shareholders of domestic corporations" from "controlling or exercising influence over a corporation's election expenditures").

*Contributions*.  Finally, the Act has a plainly legitimate sweep in barring FGIEs from making candidate contributions.  Banning corporate contributions to candidates is permissible under the more "complaisant" constitutional standard applicable to contribution restrictions.

*Beaumont*, 539 U.S. at 161–62.  The Act is even more closely drawn than the federal law upheld in *Beaumont*, as it targets the government's distinct and heightened interest in stamping out *quid pro quo* corruption and its appearance between elected officials and foreign governments.[21]

### E.    The disclaimer provision is constitutional.

The Challengers also assail subsection 6 of the Act, which requires FGIEs to identify themselves as such in certain "public communications" as unconstitutional "compelled speech." Versant Mem. 25; CMP Mem. 13.  In fact, such on-ad disclaimer provisions are commonplace in campaign-finance laws as a "less restrictive alternative" to prohibiting speech and are upheld as long as they satisfy the more deferential "exacting scrutiny" standard.  *Citizens United*, 558 U.S. at 366–68.  Under exacting scrutiny, "a law or regulation must be narrowly tailored to serve a sufficiently important governmental interest."  *Gaspee Project*, 13 F.4th at 85.  Exacting scrutiny requires only a "substantial relation" between the challenged regulation and the governmental interest.  The "fit" need not be "perfect," but merely "reasonable."  *Id.*

The First Circuit recently had occasion to address disclaimer requirements such as this one in *Gaspee Project v. Mederos*.  There the court rejected a facial First Amendment challenge to a Rhode Island law that required certain public communications pertaining to candidate or referendum elections to include the name of the sponsoring entity and its five largest donors.  *Id.* at 83.  The court concluded that the state's interest "in an informed electorate vis-à-vis the source of election-related spending is sufficiently important to support reasonable disclosure and disclaimer regulations."  *Id.* at 86.

---

[21]    *See, e.g.*, Aysha Bagchi and Josh Meyer, "Sen. Bob Menedez faces new allegations he received bribes to aid Qatari government," *USA Today* (Jan. 2, 2024), available at https://www.usatoday.com/story/news/politics/2024/01/02/sen-bob-menedez-new-allegations-qatari-government/72088900007/.

Subsection 6's disclaimer provision serves an almost identical state interest to the one found sufficiently important in *Gaspee Project.* Subsection 6 targets actions by FGIEs that, like election spending, seek to influence public opinion in a manner that will produce favorable governmental policies for the FGIE. The only difference is that subsection 6 targets "public communications" by FGIEs—essentially, advertising, *see* 21-A M.R.S. § 1064(1)(H)—to influence the citizenry to support policies beneficial to the FGIE. *See id.* § 1064(6).

CMP argues that the state's interest in an informed citizenry does not extend beyond electoral contexts. CMP Mem. at 15. But the First Circuit has discussed the public's informational interests in broader terms. In *National Organization for Marriage v. McKee*, in the course of affirming a campaign-finance law, it explained that the public's informational interest "is not limited to informing the choice between candidates for political office":

> [T]here is an equally compelling interest in identifying the speakers behind **politically oriented messages**. In an age characterized by the rapid multiplication of media outlets and the rise of internet reporting, the "marketplace of ideas" has become flooded with a profusion of information and political messages. Citizens rely ever more on a message's source as a proxy for reliability and a barometer of political spin. Disclosing the identity and constituency of a speaker engaged in political speech thus "enables the electorate to make informed decisions and give proper weight to different speakers and messages."

649 F.3d 34, 57 (1st Cir. 2011) (emphasis added); *see also Grosjean v. Am. Press Co.*, 297 U.S. 233, 250 (1936) ("informed public opinion is the most potent of all restraints upon misgovernment"). Advertising seeking to influence Mainers to contact their legislators, attend public hearings, or simply to form an opinion favorable to the FGIE on a policy matter, can only be characterized as "politically oriented messages," even if the advertising is not connected with a specific election. In either case, the advertising seeks to influence or mobilize Maine citizens to produce a political outcome favorable to the FGIE. Requiring FGIEs engaged in such public

37

messaging to identify themselves and their nature is well within the state's important interests in arming Maine citizens with the information they need to evaluate such messages.

CMP also argues that the disclaimer requirement should be subject to strict scrutiny because it requires FGIEs to "characterize themselves" in a manner that is "potentially damaging to the company's reputation because it implies a level of foreign control that may be misleading or even false." CMP Mem. at 14. But CMP cannot muster a single decision in which a court applied strict scrutiny to a disclaimer requirement in an elections context. Rather, CMP attempts to rely on *National Institute of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018), where the Supreme Court applied strict scrutiny to a law requiring organizations opposed to abortion to provide clients with a "government drafted script" with information on how to obtain a state-sponsored abortion. The Act's requirement that FGIEs include disclaimers in their advertisements disclosing—accurately—that they are partly owned by a foreign-government or FGOE (or otherwise influenced by them) is nothing like a law requiring an organization to speak in a manner antithetical to its deeply held beliefs. Indeed, it is little different than the requirement upheld in *Gaspee* that the speaker disclose the identity of its largest donors. In either case, voters could conceivably draw false conclusions about the level of influence held by the investor/donor. *See Gaspee Project,* 13 F.4th at 92 (rejecting argument that on-ad disclosure of donors might "mislead a viewer").

CMP is also mistaken that the required disclaimer could be "misleading or even false." CMP Mem. at 14. The disclaimer requires the FGIE to accurately state that it falls within the statutory definition of an FGIE, nothing more. And, even if a viewer might read more into it, they would not be mistaken to do so; managers' fiduciary obligations to their stockholders means

that they are necessarily "influenced" by a significant foreign stockholder regardless of whether the stockholder has taken overt steps to exercise that influence. *See* Part I.B.1 above.

Moreover, to the extent that an FGIE is concerned that the bare disclaimer required by the Act will not fully apprise viewers of the particular level of foreign-government influence to which it is subject, it can always provide more context. Nothing in the Act would prevent CMP from making a disclosure stating: "Sponsored by Central Maine Power, a foreign government–influenced entity as defined in Maine law because it is 10.8% owned by the Qatar Investment Authority." Such a disclaimer would comply with the statute while also making clear to the public the extent of Qatar's ownership stake. Similarly, Versant could include in its disclaimer the fact of its PUC stipulation. And by adding the phrase "as defined in Maine law"—which the Commission's rules will likely expressly permit, *see* Wayne Decl. ¶ 29—the companies can make clear that they are stating that they meet a legal definition, nothing more.

## II.      Versant's As-Applied Challenge to the Act Is Unlikely to Succeed.

Versant alone also asserts an as-applied challenge to the law as a basis for a preliminary injunction. Versant Mem. at 26. Versant asserts that the Act is unconstitutional as applied to it because it entered into a stipulation in PUC proceedings in which it agreed to certain restrictions on the City of Calgary's involvement in Versant's business. Versant asserts that this stipulation establishes that it is "not in any way foreign-government-influenced." *Id.*

Versant is unlikely to succeed on its as applied challenge, for at least three reasons:

First, as already discussed in Part I.B.1, stockholder influence on a corporation's management takes more forms than direct participation by the stockholder in the corporation's decision-making. The fiduciary duty of management to their investors means that management will necessarily be influenced by what they perceive to be the interests, preferences, and expectations of their largest shareholders, even if those shareholders do not actively seek to

influence corporate affairs.  Versant's case is the most clear-cut of them all: a situation in which a foreign government beneficially owns 100% of the corporation.  In this situation, "what's good for the parent is good for the subsidiary."  *Abrams*, 518 B.R. at 501.  Thus, regardless of whether Calgary is issuing marching orders to Versant on political spending, Versant is necessarily "influenced" by its their foreign-government owner in such decision-making.

Second, Versant's stipulation is hardly an ironclad pledge that the City of Calgary will not attempt to more overtly influence Versant's political decision-making in Maine.  As recounted in the Verified Complaint, the stipulation provides that Calgary will not have "decision-making authority regarding [Versant's] operations and management" and places some restrictions on who can serve on Versant's board.  Versant Compl. ¶ 78.  But lack of "decision-making authority" by Calgary or its ability to place city officials on Versant's board does not equate to a prohibition on Calgary seeking to *influence* its wholly owned subsidiary to take political actions favorable to the city.  Nothing in any of the documents described in the Verified Complaint appears to bar such non-authoritative influence.  Versant Compl. ¶¶ 78–89.

Moreover, Versant's as-applied argument against the "actual influence" prong of the FGIE definition, *see* Versant Mem. at 27–28, appears to concede that at least ENMAX *does* [d]irect[], dictate[], control[] or directly or indirectly participate[] in" Versant's election spending.  *See* 21-A M.R.S. § 1064(1)(E)(2)(b).  From the documents described in Versant's complaint, it appears that Calgary has far fewer restrictions on its power to influence ENMAX than it does for Versant.  Among other things, the City has, with certain restrictions, the power "to elect, re-elect, and remove ENMAX's directors," Versant Compl. ¶ 83, and is not subject to any similar restriction on its "decision-making authority" with regard to ENMAX's affairs, *id.* ¶ 78.  Because ENMAX itself may be heavily influenced by the City of Calgary, its own

influence over Versant is just as contrary to the state's compelling interest in preventing foreign-government influence as any influence coming directly from Calgary.[22]

Third, Versant's argument ignores the state's compelling interest in avoiding the appearance of foreign government influence in its elections. *See* Part I.A above. As a 100% foreign-government owned company, any election spending by Versant will be perceived by voters to be spending at the behest of a foreign government. Such perceptions of foreign-government influence undermine voters' confidence in democratic self-governance.

*Disclaimer Provision.* Versant's as-applied challenge also encompasses the disclaimer provision in subsection 6. Versant Mem. at 28. Given the lower constitutional scrutiny that applies to such provisions, Versant's as-applied challenge to that provision is even weaker. Maine voters have a sufficiently important interest in knowing whether a corporation running advertisements on matters of public concern is 100% beneficially owned by a foreign government, as Versant is. For the reasons just stated, that interest is compelling no matter what agreements the corporation may have voluntarily entered into limiting the involvement of its foreign-government owner in decision-making.

## III.   Media Plaintiffs Are Unlikely to Prevail on Their First Amendment Claims.

Media Plaintiffs advance four theories as to why subsections 7 and 8 of the Act should be enjoined. First, they claim that the Act's modest requirement that they adopt due diligence policies, procedures, and controls constitutes an impermissible burden on the freedom of the

---

[22]   Versant does not attempt to argue that the Act is unconstitutional as applied to ENMAX. Historically, it has been ENMAX, not Versant, that has been the big political spender in Maine, spending $15.9 million of the $16.3 million spent by the two companies combined since 2020. Wayne Decl. ¶¶ 17, 19. But given the identical interests of ENMAX and Versant, a ruling that the Act was constitutional as applied to ENMAX but unconstitutional as applied to Versant would presumably simply lead to Versant taking over ENMAX's role as the lead spender in Maine elections, proving the point that the First Amendment analysis here should not turn on formalities of corporate structure.

press.  *See* Media Mem. at 5–7.  Second, they argue that subsection 7 is not narrowly tailored.  *See id.* at 7–18.  Third, they argue that subsection 7 constitutes an unconstitutional prior restraint.  *See id.* at 18–19.  Fourth, they argue that subsection 8 unconstitutionally imposes liability on media entities without fault.  *See id.* at 19–20.  None of these arguments are likely to succeed.

### A.      Subsection 7's modest requirements comply with the First Amendment.

Subsection 7 requires that media entities "establish due diligence policies, procedures and controls that are reasonably designed to ensure that [they do] not broadcast" political advertisements purchased by FGIEs.  21-A M.R.S. § 1064(7).  Media Plaintiffs view this as a "special burden" that allegedly requires they "conduct some sort of investigation into the ownership of, and the sources of influence over, every political advertiser."  Media Mem. at 5.  Such a read either constitutes either a fundamental misunderstanding of the Act's requirements or a flimsily thatched straw argument.  Regardless of the intent behind the Media Plaintiffs' misread of subsection 7's requirements, their interpretation should be disregarded.

The key word in subsection 7 is the adverb "reasonably."  By requiring due diligence policies, procedures, and controls to be "reasonably designed," i.e., not "perfectly designed," the Act contemplates requirements that do not burden media entities any more than the First Amendment would permit.  While the Act provides the freedom to each media entity to design policies of their own choosing, an entity can satisfy the requirement by adopting nearly costless practices that outsource any burden to their ad buyers.  *See* Wayne Decl. ¶ 27.  Specifically, subsection 10 calls for the Commission to engage in mandatory rulemaking. And the Executive Director of the Commission has attested that he expects proposed rules will establish a "safe harbor" for media entities to avoid any risk of fines, so long as they adopt minimal safeguards, allowing them "to generally rely on self-reporting by [their] advertisers."  *Id.*

42

One basic way to comply with subsection 7's requirements could consist of the following: (1) adopting a policy of not selling campaign advertisements to an organization if the Commission has listed the entity on its public webpage as being an FGIE; (2) establishing a basic procedure when selling political ads whereby a purchaser ticks a checkbox on the ad purchase form, self-certifying that the purchaser is not an FGIE; and (3) implementing a simple control where an employee verifies that the self-certification box was checked by the ad purchaser before airing or publishing the ad.[23]  This virtually cost-free way of complying with the Act, combined with the security blanket of a safe harbor rule, *see* Wayne Decl. ¶ 27, cannot credibly be described as a meaningful "burden" on media entities.

It is not only Defendants' position that such procedures would be minimally burdensome. Media Plaintiffs admit as much.  *See* Media Mem. at 8 ("[A]dvertisers could be required to certify directly to news outlets that they are not foreign government-influenced.  These approaches would be less restrictive in that they would impose less of a burden on news outlets and would not substantially delay the running of political ads.").[24]   And if there were any uncertainty whether subsection 7's requirements should be read to require onerous regulations on the media or instead minimally burdensome standards, "[t]he ordinary rule is that statutes are to be read to avoid serious constitutional doubts, if that course is possible, and it is readily possible

---

[23] These basic requirements contrast starkly with the requirements that the Fourth Circuit found overly burdensome in *Washington Post v. McManus*, 944 F.3d 506, 510 (4th Cir. 2019)—to which Media Plaintiffs cite, Media Mem. at 16–17.  While the Act would impose nearly costless procedures on media entities, the Maryland statute in *McManus* imposed much more "circuitous and burdensome" recordkeeping and disclosure obligations on the media.  *Id.*

[24] The Act seeks to impose no greater burden on media entities than an analogous FCC regulation, which the Media Plaintiffs cite approvingly.  *See* Media Mem. at 15 ("[U]nless a broadcaster is 'furnished with credible, unrefuted evidence that a sponsor is acting at the direction of a third party, the broadcaster may rely on the plausible assurances of the person(s) paying for the time that they are the true sponsor.'" (quoting 29 FCC rcd. 10427 (2014)).

here." *United States v. Rehlander*, 666 F. 3d 45, 49 (1st Cir. 2012) (internal citation omitted); *see also Portland Pipe Line Corp. v. Envtl. Improvement Comm'n*, 307 A.2d 1, 15 (Me. 1973) (noting that the Law Court is duty-bound to adopt interpretation of statutes where an available "reasonable interpretation . . . would satisfy constitutional requirements").

The cases cited by the Media Plaintiffs only serve to underscore the differences between the Act's modest requirements and more burdensome, unconstitutional statutes. *See* Media Mem. at 6. In *Time, Inc. v. Hill*, 385 U.S. 374, 387 (1967), the Supreme Court held that New York's civil rights statutes could not be applied to allow tort damages against a publication unless the publication could be shown to have acted with "proof of knowing or reckless falsity." Yet, in response to the publication's request to strike down the statute as facially unconstitutional, the Supreme Court cautioned that doing so "would not be warranted even if it were entirely clear that" New York courts had previously applied the wrong constitutional standard. *Id.* Instead, the expectation is that state courts can and will apply statutes to the media in accordance with the First Amendment. *Id.* Maine is no different.

In *Braun v. Soldier of Fortune Magazine, Inc.*, 968 F.2d 1110, 1122 (11th Cir. 1992) the Eleventh Circuit actually let stand a jury verdict that found a publication liable for tort damages caused not by the publication of an ad, but actions taken by third-parties who merely consumed the negligently published ads. Here, the Act stops far short of what was nevertheless found to be permissible in *Braun*. No portion of the Act would hold the media liable for an FGIE's attempt to purchase a political ad—successful or not. Instead, a media entity violates the Act only if it willfully refuses to adopt any of the modest policies envisioned by subsection 7 or when an Internet platform discovers post hoc that it published an FGIE ad and willfully opts not to remove the ad from its platform or inform the Commission.

Nor could subsection 7's requirements be viewed as an unconstitutional "tax" on the press for publishing political speech. *See* Media Mem. at 7. In *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 224 (1987), the Supreme Court struck down the application of a state sales tax that exempted some press publications but not others. And in *Simon & Schuster, Inc. v. Members of the New York State Crime Victim's Board*, 502 U.S. 105, 115 (1991), the Supreme Court struck down New York's "Son of Sam" statute meant to compensate victims of violent crimes. But the Court did so because the statute forced publishers contracting with convicted and accused criminals to turn over money owed to said individuals to fund the state's victim compensation fund. *Id.* at 109. This financial penalty constituted an obvious "financial disincentive" to engage in protected speech, based solely on the speech's content. *Id.* at 116.

Subsection 7 bears no resemblance. It imposes no financial penalties on publishers, regardless of the message conveyed. And the only disincentivized speech under subsection 7 is speech that does not enjoy First Amendment protection. *See* Part I above.

**B.     Subsection 7 is narrowly tailored to survive any level of scrutiny.**

Subsection 7 does not formally prevent media entities from speaking in any way. Rather, it furthers the goal of subsection 2's ban on FGIE political ads by (1) requiring media entities to adopt minimal policies to prevent the sale of advertising to FGIEs; and (2) requiring Internet platforms that discover they have published an ad that an FGIE has purchased in violation of subsection 2 to remove the ad and inform the Commission. Any limitations on speech imposed by subsection 7 are therefore wholly derivative of—and go no further than—subsection 2's ban on FGIE spending.

As explained in Part I above, the appropriate level of scrutiny to apply to regulations touching upon alien participation in a state's democratic political institutions is "closely drawn" scrutiny. It would make no sense to allow foreign entities subject to a lower level of First

Amendment scrutiny to level up their constitutional protections merely by laundering their speech through a publisher, and therefore "closely drawn" scrutiny is the appropriate lens to analyze subsection 7.  However, should the Court decide that it must apply strict scrutiny to subsection 7's media regulations, they nevertheless survive because they are narrowly tailored to further Maine's compelling interests in preventing foreign government influence and the appearance of such influence in Maine elections.

The Media Plaintiffs' views regarding the Act's validity are hazy.  On one hand, they proclaim that they "take no position" on whether Maine can outright ban FGIE campaign expenditures.  Media Mem. at 8.  Yet on the other hand they spend significant real estate arguing that restrictions on FGIE campaign expenditures are not narrowly tailored and must be struck down.  *See generally* Media Mem. at 8–18.  In any event, much of the Media Plaintiffs' tailoring argument seems to fall into three buckets: (1) the Act imposes unconstitutional burdens on FGIE speech; (2) the Act imposes unconstitutionally burdensome media regulations; and (3) the Act constitutes a prior restraint on the media.  Each of these arguments is addressed in other areas of this memorandum.  *See* Parts I & III.A above and Part III.C below.  Media Plaintiffs' additional tailoring arguments not addressed elsewhere are addressed below.

The Media Plaintiffs argue that subsection 7 "enlists news outlets to do on the State's behalf" what the state otherwise could not do on its own.  Media Mem. at 9–10.  This is wrong for two reasons.  First, the Act does not actually impose a prior restraint on the media: The media does not risk liability if it publishes an FGIE political advertisement, inadvertently or otherwise.  Liability attaches to the media only if it fails to adopt reasonably designed due diligence policies, procedures, and controls or when an Internet platform discovers that it has assisted an FGIE in

violating subsection 2 by publishing an FGIE political advertisement and subsequently chooses not to remove it from its platform. 21-A M.R.S. § 1064(7).

In no way does the Act "[d]elegat[e] to news outlets the power to ban political speech in advance of its publication." Media Mem. at 11. Media outlets have always enjoyed—and under the Act will continue to enjoy—the power to publish ads of their choice. But the imposition of a modest step whereby media entities request that advertisers self-certify that they are not an FGIE furthers Maine's compelling government interest in two ways, by (1) dissuading FGIEs from violating the Act in the first instance; and (2) demonstrating willfulness on FGIEs' part if they falsely self-certify and purchase an ad in violation of the Act.

Second, blanket bans on unprotected speech that impose liability post-violation do not constitute impermissible prior restraints. *See, e.g.*, *New York v. Ferber*, 458 U.S. 747 (1982) (upholding state ban on child pornography). Instead, prior restraints occur when the government issues an order or otherwise injects itself to stop a speaker from engaging in protected speech before speech occurs. Most prior restraints take the form of a "judicial order *forbidding* certain communications issued in advance of the time that such communications are to occur." *Sindi v. El-Moslimany*, 896 F.3d 1, 31 (1st Cir. 2018) (quoting *Alexander v. United States*, 509 U.S. 544, 550 (1993) (emphasis in *Alexander*)). The cases cited by Media Plaintiffs where a government act was declared unconstitutional underscore this difference. *See, e.g.*, *Matter of Providence J. Co.*, 820 F.2d 1342, 1347 (1st Cir. 1986) (court could not hold publisher in criminal contempt for violating "transparently invalid" order prohibiting publication of protected speech); *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 570 (1976) (court could not validly prohibit publisher from publishing constitutionally protected speech regarding criminal defendant confessions).

Buried deep within a footnote—and citing no case law for the proposition—Media Plaintiffs also assert that subsection 7 is unconstitutional because it "compels political speech" by requiring Internet platforms to notify the Commission if they become aware that an FGIE has purchased a political advertisement from the entity in violation of subsection 2. Media Mem. at 16 n.4. The Media Plaintiffs have waived this argument by failing to develop it in any meaningful manner. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") But waiver aside, the argument holds no water. Requiring an entity to report when it realizes that it has engaged in a commercial transaction in which the other party has violated the law is not unconstitutional compelled speech under the First Amendment.

### C.    Subsection 7 does not constitute an unconstitutional prior restraint.

The Act states that if an Internet platform "discovers that it has distributed a public communication" made by an FGIE in violation of the Act, the Internet platform "shall immediately remove the communication" and notify the Commission. 21-A M.R.S. § 1064(7). The Media Plaintiffs argue that this requirement constitutes an unconstitutional "prior restraint" and that it therefore cannot be enforced. Media Mem. at 18–19. They are wrong.

Indeed, the two cases cited by the Media Plaintiffs illustrate why the provision does not constitute a prior restraint. In *Matter of Providence Journal Company*, a federal district court had issued a temporary restraining order barring local media from publishing material related to an alleged organized crime leader, which the media had obtained from the FBI through a FOIA request. 820 F.2d at 1345. The district court eventually vacated the order, but while the order was in effect, a newspaper published an article containing information obtained from the restrained materials, and the district court found the newspaper in criminal contempt. *Id.* On appeal, the First Circuit held that because the initial restraining order was "transparently invalid,"

48

the newspaper could not be held in criminal contempt for violating such a prior restraint.  *Id.* at 1353.  But the court also acknowledged the difference between a court order that is "transparently invalid" on one hand and those that are "appropriate" and even "merely invalid" on the other.  *Id.* at 1347.  In *Freedman v. Maryland*, 380 U.S. 51 (1965), the Supreme Court reaffirmed its position that not all prior restraints on speech are inherently unconstitutional.  *Id.* at 53–55.  But it nevertheless struck down a Maryland statute which required the submission of films to Maryland's Board of Censors before they could be exhibited.  *Id.* at 59–60.

There are stark differences between the Act's provisions and those at issue in *Providence Journal* and *Freeman*.  Principally, subsection 7's removal provision is not a "prior" restraint at all.  In both court cases, the government—by way of a federal court order in *Providence Journal* and a state censorship board in *Freedman*—was attempting to stop the speaker *before* any message was conveyed.  But here the Act instructs Internet platforms to remove communications *after* they have been conveyed, which by definition is not a "prior" restraint.[25]  Nor does the Act require government approval in advance of publication.

### D.    Subsection 8 does not impose unconstitutional "liability without fault."

The Media Plaintiffs assert that subsection 8 "subjects news outlets to fines for violating the Act without any requirement that the conduct be intentional or even negligent," and therefore it must be struck down as unconstitutional.  *See* Media Mem. at 19–20.  But the Media Plaintiffs

---

[25] Moreover, there are no "due process or procedural safeguards" issues as alluded to by Media Plaintiffs.  *See* Media Mem. at 18.  Subsection 7's removal provision requires Internet platforms to remove unlawful ads only if the platforms, themselves, discover a violation.  If the government discovers that an Internet platform has published an unlawful ad and seeks to impose civil penalties, it would be the advertiser, not the Internet platform at risk of being fined.  The Internet platform risks fines under subsection 8 only if it knowingly discovers a violation and refuses to remove the ad.  And even then, the Internet platform would enjoy the standard hearing and due process protections provided in any matter brought before the Commission.

misinterpret this provision by reading it far too broadly.  In fact, subsection 8 does not provide for no-fault liability against the media at all.

While subsection 8 describes the types of civil monetary penalties the Commission may levy for violations, the only requirements that the Act places upon media entities under which a violation could occur are found in subsection 7.  Subsection 7 imposes just two requirements on the media.  First, media entities must develop basic policies to advance subsection 2's goal of preventing FGIE political campaign expenditures.  As discussed in Part III.A above, these basic policies will likely allow media entities to rely upon self-certification by ad-buyers that those purchasers are not violating the Act.  *See also* Wayne Decl. ¶ 27.  The actual sale of an ad to the media by an FGIE—knowingly or unknowingly—is not a violation.  In other words, the only way in which a media entity could violate this aspect of subsection 7 would be to willfully refuse to develop policies that meet the basic buyer self-certification policies described above.

Second, the other form of violation that could occur under subsection 7 relates to the discovery of an ad sold to an FGIE.  Subsection 7 states that when an "Internet platform discovers that it has distributed [an FGIE political ad purchased] in violation of [the Act], the Internet platform shall immediately remove the communication and notify the commission." The word "discovers" in subsection 7 incorporates a scienter requirement that protects platforms from being held liable for failing to remove an ad or notifying the Commission if the Internet platform was not aware that the ad was purchased in violation of the Act.

Rather than make the Media Plaintiffs' point, the cases they cite only underscore how the Act is different from unconstitutional regulatory regimes.  In *Smith v. California*, 361 U.S. 147 (1959), the Supreme Court struck down a municipal ordinance that imposed strict liability in a criminal context for the sale of obscene materials.  But unlike in *Smith*, where a retailer could be

thrown in jail for selling a book without realizing its contents violated local obscenity laws, media entities can be held civilly liable under the Act only if they willfully violate it—either by refusing to adopt the very minimal policies described above, or refusing to take down an ad they know to violate the Act or inform the Commission of it.  The same types of materially distinguishable elements are evident in the out-of-circuit cases cited by the Media Plaintiffs.  *See Am.-Arab Anti-Discrimination Comm. v. Dearborn*, 418 F.3d 600, 612 (6th Cir. 2005) (striking down ordinance that criminalized a person "who unknowingly participates" in a permitless march"); *Video Software Dealers Ass'n v. Webster*, 968 F.2d 684, 690 (8th Cir. 1992) (striking down state video rental statute that penalized "video dealers regardless of their knowledge of a video's contents"); *Am. Patriot Express v. Glens Falls*, 474 F. Supp. 3d 508, 539 (N.D.N.Y. 2020) (striking down local parade ordinance imposing criminal liability where an organizer could be found guilty despite a "lack of intent" to violate the ordinance).

If there is any lingering doubt that the Media Plaintiffs are protected from no-fault liability, subsection 8 also requires that the Commission take into account, when assessing a violation, "whether the violation was intentional."  21-A M.R.S. § 1064(7).  No media entity that earnestly attempts to comply with the Act's minimal requirements has a realistic chance of being found liable for a violation under subsection 8.[26]

---

[26] To the extent that there is any discrepancy between the Media Plaintiff's and Defendants' read of the Act, Defendants' interpretation is entitled to substantial deference. *See March v. Mills* 867 F.3d 46, 60 n.11 (1st Cir. 2017) (acknowledging duty to defer to Maine Attorney General's authoritative construction of state statute); *see also Forsyth City, Ga. v. Nationalist Movement*, 505 U.S. 123, 131 (1992) ("In evaluating respondent's facial challenge, we must consider the [government's] authoritative constructions of the ordinance, including its own implementation and interpretation of it.").

## IV.     The Act Is Not Preempted by Federal Law.

Versant alone argues that the Act is preempted by federal law.  Versant Mem. at 9–14.  In this apparent facial preemption challenge, it is Versant's burden to demonstrate that the Act is preempted and that that "no set of circumstances exists under which the [statute] would be valid."  *NCTA—The Internet & Television Ass'n v. Frey*, 7 F.4th 1, 17 (1st Cir. 2021).  Because the Act does not regulate federal elections in any way, Versant cannot meet its burden.

### A.     FECA does not expressly preempt the Act.

FECA contains an express preemption provision, which provides in relevant part that "the provisions of this Act, and of rules prescribed under this Act, supersede and preempt any provision of State law with respect to election to Federal office."  52 U.S.C.A. § 30143(a).  The FEC has adopted rules that restate this general preemption provision and go on to specify categories of state regulations that are and are not preempted.  11 C.F.R. § 108.7.  The only item on either list pertaining to spending to influence an election is subsection (b)(3), which preempts state law concerning the "[l]imitation on contributions and expenditures regarding Federal candidates and political committees."  *Id.* § 108.7(b)(3).

Courts have long recognized that FECA's preemption provision is narrow.  In *Stern v. General Electric Co.*, 924 F.2d 472, 475 (2d Cir. 1991), the Second Circuit recognized the "narrow wording" of the preemption provision in holding that it did not apply to state-law prohibitions on waste of corporate assets.  Similarly, the Fifth Circuit recognized that FECA's preemption provision should be "construed . . . narrowly," distinguishing caselaw in favor of preemption as involving state laws that "specifically regulated federal campaign finance." *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 200 (5th Cir. 2013); *see also Karl Rove & Co. v. Thornburgh*, 39 F.3d 1273 (5th Cir. 1994) (holding FECA preemption did not preempt a state law holding federal candidates personally liable for the debts of their

campaign committees).  "[E]ven with respect to election-related activities, courts have given [52 U.S.C. § 30143] a narrow preemptive effect in light of its legislative history."  *Stern*, 924 F.2d at 475 n.3 (citing *Reeder v. Kansas City Bd. of Police Comm'rs*, 733 F.2d 543, 545–46 (8th Cir. 1984)); *accord Janvey*, 712 F.3d at 201.

The Act is well outside the narrow confines of FECA's preemption provision.  The Act cannot reasonably be read—and is not read by the enforcing agencies, *see* Wayne Decl. ¶¶ 5–10—to regulate federal elections in any way.  The initiators chose to place the Act within Chapter 13 of Title 21-A, which contains virtually all of Maine's campaign finance laws.  A provision near the start of that chapter affirmatively states that the Commission "does not have jurisdiction over financial activities to influence the nomination or election of candidates for federal office."  21-A M.R.S.A. § 1011.  Moreover, the Act is also within Subchapter 4 of Chapter 13, which states that the subchapter applies to PACs and BQCs activities to "influence the nomination or election of a candidate to *state, county or municipal office*."  21-A M.R.S. § 1051 (emphasis added).

These overarching limitations on the scope of Chapter 13 and Subchapter 4 establish that each of the provisions they contain—including the Act—applies only to efforts to influence state, county, and municipal election campaigns.  And, indeed, that is precisely how the Commission has long interpreted all the provisions of Chapter 13, even if some individual provisions use language that might, in a vacuum, allow a broader interpretation.  Wayne Decl. ¶¶ 6–8.

Given these statutory limitations on the scope of the provisions contained in Chapter 13 and Subchapter 4, had drafters of the Act wished to regulate federal elections, they would have needed to include express language indicating that the Act applies to federal elections "notwithstanding sections 1011 and 1051."  *See* Wayne Decl. ¶ 9.  They did not do so.

53

In short, the Act, construed within its overall statutory framework, neither regulates "with respect to election to *Federal* office," 52 U.S.C.A. § 30143(a) (emphasis added), nor imposes any "[l]imitation on contributions and expenditures regarding *Federal* candidates and political committees" 11 C.F.R. § 108.7(b)(3) (emphasis added).  If Versant wishes to contribute to federal candidates, the only limitations on it doing so are those contained in federal law.  The Act is therefore not within the scope of FECA's express preemption provision.

**B.      The Act is not conflict-preempted by FECA.**

Versant further argues that the Act is impliedly preempted by FECA because it "contravenes the scope of restrictions the federal government has placed on foreign nationals' involvement in U.S. elections."  Versant Mem. at 10.  But, as the Supreme Court has recognized, "when Congress has considered the issue of pre-emption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a reliable indicium of congressional intent with respect to state authority, there is no need to infer congressional intent to pre-empt state laws from the substantive provisions of the legislation." *Cipollone v. Liggett Grp., Inc*., 505 U.S. 504, 517 (1992) (cleaned up).  Although the existence of an express preemption provision does not automatically preclude conflict preemption, *see Freightliner Corp. v. Myrick*, 514 U.S. 280, 288 (1995), courts have confirmed that FECA's preemption provision does in fact provide a "reliable indicium of congressional intent" as to the scope of FECA preemption.  *Weber v. Heaney*, 995 F.2d 872, 875 (8th Cir. 1993); *Choi*, 2023 WL 8803357, at *12.  Thus, Congress's decision to limit the scope of FECA's preemptive force to "election to Federal office," 52 U.S.C.A. § 30143(a), establishes that Congress did not mean to preempt laws regulating state and local elections.  If Congress had intended FECA to preempt such laws, it could have easily said so.

Even if FECA's express preemption provision were not dispositive of the implied preemption claim, there would be no conflict between FECA's ban on contributions by foreign nationals and the additional regulations imposed by the Act. Conflict preemption exists where "compliance with both state and federal law is impossible" or where "the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *ACA Connects v. Frey*, 471 F. Supp. 3d 318, 323 (D. Me. 2020) (quoting *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015)). In assessing conflict preemption, the court should not engage in a "freewheeling judicial inquiry into whether a state statute is in tension with federal objectives," because "such an endeavor 'would undercut the principle that it is Congress rather than the courts that pre-empts state law.'" *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 607 (2011) (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 111 (1992) (Kennedy, J., concurring)).

Indeed, a strong presumption against preemption applies to Versant's implied preemption claim. "Consideration of issues arising under the Supremacy Clause 'start[s] with the assumption that the historic police powers of the States [are] not to be superseded by . . . Federal Act unless that [is] the clear and manifest purpose of Congress." *Cipollone*, 505 U.S. at 516 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). The presumption is strongest "in fields of traditional state regulation." *N.Y.S. Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995); *see also Ouellette v. Mills*, 91 F. Supp. 3d 1, 7 (D. Me. 2015). As one court recently held in a similar context, regulation of state elections

is such a traditional area of state regulation. *Choi*, 2023 WL 8803357, at \*12; *see also Oregon v. Mitchell*, 400 U.S. 112, 125 (1970).[27]

The presumption against preemption makes any claim of conflict preemption untenable. Compliance with state and federal law is not impossible here. The Act simply expands the scope of protections against foreign influence already found in federal law. Thus, the only way that the Act could be preempted is if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *ACA Connects*, 471 F. Supp. 3d at 323. But the Act not only does not conflict with Congress's purposes; it affirmatively furthers those purposes.

The text and legislative history of § 30121 shows a one-sided concern by Congress to staunch the flow of foreign money into U.S. elections. The text of the law reads as a flat prohibition on participation in elections by foreign governments and other foreign nationals; there are no carve-outs, exceptions, or savings clauses written into the text of the statute by which Congress affirmatively authorized or protected some types of foreign influence. Moreover, the legislative history of the law shows a singular and growing concern about foreign influence in U.S. elections. The original law, enacted in 1966, prohibited only agents and foreign governments and entities from making contributions to candidates. Pub. L. No. 89–486, § 8, 80 Stat. 244, 248–49 (1966); *see Bluman*, 800 F. Supp. 2d at 283. Congress ratcheted up those restrictions in 1974, extending the ban to cover all foreign citizens except lawful

---

[27]     There is no presumption against preemption when Congress legislates pursuant to its enumerated power under the Elections Clause. *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 14–15 (2013). However, the Elections Clause authorizes Congress to regulate congressional elections, not state and local elections. *See* U.S. Const. art. I, § 4, cl. 1. Thus, Congress could not have been legislating under its Elections Clause powers when it included state and local elections within the scope of § 30121. It must have invoked some other enumerated power. The presumption against preemption therefore applies to § 30121's regulation of state and local elections even if it does not otherwise apply to FECA. *But see New York v. Trump*, No. 23 CIV. 3773, 2023 WL 4614689, at \*9 (S.D.N.Y. July 19, 2023) (applying the presumption against preemption to FECA as a whole).

permanent residents. *Bluman*, 800 F. Supp. 2d at 283. And Congress ratcheted up those restrictions even further in 2002, expanding the scope of the prohibition to cover expenditures and contributions to political parties. *Id.* Text and history thus shows not an intent by Congress to balance interests by authorizing some forms of foreign influence in state and local elections while prohibiting others, but a decades-long effort to crack down on foreign influence in U.S. elections. The Act in no way conflicts with that congressional intent.

Versant asserts that, in enacting § 30121, Congress was attempting to "defin[e] the composition of the community that may participate in electioneering" in state and local elections. Versant Mem. at 13. But its only support for that assertion is the fact that § 30121 does not go as far as the Act in regulating foreign-government influence in elections. That is not enough to overcome the presumption against preemption. Versant points to nothing in the law's text or history suggesting that Congress was trying to protect U.S.-based foreign government–influenced entities. It points to nothing suggesting that Congress understood itself to be dictating to state and local governments whom they must include in their political communities, as opposed to whom they must exclude.

Versant's apparent inability to find any support for its position is not surprising; an attempt by Congress to give states such comprehensive, binding direction in the context of purely state and local elections—where federal regulatory interests are limited and state interests are at their zenith—would be an affront to state sovereignty. As the Supreme Court has observed, "[n]o function is more essential to the separate and independent existence of the States and their governments than the power to determine within the limits of the Constitution . . . the nature of their own machinery for filling local public offices." *Mitchell*, 400 U.S. at 125. Consistent with the presumption against preemption, a sweeping congressional intent to intrude

in these matters cannot be inferred from the mere fact that Congress could have gone further in regulating foreign influence in elections, but, for unknown reasons, did not.

Versant's attempt to assert conflict preemption by characterizing the Act as an intrusion on U.S. foreign policy is similarly without merit. Versant Mem. at 13–14. The Act is a far cry from the sort of clear state intrusions in U.S. foreign policy that has led to preemption in other decisions. *See, e.g.*, *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 375 (2000) (state law imposing sanctions on Burma preempted by federal law imposing different sanctions); *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 413 (2003) (state law regulating Holocaust-related insurance claims preempted by conflicting federal agreements with Germany, Austria, and France). Nothing in FECA suggests that Congress was establishing a U.S. foreign policy of ensuring that foreign nationals' U.S.-based subsidiaries may participate in state and local elections. Nor does Versant point to any past or ongoing diplomatic efforts or foreign policy initiatives of the U.S. government that would be thwarted or undermined if the Act is allowed to stand.

The First Circuit's decision in *Museum of Fine Arts, Bos. v. Seger-Thomschitz*, 623 F.3d 1, (1st Cir. 2010) is instructive. In that case, the plaintiff argued that a state statute of limitations was preempted as applied to a dispute over ownership of Nazi-confiscated art based on alleged U.S. foreign policy interests. *Id.* at 11. The First Circuit rejected the plaintiff's claim because there was no "express federal policy" disfavoring application of generally applicable statutes of limitations to claims relating to Nazi-looted artwork. *Id.* at 12. The First Circuit concluded that the various documents relied upon by the plaintiff were "too general and too hedged" to create an express federal policy. *Id.* at 13. And, even if this were not the case, the Court concluded that Massachusetts law was not in "clear conflict" with any such federal policy. *Id.* 13–14.

58

Similarly, here, Versant points to no "express federal policy" of protecting the ability of foreign governments or their U.S.-based subsidiaries to influence state and local elections.  Nor can it be said that there is a "clear conflict" between the Act and Congress's various amendments to § 30121 over the last several decades, which, as shown above, evince growing concern over foreign influence in U.S. elections over the last several decades.

Moreover, like the law in *Museum of Fine Arts*, the Act does not target specific countries, but rather enacts generally applicable prohibitions in an area—state and local elections—where Maine has a "substantial state interest."  *Id.* at 13; *see also Portland Pipe Line Corp.* 288 F. Supp. 3d at 444 (recognizing municipality's "historically important and legitimate interest" in zoning in rejecting foreign-policy preemption claim).  Because the Act does not clearly conflict with the express foreign policy of the United States, it is not conflict-preempted on the basis of U.S. foreign policy.

## V.     The Challengers Are Unlikely to Succeed on their Vagueness Challenges.

The Challengers all assert that some aspect of the Act is unconstitutionally vague, violating their right to Due Process.  CMP Mem. at 16–18; Electors Mem. at 23–25; Media Mem. at 2–4; Versant Mem. at 24–25.  Their arguments are unlikely to succeed on the merits for at least three different reasons. First, no Plaintiff has explained how their overbreadth and vagueness theories would render the Act unconstitutionally vague. Second, the Act's terms that the Challengers assail are not vague. Third, the Act provides for mandatory rulemaking whereupon any misconceptions about the meanings of the Act's terms can and will be clarified by the Commission.

### A.     The Challengers' overbreadth arguments will not succeed.

The Challengers' varied vagueness challenges primarily allege overbreadth.  But the Supreme Court "has repeatedly warned that 'invalidation for First Amendment overbreadth is

strong medicine that is not to be casually employed.'" *United States v. Sineneng-Smith*, 140 S.Ct. 1575, 1581 (2020) (quoting *Williams*, 553 U.S. at 293). The "traditional rule" provides that litigants "may not challenge [a] statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the Court." *L.A. Police Dept. v. United Reporting Publ'g Corp.*, 528 U.S. 32, 39 (1999). Therefore, facial vagueness challenges— whether alleging overbreadth or otherwise—must demonstrate a "substantial risk" of concrete harm. *Nat'l Endowment for Arts v. Finley*, 524 U.S. 569, 580 (1998); *see also Savage v. Gee*, 665 F.3d 732, 740 (6th Cir. 2012) ("While the doctrines of overbreadth and vagueness provide an exception to the traditional rules … '[a]llegations of a subjective chill are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm.'" (quoting *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972))).

Here, the Challengers cannot justify the Court's consideration of whether the Act is unconstitutionally vague on its face. They have made no showing of harm beyond asserting, without substantiation, that there will be a chilling effect of unspecified substance and scope. This deficiency alone is sufficient to deny the Challengers' injunction requests on their facial vagueness challenges. *See L.A. Police Dep't.*, 528 U.S. at 40–41 (dismissing claims that did "not fit within the case law allowing courts to entertain facial challenges"). The Challengers' true gripe seems not to be that the Act is vague, but instead that they dislike it. *See, e.g.*, Versant Mem. at 25 ("At bottom, the Act imposes unjustified restrictions on core political speech and further stifles legitimate speech because of its overbreadth and vagueness."). Disagreement with duly enacted laws does not establish constitutional prominence simply because the regulated parties object to its contours.

**B.    The terms highlighted by Challengers are not unconstitutionally vague.**

A statute is unconstitutionally vague only when it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Williams*, 553 U.S. at 304.  In fact, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Id.* (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)).

Moreover, "scienter requirements alleviate vagueness concerns." *Gonzales v. Carhart*, 550 U.S. 124, 149 (2007); *see also Colautti v. Franklin*, 439 U.S. 379, 395 (1979) ("[The Supreme] Court has long recognized that the constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of *mens rea*.").  The Act imposes explicit scienter requirements for criminal violations, 21-A M.R.S.A § 1064(9), and also requires scienter to be considered in fining entities for civil violations, *id.* § 1064(8).

Even if the Court analyzed each of the purportedly defective statutory terms flagged by the Challengers, the Act is not unconstitutionally vague because it provides Challengers the "fair warning" that Due Process demands. *Grayned v. Rockford*, 408 U.S. 104, 108 (1972).  In short, vagueness can void a statute only when "its prohibitions are not clearly defined." *Id.*  Here, the Act sufficiently defines FGIEs and FGOEs and describes the actions that they may not undertake and under which circumstances.

The Act defines FGIEs to cover "firm[s], partnership[s], corporation[s], association[s], organization[s], or other entit[ies]" that meet certain benchmarks of foreign-government ownership or control.  21-A M.R.S.A. § 1064(1)(E)(2).  The Electors claim that the words "association," "organization," and "other entity," render the Act unconstitutionally vague because those are all terms "undefined by Maine law."  Electors Mem. at 24.  But no statutory definition is required; laypersons can easily understand the terms—particularly read in context of

the full definition—are meant to capture any type of legal entity whose expenditures are subject to Maine law.  What is more, these terms in fact are used—and often specifically defined—throughout the Maine Revised Statutes.  *See, e.g.*, 13 M.R.S. § 1501(1) ("'Association' means a group enterprise legally incorporated under this subchapter . . ."); 5 M.R.S. § 1782(4) ("'Other organization' means any not-for-profit, sole proprietorship, partnership, corporation or association that is not a state agency."); 24-A M.R.S. §2381-C(1) (defining "'Advisory organization"); 10 M.R.S. § 963-A(24) (defining "Insured" to include "any individual, partnership, corporation, *association* or *other entity* . . .").  Under the Electors' theory, any Maine statute that uses these terms should be struck down as unconstitutional, an absurd result.[28]

Next, several Challengers take issue with the Act's definition of an FGIE incorporating the phrase "directly or indirectly participat[ing]" in the decision-making process regarding campaign spending.  *See* CMP Mem. at 17; Versant Mem. at 25; Electors Mem. at 24.  The full definition states an entity qualifies as a FGIE if it "[d]irects, dictates, controls or directly or indirectly participates in the decision making process" regarding campaign spending.  As with terms such as "organization" and "association," the concept of "direct participation" and "indirect participation" in decisionmaking is not a difficult concept to grasp, particularly when read in the context of the full statutory definition.  "Direct" participation means that the foreign government or FGOE directly communicates with the FGIE about election spending.  "Indirect" participation means that the foreign government or FGOE communicates via an intermediary.

---

[28] Even if a catchall term such as "other entity" were unconstitutionally vague—which it is not—that does not mean the Act as a whole would be unenforceable or unconstitutional.  Instead, the correct path forward would be to simply sever the singular unconstitutional term from the list of entities subject to the Act.  *See* 1 M.R.S.A. § 71(8) (stating that the "provisions of any session law are severable"); *see also* Part VIII.

Additionally, the Commission's Executive Director has described plans to adopt rules providing additional guidance on these terms. *See* Wayne Decl. ¶ 28. It would be inappropriate to strike down the Act on a facial vagueness challenge when mandatory rulemaking under 21-A M.R.S. § 1064(10) is forthcoming. If there were any lingering vagueness concerns, the appropriate action would be for the Court to abstain from making a ruling in order allow this important state administrative rulemaking to occur, in the vein of *Railroad Commission v. Pullman Company*, 312 U.S. 496 (1941) and *Burford v. Sun Oil Company*, 319 U.S. 315 (1943). This forthcoming rulemaking underscores why vagueness challenges are unlikely to succeed on the merits, rending preliminary relief inappropriate at this time.

Some Challengers claim not to understand the Act's definition of 5% ownership regarding FGIEs. CMP Mem. at 17; Electors Mem. at 25. CMP states that it does not know whether the provision applies to entities who have multiple foreign government ownership that totals more than 5%, or whether an entity qualifies as a an FGIE only if a single foreign government owns more than 5%. The Act is clear. It states that an entity qualifies as an FGIE if "*a* foreign *government*" owns more than a 5% interest in the entity. By using the singular article "a" and singular noun "government," without any modification, the Act applies only to entities where a singular foreign government holds more than 5% ownership in an entity.[29]

The Electors' plaint on this issue is even more confusing, asserting that there is "no possible means" of knowing whether a foreign government owns at least 5% of an entity. Electors Mem. at 25; *see also* Versant Mem. at 21-23. Not so. Common sense dictates that entities can—and do—understand their ownership structure for purposes of distributing profits

---

[29] Even if the term was not obvious, CMP lacks standing to challenge the provision as unconstitutionally vague since CMP has admitted that it is an entity whose ownership consists of at least one singular government, the State of Qatar, that totals more than 5%. CMP Compl. ¶¶ 23–24.

and paying taxes, to name just two examples.  Moreover, the Williams Act already requires disclosure if a foreign-government or FGOE owns more than 5% of a publicly traded company. 15 U.S.C.A. § 78m(f).  If an entity chooses to organize itself through confusing shell companies or other hazy legal or accounting mechanisms, that has no impact on whether the Act is vague.

Finally, the Media Plaintiffs assail the Act's requirement that they adopt "due diligence policies, procedures and controls," claiming that they are "left to guess" what this requirement means and "how they would go about complying" with it.  Media Mem. at 3.  Media Plaintiffs read into this basic due diligence requirement the potential obligation to "hire investigators and attorneys to determine" potential ad buyers' FGIE or FGOE status.  *Id.*  The Court should not credit this straw argument, which does not appear in the Act.

First, requiring entities to adopt basic due diligence policies is entirely common. Second, nothing in the Act suggests or leaves open the possibility that a media company would need to hire lawyers or investigators before running a political advertisement, as the Media Plaintiffs suggest.  Instead, the Act only requires that media companies establish policies, procedures, and controls that are "reasonably designed" to prevent the distribution of FGIE political advertisements.  21-A M.R.S.A. § 1064(7).  This requirement could include something as simple as the very basic ad buyer self-certification procedures Defendants described in Part III.A above in response to the Media Plaintiffs' First Amendment burden concerns.

And although not necessary to insulate the Act from a facial vagueness challenge, the Commission is likely to adopt a "safe harbor provision" that will provide "regulated entities certainty that their 'policies, procedures and controls' will be deemed sufficient by the Commission as long as they contain certain required elements."  *See* Wayne Decl. ¶ 27.  Such

forthcoming rules would erase all purported doubt in the minds of the Media Plaintiffs regarding how they can comply with the Act's due diligence policies requirements.[30]

## VI.  Versant Is Unlikely to Prevail on Its Claim that the Act Violates the Dormant Foreign Commerce Clause.

In its two-paragraph argument for why the Act violates the Constitution's dormant Foreign Commerce Clause, Versant points to only two principal cases: *National Foreign Trade Council v. Natsios*, 181 F.3d 38 (1st Cir. 1999) and *Portland Pipe Line*, 288 F. Supp. 3d at 449–450.[31]  Versant Mem. at 29.  Considering Versant's lack of argumentation as to precisely how the Act violates the dormant Foreign Commerce Clause, it has not met its burden of establishing the necessity for extraordinary relief on that basis, and any future arguments Versant may press in a Reply memorandum are waived.  *See Zannino*, 895 F.2d at 17.  Nevertheless, assuming Versant has not waived its argument, it is not likely to succeed on the merits.

This Court's decision in *Portland Pipe Line* provides an overview of the four types of dormant Foreign Commerce Clause arguments a litigant challenging a state statute or policy may bring.  288 F. Supp. 3d. at 449–50.  First, a state statute might fail because it "purports to regulate commerce occurring wholly beyond the boundaries of the enacting state."  *Id.* at 449 (quoting *Alliance of Auto Mfrs. v. Gwadosky*, 430 F.3d 30, 35 (1st Cir. 2005)).  Second, a statute can be invalidated if it "has no direct extraterritorial reach but . . . discriminates against interstate commerce on its face."  *Id.* (quoting *Gwadosky*, 430 F.3d at 35).  Third, a statute that seeks to

---

[30] As with the terms "direct and indirect participation," the Commission's forthcoming rules under the Act's mandatory rulemaking requirement would be grounds for abstention if such rules could mean the difference between upholding or striking down the Act's due diligence policies, procedures, and controls requirements on a facial vagueness challenge.  It therefore undercuts the likelihood of success on the merits arguments the Media Plaintiffs offer and provides an additional basis to deny preliminary relief.

[31] Versant cites a third case, *American Insurance Association v. Garamendi*, 539 U.S. 396 (2003), but that decision was a conflict preemption case based on the President's foreign affairs powers, not a dormant Foreign Commerce Clause case.  *See id.* at 427.

"regulate evenhandedly" but nevertheless fails the balancing test laid out in *Pike v. Bruce Church, Inc.*, 397 U.S. 90 (1970) may be struck down. *Id.* Fourth and finally, statutes that "interfere with the federal government's ability to 'speak with one voice when regulating commercial relations with foreign governments'" may also violate the dormant Foreign Commerce Clause. *Id.* (quoting *Japan Line, Ltd. v. L.A. Cty.* 441 U.S. 434, 449 (1979)).

Versant's sole theory for why the Act violates the dormant Foreign Commerce Clause is based on this final prong, arguing that the Act "impedes the federal government's ability to 'speak with one voice' in foreign affairs," much like the "Massachusetts Burma Law" at issue in *Natsios*.[32] *See* Versant Mem. at 29. But this Act is wholly different in structure, purpose, and effect. The Massachusetts Burma Law was enacted to restrict state agencies' ability "to purchase goods or services from individuals or companies that engage in business with Burma." *Natsios*, 181 F.3d at 45. Its sponsor identified engagement in foreign policy as a primary purpose of his bill and that the "'identifiable goal' of the law was 'free democratic elections in Burma.'"[33] *Id.* at 46. Meanwhile, the United States adopted its own set of policies aimed at the Burmese government—policies that may have shared similar goals to those of Massachusetts but were nevertheless different in substance and scope. *Id.* at 47–48.

Under this constellation of facts, the First Circuit concluded that the Massachusetts Burma Law "imped[ed] the federal government's ability to 'speak with one voice' in foreign

---

[32]   Even if Versant had not waived argumentation on any of the other three potential dormant Foreign Commerce Clause theories, the Act would survive such scrutiny, as Maine's legitimate interest in protecting its state and local elections from foreign government influence far outstrips any incidental burden on commerce, for all of the reasons spelled out in Part I.A above.

[33]   The governor and lieutenant governor of Massachusetts made similar comments upon the law's adoption. *Natsios*, 181 F.3d at 46. And in defending the law in federal court, Massachusetts argued that the law "expresses the Commonwealth's own disapproval of the violations of human rights committed by the Burmese government." *Id.* at 46–47.

affairs, because such state action harms 'federal uniformity in an area where federal uniformity is essential.'" *Id.* at 68 (quoting *Japan Line, Ltd.*, 441 U.S. at 448–49).

Conversely, Maine is not "speaking" on any matter upon which the federal government has (or could) express the views of the United States. The Act does not seek to shape the domestic policies of foreign governments. And it does not inject Maine into international relations. Nor the Act it seek to impede the flow of goods and services between the United States and other foreign nations. Instead, it merely seeks to prevent foreign governments from influencing the outcomes of Maine's own state and local elections, whose purview federal courts have long held are reserved to the states, themselves. *See Mitchell*, 400 U.S. at 125; *Moore v. Harper*, 600 U.S. 1, 34 (2023); *Bonas v. N. Smithfield*, 265 F.3d 69, 74 (1st Cir. 2001).

Versant cannot meet its burden to demonstrate that the Act violates the dormant Foreign Commerce Clause, and therefore no preliminary relief should be granted to Versant on this basis.

## VII.   The Electors' Separation of Powers Claim Is Barred by Sovereign Immunity.

The Electors make a cursory argument that the Act violates the Maine Constitution's separation of powers. Electors Mem. at 25–26. This claim is barred by sovereign immunity.

The Eleventh Amendment prohibits citizens from suing a state in federal court unless either the state has expressly consented to such suit or Congress has explicitly and constitutionally abrogated the state's immunity. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54–58 (1996); *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144 (1993); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99-100 (1984). As the U.S. Supreme Court explained in *Pennhurst*, "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment." 465 U.S. at 106. For this reason, whenever a plaintiff asks a federal court to

compel officers to comply with state law, the only appropriate response is dismissal.  *See Cuesnongle v. Ramos*, 835 F.2d 1486, 1496 (1st Cir. 1987) ("[S]overeign immunity prohibits federal courts from ordering state officials to conform their conduct to state law.").

The Electors' ask this Court to order state officials to comply with the Electors' (erroneous) view of the state constitution's proscriptions.  Because the Electors may not advance such a claim in federal court, it cannot form the basis of any preliminary relief.[34]

## VIII.   The Remaining Injunction Factors Likewise Tip Against Issuing Preliminary Relief.

All Challengers argue that they will be irreparably harmed if an injunction does not issue.  *See* CMP Mem. at 19; Versant Mem. at 30; Electors Mem. at 26–27; Media Mem. at 20.  But each of these arguments is grounded in the false premise that the Challengers are likely to succeed on their First Amendment claims.  Because the Challengers desired speech and actions fall outside First Amendment protection, there is no irreparable harm.  When these arguments fall away, it is not possible for any challenger to succeed in carrying its burden in demonstrating that irreparable harm is likely, a burden that the First Circuit places "squarely upon the movant."  *See Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 18 (1st Cir. 1996); *see also Winter v. N.R.D.C.*, 555 U.S. 7, 22 (2008) ("[P]laintiffs seeking preliminary relief [must] demonstrate that irreparable is *likely* in the absence of an injunction.").

The final preliminary injunction factors, balance of hardships and consideration of the public interest, merge when the government is the party opposing a preliminary injunction.  *See*

---

[34]   Even if sovereign immunity did not apply here—and it plainly does—the Elector have waived their argument by advancing it in only "the most skeletal way."  *See Wilson v. Dep't of Veterans Affairs*, Dkt. No. 2:20-cv-00019-NT, 2021 WL 1840753 at *2 (May 7, 2021) (quoting *Zannino*, 895 F.2d at 17). In any event, there is nothing untoward about legislating on the rules of how future legislation is to be adopted.  *Cf. Sawyer v. Gilmore*, 83 A. 673, 678 (Me. 1912) ("The powers of the Legislature in matters of legislation, broadly speaking, are absolute, except as restricted and limited by the Constitution").

*Nken v. Holder*, 556 U.S. 418, 435 (2009).  Here, Defendants have thoroughly explained Maine's compelling interest in keeping the long arms of foreign governments from meddling in its state and local elections.  *See* Part I.A above.  The people of Maine have indicated overwhelmingly that they no longer wish to allow unprotected FGIE speech to drown out other voices in the public discourse.

Challengers' inability to meet their burden of persuasion on additional preliminary injunction factors only serves to underscore that each of their motions should be denied.

## IX.   If the Court Issues an Injunction It Should Be Limited in Scope.

The Court should not issue an injunction at all, for the reasons already stated.  But if it decides otherwise, it should consider that the Act contains many constitutional applications that are severable from any potentially unconstitutional ones.  Thus, any injunction should apply only to the specific portions and applications of the law the Court finds unconstitutional.  *See, e.g.*, *March v. Mills*, No. 2:15-CV-515-NT, 2016 WL 2993168, at *15 n.16 (D. Me. May 23, 2016) (excluding severable portion of challenged law from preliminary injunction); *Nat'l Fire Adjustment Co., Inc. v. Cioppa*, 357 F. Supp. 3d 38, 49 n.13 (D. Me. 2019) (observing that "the Court can wield a carving knife rather than an axe" in fashioning relief).

Severability in this context is a question of state law.  *Pharm. Care Mgmt. Ass'n v. Maine Att'y Gen.*, 324 F. Supp. 2d 71, 72 (D. Me. 2004); *cf. City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 772 (1988) (remanding for determination of whether partly unconstitutional ordinance was severable under state law).  And Maine law expressly provides that Maine statutes are severable.  *See* 1 M.R.S. § 71(8).  This default rules severs not just invalid "provision[s]" from Maine statutes but also invalid "application[s]."  *Id*.  Thus, under Maine law "[a]n invalid portion of a statute or an ordinance will result in the entire statute or ordinance being void only when it is such an integral portion of the entire statute or ordinance that the enacting body would

69

have only enacted the legislation as a whole." *Cioppa*, 357 F. Supp. 3d at 49 n.13 (quoting

*Kittery Retail Ventures, LLC v. Town of Kittery*, 2004 ME 65, ¶ 18, 856 A.2d 1183).

Applying these liberal standards, the Court should conclude that nearly every aspect of

the Act is severable.  If the Court were to find that the 5% ownership threshold for an FGIE to be

too low, it could, consistent with 1 M.R.S. § 71(8), enjoin applications of the statute to FGIEs

only where the FGIE was 50% or less owned by a foreign government.  The Court would thereby

preserve Maine's compelling interest in regulating foreign government–controlled corporations

even if it disagreed that Maine's interest extends to companies with minority ownership stakes

by foreign governments.  Or, if the Court concluded it could not sever the Act by "application," 1

M.R.S. § 71(8), it could still sever out the full second prong of the FGIE definition, which spells

out the 5% ownership threshold.[35]  *See* 21-A M.R.S. § 1064(1)(E)(2)(a).  Severing the law in

that way would still preserve Maine's ability to pursue its compelling interest in restricting

election activities by actual foreign governments, *id.* § 1064(1)(E)(1), entities those governments

and FGOEs actively try to influence, *id.* § 1064(1)(E)(2)(b), and other individuals who facilitate

or seek to benefit from such activities, *id.* § 1064(3)–(5).

CMP asserts that the Act is inseverable under Maine law.  CMP Mem. at 18.  But CMP's

argument assumes that subsection 2—the heart of the Act—would fall in its entirety, rendering

the remaining provisions unworkable.  CMP fails to consider that the Act's definition of a FGIE

is itself severable into at least three parts, or that Maine law allows for "applications" as well as

provisions to be severed.  In this case, it is beyond cavil that Maine voters would want the

entities most influenced by foreign governments—foreign governments themselves and

---

[35]  Even with regard to this type of FGIE, the Court could and should limit any injunction to the
prohibition on expenditures, since the Act's restrictions on candidate contributions are plainly
constitutional under *Beaumont.*

FGOEs—to be restricted from election activities even if other entities over which those governments and FGOEs have less direct control cannot be.  Severing the law in this way would produce no incongruities or unworkability.  It would simply narrow the field of who is regulated.

For the same reasons, if any secondary provisions of the Act, such as the media due-diligence provisions, were found unconstitutional, or if any of the challenged terms used in the Act were found to be unconstitutionally vague, those provisions and terms could also be severed from the Act without disrupting its functioning or the intent of the voters.  The Court should fashion any injunction with these principles in mind.

### Conclusion

The Court should deny the motions for injunctive relief.

Dated: January 12, 2024                        AARON M. FREY
                                               Attorney General


                                               /s/ Jonathan R. Bolton
                                               Jonathan R. Bolton
                                               Paul Suitter
                                               Assistant Attorneys General
                                               Office of the Attorney General
                                               6 State House Station
                                               Augusta, ME 04333-0006
                                               Tel. (207) 626-8800
                                               jonathan.bolton@maine.gov
                                               paul.suitter@maine.gov

71