## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| CENTRAL MAINE POWER COMPANY; VERSANT POWER; ENMAX CORPORATION; MAINE PRESS ASSOCIATION; MAINE ASSOCIATION OF BROADCASTERS; and JANE P. PRINGLE, KENNETH FLETCHER, BONNIE S. GOULD, BRENDA GARRAND, and LAWRENCE WOLD, individually and in their capacity as registered voters and Electors, | |
| *Plaintiffs*, | Case No. 1:23-cv-450-NT |
| v. | |
| MAINE COMMISSION ON GOVERNMENTAL ETHICS AND ELECTION PRACTICES; DAVID R. HASTINGS, III, SARAH E. LECLAIRE, DENNIS MARBLE, STACEY D. NEUMANN, and WILLIAM J. SCHNEIDER, in their capacity as members of the Commission; and AARON FREY, in his capacity as Attorney General for the State of Maine, | |
| *Defendants*. | |

## AMICUS CURIAE BRIEF OF THE REPORTERS COMMITTEE
## FOR FREEDOM OF THE PRESS

Scott D. Dolan, Esq., #6334
Petruccelli, Martin & Haddow LLP
Two Monument Square, Ste. 900
Portland, ME 04101

(207) 775-0200
sdolan@pmhlegal.com

*Counsel for Amicus Curiae
the Reporters Committee for
Freedom of the Press*

Katie Townsend*
Mara Gassmann*
Julia Dacy*
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th Street NW, Ste. 1020
Washington, D.C. 20005
(202) 795-9300
ktownsend@rcfp.org

*Of Counsel*

## CORPORATE DISCLOSURE STATEMENT

The Reporters Committee for Freedom of the Press is an unincorporated

association of reporters and editors with no parent corporation and no stock.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES.................................................................................. iii

INTEREST STATEMENT OF AMICUS CURIAE ................................................1

INTRODUCTION ..................................................................................................2

ARGUMENT ..........................................................................................................4

I.   The "due diligence" requirements the Act imposes on the press are
     unconstitutionally vague. ..............................................................................4

II.  The Act imposes unworkable burdens on the news media............................9

     A.   The development and implementation of the requisite "policies,
          procedures and controls" would be onerous for the press......................9

     B.   The Act will force some media organizations to decline political
          advertisements, which will chill political speech and pose
          additional financial burdens on news outlets. ........................................12

III. Conscripting the press, as the Act attempts to do, is unconstitutional
     and has properly been rejected by states and courts alike.............................15

CONCLUSION ......................................................................................................18

# TABLE OF AUTHORITIES

**Cases**

*Gooding v. Wilson*,
  405 U.S. 518 (1972) ..........................................................................18

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972) ................................................................... 5, 6, 9

*Indiana Right to Life Victory Fund v. Morales*,
  66 F.4th 625 (7th Cir. 2023) ...............................................................12

*Mills v. Alabama*,
  384 U.S. 214 (1966) ..........................................................................14

*N.Y. Times Co. v. Sullivan*,
  376 U.S. 254 (1964) .................................................................... 12, 13

*Nat'l Ass'n for Advancement of Colored People v. Button*,
  371 U.S. 415 (1963) ..........................................................................18

*Reno v. Am. C.L. Union*,
  521 U.S. 844 (1997) ............................................................................6

*Stenberg v. Carhart*,
  530 U.S. 914 (2000) ..........................................................................12

*Wash. Post v. McManus*,
  944 F.3d 506 (4th Cir. 2019)...................................................... 13, 16, 17

**Statutes**

21-A M.R.S. § 1064 ..............................................................................2

21-A M.R.S. § 1064(1) ..........................................................................6

21-A M.R.S. § 1064(7) ................................................................. *passim*

21-A M.R.S. § 1064(8) ..........................................................................5

Alaska Stat. § 15.13.068 (2018)...........................................................16

Colo. Rev. Stat. § 1-45-103.7 (2023) ........................................................16

L.D. 1610 ...........................................................................................8, 9

Minn. Stat. § 211B.15 (2023) .................................................................16

S.B. 875, Reg. Sess. (Md. 2018) ..............................................................16

**Other Authorities**

Basel Comm. on Banking Supervision, Bank for Int'l Settlements,
    *Compliance and the Compliance Function in Banks* (Apr. 2005),
    https://www.bis.org/publ/bcbs113.pdf....................................................7

Dan Kennedy, *A New Study Measures The Cost Of Corruption When The
    Local Newspaper Dies*, WGBH (June 6, 2018),
    https://www.wgbh.org/news/commentary/2018-06-06/a-new-study-
    measures-the-cost-of-corruption-when-the-local-newspaper-dies......................14

Erin Karter, *As newspapers close, struggling communities are hit hardest by
    the decline in local journalism*, Northwestern Now (June 29, 2022),
    https://news.northwestern.edu/stories/2022/06/newspapers-close-decline-
    in-local-journalism/ ...............................................................................14

Letter from Janet T. Mills, Governor of Maine, to Members of the 131st
    Legislature of Maine (July 19, 2023),
    https://www.maine.gov/governor/mills/sites/maine.gov.governor.mills/
    files/inline-files/7.19.23_LD%201610%20Letter.pdf....................................8, 11

Mary Ellen Klas, *Less Local News Means Less Democracy When local
    journalism declines, so does government transparency and civic
    engagement*, NiemanReports (Sept. 20, 2019),
    https://niemanreports.org/articles/less-local-news-means
    -less-democracy/ ............................................................................ 14, 15

Michael Dresser, *Google no longer accepting state, local election ads in
    Maryland as result of new law*, Balt. Sun (June 29, 2018),
    https://www.baltimoresun.com/2018/06/29/google-no-longer-accepting-
    state-local-election-ads-in-maryland-as-result-of-new-law/ ..............................17

Nicole LaMarco, *The Role of Advertising in Media*, CHRON (Mar. 6, 2019),
    https://smallbusiness.chron.com/role-advertising-media-24611.html ................14

## INTEREST STATEMENT OF AMICUS CURIAE

The Reporters Committee for Freedom of the Press ("Reporters Committee" or "amicus") is an unincorporated nonprofit association, founded by leading journalists and media lawyers in 1970, when the nation's news media faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources.  Today, its attorneys provide pro bono legal representation, amicus curiae support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists.[1]  The Reporters Committee has filed amicus briefs in Maine courts and the U.S. Court of Appeals for the First Circuit in cases that present issues affecting the newsgathering and First Amendment rights of journalists.  *See, e.g.*, *Thurlow v. Nelson*, No. CUM-20-63 (Me. June 22, 2021) (Maine Anti-SLAPP law); *see also, e.g.*, *Doe v. Volokh*, No. 22-1525 (1st Cir. Sept. 19, 2022) (court access); *Courthouse News Serv. v. Glessner*, No. 21-1624 (1st Cir. Dec. 15, 2021) (same); *Centro de Periodismo Investigativo v. Fin. Oversight & Mgmt. Bd. for P.R.*, No. 21-1301 (1st Cir. June 25, 2021) (freedom of information); *Alasaad v. Wolf*, Nos. 20-1077, 20-1081 (1st Cir. Aug. 7, 2020) (newsgathering materials and source protection).

---

[1]     The Reporters Committee paid for and prepared this amicus curiae brief.  No other entity, including the parties to the litigation or their counsel, contributed to its cost or preparation.

This case presents an issue of significant legal and practical consequence for the press: whether the government lawfully may impose burdensome and chilling "due diligence" obligations on news organizations to accept political advertising. Given the substantial importance of this issue, and to aid the Court in resolving it, the Reporters Committee writes to address the constitutionality of the Act to Prohibit Campaign Spending by Foreign Governments and Promote an Anticorruption Amendment to the United States Constitution, 21-A M.R.S. § 1064 (the "Act"), and its real-world implications for the press inside and outside Maine.

## INTRODUCTION

The Reporters Committee agrees with the arguments set forth in support of the Motion for Preliminary Injunction filed by the Maine Press Association and the Maine Association of Broadcasters (collectively, the "Maine Media Plaintiffs") concerning the constitutionality of the Act's provisions targeting the press including, specifically, 21-A M.R.S. § 1064(7), which imposes "due diligence" obligations on news organizations to accept political advertising ("Subsection 7"). The Reporters Committee writes to emphasize the onerous burden Subsection 7 imposes on news entities, and to underline not only its constitutional defects but also the practical problems it poses for the press.

As the Maine Media Plaintiffs correctly argue, Subsection 7 is unconstitutionally vague. As written, this provision could be wielded as a political

tool—or cudgel—against a news organization at the discretion of whomever is tasked at a given time with enforcing it.  And especially because they are impermissibly ill-defined, the particular obligations that Subsection 7 imposes on news organizations that accept political advertising (which, at present, is most) are exceedingly burdensome:  Subsection 7 saddles media organizations—both large and small—with investigative and enforcement duties that they may not be equipped (and in fact may be unable) to fulfill.  The Act, if allowed to stand in its current form, therefore imposes significant financial and structural burdens on the press to accept political advertising, an important source of revenue for news organizations.

While smaller local and regional newsrooms—many of which are already facing challenging economic circumstances—are likely to be hardest hit if forced to choose between attempting to comply with the Act's imprecise requirements or declining to accept political advertising at all, larger news outlets also will suffer.  And, importantly, it is the public that will suffer the most.  News consumers may receive less information from news organizations that must divert scarce resources away from reporting in order to comply with the Act.  And, by incentivizing (or forcing) some media organizations to reject political advertising entirely, the Act will harm Mainers who want to engage in or receive political speech through political advertising and will find no outlet to do so.

The Act in its present form cannot survive First Amendment scrutiny. Accordingly, for the reasons set forth herein and in the Motion for Preliminary Injunction filed by the Maine Media Plaintiffs, the Reporters Committee respectfully urges the Court to enjoin those provisions of the Act—specifically, Subsection 7—that target the news media.[2]

## ARGUMENT

**I.    The "due diligence" requirements the Act imposes on the press are unconstitutionally vague.**

Subsection 7 of the Act states:

> ***Due diligence required.*** Each television or radio broadcasting station, provider of cable or satellite television, print news outlet and Internet platform *shall establish due diligence policies, procedures and controls that are reasonably designed to ensure* that it does not broadcast, distribute or otherwise make available to the public a public communication *for which a foreign government-influenced entity has made an expenditure, independent expenditure, electioneering communication or disbursement in violation of this section*. If an Internet platform discovers that it has distributed a public communication for which a foreign government-influenced entity has made an expenditure, independent expenditure, electioneering communication or disbursement in violation of this section, *the Internet platform shall immediately remove the communication and notify the commission.*

21-A M.R.S. § 1064(7) (emphasis added).  The following subsection of the Act imposes monetary damages "for a violation of this section" and provides that:  "In

---

[2]    Amicus does not address the constitutionality of other provisions of the Act that are applicable to and are being challenged by the non-media plaintiffs in this now-consolidated action.

assessing a penalty under this section, the commission shall consider, among other things, whether the violation was intentional and whether the person that committed the violation attempted to conceal or misrepresent the identity of the relevant foreign government-influenced entity." 21-A M.R.S. § 1064(8) ("Subsection 8").[3]

The Act therefore threatens media organizations that accept political advertising with monetary penalties for failure to comply with a broad range of responsibilities, including "establish[ing] due diligence policies, procedures and controls" that are "reasonably designed to ensure" that they do not broadcast or otherwise distribute political advertisements that are in any way financially tied to a foreign government-influenced entity. 21-A M.R.S. § 1064(7). In doing so, the law unquestionably puts a tremendous onus on the press, but it does so in language so vague and ill-defined that it does not enable news organizations—even if they *could* feasibly comply—to know *how* to comply.

A law is impermissibly vague under the Fourteenth Amendment's Due Process Clause "if its prohibitions are not clearly defined." *Grayned v. City of*

---

[3]     The Government claims that the Act does not levy financial penalties against the news media for noncompliance. State Defs.' Combined Opp'n to Mots. for Prelim. Relief (ECF No. 47) (hereinafter "Opp'n") at 45. However, there is nothing in the plain text of the Act that would indicate that a violation of Subsection 7 by a news organization would not result in a monetary penalty under Subsection 8. 21-A M.R.S. § 1064(7)–(8).

*Rockford*, 408 U.S. 104, 108 (1972).  Without such clarity, a law does not provide "fair warning" of what conduct is required or proscribed and, thus, cannot survive constitutional scrutiny.  *Id*.  Were it otherwise, imprecise and ill-defined laws could "trap the innocent" and enable arbitrary enforcement by officials—both of which are anathema to due process.  *Id.*

When a statute implicates the exercise of First Amendment rights—as Subsection 7 of the Act does—vagueness concerns are heightened because speakers, including journalists and news organizations, are likely to "steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked."  *Id.* at 109 (citations omitted); *Reno v. Am. C.L. Union*, 521 U.S. 844, 871–72 (1997) (noting that vagueness "raises special First Amendment concerns because of its obvious chilling effect on free speech").  The plain language of Subsection 7 provides little (if any) guidance to news organizations seeking to avoid running afoul of its requirements, and the broad, imprecise obligations it imposes on the press will necessarily be interpreted broadly by those seeking to steer clear of the unlawful zone.

While the Act defines "foreign governments" and "foreign government-influenced entities," 21-A M.R.S. § 1064(1), (7), it does not define or otherwise explain what "reasonably designed" "policies, procedures and controls" means or should include, *see id.*  How extensive a media organization's "due diligence"

6

measures must be and the process for assessing—should an advertisement that violates the Act slip through the "controls"—whether that media organization was sufficiently diligent, and whether its procedures were "reasonably designed," are uncertain.  Simply put, the Act, on its face, is devoid of adequate guidance for media organizations as to how they can clearly satisfy the new "due diligence" obligations imposed by the Act, and leaves what constitutes a "reasonabl[e]" approach to the unguided discretion of those tasked with enforcing those obligations.

Faced with this uncertainty (and potential penalties for failing to comply), news organizations can be expected to steer clear of missteps by rejecting certain permissible content or instituting unnecessary and costly compliance measures. For instance, as written, Subsection 7 could be seen as mandating the creation of a new position or entire department within a media organization dedicated to vetting advertising for possible foreign connections.  In industries that regularly encounter due diligence requirements, such as banking, many businesses employ compliance officers whose sole job it is to ensure that such requirements are met.  *See* Basel Comm. on Banking Supervision, Bank for Int'l Settlements, *Compliance and the Compliance Function in Banks* (Apr. 2005), https://www.bis.org/publ/bcbs113.pdf. The Act does not indicate whether media organizations in Maine that accept political advertising are now expected to do the same.  Further, the Act gives no

guidance as to the level of detail an investigation into a potential advertiser must entail, and how much time and effort a news organization is expected to expend on such efforts.  Without clear guidance, news organizations will be required to go the extra—and potentially cost prohibitive—mile to ensure their compliance with the Act.

Concerns about the Act's constitutionality—particularly its provisions targeting the media—are not new.  As a bill, known as L.D. 1610, the Act was vetoed last year by Governor Janet Mills.  *See* Letter from Janet T. Mills, Governor of Maine, to Members of the 131st Legislature of Maine (July 19, 2023), https://www.maine.gov/governor/mills/sites/maine.gov.governor.mills/files/inline-files/7.19.23_LD%201610%20Letter.pdf (hereinafter "Governor's Letter").  In a public letter explaining her veto, the Governor pointed to several provisions and terms in the statute that she characterized as "very difficult to discern."  *Id.* Despite her stated "desire to find ways to prevent foreign influence in" Maine elections, the Governor agreed with critics who argued that "the language of the bill is too broad" and noted it "would likely result in the unintended consequence of effectively silencing legitimate voices."  *Id.*  Many of the Governor's related objections stemmed from the bill's "attempts to regulate the activities of the press and other media outlets," which ran "counter to the longstanding tradition and cornerstone of a free press in America."  *Id.*

After the Governor's veto, the legislation was placed before voters as a referendum on the November ballot and passed into law.  No substantive changes had been made to address the constitutional concerns raised by the Governor and representatives of the news media before the measure was presented to voters. Subsection 7, in particular, is identical to a provision in the previously vetoed bill. *Compare* 21-A M.R.S. § 1064(7), *with* L.D. 1610.

The concerns identified by the Governor about the Act's vagueness and its effects on the press, accordingly, remain.  In particular, the "due diligence" requirements imposed on the media by Subsection 7 of the Act are impermissibly far from "clearly defined."  *See Grayned*, 408 U.S. at 108.  Because its provisions targeting the media are unconstitutionally vague, Subsection 7 should be enjoined.

## II.     The Act imposes unworkable burdens on the news media.

### A.     The development and implementation of the requisite "policies, procedures and controls" would be onerous for the press.

In no small part due to its vagueness, Subsection 7 imposes an untenable burden on media outlets both large and small.  Defendants argue that an obligation to establish reasonable "due diligence policies, procedures and controls" to ferret out foreign influence is not a weighty requirement.  *See* Opp'n at 64–65.  They assert that these procedures and controls need only be "'reasonably designed,' i.e. not 'perfectly designed.'"  *Id.* at 42.  They also suggest that policies can be "nearly costless" because the "burden" can simply be "outsource[d] . . . to their ad buyers."

*Id.*  Defendants dismiss the media's concerns while defending a statute that on its face imposes significant practical burdens.  Specifically, they seem to suggest on the one hand that compliance with the Act can be accomplished without much effort while, on the other, claiming that conscripting the media in the broad way the statute provides is a necessary step to fight foreign interference in Maine elections and an essential feature of the statute.  These are difficult points for the news organizations subject to the Act to reconcile, and the Government's representations in opposition to preliminary injunctive relief are cold comfort.

The statute, if permitted to stand in its present form, will require media companies to comply as best they can if they choose to continue to accept political advertising.  This means they will likely need to retain lawyers and/or other experts to design "policies" as directed by the Act and may also need to hire new staff or outside vendors—including, potentially, as the Governor referenced in her veto letter, investigators—in order to implement the "procedures" and "controls" required under the Act.  These are not minor burdens to place on a news organization of any size and could be wholly out of reach for small ones.  To ensure compliance with the Act's uncertain requirements, news outlets would be forced to undertake significant efforts, including investigating political advertisers, if, as discussed in more detail below, they do not simply choose to reject all such advertising.  Thus, as the Governor correctly noted when describing the legislation,

the Act is "a bureaucratic morass that will entrap and silence otherwise legitimate voices and undermine the fundamental American cornerstones of free speech and free press."  Governor's Letter, *supra* p. 8.

The constitutional deficiencies in the statute as written is made especially clear by Defendants' repeated reliance on the agency rulemaking.  Opp'n at 42.  In their opposition, they ask the Court to ignore the failures of the law by arguing that the future rulemaking *might* clarify and mitigate some of the burdens.  *Id.* at 50, 64. The declaration from the agency executive director charged with promulgating election regulations in Maine only emphasizes the speculative nature of Defendants' argument with respect to Subsection 7.  Specifically, the rules to which Defendants refer "are currently in the process of [being] draft[ed]" by commission staff, and the agency director "currently expect[s] to present the proposed rules to the Commission for initial consideration" on January 31, 2024. Decl. of Jonathan Wayne (ECF No. 47-1) ¶¶ 24–25.   The draft rules will then go through public comment, a possible hearing, and back to Commissioners who will "decide whether to adopt the rules as proposed or to alter the[m]."  *Id.* ¶ 24. Although the agency states that it expects the "proposed rules … still in the drafting process … will address several topics that … have been raised by the plaintiffs," the declaration offers broad summaries of what the agency staff "expects" the draft rules to look like.  *Id.* ¶¶ 26–28.  Defendants' speculation that

11

the rulemaking process could "likely" bring some clarity about the requirements of the law or alleviate its burdens is not supported and also does not cure the Act's constitutional defects. *See Indiana Right to Life Victory Fund v. Morales*, 66 F.4th 625, 630 (7th Cir. 2023) (the court cannot accept the government's invitation to "adopt a narrowing construction of a state statute" when such a construction is not "reasonable and readily apparent") (citing *Stenberg v. Carhart*, 530 U.S. 914, 944 (2000)).

### B. The Act will force some media organizations to decline political advertisements, which will chill political speech and pose additional financial burdens on news outlets.

Media outlets that simply do not have the resources to implement the "policies, procedures and controls" required by Subsection 7 will be forced to decline most if not all political advertisements—including ads that have *no* financial connection to any foreign government-influenced entity. This is because the costs of compliance—and the risks of getting it "wrong" in any given case—will be too steep for many news organizations to bear. And the erasure of all political advertising from certain news outlets in Maine will harm not just news organizations, but the public in the following three ways.

First, political and issue advertising are an essential part of the information ecosystem; they contribute to the marketplace of ideas and often initiate or further critical societal conversations on matters of public concern. *See N.Y. Times Co. v.*

12

*Sullivan*, 376 U.S. 254, 269–70 (1964) (recognizing the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open" in a case involving applying a heighted First Amendment standard to political advertising). Should news organizations terminate or limit their distribution of political and issue advertisements as a result of the Act, the public will lose access to that information.

Second, advertisements, including political advertisements, are a vital source of revenue for most news organizations. The Act may force many such organizations to forego that revenue for fear of running afoul of the Act's requirements. And even for those who find a way to comply with the Act and continue to accept political and issue advertising, the compliance costs imposed by the law will make it more expensive to disseminate political advertising than other kinds of speech. *See Wash. Post v. McManus*, 944 F.3d 506, 516 (4th Cir. 2019) (recognizing "the predominant purpose of hosting ads is to raise revenue," and criticizing Maryland electioneering statute for "mak[ing] certain political speech more expensive to host than other speech because [of] compliance costs"). The Act therefore will either close off or significantly diminish an important revenue stream for journalism at a time when the industry is already facing economic challenges—a consequence that will be felt by all news media operating in the state from the smallest newspaper to the largest national organization. *See* Erin

13

Karter, *As newspapers close, struggling communities are hit hardest by the decline in local journalism*, Northwestern Now (June 29, 2022), https://news.northwestern.edu/stories/2022/06/newspapers-close-decline-in-local-journalism/; Nicole LaMarco, *The Role of Advertising in Media*, CHRON (Mar. 6, 2019), https://smallbusiness.chron.com/role-advertising-media-24611.html.

Third, the financial commitment imposed by these due diligence requirements would also divert necessary resources away from newsgathering efforts, a harm that would directly be felt by the public who rely on robust reporting to stay informed about important local and national issues. This is particularly concerning in light of studies showing that thriving local news plays a role in exposing and mitigating political corruption. *See Mills v. Alabama*, 384 U.S. 214, 219 (1966) ("The Constitution specifically selected the press . . . to play an important role in the discussion of public affairs."); *see also* Dan Kennedy, *A New Study Measures The Cost Of Corruption When The Local Newspaper Dies*, WGBH (June 6, 2018), https://www.wgbh.org/news/commentary/2018-06-06/a-new-study-measures-the-cost-of-corruption-when-the-local-newspaper-dies (summarizing the relationship between stronger local journalism and decreased political corruption); Mary Ellen Klas, *Less Local News Means Less Democracy When local journalism declines, so does government transparency and civic engagement*, NiemanReports (Sept. 20, 2019), https://niemanreports.org/articles/

14

less-local-news-means-less-democracy/ ("Researchers at Harvard have

demonstrated that as the public increasingly relies on social media and national

news for political information, where partisan cues are more intense than local

news, it is more vulnerable to misinformation and manipulation.  Then there's the

evidence that as local news disappears and political information becomes more

nationalized, voter polarization increases.").

**III.    Conscripting the press, as the Act attempts to do, is unconstitutional and has properly been rejected by states and courts alike.**

Subsection 7 attempts to co-opt the news media for its own purposes by

requiring the press to perform investigative and regulatory functions on behalf of

the government.  Other states, however, have accomplished the stated goals here—

protecting elections—by regulating advertisers directly rather than enlisting news

organizations to enforce laws that have a chilling effect on speech.  Likewise,

courts have rejected as unconstitutional similar attempts to use online platforms,

including news websites, in ways that may chill speech.  And, indeed, because of

the singular, constitutionally recognized role the independent press plays in

informing the public, courts should be skeptical of any attempt to regulate the press

or conscript the news media in ways that undermine that role.

Maine is not the first state to try to limit the influence of foreign

governments in elections; other states also have passed laws targeting entities with

foreign ownership.  Unlike Maine, however, these states did so by focusing their

regulations on the advertisers rather than the news media.  *See, e.g.*, Minn. Stat. §

211B.15 (2023) (prohibiting foreign-influenced corporations from making direct

independent expenditures in connection with state and local elections if they meet

certain requirements); Alaska Stat. § 15.13.068 (2018) (restricting foreign-

influenced corporations from making contributions or independent expenditures

including for or against ballot measures); Colo. Rev. Stat. § 1-45-103.7 (2023)

(banning contributions by U.S.-operated LLCs with foreign owners).

Courts have also properly rejected legislation, like Subsection 7, that

imposes the regulatory burden on news entities and others who operate online

platforms.  For instance, in 2018, Maryland expanded its existing campaign

finance laws with the passage of the Online Electioneering Transparency and

Accountability Act, which imposed record-keeping and disclosure requirements on

online platforms.  S.B. 875, Reg. Sess. (Md. 2018).  The law was a departure from

the way the state had previously regulated campaign speech because it targeted

third-party platforms, including those hosted by news organizations.  *Wash. Post*,

944 F.3d at 510–11.  The law required that these platforms self-publish information

about paid political advertisements, post about the origin of these advertisements

online, and create records about all political advertisements to be made available

for state inspection.  *Id.* at 512.  Several news organizations that operate news

websites, including The Baltimore Sun and Washington Post, met the statute's

definition of an online platform and sued to prevent enforcement of the disclosure obligations. *Id.* at 522.  The U.S. Court of Appeals for the Fourth Circuit held that diligence measures such as disclosure obligations are different from conventional campaign finance regulations because they target neutral third-party platforms rather than political actors—a scheme that the court noted "poses First Amendment problems of its own." *Id.* at 515.

*Washington Post* also illustrates the chilling effect that laws imposing due diligence requirements can have on speech. *Id.* at 516–17.  Following the enactment of the Maryland law, some websites stopped hosting political advertisements in the state and several local political candidates complained of difficulties communicating with voters. *See id.*; *see also* Michael Dresser, *Google no longer accepting state, local election ads in Maryland as result of new law*, Balt. Sun (June 29, 2018), https://www.baltimoresun.com/2018/06/29/google-no-longer-accepting-state-local-election-ads-in-maryland-as-result-of-new-law/.  For these reasons, the Fourth Circuit found that the Maryland law suffered from "a host of First Amendment infirmities," and struck down its requirements as applied to media. *Wash. Post*, 944 F.3d at 523.

Like the overbroad statutory provisions that sought to co-opt news organizations and others operating online platforms that were struct down in *Washington Post*, Subsection 7 of 21-A M.R.S. § 1064 is riddled with "First

Amendment infirmities."  Like Maryland's Law, it is overbroad, sweeping up protected speech—such as that of businesses and candidates who are not being funded by foreign entities and are simply looking to advertise locally.  The Supreme Court has established that overbroad statutes targeting speech are unconstitutional because they allow for selective enforcement and have a chilling effect on the exercise of First Amendment rights.  *See Gooding v. Wilson*, 405 U.S. 518, 522 (1972) ("[T]he statute must be carefully drawn or be authoritatively construed to punish only unprotected speech and not be susceptible of application to protected expression."); *see also Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 433 (1963) ("Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity.").  While limiting foreign interference in elections may be a legitimate state interest, statutes aimed at furthering that interest must comport with the Constitution.  Many states have enacted election reforms without infringing on press freedom.  For this reason, this Court should reject the Act's overly broad requirements imposed on the news media.

## CONCLUSION

For the foregoing reasons, and those set forth in the Motion for a Preliminary Injunction filed by the Maine Press Association and Maine Association of Broadcasters, the Reporters Committee urges this Court to enjoin the

implementation and enforcement of those provisions of the Act applicable to the press, including, specifically, Subsection 7.

DATED: January 22, 2024

*/s/ Scott D. Dolan*

Scott D. Dolan, Esq., #6334
Petruccelli, Martin & Haddow LLP
Two Monument Square, Ste. 900
Portland, ME 04101
(207) 775-0200
sdolan@pmhlegal.com

*Counsel for Amicus Curiae
the Reporters Committee for
Freedom of the Press*

Katie Townsend*
Mara Gassmann*
Julia Dacy*
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th Street NW, Ste. 1020
Washington, D.C. 20005
(202) 795-9300
ktownsend@rcfp.org

*\*Of Counsel*