**UNITED STATE DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

| | |
|---|---|
| CENTRAL MAINE POWER COMPANY, VERSANT POWER and ENMAX CORP., MAINE PRESS ASSOCIATION and MAINE ASSOCIATION OF BROADCASTERS, AND JANE P. PRINGLE, KENNETH FLETCHER, BONNIE S. GOULD, BRENDA GARRAND and LAWRENCE WOLD,<br><br>                Plaintiffs,<br><br>v.<br><br>MAINE COMMISSION ON GOVERNMENTAL ETHICS AND ELECTION PRACTICES, WILLIAM J. SCHNEIDER, DAVID R. HASTINGS, III, SARAH E. LECLAIRE, DENNIS MARBLE, STACEY D. NEWMANN, AARON FREY,<br><br>                Defendants. | Civil No. 1:23-cv-00450-NT<br>*Consolidated* |

**REPLY MEMO IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION BY MAINE PRESS ASSOCIATION AND MAINE ASSOCIATION OF BROADCASTERS**

Sigmund D. Schutz, Esq.
Benjamin S. Piper, Esq.
Jonathan Mermin, Esq.
Alexandra A. Harriman, Esq.
Preti Flaherty Beliveau & Pachios, LLP
P.O. Box 9546
Portland, ME  04112-9546
207-791-3000
sschutz@preti.com
bpiper@preti.com
jmermin@preti.com
aharriman@preti.com

21342810.4

### I. Subsection 7 is unconstitutionally vague and unconstitutionally burdensome.

The State does not appear to dispute the Media Plaintiffs' argument that subsection 7 of the Act would impose an unconstitutional burden on First Amendment activities if it is interpreted to require the investigatory steps described in the motion. The State argues instead that the Media Plaintiffs' interpretation is simply wrong, and that under what the State claims is the correct reading the statute's requirements are clear and "nearly costless." (ECF No. 47 at 42.) According to the State, all that subsection 7 requires is that news outlets check an advertiser's name against a list of foreign government-influenced entities on the Commission's website, have advertisers check a box certifying that they are not foreign government-influenced, and confirm that the box has been checked. *Id*. at 43.

As a threshold matter, subsection 7 would be unconstitutional even under the State's proposed interpretation, as it is not narrowly tailored to achieve a compelling governmental interest.[1] *See Rideout v. Gardner*, 838 F.3d 65, 70 (1st Cir. 2016). If foreign government-influenced entities buying political ads in Maine is a problem, the narrowly tailored solution would be to enforce the ban on such purchases against the advertisers—not to saddle news outlets with enforcement obligations that would have little to no effect. *See Bartnicki v. Vopper*, 532 U.S. 514, 529 (2001) ("The normal method of deterring unlawful conduct is to impose an

---

[1] Whatever level of scrutiny the Court applies to other plaintiffs' claims, strict scrutiny applies to the Media Plaintiffs' First Amendment challenge. The Media Plaintiffs are not proceeding on behalf of prospective advertisers or "foreign entities," but are asserting their own First Amendment right to publish political speech. And as explained in the motion, the chilling effect of subsection 7 would impact the willingness of news outlets to publish *any* political ads, not just ads paid for by foreign government-influenced entities. The State's contention that applying strict scrutiny to the Media Plaintiffs' claims would "allow foreign entities subject to a lower level of First Amendment scrutiny to level up their constitutional protections merely by laundering their speech through a publisher" (ECF No. 47 at 45–46) mischaracterizes the situation. The State misses the distinction between banning political spending by advertisers and regulating speech by news outlets. *cf. Bartnicki v. Vopper*, 532 U.S. 514, 530 (2001) (observing that there are only "rare occasions in which a law suppressing one party's speech may be justified by an interest in deterring criminal conduct by another").

appropriate punishment on the person who engages in it.") A foreign government-influenced entity that places a political ad is committing a felony, and it is doubtful that asking a lawbreaker to self-certify that it is not breaking the law would accomplish very much. Nor is there any real need for advertiser self-certification in the case of prominent corporations like Avangrid, Inc. that could not plausibly run paid political ads in Maine without regulators noticing. The State offers no logical reason why enforcing the ban against the advertisers would not achieve the Act's objectives. And there is no evidence that the novel due diligence burdens the Act would impose on news outlets are necessary to deter advertisers from breaking the law. *See id*. at 532 ("The justification for any such novel burden on expression must be 'far stronger than mere speculation about serious harms.'") Even under the State's proposed interpretation, subsection 7 would be unnecessary and ineffective, and therefore could not survive strict scrutiny review.

But even if the First Amendment would permit the imposition on news outlets of the requirements the State's brief envisions, the Media Plaintiffs still need injunctive relief, because there is no way they could know by reading the statute that advertiser self-certification is enough to ensure compliance with subsection 7. The Media Plaintiffs should not be required to rely on the State's assurances about how it may exercise its enforcement discretion in the future.[2]

If the drafters of subsection 7 intended to require just an advertiser's self-certification that they are not foreign government-influenced, the statute could have so provided. Instead, it requires that news outlets "establish due diligence policies, procedures and controls that are reasonably designed to ensure" that they do not run ads paid for by a foreign government-influenced entity. 21-A M.R.S. § 1064(7). While it may be "common" to require "entities" that

---

[2] The State is simply wrong when it says "Subsection 7 . . . imposes no financial penalties on publishers" (ECF No. 47 at 45.) Subsection 8 authorizes financial penalties with no indication that news outlets may not be subject to them.

2

21342810.4

are not engaged in core First Amendment activities to "adopt basic due diligence policies" (ECF No. 47 at 64), the State cites no precedent anywhere for anything like subsection 7. None of the ten states listed in Protect Maine Elections' brief as having laws against political spending by foreign nationals (ECF No. 46 at 19) impose any due diligence requirements on news outlets.

"Due diligence" is commonly understood to mean something more than having a counterparty to a transaction check a box: Black's Law Dictionary defines "due diligence" as "[t]he diligence reasonably expected from, and ordinarily exercised by, a person who seeks to satisfy a legal requirement or to discharge an obligation," and gives as an example "[a] prospective buyer's or broker's *investigation and analysis* of a target company, a piece of property, or a newly issued security." DILIGENCE, Black's Law Dictionary (11th ed. 2019) ("A failure to exercise due diligence may sometimes result in liability, as when a broker recommends a security without first *investigating* it adequately."). The Media Plaintiffs have good reason to believe that the requirement that news outlets "establish due diligence policies, procedures and controls that are reasonably designed to ensure" that they do not publish ads paid for by foreign government-influenced entities requires more than just accepting the say-so of the advertiser. Especially when it is not mere "due diligence" that the Act requires, but "due diligence *policies, procedures and controls*"—a construction suggesting that within the universe of things "due diligence" could mean, as used here it means something on the more comprehensive end of the spectrum. Even if a self-certification check box might be characterized as a due diligence "policy," is it also (the statute requires "policies, procedures *and* controls) a due diligence "procedure" and "control"? While the Media Plaintiffs' position is not that subsection 7 *must* be interpreted to require all the investigatory steps described in the motion, the claim that this

3

reflects a "fundamental misunderstanding of the Act's requirements or a flimsily thatched straw argument" (ECF No. 47 at 42), or is "pure fantasy" (ECF No. 46 at 34), is simply wrong.

The argument by Protect Maine Elections that subsection 7's "due diligence requirements . . . closely resemble the FCC's sponsorship identification rules for paid advertising" (ECF No. 46 at 32), and that "[a] basic inquiry with potential advertisers would meet [subsection 7's] burden, as the D.C. Circuit suggested would suffice in *National Association of Broadcasters*" (*id*. at 34), ignores the obvious distinction that the statute at issue there requires only that a broadcaster "exercise reasonable diligence to obtain [information] *from its employees, and from other persons with whom it deals directly*" (47 U.S.C. § 317(c)). Subsection 7 has no such limitation on the due diligence it requires. Neither Protect Maine Elections nor the State explains why subsection 7's expansive requirement must be construed as being identical to the narrow and specific due diligence requirements in federal law.[3]

Protect Maine Elections fares no better with the argument that "Maine's due diligence requirements mirror federal regulations that courts have deemed consistent with the First Amendment." (ECF No. 46 at 31.) The example they give—regulations that "require the exercise of due diligence to avoid 'knowingly' taking contributions from foreign nationals" and "an inquiry if a person becomes aware of 'facts that would lead a reasonable person to inquire whether the source of the funds' is a foreign national" (*id*.)—imposes no due diligence obligation unless a recipient of funds knows or has reason to believe they are dealing with a foreign national. Subsection 7, by contrast, imposes a blanket requirement that news outlets perform due

---

[3] Equally irrelevant is *McConnell v. FEC*, 540 U.S. 93 (2003) (cited by Protect Maine Elections), as the requirement held to be constitutional there was not vague, could not plausibly be read to require a global investigation into the ownership of corporate entities (but instead just recordkeeping), and was limited to broadcasters, where restrictions that would not otherwise pass constitutional muster may be upheld based on the scarcity of licensed frequencies.

diligence on *every* advertiser. Protect Maine Elections suggests that news outlets should be thankful for subsection 7's vagueness, because it leaves them with "discretion to establish those internal processes that they believe most effective and efficient at identifying illegal foreign advertising."[4] (ECF No. 46 at 33.) But the statute leaves news outlets in the dark as to whether the processes they "believe" are appropriate will pass judicial muster. It thus has a chilling effect.

The State focuses on what it claims is the minimal burden the Act would impose on news outlets, but neglects to acknowledge a key interrelated point: as explained above, under the State's interpretation subsection 7 would also be minimally effective in achieving any statutory objective, and would therefore "ensure" very little. If, as Protect Maine Elections contends, subsection 7's "requirements are *key* to enforcement of Maine's foreign corporate money ban" (ECF No. 46 at 31 (emphasis added)), it is reasonable to assume that the "due diligence policies, procedures and controls" it requires must entail more than self-certification. Unlike the State's reading, the reading the Media Plaintiffs are concerned about takes the statutory text seriously. Yes, the statute says "reasonably designed," not "perfectly designed" (ECF No. 47 at 42)—but the State's insistence that the Media Plaintiffs may rest assured that subsection 7's "reasonably designed" requirement is met by mere advertiser self-certification is unfounded.

The State does not solve the problem of subsection 7 being unconstitutionally vague and unconstitutionally burdensome by having the Commission's Executive Director submit an affidavit stating that he "expects" the Commission to establish rules that are consistent with the State's interpretation. (ECF No. 47 at 42.) For one thing, the Executive Director does not have the power to unilaterally make or even vote on the rules. *See* 1 M.R.S. § 1002(1-A), (5). And even if he did, his promise as to how he "expects" the five-member Commission to exercise its

---

[4] This argument is in tension with the State's reading of the statute, as the measures the State envisions would (as explained above) not be at all effective in identifying illegal foreign advertising.

power is not legally enforceable. The Commission's rulemaking authority is also limited by subsection 10 to "routine technical rules"—rules that by definition do not "[r]equire the exercise of significant agency discretion or interpretation in drafting," but instead are just "procedural rules that establish standards of practice or procedure for the conduct of business with or before an agency." 5 M.R.S. 8071(2) (distinguishing routine technical rules from major substantive rules). The Commission has no authority to make substantive changes to statutory standards.

The State claims that "Subsection 7 does not *formally* prevent media entities from speaking . . . ." (ECF No. 47 at 45 (emphasis added).) One problem here is that a news outlet's speech includes ads, and the law requires news outlets to "immediately remove" certain ads. More generally, subsection 7 has a clear chilling effect on political speech. This is not "a chilling effect of unspecified substance and scope" (ECF No. 47 at 60)—the Media Plaintiffs are specific about the chilling effect subsection 7 creates. *See* Motion at 4 ("Because [the due diligence provision] is inscrutable, the Media Plaintiffs do not know what they have to do to avoid being fined . . . . The upshot is that the Act . . . incentivizes [news outlets] to stop running political ads altogether."). Because of this chilling effect, it is not true that "[a]ny limitations on speech imposed by subsection 7 are . . . wholly derivative of—and go no further than—subsection 2's ban on FGIE spending." (ECF No. 47 at 45). Political speech by 100% domestic advertisers will also be chilled.[5]

The state also misconstrues the discussion of prior restraints on pages 10–11 of the motion. *See* ECF No. 47 at 47. The argument is not that subsection 7's due diligence requirement

---

[5] The Media Plaintiffs do not "spend significant real estate arguing that *restrictions on FGIE campaign expenditures* are not narrowly tailored and must be struck down." (ECF No. 47 at 46 (emphasis added).) The argument in the motion is about whether subsection 7, as applied to news outlets—not the underlying "restrictions on FGIE campaign expenditures"—is narrowly tailored to achieve the Act's objectives.

literally imposes a textbook prior restraint on speech, but that its impact would be functionally equivalent to having the government screen political ads for foreign government influence before publication. *See* Motion at 10 ("*If* the Act banned political ads that had not first been screened by the State for foreign government influence, a successful action by the State for an injunction to enforce that ban *would* amount to an unconstitutional prior restraint on speech.") (emphasis modified). The Act does, as a practical matter, "[d]elegat[e] to news outlets the power to ban speech in advance of its publication" (ECF No. 47 at 47), as it requires them to establish due diligence policies, procedures and controls that are reasonably designed to ensure that they do not publish political speech. And it requires internet platforms to immediately remove banned speech. The analogy to a prior restraint is instructive in evaluating this unprecedented statute.[6]

## II.     The Media Plaintiffs need injunctive relief.

The government cannot defeat a motion to enjoin the enforcement of an unconstitutional statute simply by announcing in a brief that the plaintiffs have no cause for concern because the government may not enforce the statute the way its plain language suggests it could be enforced. As the Supreme Court has explained:

> the First Amendment protects against the Government; it does not leave us at the mercy of noblesse oblige. We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly.

*United States v. Stevens*, 559 U.S. 460, 480 (2010); *see also id*. ("The Government's assurance that it will apply § 48 far more restrictively than its language provides is pertinent only as an

---

[6] On the Media Plaintiffs' argument that subsection 8 is unconstitutional because it imposes liability without fault, the State is wrong to say that "media entities can be held civilly liable under the Act only if they willfully violate it . . . ." (ECF No. 47 at 51.) As explained above, news outlets could make a good-faith effort to interpret the due diligence requirement and still be penalized if the Commission or a court takes a different view. That being so, the Act does not impose liability only for willful violations. Indeed, the Attorney General's own summary of the Act, drafted pursuant to 1 M.R.S. § 353, explains that violations are subject to fines "whether the violation was knowing or inadvertent." Maine Citizens Guide to the Referendum Election (Nov. 7, 2023) at 13 [ECF No. 3-5 in Case 1:23-cv-00452].

implicit acknowledgment of the potential constitutional problems with a more natural reading."). As the Third Circuit explains, the holding in *Stevens* was that "a promise by the government that it will interpret statutory language in a narrow, constitutional manner cannot, without more, save a potentially unconstitutionally overbroad statute." *Free Speech Coal., Inc. v. Att'y Gen. of U.S.*, 677 F.3d 519, 539 n.15 (3d Cir. 2012). That is because "there is no guarantee that the government's current interpretation . . . will remain unchanged." *Id.*; *see also Smiley v. Citibank (S. Dakota), N.A.*, 517 U.S. 735, 741 (1996) (quotation marks omitted) (Courts "deny deference to agency litigating positions that are wholly unsupported by regulations, rulings, or administrative practice," because "[t]he deliberateness of such positions, if not indeed their authoritativeness, is suspect."). As the Eleventh Circuit has put the point, the courts "cannot find clarity in a wholly ambiguous statute simply by relying on the benevolence or good faith of those enforcing it." *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1322 (11th Cir. 2017) (en banc). Whatever the government may now say it expects to do going forward, the Media Plaintiffs need injunctive relief to ensure that their First Amendment rights are secure.

"In the First Amendment context, facial vagueness challenges are appropriate if the statute clearly implicates free speech rights." *California Tchrs. Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1149 (9th Cir. 2001). And "a chilling of speech because of the mere existence of an allegedly vague or overbroad statute can be sufficient injury to support standing." *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 660 (5th Cir. 2006); *see also Speet v. Schuette*, 726 F.3d 867, 878 (6th Cir. 2013) ("'[F]ree expression may be inhibited almost as easily by the potential or threatened use of power as by the actual exercise of that power.'") (quoting *N.Y. State Club Ass'n v. City of N.Y.*, 487 U.S. 1, 11 (1988)). Subsection 7 clearly implicates free speech rights by creating an obstacle to the publication of political speech. And it will have a

chilling effect on that speech if enforcement is not enjoined, as prudent news outlets that would have to undertake burdensome investigations before running political ads to ensure that they did not violate the law may instead decide to avoid that category of speech altogether.

As in *Nat'l Org. for Marriage v. McKee* (cited by the State), this is "a preenforcement challenge based on conduct forgone due to an alleged chill," so the question is "whether 'the statutory terms are clear in their application to [the] *proposed* conduct.'" 649 F.3d 34, 50 (1st Cir. 2011) (emphasis in original). Restrictions on vagueness challenges are "'relaxed . . . in the First Amendment context, permitting plaintiffs to argue that a statute is overbroad because it is unclear whether it regulates a substantial amount of protected speech.'" *Id.* at 51.

Subsection 7 is overbroad in that it requires news outlets that wish to run *any* political ad, paid for by *any* entity, to establish due diligence policies, procedures and controls; there are no circumstances where a news outlet that runs political ads is not subject to subsection 7. As most entities that buy political ads in Maine are presumably not foreign government-influenced, subsection 7 is overbroad, because it requires a due diligence investigation of *all* advertisers.

At a minimum, a facial challenge is appropriate "if the impermissible applications of the law are substantial when judged in relation to the statute's plainly legitimate sweep." *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999) (quotation marks omitted). Even if subsection 7 has some "legitimate sweep," its chilling effect would still be substantial. *See Speet*, 726 F.3d at 878 (a facial challenge is appropriate where "the risk exists that, if left on the books, the statute would chill a substantial amount of activity protected by the First Amendment.").

The State has no answer to the Media Plaintiffs' evidence that subsection 7's due diligence provision would chill an important category of political speech and cause some news outlets to reexamine whether to continue to run political ads at all (*see* Jalbert Dec. ¶¶ 12; Meyer

9

Decl. ¶ 33; Moore Decl. ¶ 30; Spencer Decl. ¶ 34), other than to brush off concern about what the statute may be construed to require as a "straw argument" (ECF No. 47 at 42). Because subsection 7 is extraordinary and unprecedented, and the State offers no contrary evidence in response to the Media Plaintiffs' affidavits, its chilling effect cannot be so easily dismissed, and there is in fact "a 'substantial risk' of concrete harm." (ECF No. 47 at 60.) The First Amendment therefore provides the "expansive remedy" of a facial challenge "out of concern that the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech . . . ." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003); *see also Speet*, 726 F.3d at 879 ("We are concerned that '[m]any persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech, harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas.'") (quoting *Hicks*, 539 U.S. at 118 (2003)).

The same goes for Protect Mane Elections' complaint about "the inherently speculative nature of plaintiffs' objections," which it claims "is all the more problematic because they bring a pre-enforcement facial challenge prior to any regulatory implementation of the Act . . . ." (ECF No. 46 at 34.) As just explained, leaving subsection 7 in place while the Commission proceeds with the rulemaking process would chill a substantial amount of political speech. Far from it being "premature to review [subsection 7's] due diligence requirements without information about their regulatory implementation" (*id.* at 35 (quotation marks omitted)), the First Amendment requires that the Court enjoin enforcement of this unconstitutional statute.

## CONCLUSION

WHEREFORE, the Media Plaintiffs respectfully request that the Court enjoin the Defendants from enforcing subsection 7 of the Act.

10

21342810.4

Dated at Portland, Maine this 31st day of January, 2024.

          Respectfully Submitted,
          MAINE PRESS ASSOCIATION AND
          MAINE ASSOCIATION OF
          BROADCASTERS

          by their attorneys,
          PRETI FLAHERTY BELIVEAU &
          PACHIOS, LLP


          */s/ Sigmund D. Schutz*
          Sigmund D. Schutz
          Benjamin S. Piper
          Jonathan G. Mermin
          Alexandra A. Harriman
          One City Center
          P. O. Box 9546
          Portland, ME  04112-9546
          (207) 791-3000
          sschutz@preti.com
          bpiper@preti.com
          jmermin@preti.com
          aharriman@preti.com