## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

CENTRAL MAINE POWER COMPANY, *et al.*,

                        Plaintiffs,

v.

MAINE COMMISSION ON
GOVERNMENTAL ETHICS AND
ELECTION PRACTICES, *et al.*,

                        Defendants.

Case No. 23-cv-00450-NT

<u>ORAL ARGUMENT REQUESTED</u>

## CENTRAL MAINE POWER COMPANY'S REPLY IN SUPPORT OF ITS <u>MOTION FOR PRELIMINARY INJUNCTION</u>

The State's brief inadvertently highlights the central constitutional flaw of the Initiative. The sole "evidence" proffered by the State in support of the purported justification for the Initiative—protecting democratic self-government from foreign influence—consists of the spending by CMP and others in opposition to two referenda. The State conveniently ignores the nature of the referenda, which were targeted efforts to deprive CMP and others of their property. CMP, a Maine company, faced a choice: either engage in political speech to protect its property or be deprived of that property. CMP's defensive effort is now being used to justify depriving CMP of its free speech rights as a Maine company. This act of political retribution cannot be redeemed by invoking democratic legitimacy: "the voters may no more violate the Constitution by enacting a ballot measure than a legislative body may do so by enacting legislation." *Citizens Against Rent Control/Coal. for Fair Hous. v. City of Berkeley*, 454 U.S. 290, 295 (1981). As with the two prior anti-CMP referenda, the Initiative is unconstitutional.[1]

## I.  The Initiative is subject to strict scrutiny, but it fails both strict and exacting scrutiny.

Strict scrutiny, not exacting scrutiny, applies. Although regulation of expenditures typically receives greater scrutiny than regulation of contributions, *see McCutcheon v. FEC*, 572 U.S. 185, 196-97 (2014), the First Circuit has held, in a case ignored by the State, that strict scrutiny applies to a law that "forbids juridical persons from spending *any* money on political campaigns, be they direct contributions, independent expenditures, or otherwise" without satisfying various regulatory requirements, *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 12 (1st Cir. 2012). This standard must, *per force*, also apply to a law that flatly bans all campaign spending.

There is no basis to depart from the rule in *Fortuno*. It is consistent with Supreme Court precedent, which distinguishes between limits on expenditures and contributions because of the extent

---

[1] CMP has standing, as established by its verified complaint stating that it (1) has made campaign contributions; (2) intends to continue to make contributions, including in this election cycle, but for the Initiative; and (3) has received solicitations for contributions which it has declined because of the Initiative. Compl. ¶¶ 32-34, 60, 63. This easily crosses the low threshold to establish standing for a First Amendment claim. *Cushing v. McKee*, 738 F. Supp. 2d 146, 153 (D. Me. 2010).

of the burden such limits place on speech. *Id.* (citing *Citizens United*, 558 U.S. at 339). The Initiative's outright ban on all spending imposes the greatest possible burden on speech. *Id.* This Court is bound by *Fortuno*, which applies *Citizens United* and post-dates the Supreme Court precedent cited by the State. *See Brazier v. Oxford Cnty.*, 575 F. Supp. 2d 265, 269 (D. Me. 2008).[2] Further, the fact that the Initiative has some relation to regulating foreign entities does not mean that lesser scrutiny applies; the State cites no First Amendment cases on this point. *Cf. Foley v. Connelie*, 435 U.S. 291, 295-96 (1979) (equal protection claim). The State's argument is foreclosed by *Citizens United*, which applied strict scrutiny even when assessing the asserted interest in preventing foreign influence. 558 U.S. at 362.

In any event, the Initiative's limits fall whether strict scrutiny or exacting scrutiny applies. *See Minn. Chamber of Com. v. Choi*, 2023 WL 8803357, at *5 (D. Minn. Dec. 20, 2023). Both tests "assess the fit between the stated governmental objective and the means selected to achieve that objective." *McCutcheon*, 572 U.S. at 199. "Or to put it another way, if a law that restricts political speech does not avoid unnecessary abridgment of First Amendment rights it cannot survive rigorous review." *Id.* (cleaned up). The Initiative's restrictions simply do not fit its proffered justification.

## II.     The State has not carried its burden to justify the Initiative's ban on political speech.

The Initiative, although unique in its conceded purpose of silencing a U.S. company based on its opposition to referenda that would have deprived it of its property, is not unique in its structure. In a decision barely mentioned by the State, the District of Minnesota recently enjoined a functionally indistinguishable law that banned "foreign-influenced corporations" from engaging in campaign spending in state elections. *See Choi*, 2023 WL 8803357, at *1. The court held that the law, which applied to companies with a foreign ownership interest of 5% in the aggregate (or 1% individually), *id.* at *2, likely violated the First Amendment, *id.* at *10. As the court reasoned:

---

[2] The State relies on *FEC v. Beaumont*, 539 U.S. 146 (2003), which pre-dates *Citizens United* and has been called into question. *See McCutcheon*, 572 U.S. at 199. Regardless of the State's view of the vitality of *Beaumont* in light of subsequent Supreme Court precedent, that issue has been settled by the First Circuit's controlling precedent in *Fortuno*.

Corporations and other associations, like individuals, contribute to the 'discussion, debate, and the dissemination of information and ideas' that the First Amendment seeks to foster." *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 8 (1986) (quoting *First Nat'l Bank v. Bellotti*, 435 U.S. 765, 783 (1978)). Although "foreign organizations operating abroad have no First Amendment rights," *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 140 S. Ct. 2082, 2088 (2020), domestic corporations are protected under the First Amendment. *Citizens United*, 558 U.S. at 342 (collecting cases). There is no support for the proposition that corporations lose their First Amendment protections merely because a foreign national purchases some share or interest, no matter how small. *Cf. id.* After all, "American corporations ... [are] members of the American political community." *Bluman v. FEC*, 800 F. Supp. 2d 281, 290 (D.D.C. 2011), *aff'd*, 565 U.S. 1104 (2012). And no case holds that a corporation ceases to be "American" by virtue of any quantum of foreign ownership.

*Id.* at *4 (citations cleaned up). The court concluded that the law failed under either strict or exacting scrutiny, *id.* at *5, because (1) Minnesota lacked a compelling interest in preventing speech by U.S. companies with passive foreign shareholders, *id.* at *6; (2) the state had not shown that foreign shareholders had exerted influence over corporate election spending in Minnesota or elsewhere, *id.* at *7; and (3) the law was both overinclusive and underinclusive, *id.* at *8-9. The Initiative similarly fails.

**A.     The State does not have a sufficient interest that justifies Section 1064(2).**

The State offers one justification for the Initiative: protecting democratic self-government. State Br. at 15-23.[3] *Bluman* suggests that there is a compelling interest in "limiting the participation of *non-Americans* in the activities of democratic self-government." 800 F. Supp. 2d at 290. This justification, however, is too limited to sustain the Initiative's broad provisions, and, in any event, the State has not offered any evidence actually supporting its asserted justification.

**1.     The State does not have an interest in silencing a Maine company.**

The State's proffered justification is more limited than the State asserts. The State claims that its asserted interest supports silencing U.S. companies with foreign ownership as low as 5%. State Br. at 24. *Amici* argue that a company loses its speech rights if it has one non-citizen shareholder. PME Br. at 23 n.17; FSFP Br. at 7-8. As the court held in *Choi*: "Not so." 2023 WL 8803357, at *6.

---

[3] The State mentions *quid pro quo* corruption, but it (1) waived the argument by not developing it, *U.S. v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990), and (2) failed to provide evidence of corruption, as it must, *FEC v. Cruz*, 596 U.S. 289, 307 (2022).

The Supreme Court rejected these arguments in *Citizens United*. In that case, Justice Kennedy observed that the ban on corporate expenditures was overbroad because the ban was "not limited to corporations or associations that were created in foreign countries or funded *predominately* by foreign shareholders." 558 U.S. at 362 (emphasis added). As *Citizens United* establishes, therefore, a state interest in preventing foreign interference does not justify silencing U.S. companies that are not "predominately" foreign-owned. As in *Choi*, the 5% threshold at issue here "is a far cry from predominately." 2023 WL 8803357, at *6. The State's argument ignores this controlling precedent.

The State also stretches *Bluman* far beyond its holding. *Bluman* concluded only that there is a compelling interest in "limiting the participation of *foreign citizens* in activities of American democratic self-government." 800 F. Supp. 2d at 288 (emphasis added). The court reasoned that this limitation was justified because foreign citizens are not members of the American political community. *Id.* at 290. Notably, *Bluman* left open the possibility that foreign nationals who are lawful permanent residents in the United States may not be subject to a ban on political contributions, as participants in the political community, *id.* at 290-91; and, importantly, the court stated that it had "no occasion to analyze the circumstances under which a corporation may be considered a *foreign* corporation for purposes of First Amendment analysis." *Id.* at 292 n.4; *see Choi*, 2023 WL 8803357, at *6.[4]

Despite then-Judge Kavanaugh's careful limits on *Bluman*'s rationale and holding, the State now seeks to stretch *Bluman* to justify a ban on speech by U.S. companies with indirect, passive foreign investors. But such companies are differently situated than the foreign citizens regulated in *Bluman*. A company organized under and subject to U.S. law, but with some foreign ownership, is simply not the same as a foreign national. *Bluman* itself acknowledges that, in contrast to foreign nationals, "American corporations . . . [are] members of the American political community." *Id.* at 290. That is certainly true

---

[4] *See Agency for Int'l Dev.*, 140 S. Ct. at 2085-86, 89 (restraint on free speech did not apply to U.S. organizations); *OneAmerica Votes v. State*, 518 P.3d 230, 237 (Wash. Ct. App. 2022) (banning contributions or expenditures only if such spending was made directly by foreign nationals, was financed by foreign nationals, or involved participation by foreign nationals).

of CMP, a 124-year-old Maine company with a long history of participating in Maine's public affairs. Compl. ¶¶ 15, 26-30. Accordingly, *Bluman* does not support the State. U.S. companies retain their First Amendment rights regardless of limited foreign ownership interest. *Choi*, 2023 WL 8803357, at *6.

As the court concluded in *Choi*, existing precedent leads to the conclusion "that preventing the exercise of First Amendment-protected political speech by a corporation with foreign shareholders, without more, does not alone represent a compelling interest." *Id.* It "does not follow" from *Bluman* "that a foreign shareholder indirectly participates in our national political process simply by possessing shares." *Id.* Accordingly, the state interest in "prevent[ing] foreign nationals from participating in our national political process" is limited in that it only "extends to preventing foreign nationals—including foreign shareholders of domestic corporations—from controlling or exercising influence over a corporation's election expenditures." *Id.*

## 2.  The State does not have an interest in limiting debate over referenda.

Even the limited justification supported by *Bluman* does not apply in the context of referenda campaigns. *Bluman* itself dealt with campaign spending only in candidate elections. 800 F. Supp. 2d at 291.[5] The State does not meaningfully respond to *Citizens Against Rent Control*, 454 U.S. at 290, and *Bellotti*, 435 U.S. at 788-91, which establish that "there is no significant state or public interest in curtailing debate and discussion of a ballot measure." *Citizens Against Rent Control*, 454 U.S. at 299. Indeed, the only district court to consider the issue—in another case ignored by the State—rejected the argument that protecting democratic self-government is a compelling interest in the context of referenda. *See SD Voice v. Noem*, 380 F. Supp. 3d 939, 948-50 (D.S.D. 2019).

As CMP has explained, the reason for this is simple: "[T]he fact that advocacy may persuade the electorate is hardly a reason to suppress it." *Bellotti*, 435 U.S. at 790. The Supreme Court has made

---

[5] Contrary to the State's claim, it has been clear for decades that federal limits on spending by foreign nationals do not apply to referenda. *See* FEC Advisory Op. 1989-32, *available at* https://www.fec.gov/files/legal/aos/1989-32/1989-32.pdf.

#16780356v8

clear that the First Amendment commits "the responsibility for judging and evaluating the relative merits of conflicting arguments" to the electorate. *Id.* at 791. *Bellotti*'s reasoning is amply justified by the State's own evidence: despite the spending in opposition to the initiative that sought to bar the NECEC project, the voters approved it. *See NECEC Transmission LLC v. BPL*, 2022 ME 48, ¶¶ 17, 20; *see* Wayne Decl. ¶ 22. In other words, the electorate rejected CMP's political arguments. Accordingly, the State's proffered justification does not support banning speech relating to referenda.

### 3.   The State has not offered evidence supporting its asserted interest.

Not only is the State's proffered justification incongruent with the Initiative's actual provisions, but the evidence relied upon by the State fails to support that justification. First, the State cannot point to campaign spending by a U.S. company in opposition to referenda that would result in the seizure of its property as evidence of wrongful foreign interference. Second, as in *Choi*, the record is devoid of any evidence of *foreign* control of campaign spending. Third, the State cannot substitute a broad interest in avoiding the appearance of foreign influence absent such evidence.

First, the State cannot justify the Initiative based on spending relating to two referenda targeted at CMP. This evidence demonstrates that the Initiative is a punitive measure, backed by CMP's opponents, designed to silence CMP because of its spending in opposition to measures which would have (1) rendered a $450 million investment by CMP into a joint electric transmission project with H.Q. Energy Services (U.S.) Inc. ("HQUS") valueless, and (2) expropriated the assets of both CMP and Versant. ECF No. 47-8 at 30-31, 47-48, 53-56, 73, 112-13; ECF No. 47-9 at 56-57; *see* Compl. ¶¶ 27-28; *NECEC Transmission LLC*, 2022 ME 48, ¶¶ 17, 20.[6] Given the subject of the referenda that caused the spending, it is apparent that the spending highlighted by the State is not evidence of foreign

---

[6] Notably, the principal sponsor of the Initiative, Senator Bennett, was a named plaintiff in litigation seeking to derail CMP's transmission project and a principal sponsor of the legislation that would have seized CMP's assets. Compl. ¶ 41; *Black v. BPL*, 2022 ME 58, ¶ 1 n.2; Testimony of Senator Bennett, LD 1708, *available at* https://www.mainelegislature.org/legis/bills/getTestimonyDoc.asp?id=166183. CMP's opponents have themselves linked the various referenda. *See, e.g.*, ECF No. 47-8 at 16-17, 112-13. The link between the Initiative's ban and prior anti-CMP efforts casts substantial doubt on the purported interests the State now asserts. *See Cruz*, 596 U.S. at 310-11.

6

#16780356v8

meddling at all; it is simply evidence that U.S. companies such as CMP may have legitimate and compelling reasons to lawfully engage in the political process in a purely defensive effort to protect their U.S. business interests. As the State would have it, CMP cannot win: it must either remain silent as its property is taken, or have its opposition used to justify a deprivation of its of free speech rights. The Court should reject the State's self-serving evidence as antithetical to the First Amendment.

Second, the State fails to provide evidence that foreign governments have controlled or influenced political spending by Maine companies, such as CMP, through minority ownership. For a law to be necessary to advance a stated interest, "[t]here must be a direct causal link between the restriction imposed and the injury to be prevented." *Choi*, 2022 WL 8803357, at *7 (quoting *United States v. Alvarez*, 567 U.S. 709, 725 (2012)). "To this end, courts consider evidence of the harm the Government seeks to prevent." *Id.* As discussed below, the State (like Minnesota) identifies several ways foreign shareholders could theoretically control or influence political expenditures. *See id.* "But explaining how foreign minority shareholders *could* exercise influence over corporations is not enough to justify [the Initiative]'s ban on corporations' political speech." *Id.* Rather than simply "posit[ing] the existence of the disease sought to be cured," *id.* (quoting *Colo. Republican Fed. Campaign Comm. v. FEC*, 518 U.S. 604, 618 (1996)), the State must "offer evidence that minority foreign shareholders have . . . exercised influence or control over a corporation's election expenditures in [Maine] or elsewhere," *id.*

It has not provided a single shred of such evidence. As in *Choi*, the State has not identified "how, or if" QIA or Norges Bank "exercised control or influence over [CMP]'s election-related expenditures." *Id.* The State points only to the spending itself, without even suggesting that QIA or Norges Bank controlled or even participated in that spending. State Br. at 19. Indeed, the notion that CMP needed direction from investors in its parent's parent's parent's parent company to oppose these initiatives borders on the ludicrous. With respect to CMP, the only evidence is that political spending decisions were made by CMP's U.S. board and management. Compl. ¶¶ 18, 37. In a bizarre *non sequitur*,

the State instead points to the Mueller Report, while providing no explanation of how that report or other reports of foreign efforts to influence U.S. elections relate to the Initiative's provisions. In fact, there is no such link. The State simply has not shown that foreign governments have exerted control over the campaign spending of U.S. companies, like CMP, through minority ownership interests.

Third, the State's proffered interest in avoiding the appearance of foreign government influence does not save its inadequate evidentiary showing because the State stretches this interest far beyond its origins in *Buckley v. Valeo*, 424 U.S. 1 (1978). The Supreme Court has made it clear that an interest in preventing corruption or appearance of corruption is limited to *quid pro quo* corruption. *Citizens United*, 558 U.S. at 359; *see Cruz*, 596 U.S. at 305-08; *McCutcheon*, 572 U.S. at 207-208. "Reliance on a generic favoritism or influence theory is at odds with standard First Amendment analyses because it is unbounded and susceptible to no limiting principle." *Citizens United*, 558 U.S. at 359 (cleaned up). The State's new theory of "appearance of improper influence" based on spending in opposition to referenda, without more, is similarly unbounded—the State would use it to bar speech by U.S. corporations over which no foreign government exercises control, and even as to independent expenditures. This is inconsistent with *Citizens United*, which rejected the argument that the state can limit speech by corporations not "funded predominately by foreign shareholders" as well as the argument that independent expenditures undermine voter confidence. *Id.* at 360-62.

The State's theory also contravenes the Supreme Court's requirement that the State show actual corruption in order to justify a law meant to avoid the appearance of corruption. *Id.* at 360-61; *Cruz*, 596 U.S. at 308-10. Applied to the State's novel justification, this requirement mandates that the State make a showing of improper foreign interference with internal U.S. affairs. For example, in *Nixon v. Shrink Missouri Government PAC*, the Supreme Court considered evidence of the popular vote on an initiative imposing campaign contribution limits only *after* noting evidence of actual pay-for-play and kick-back scandals. 528 U.S. 377, 393-94 (2000); *see Daggett v. Comm'n on Gov'tl Ethics & Elec. Pracs.*,

205 F.3d 445, 456-57 (citing *Nixon* and additional evidence of undue influence in Maine). The State has simply skipped that step in this case, suggesting instead that voter perceptions—regardless of their basis in reality—are alone sufficient. But First Amendment rights cannot rest on such a thin reed. *Nixon*, 528 U.S. at 394 ("[M]ajority votes do not, as such, defeat First Amendment protections.").

Ultimately, the "appearance of influence" argument is just another version of the argument that the state may silence some speakers to prevent other voices from being "drowned out." State Br. at 21; *see* PME Br. at 23 ("spending campaigns . . . have often overwhelmed Maine-based advocacy"). While CMP's opponents wish to level the playing field, the Supreme Court has "rejected the premise that the Government has an interest in equalizing the relative ability of individuals and groups to influence the outcome of elections." *Citizens United*, 558 U.S. at 350 (quotation marks omitted); *see Cruz*, 596 U.S. at 310-11. "[T]he concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment, which was designed to secure the widest possible dissemination of information from diverse and antagonistic sources." *Buckley*, 424 U.S. at 48-49 (quotation marks omitted).

### B.    The State has not shown that the Section 1064(2) is narrowly tailored.

The State cannot carry its burden to demonstrate that the Initiative imposes the least restrictive means of accomplishing its asserted interest. *Rideout v. Gardner*, 838 F.3d 65, 71 (1st Cir. 2016). The Initiative's 5% threshold is overinclusive because it would regulate U.S. companies with purely passive investors and underinclusive because it fails to address other forms of foreign influence.

### 1.    Section 1064(2) is overinclusive.[7]

The State's defense of the 5% threshold fails out of the gates because, as discussed *supra*, it does not rest on any evidence that foreign governments have participated in decisions by U.S.

---

[7] This reply brief focuses on the overinclusive 5% threshold in 21-A M.R.S. § 1064(1)(E)(2)(a) because the State's justifications focus on this threshold. CMP has also argued that the "directly or indirectly participates" standard in § 1064(1)(E)(2)(b) is overinclusive, an issue addressed further in CMP's vagueness argument below.

companies to exercise their right to express political speech. "Because the [State] has failed to identify evidence that minority foreign shareholders regularly (or ever) exercise influence or control over corporations' political expenditures, the challenged provisions of [the Initiative] sweep far too broadly." *Choi*, 2023 WL 8803357, at *8. In the absence of such evidence, the State asks the Court to infer that foreign interference could occur by virtue of shareholder influence. But the *potential* for influence does not justify the *presumption* of influence underlying the Initiative's ban on speech. *Id.* at *7. In any event, the State has failed to establish that the 5% threshold is a proxy for real influence.

First, although the State argues that "U.S. managers are inextricably linked to their foreign-government investors by the duty of loyalty that corporate directors owe to their shareholders," State Br. 26, board directors need not follow the directives of any specific investor. A board director's fiduciary duty flows to the corporation itself, ahead of the interests of specific investors. *See, e.g.*, 13-C M.R.S. § 831(1) (requiring board members to act "in the best interests of the corporation"); ABA Model Business Corporation Act ("MBCA"), § 8.30(a) (same). Thus, "directors owe fiduciary duties to the corporation, for the benefit of the shareholders *as a group* (not 'and to the shareholders')." Edward B. Rock, *Adapting to the New Shareholder-Centric Reality*, 161 U. Pa. L. Rev. 1907, 1957 (2013) (emphasis added). This is so because, in corporations with shareholders who hold differing views, it would be impossible to honor the precise wishes of each shareholder. MBCA, § 8.30(a), cmt. 1 (directors have "wide discretion" to determine the "best interests of the corporation" because "the interests of various groups of shareholders … may differ"). It simply is not true that corporate law requires the director or officer of a U.S. corporation to follow the wishes of any given investor.

Second, and relatedly, there is no basis for the State to argue that fiduciary duties require board members of U.S. companies to follow the wishes of specific investors with respect to a corporation's political spending decisions. While the State cites Justice Stevens's concurring opinion in *Citizens United* for the point that shareholders "foot[] the bill" for corporations' political spending decisions, that

concurrence also observed that "the internal authority wielded by boards and managers and the expansive protections afforded by the business judgment rule" permit directors and officers to make decisions concerning corporate political activity without regard to shareholder's wishes. 558 U.S. at 475, 477. In other words, the State has it precisely backwards: basic principles of corporate law permit corporate directors and officers to *disregard* the wishes of specific investors when it comes to political spending decisions, rather than compel managers to follow those wishes.[8]

Third, Congress' use of various ownership thresholds in different federal statutes does not demonstrate that 5% ownership serves as a reasonable proxy for corporate control. State Br. at 24-25.

The State's primary example is the Williams Act, which addresses abuses in the use of cash tender offers as a means to effect a takeover of a publicly-traded corporation. *See Calvary Holdings, Inc. v. Chandler*, 948 F.2d 59, 62-63 (1st Cir. 1991) (discussing policy goals of the act). The Williams Act does not concern foreign government ownership at all; instead, it provides investors in publicly traded companies with transparency concerning the identity of potential "takeover bidders." *Id.* Although the Williams Act requires those who own 5% or more of a company to register with the SEC, it employs that threshold not because Congress determined that 5% constituted control, but rather because Congress determined that those with ownership interests of 5% or more may seek to obtain control over the company *in the future. See* Thomas Lee Hazen, *Treatise on the Law of Securities Regulation* § 11:7 (2023) (noting that the Williams Act gives "investors and the public markets *an early warning* of a major stock acquisition that *could be a first step* in acquiring control" (emphases added)). Congress thus adopted the 5% threshold to allow investors to identify "takeover bidders" in advance of an actual takeover. *Id.* The cases the State cites in its brief make this point, *see* State Br. at 24-25, but the State confuses

---

[8] Indeed, critics of *Citizens United* have attacked the decision on this very basis, arguing that the existing legal boundaries imposed by fiduciary duties are insufficient to permit shareholders to influence the political spending decisions of corporate directors and officers, opening the risk that political spending decisions would be *adverse to*, not consistent with, the wishes of shareholders. *See* Joseph K. Leahy, *Corporate Political Contributions as Bad Faith*, 86 U. Colo. L. Rev. 477 (2015).

the *potential* for a *future* takeover bid, which may arise at 5% ownership, with *present* control. The Williams Act adopted the 5% threshold for a qualitatively different reason than the Initiative.

The State next relies on provisions of federal telecommunications law prohibiting the Federal Communications Commission from issuing radio licenses to entities more than 20% owned by foreign nationals or foreign governments. Unlike the Williams Act, federal telecommunications law arguably serves the same qualitative purpose as the State asserts here. But the State's argument breaks down because of the significant quantitative difference between the federal law's 20% threshold, *see* 47 U.S.C. § 310(b)(3), and the Initiative's 5% threshold. Thus, although the federal government may be concerned with foreign ownership in the telecommunications industry, that concern arises only at a far higher level than that imposed by the Initiative. The State breezes by this distinction by stating Congress "happened to" choose a different threshold, State Br. at 25, but Congress's judgment is either relevant or it is not. If it is relevant, then the fact that Congress chose a threshold *four times* larger than that imposed by the Initiative shows that the Initiative is overinclusive. If it is not, then the Court can disregard the State's arguments concerning the statutory thresholds in federal law.[9]

Fourth, the State's mishmash of case law, newspaper articles, and law review pieces also do not show that a 5% shareholder enjoys practical influence over daily operations. State Br. at 27-29.

The State's citations to Delaware cases miss the point. In *Voigt v. Metcalf*, the court concluded that a plaintiff sufficiently alleged the defendant to be a fiduciary because of the defendant's 34.8% equity interest in the relevant corporation, taken together with other facts. 2020 WL 614999, at *14-19 (Del. Ch. Feb. 10, 2020). This was a "fact-intensive" inquiry, and the court noted that in some cases those with a greater than 45% interest might not have control. *Id.* at *17. But even if the only factor

---

[9] The federal regulation regarding shareholder proposals cited by the State also does not support its argument. The relevant regulation permits the company to exclude the shareholder proposal if it "deals with a matter relating to the company's ordinary business operations." 8 C.F.R. § 240.14a-8(i)(7). And "most shareholder proposals—and virtually all social and environmental proposals—are precatory, which means that they are recommendations and are not binding on management." Sarah C. Haan, *Shareholder Proposal Settlements and the Private Ordering of Public Elections*, 126 Yale L.J. 262, 273 (2016). The regulation does not show that de minimis investors wield anything close to significant control.

was the defendant's equity interest, it is irrelevant here: 35% is materially larger than 5%. *Third Point LLC v. Ruprecht* is even further afield. 2014 WL 1922029 (Del. Ch. May 2, 2014). There, the court denied a motion for preliminary injunction brought by a so-called "activist hedge fund" owning 9.6% in Sotheby's, where the hedge fund alleged that Sotheby's board violated its fiduciary duties when adopting a stockholder rights plan that the hedge fund found disadvantageous. *Id.* at *1-2. The court's ruling *against* the shareholder demonstrates that investors often *cannot* bend a board to their will to protect their interests. It hardly supports the proposition that a 5% shareholder gets to call the shots.

The State's citations to articles and newspaper reports are similarly unconvincing, even if they could be considered admissible evidence. The academic articles are based on anecdotal evidence, and do not address, much less draw any conclusions concerning, the ownership threshold at which a shareholder may direct a corporation's political spending. Moreover, each paper demonstrates that activist hedge funds must resort to highly aggressive tactics just to claw their way into the decision-making process of a corporation; again, hardly evidence that limited ownership stakes provide a clear avenue for investor control of specific operational decisions. And the 12-year-old newspaper article relating to QIA involved two European companies and has no nexus to Maine or U.S. corporate, securities, or campaign finance law.[10] Given that QIA is one of the few sovereign wealth funds identified as relevant to this litigation, the State's failure to identify any other examples of QIA's influence-seeking speaks volumes about the dearth of support for the State's position.

## 2. Section 1064(2) is underinclusive.

The Initiative's under-inclusivity—in that it permits lobbying other than as to referenda[11]—is not saved by the principle that a legislature may proceed "piecemeal." State Br. at 29. That principle

---

[10]   *See*   Mark   Scott,   *Glencore   Completes   Deal   for   Xstrata*,   (May   2,   2013),
https://archive.nytimes.com/dealbook.nytimes.com/2013/05/02/glencore-completes-deal-for-xstrata/.

[11] The lobbying issue is just one example of the Initiative's under-inclusivity; there are more such problems. For instance, it sweeps in only equity owners, 21-A M.R.S. § 1064(1)(E)(2)(a), but excludes any creditors.

#16780356v8

has the most force in the context of equal protection and due process. *See, e.g.*, *Buckley*, 424 U.S. at 668, 670, 676 (rejecting equal protection claim). In the First Amendment context, the Supreme Court has recognized that failure to address a significant source of the very same damage allegedly addressed by the restriction on speech casts doubt on the state's asserted interest. *Reed v. Town of Gilbert*, 576 U.S. 155, 172 (2015); *Bellotti*, 435 U.S. at 793; *Showtime Ent., LLC v. Town of Mendon*, 769 F.3d 61, 73 (1st Cir. 2014). The State cannot dodge this point by pretending that there is a difference in proof regarding purported foreign government influence in campaign activities as compared to lobbyists. It claims that spending by CMP and Versant in referenda is proof of invidious foreign influence; if that is so, why is the evidence in this case of lobbying by CMP and Versant not also proof of the same? *See* Compl. ¶ 35; Versant Compl. ¶ 92. The State's claim that the Initiative addresses the most significant threat of corruption would hold more weight if it had "proffered evidence that minority foreign shareholders controlling or exercising influence over domestic corporations' political expenditures was the most serious risk of foreign influence." *Choi*, 2023 WL 8803357, at *9. But it did not. *See id.*

### 3. Section 1064(2) is not the least restrictive means available to the State.

As the over-inclusivity and under-inclusivity of the Initiative demonstrates, the State had less restrictive means to address its asserted interest. *Id.* Federal regulations already prohibit foreign nationals from directly or indirectly influencing federal, state, and local elections. *Id.* (citing 11 C.F.R. § 110.20(i)). Importantly, the federal regulations directly apply to foreign nationals, and do not broadly ban speech by U.S. corporations. Similarly, the Initiative could have protected the asserted state interest simply by regulating "the source of the foreign influence rather than banning corporations' political speech." *Id.* The Initiative is a blunderbuss, not a scalpel.

### C.   The Initiative's vague provisions exacerbate its First Amendment flaws.

The State proffers definitions for unclear provisions in the Initiative in an effort to save the law, but simply succeeds in demonstrating the overinclusive and underinclusive nature of the law.

#16780356v8

First, the State proposes a definition of "directly or indirectly participates" under Section 1064(1)(E)(2)(b) that is shocking in its scope. The State suggests that "'[d]irect' participation means that the foreign government or FGOE directly communicates with the FGIE about election spending," while "'[i]ndirect' participation means that the foreign government or FGOE communicates via an intermediary." State Br. at 62.[12] This means that, if a FGOE simply sends an unsolicited email to a U.S. company with no foreign ownership about an election-related issue, then the U.S. company immediately loses its First Amendment rights, even if it does not agree with, is not influenced by, and does not act on the communication. *See* 21-A M.R.S. §§ 1064(E)(2)(a), (b). If the State is correct that the term is not vague, then it is overbroad; if not, then its meaning is unclear.

Second, the State proposes a definition of Section 1064(1)(E)(2)(a) that illustrates the law's under-inclusivity. As an initial matter, it is a plausible reading of the statute that a company with multiple foreign ownership interests totaling 5% ownership interest in the aggregate could be classified as an FGIE because singular words ("a foreign government") may include the plural. *Packgen, Inc. v. Bernstein, Shur, Sawyer & Nelson*, 2019 ME 90, ¶ 30 & n.10 (citing 1 M.R.S. § 71(9)). If it is true that the law requires more than a 5% ownership interest by a single foreign entity, as the State asserts and as its proposed rules would provide, *see* State Br. at 63, then the Initiative leaves a massive loophole: it would allow a company with multiple foreign government ownership interests totaling more than 5% in the aggregate to engage in campaign spending. The law is thus either vague or underinclusive.

The scienter requirement for criminal penalties does not remedy these flaws. Although a scienter requirement can protect an accused from conviction, *Gonzales v. Carhart*, 550 U.S. 124, 149 (2007), that is of little comfort here. The Initiative's ban and civil penalties are not contingent upon any scienter requirement. 21-A M.R.S. § 1064(2),(8). Its vague terms thus continue to chill speech.

---

[12] The Commission's proposed rules define "participate" to mean "to communicate a . . . preference." *See* Proposed 94-270 C.M.R. ch. 1, § 15(1)(C), (H), *available at* https://www.maine.gov/ethics/sites/maine.gov.ethics/files/inline-files/6%20-%20Proposed%20Rulemaking%20on%20FGIEs.pdf.

**III.     The State has not justified the Initiative's disclaimer requirement in Section 1064(6).**

The Court should apply strict scrutiny to the Initiative's disclaimer requirement. The State complains that CMP has not cited a decision applying strict scrutiny to a disclaimer requirement in the elections context, State Br. at 38, but that simply demonstrates the unprecedented nature of Section 1064(6). Typically, disclaimer requirements simply mandate that an election communication include objective information—*e.g.*, the name of the sponsor and/or donors. *Gaspee Proj. v. Mederos*, 13 F.4th 79, 83 (1st Cir. 2021). Here, by contrast, the Initiative requires CMP to adopt and promote the characterization that it is a "foreign government-influenced entity." 21-A M.R.S. § 1064(6). The State has cited no example of a similarly pejorative label being subject to anything less than strict scrutiny. To the contrary, such a pejorative label suffers from the same flaw as the law at issue in *National Institute of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018)—namely, that it requires regulated entities such as CMP to convey a message with which it strongly disagrees.[13] The State cannot shift the burden onto the speaker to provide an explanation of why the label is inaccurate. State Br. at 39. A private entity cannot be compelled to carry a message that it disagrees with, and thereby be "forced either to appear to agree . . . or to respond." *Pac. Gas & Elec. Co.*, 475 U.S. at 15; *see id.* at 16 (the government cannot "require speakers to affirm in one breath that which they deny in the next").

In any event, the disclaimer requirement fails exacting scrutiny. The State relies upon an interest in an informed electorate, *see Gaspee Proj.*, 13 F.4th at 84, but that justification does not fit the disclaimer requirement. The disclaimer does not even apply to electioneering communications, which are banned; rather, it applies to general communications conceivably having some relationship with public policy, 21-A M.R.S. § 1064(6). That means that CMP would likely be required to label itself as

---

[13] *Meese v. Keene*, 481 U.S. 465 (1987), cited by PME, does not support the Initiative. In *Meese*, the relevant statute required agents of foreign principals to provide a disclaimer identifying the agent and the principal. *Id.* at 470-71. Notably, and contrary to PME's claim, the disclaimer did not include the label "political propaganda"; rather, that pejorative term was used only in the statute. *Id.* at 471 ("It should be noted that the term 'political propaganda' does not appear on the form."). As a result, unlike the Initiative, the statute at issue in *Meese* did not mandate a pejorative government message.

#16780356v8

a "foreign government-influenced entity" every time it runs an ad concerning issues related to the services it provides, given that CMP is a highly regulated company. Compl. ¶ 26. The State seeks to justify this based on *National Organization for Marriage v. McKee* ("*NOM*"), but the law in that case was very different; it addressed a disclaimer requirement for political advertisements published just before an election. 649 F.3d 34, 43-44, 61 (1st Cir. 2011). By divorcing the reasoning in *NOM* from its context, the State proffers a justification for disclaimers that has no bounds; it claims that any advertisements can be "characterized as 'politically oriented messages,' even if the advertising is not connected with a specific election." State Br. at 37. The Court should not accept the State's limitless justification.[14]

Even if the State's justification fit the Initiative's requirements, the disclaimer requirement is not narrowly tailored. *Gaspee Proj.*, 13 F.4th at 84. The State's asserted interest could be protected by a requirement that companies disclose the amount of any foreign government ownership interest. Instead, the Initiative requires use of a pejorative label which is less informative to viewers than a factual disclosure and, at least in the case of CMP, false. Compl. ¶ 37. The falsity of the disclosure is not remedied simply because the Initiative classifies CMP as an FGIE. State Br. at 38. It would be circular to use the Initiative as a justification for the Initiative: the state cannot justify a law requiring any nonprofit to describe itself as a "tax evader," simply because the same law defines "tax evader" to mean any nonprofit regardless of the legality of the nonprofit's tax-exempt status. The Initiative has imposed a remedy that is divorced from the State's asserted interest and misleading.

## IV.   Because of its constitutional flaws, the Initiative should be struck down in its entirety.

### A.   The Initiative is facially unconstitutional.

A law is overbroad if there is "a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court," *Members of*

---

[14] PME attempts to analogize the state interest to the Foreign Agents Registration Act ("FARA"), but elide a key point: FARA applies to persons *acting as an agent of a foreign principal*. 22 U.S.C. § 612(a). The Initiative, however, is not so limited.

*City Council of City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984), in a "substantial number of its applications" as compared to its "plainly legitimate sweep," *Ams. For Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2387 (2021). The step from the conclusion that a law is not narrowly tailored to the conclusion that it is also substantially overbroad is not a significant one. *Id.*; *United States v. Stevens*, 559 U.S. 460, 481-82 (2010). The Initiative is facially invalid under this standard.

First, the Initiative presents real, not hypothetical, unlawful applications. The State agrees that it bans speech of U.S. companies with passive investors. *See* State Br. at 35. And the State's evidence shows that the Initiative would have silenced CMP in multiple referenda. *Id.* at 5.

Second, the disproportionately unlawful sweep of the Initiative is clear. As of the end of 2023, sovereign wealth funds and public pension funds, which are FGOEs, have assets under management of $11.2 trillion and $23.1 trillion, respectively.[15] The scale of such investments inevitably means that many U.S. companies qualify as FGIEs because of foreign investment; for example, as of 2022, Norges Bank alone has a greater than 5% interest in 21 U.S. companies, including Unum Group.[16] While the precise number of companies covered by the Initiative cannot be ascertained without reviewing the filings of every publicly held U.S. company (an exercise which still would not identify privately held U.S. companies qualifying as FGIEs), the only possible inference is that a very significant number of U.S. companies with passive investors would be silenced. In contrast, the State points to *no* evidence of instances of actual foreign government intervention that would be barred by the Initiative.

## B.    The Court should not re-write the statute as the State requests.

The Court should reject the State's invitation to save the Initiative by conducting extensive surgery on its provisions. Courts do not "rewrite a law to conform it to constitutional requirements," particularly in the context of facial challenges. *Reno v. ACLU*, 521 U.S. 844, 883-85 (1997). Because

---

[15] Global SWF, 2024 Annual Report, at 5, *available at* https://globalswf.com/reports/2024annual.
[16] Norges Bank, https://www.nbim.no/en/the-fund/investments/#/2022/investments/equities.

#16780356v8

the Initiative as a whole cannot survive if Section 1064(2) is unconstitutional, the State asks the Court to reform the definitions in Section 1064(1)(E). State Br. at 69-71. Under Maine law, however, "[w]hen the provisions of a statute are so related in substance and object that it is impossible to determine that the legislation would have been enacted except as an entirety, if one portion offends the Constitution, the whole must fall." *Op. of the Justs.*, 2004 ME 54, ¶ 25, 850 A.2d 1152. Here, given the law's clear intent to silence CMP's political speech and the constitutional flaws that infect not only subsection (1)(E)(2)(a) but also (1)(E)(2)(b)—not to mention the additional flaws raised by various parties relating to subsections (3)-(7)—no workable portion of the statute can survive. *See Reno*, 521 U.S. at 883-84.

## CONCLUSION

If there is one fixed star in the constellation of First Amendment law, it is that a speaker such as CMP cannot be deprived of its right to free speech based on political disagreement. *Texas v. Johnson*, 491 U.S. 397, 414 (1989). The Initiative violates the First Amendment's guarantee of free speech.


Dated:  January 31, 2024

/s/ Joshua D. Dunlap
Joshua D. Dunlap
Nolan L. Reichl
Katherine E. Cleary
PIERCE ATWOOD LLP
Merrill's Wharf
254 Commercial Street
Portland, ME 04101
Tel: (207) 791-1100
Fax: (207) 791-1350
jdunlap@pierceatwood.com
nreichl@pierceatwood.com
kcleary@pieceatwood.com

*Attorneys for Plaintiff*
*Central Maine Power Company*

## CERTIFICATE OF SERVICE

I hereby certify that on January 31, 2024, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will distribute a copy of the document to all counsel of record.

Dated:  January 31, 2024

*/s/ Joshua D. Dunlap*
Joshua D. Dunlap
Nolan L. Reichl
Katherine E. Cleary
PIERCE ATWOOD LLP
Merrill's Wharf
254 Commercial Street
Portland, ME 04101
Tel: (207) 791-1100
Fax: (207) 791-1350
jdunlap@pierceatwood.com
nreichl@pierceatwood.com
kcleary@pieceatwood.com

*Attorneys for Plaintiff*
*Central Maine Power Company*

.

#16780356v8