UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| CENTRAL MAINE POWER COMPANY *et al.*,<br><br>                      Plaintiffs,<br><br>v.<br><br>MAINE COMMISSION ON GOVERNMENTAL ETHICS AND ELECTION PRACTICES, *et al.*,<br><br>                      Defendants. | Case No. 23-cv-00450-NT |

**PLAINTIFFS VERSANT POWER AND ENMAX CORPORATION'S REPLY IN SUPPORT OF THEIR MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**Preliminary Statement**

> The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections.

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943). Defendants repeatedly invoke the lopsided vote in favor of the Act as proof of its *bona fides*. Majority rule, however, cannot serve to support the Act's curtailment of First Amendment rights. Rather, Defendants must prove that the Act's restrictions further a compelling governmental interest. Defendants have fallen far short of satisfying that burden; they present no evidence of the "pernicious" foreign-government influence they say infects the electioneering activities of U.S. subsidiaries of foreign entities generally, and Versant in particular. Without such factual support, it is not surprising that the Act is not narrowly tailored to address a specific interest. Instead, Defendants' pronounced rationale for the Act—reducing campaign spending by corporations who had the most at stake in recent ballot initiatives—tellingly points to the Act's real (but impermissible) purpose of reducing their campaign spending and thus leveling the playing field.  The Act's ills go even deeper. It is not limited to state and local elections and is thus expressly preempted by FECA. It conflicts with Congress' judgment not to ban U.S. subsidiaries of foreign corporations from electioneering and is, thus, impliedly preempted by FECA. And contrary to Defendants' assertion that the Act could not affect U.S. foreign policy, it directly conflicts with long-standing federal foreign policy to treat foreign and domestic investors equally, thus violating the Foreign Dormant Commerce Clause.

**Argument**[1]

A. **Preventing Foreign-Government Influence Or Its Appearance Are Not Sufficiently Compelling Interests To Justify The Act's First Amendment Restrictions**

Defendants assert two compelling interests that justify the Act's First Amendment restrictions: (i) preventing foreign-government influence in Maine elections and (ii) preventing the appearance of such influence. Opp'n 15. That claim must be "rigorously test[ed]." *Minn. Chamber of Com. v. Choi*, 2023 WL 8803357, at *6 (D. Minn. Dec. 20, 2023) (citing *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010)). Defendants' claim fails the test.

1. **Candidate Elections Are Already Subject To FECA's Restrictions And Defendants Offer Insufficient Evidence As To Why Further Regulation Is Necessary**

Defendants have the burden of proving that the Act furthers a compelling governmental interest. *Fed. Elec. Comm'n. v. Cruz*, 596 U.S. 289, 296 (2022). But they have failed to carry their burden of demonstrating that there is a "pernicious source of foreign influence" in candidate elections, Opp'n 2, sufficient to justify the Act's restrictions.

The Federal Election Campaign Act ("FECA"), 52 U.S.C. §§ 30101-30146, already bans "foreign nationals," including "foreign principals," from directly or indirectly contributing or donating money in connection with federal, state, or local elections.[2] 52 U.S.C. §§ 30121(a), (b). Defendants offer no evidence that FECA has failed in its purpose in Maine. The only evidence they do offer in support of their claim that additional regulation is necessary is the fact that Versant has made $85,500 in contributions to various PACs that support state legislative candidates of both parties. *See* Decl. of

---

[1] Given space restrictions, Plaintiffs expressly incorporate and adopt the First Amendment and standing arguments set forth in CMP's Reply Br. (ECF No. 52) as if set forth fully herein. *See Sacay v. Research Found. of City Univ. of NY,* 44 F. Supp. 2d 505, 510 (E.D.N.Y. 1999) (permitting adoption of argument equally applicable to multiple parties). Plaintiffs have standing to bring this action: the Act's ban of campaign spending represents direct injury that will be redressed by enjoining enforcement of the Act. *See Minn. Chamber of Com. v. Choi, 2023 WL 8803357, at *3 (D. Minn. Dec. 20, 2023).*

[2] A "foreign national" includes an individual who is "not a citizen or national of the United States and who is not lawfully admitted for permanent residence." 52 U.S.C. § 30121(b)(2). "Foreign principals" include foreign governments, political parties, partnerships, associations, corporations, and organizations organized in a foreign country or having its principal place of business in a foreign country. 22 U.S.C. § 611.

Jonathan Wayne ¶ 18, ECF No. 47-1. But they make no attempt to rebut the sworn averment in Plaintiff's Verified Complaint that "[n]o employee, office holder, or representative of the City [of Calgary] was consulted or participated in any way with respect to Versant's decisions to make any of its cash payments or in-kind contributions to [Maine candidates]." Ver. Compl. ¶ 98, ECF No. 1. This unrebutted averment demonstrates that there was, in fact, no foreign-government influence in the only example Defendants can muster of spending on candidate elections. Defendants have failed in their obligation to "point to 'record evidence or legislative findings' demonstrating the need to address a special problem." *Cruz,* 596 U.S. at 307 (citing *Colo. Republican Fed. Campaign Comm. v. Fed. Election Comm'n*, 518 U.S. 604, 618 (1996)). In short, because Congress has already legislated on the subject and in the absence of any evidence showing a need to double-up on FECA's protections, Defendants cannot demonstrate a compelling interest in preventing foreign-government influence in Maine candidate elections.

> **2.  There Is No Compelling Interest That Would Justify The Act's Ban On Speech Regarding Ballot Initiatives**

There is "only one permissible ground for restricting political speech: the prevention of '*quid pro quo*' corruption or its appearance." *Cruz,* 596 U.S. at 305 (citing *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 206 (2014)). The Supreme Court has also expressly recognized that this risk of corruption or its appearance is not present in the context of ballot questions. *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 790 (1978) ("The risk of corruption perceived in cases involving candidate elections simply is not present in a popular vote on a public issue." (citations omitted)). Accordingly, in *Citizens Against Rent Control/Coalition for Fair Housing v. City of Berkeley*, the Court ruled that "there is no significant state or public interest in curtailing debate and discussion of a ballot measure." 454 U.S. 290, 299 (1981). This ruling reflects the understanding that "curtailment of speech and association in a ballot measure campaign, where the people themselves render the ultimate political decision cannot be justified on [the] basis [of preventing corruption]." *Id.* at 302 (Blackmun, J., concurring); *see also SD*

*Voice v. Noem*, 380 F. Supp. 3d 939, 948-49 (D.S.D. 2019) (holding that the South Dakota's purported interest in protecting democratic self-government was not a compelling interest justifying interference with political speech concerning ballot questions).

> 3. ***Bluman*** **Does Not Support Defendants' Claim That The State Has A Compelling Interest In Muzzling The Campaign Speech Of Maine Corporations That Have Foreign Shareholders**

Defendants argue that *Bluman v. Federal. Election Commission*, 800 F. Supp. 2d 281, 283 (D.D.C. 2011), *aff'd*, 565 U.S. 1104 (2012) announced a "rare exception to its otherwise steadfast rule that election spending restrictions must target *quid pro quo* corruption." Opp'n15 (citation omitted). *Bluman* cannot bear the weight Defendants place upon it.

In the first instance, Defendants fail to acknowledge that by summarily affirming the district court's decision, the Supreme Court greatly limited *Bluman*'s precedential scope. While a summary affirmance generally binds lower courts in cases presenting the same issues, it "will not control later lower court cases involving significantly dissimilar facts" and "should not be understood as breaking new ground but as applying principles established by prior decisions to the particular facts involved." *Auburn Police Union v. Carpenter*, 8 F.3d 886, 894 (1st Cir. 2015) (quoting *Mandel v. Bradley*, 432 U.S. 173, 176 (1977)). Among the many salient facts distinguishing it from this case, *Bluman* involved application of FECA's ban of spending on candidate election campaigns by foreign national individuals temporarily residing in the United States. In stark contrast, this action involves a state law ban of spending on ballot questions by Maine corporations and associations. Ignoring these distinctions, Defendants cite to *United States v. Singh*, 979 F.3d 697, 711 (9th Cir. 2020) as support for their generic claim that *Bluman* is "nationwide precedent binding on the lower federal courts." Opp'n 17. That sweeping contention is misleadingly lacking in context. *Singh's* finding that "we are bound by the Supreme Court's summary affirmance in *Bluman"* was based on the express finding that "*Bluman* did decide the precise issue present in this case." 979 F.3d at 711. *Bluman* did not decide the precise issue

in *this* case.

*Choi* is instructive in this regard. Like Defendants here, the *Choi* defendants argued that *Bluman*'s rationale could be properly extended to allow restrictions on the campaign speech of corporations with foreign shareholders. 2023 WL 8803357, at *6. The Minnesota district court, however, rejected applying *Bluman* beyond the narrow issues it decided. Rather, *Choi* found that *Bluman* extended only so far as to support a finding that "Minnesota has a compelling interest to limit the participation of *foreign citizens and foreign corporations* in activities of American democratic self-government, including spending money to expressly advocate for or against a *political candidate*." *Id.* (citing *Bluman*, 800 F. Supp. 2d at 289–90 (emphasis added)). Indeed, *Bluman* involved spending in federal campaigns by *individuals* and had "no occasion to analyze the circumstances under which a *corporation* may be considered a *foreign* corporation for purposes of First Amendment analysis." *Bluman*, 800 F. Supp. 2d at 292 n.4 (first emphasis added).

Given the limits of *Bluman's* reach, *Choi* concluded that:

> [P]reventing the exercise of First Amendment-protected political speech by a corporation with foreign shareholders, without more, does not alone represent a compelling interest. As *Bluman* explained, "American corporations...[are] members of the American political community." *Bluman*, 800 F. Supp. 2d at 290. And although *Bluman* found § 441e(a)'s indirect prohibition constitutional, it does not follow that a foreign shareholder indirectly participates in our national political process simply by possessing shares. Instead, Minnesota's compelling interest to prevent foreign nationals from participating in our national political process extends to preventing foreign nationals—including foreign shareholders of domestic corporations—from controlling or exercising influence over a corporation's election-expenditures.

2023 WL8803357, at *6.[3]

This Court should similarly reject Defendants' expansive application of *Bluman's* limited holding. Maine does not have a compelling interest in limiting the First Amendment rights of Maine

---

[3] It is worth noting that the while *Citizens United* declined to decide the question "whether the Government has a compelling interest in preventing foreign individuals or associations from influencing our Nation's political process," it did observe that the section of FECA at issue was overbroad because it was "not limited to corporations or associations that were *created in foreign countries or funded predominantly by foreign shareholders*." 558 U.S. at 362 (emphasis added).

5

corporations based simply on their having foreign-government shareholders. On the contrary, Defendants have failed to demonstrate that any of the political speech they highlight, *see* Opp'n 4-5, was in fact influenced by a foreign government. Rather, Defendants merely presume that foreign governments called the shots. In the case of Versant and ENMAX, the record evidence demonstrates exactly the opposite. *See* Ver. Compl. ¶¶ 97-98. Moreover, Defendants ignore the essential fact that all of the campaign spending they highlight involved ballot questions that directly affected the interests of Maine corporations: in the case of Versant, an initiative intended to put it out of business. Indeed, it defies common sense that some "pernicious" foreign=government influence was afoot in the corporate decisions to spend monies to oppose the ballot questions that Defendants offer as evidentiary support.[4] Opp'n 2. Such spending was necessary to preserve Versant's very existence. Neither Versant nor ENMAX required (nor received) influence by the City of Calgary to make the call as to whether and to what extent they should oppose the Pine Tree Power Initiative.

**B.    The Court Should Apply The Strict Scrutiny Standard Of Review**

The Supreme Court has generally employed different levels of Constitutional scrutiny to campaign finance laws depending upon whether the speech involved campaign contributions or independent expenditures, with expenditure limits subject to "strict scrutiny" and contribution limits typically being subject to "closely drawn" scrutiny. *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 134–141 (2003). Nevertheless, Plaintiffs argued for application of strict scrutiny to all of the Act's spending restrictions, whether on expenditures or contributions, because they were entirely banned. Pls.' Mot. For TRO And Prelim. Inj. With Incorporated Mem. Of Law 15, ECF No. 4. Defendants countered, claiming that the Supreme Court "rejected that exact argument" in *Federal Election Commission. v.*

---

[4] Defendants repeatedly conflate the notions of shareholder *interest* and shareholder *influence*. *See, e.g.,* Opp'n 26-27, 34. As a matter of logic, an alignment of interest between shareholder and corporation is not proof of shareholder influence. As a matter of fact, while Versant's campaign spending may also have been be in the interest of the City, the City exerted no influence over such spending. Ver. Compl. ¶ 98, ECF No. 1.

*Beaumont*, 539 U.S. 146, 161 (2003). Opp'n 14. Not so.

The *Beaumont* Court's decision to apply closely drawn scrutiny to restrictions on campaign contributions was not based on a rejection of the notion that bans on contributions can *never* be subject to strict scrutiny. Rather, the Court applied closely drawn scrutiny because the plaintiff's argument was based on a false premise:

> [Plaintiff] is simply wrong in characterizing § 411b as a complete ban. As we have said before, the section "permits some participation of unions and corporations in the federal electoral process by allowing them to establish and pay the administrative expenses of [PACs]."

539 U.S. at 162.

*Beaumont* does not stand for a hard-and-fast rule that independent expenditures receive strict scrutiny while contributions receive closely draw scrutiny. Instead, the proper analysis focuses on the restrictions placed on political speech and the consequent abridgment of First Amendment rights. Thus, *Citizens United* recognized that

> [w]hen Government seeks to use its full power, including the criminal law, to command where a person may get his or her information or what distrusted source he or she may not hear, it uses censorship to control thought. This is unlawful. The First Amendment confirms the freedom to think for ourselves.

558 U.S. at 907. Applying such reasoning, the First Circuit in *Sindicato Puertorriqueno de Trabajadores v. Fortuno* applied strict scrutiny to Puerto Rico's "Law 222," which forbade labor unions "from spending *any* money on political campaigns, be they direct contributions, independent expenditures, or otherwise, without the process the statute prescribes." 699 F.3d 1, 12 (1st Cir. 2012)  Even though Law 222 was less restrictive than the Act—inasmuch as it imposed oppressive regulations on political speech as opposed to an outright ban—the Court still determined that strict scrutiny applied because the "challenged provisions are designed to regulate the if and how of . . . political speech." *Id.*

Similar to the Plaintiffs in *Citizens United* and *Fortuno*, Plaintiffs' political speech—both in the form of contributions and independent expenditures—is silenced by the Act. Strict scrutiny is the

7

appropriate standard of review.

C. **The Act Is Not Narrowly Tailored To Achieve The Claimed Interest In Preventing Foreign-Government Influence In Maine Elections**

1. **The 5% Ownership Threshold Sweeps Too Broadly**

Defendants assert that the Act's 5% foreign ownership threshold is not arbitrary; that it was chosen based on a similar threshold found in the Willaims Act, 15 U.S.C. § 78m(d). Opp'n 24-25. They go on to claim that the Williams Act's 5% threshold evinces "a recognition by Congress that shareholders with that magnitude of ownership wield real power in the affairs of the corporation, to the extent of taking over a company in its entirety," Opp'n 25, but cite no authority for that claim. And with good reason—there is none. Section 78m(d) of the Williams Act is an early warning system that protects the informational interests of shareholders and management of publicly traded corporations regarding actual or *potential* changes in control. *See Nano Dimension Ltd. v. Murchinson Ltd.*, No. 1:23-cv-02566, 2023 WL 442278 at *7 (S.D.N.Y. July 10, 2023). The Williams Act's disclosure requirement in no way represents a Congressional finding that 5% share ownership is a proxy for corporate control.[5]

Defendants assert broad (and inaccurate) generalizations regarding the duty of loyalty of directors and officers of US corporations to support their claim that corporate managers are necessarily subject to influence by foreign shareholders. Opp'n 25-27. Tellingly, they cite no Maine or First Circuit law, likely because it undercuts their argument. The Maine Business Corporation Act makes clear that a director's and officer's duty of loyalty is to the corporation itself, not the shareholders. *See* 13-C M.R.S. § 831(1)(B) (setting standards of conduct for directors); 13-A M.R.S. §

---

[5] Nor does the FCC's prohibition against issuing broadcast licenses to corporations in which 20% of the stock is owned by a foreign government or foreign national provide justification for the Act's 5% threshold. The difference in the corporate control a 20% shareholder might exert dwarfs that of 5% shareholder. Moreover, as the DC Circuit has recognized, the policy interest underlying § 310 of the FCC Act was national security, an interest Defendants have not advanced as supporting the Act. *Moving Phones P'ship L.P. v. FCC*, 998 F.2d 1051, 1055 (D.C. Cir. 1993).

8

843(1)(C) (setting standards of conduct for officers).[6] The leading treatise on Maine Corporation Law, in discussing § 831, explains that it:

> is an intentional change from prior law, which expressly referred as well to the interests 'of the shareholders.' The Official Comment points out that the use of the term 'corporation' is intended as a 'surrogate' for the business enterprise as well as a frame of reference encompassing the shareholder body. This focus on the interests of the corporation, and not directly on the interests of shareholders, is reflected elsewhere in the Act as well.

JAMES B. ZIMPRITCH, MAINE CORPORATION LAW AND PRACTICE § 8.7 at 300 (3d ed. 2015).

In addition to lacking legal justification for the 5% threshold representing a sufficient proxy for foreign-government influence, Defendants fall short of factual support. They offer only presumptions and suppositions. Plaintiffs, however, offer facts showing no foreign-government influence over their political spending. Ver. Compl. ¶¶ 97-98.

### 2. The Act Leaves The Most Significant Opportunity For Foreign-Government Influence Unregulated

Since 2020, the Maine Legislature has been presented with thousands of Legislative Documents, or LDs (the number assigned when a bill is received by the Clerk of the House or Secretary of the Senate) and has enacted hundreds of them into law each year.[7] In that same time frame, Maine voters considered fourteen statewide ballot questions.[8] Yet, the Act in no way addresses the alleged concern over foreign-government influence with respect to lobbying Maine's Legislators. "[W]ildly underinclusive" speech restrictions such as this raise "serious doubts about whether the State is pursuing the interest it invokes or is instead disfavoring a particular speaker or viewpoint." *Brown v.*

---

[6] Similarly, Canadian corporate law, which applies to ENMAX, requires directors to act in the best interest of the corporation (rather than the shareholder). *See* Alberta Business Corporations Act § 122(1)(a) ("Every director and officer of a corporation in exercising the director's or officer's powers and discharging the director's or officer's duties shall (a) act honestly and in good faith with a view to the best interests of the corporation.")

[7] *See PDF Editions of Published Session Laws and Other Materials*, Maine State Legislature, https://legislature.maine.gov/ros/pdf-editions-of-published-session-laws-and-other- materials/12024.

[8] *See Maine 2020 ballot measures,* Ballotpedia, *https*://ballotpedia.org/Maine_2020_ballot_measures; *Maine 2021 ballot measures,* Ballotpedia, https://ballotpedia.org/Maine_2021_ballot_measures; *Maine 2022 ballot measures,* Ballotpedia , https://ballotpedia.org/Maine_2022_ballot_measures; *Maine 2023 ballot measures,* Ballotpediahttps://ballotpedia.org/Maine_2023_ballot_measures.

*Ent. Merchs. Ass'n*, 564 U.S. 786, 802 (2011). Defendants' proffered justification for the Act's under-inclusiveness raises those very doubts:

> Here, there is no record evidence that Maine has a problem with foreign-government influence among its lobbyists—and Versant and CMP have not identified any such problem. *In contrast, there is substantial record evidence of massive and unprecedented spending by FGIEs in Maine's recent referendum elections.*

Opp'n, 29 (emphasis added). This argument tellingly suggests that the real interest the Act seeks to address is leveling the playing field in ballot initiative spending by silencing those targeted by initiatives who, therefore, are among the biggest campaign spenders. This interest that is plainly unconstitutional. *McCutcheon*, 572 U.S. at 206 ("[I]t is not an acceptable governmental objective to 'level the playing field.'") (quoting *Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 750-51 (2011)).

### 3. The Act Is Facially Invalid As Overbroad

The Supreme Court has recognized a specific type of facial challenge in the First Amendment context: "a law may be invalidated if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (cleaned up); *see also Ams. for Prosperity v. Bonta*, 141 S. Ct. 2373, 2389 (2021). "Overbreadth is a judicially created doctrine designed to prevent the chilling of protected expression." *Massachusetts v. Oakes*, 491 U.S. 579, 584 (1989).

Looking beyond Plaintiffs in this case, ample evidence further supports the conclusion that the Act's central premise—5% foreign-government ownership amounts to "influence" over that entity—sweeps far too broadly. For example, the Government of Norway, via its sovereign wealth fund, has reported owning more than 5%[9] of one of Maine's ten largest employers, Unum Group.[10] Because investment analysts in Norway have found it to be a worthy investment, Unum is thus

---

[9] *Unum Group*, Norges Bank Investment Management, https://www.nbim.no/en/the-fund/investments/#/2022/investments/equities/9036/Unum%20Group. This reporting was done at the end of 2022.
[10] Maine.gov, *Maine Top 50 Employers*, https://www.maine.gov/labor/cwri/publications/pdf/MaineTop50Employers.pdf.

10

branded a "foreign=government influenced entity" under the Act. Act, § 1. Other public companies are certain to be similarly branded by passive sovereign wealth fund investment. For instance, the Saudi Public Investment Fund invests over $650 billion worldwide and is reported to have over a five-percent stake in Electronic Arts, Take-Two Interactive, Activision Blizzard, and Live Nation.[11] And, while less transparent, sovereign wealth funds also invest in the vast private market. Again, by example, the Abu Dhabi sovereign wealth fund purchased a majority stake[12] in New York based Fortress Investment Group, a private-equity company.[13] One of Fortress's recent investments (which it has since sold) was Central Maine and Quebec Railway (formerly Montreal, Maine and Atlantic Railway).[14] Given the scope of foreign-government investment in the United States, it is little surprise that modest scrutiny of public information reveals that, in Maine, a major employer, utilities, and a former key transportation company would all be subject to the Act's vast reach. Contrary to Defendants' conclusory assertion, *see* Opp'n 60, the Act's concrete harm is patent.

### D.     FECA Preempts the Act

#### 1.     The Act's Restrictions Are Not Limited To State And Local Elections

The Act's terms are not limited to state and local elections. Defendants attempt to cabin the Act's text by referring to a concatenation of definitions and provisions that do not apply to the Act and a statement from a Commission staff member that he believes it does not apply to federal elections. Opp'n 53–54. Neither argument unsettles the Act's plain language which Defendants duck.

"As th[e] [First Circuit] has repeatedly stated, the text of the law controls over purported

---

[11] Chirs Isidore, *Saudi Arabia's Public Investment Fund just reshaped pro golf. It's not stopping there,* CNN, https://www.cnn.com/2023/06/07/investing/saudi-arabia-pif-golf-liv/index.html.
[12] In this manner, the effects of foreign-government investment are amplified. Countless private-equity backed private companies could be "foreign-government influenced," not because of any direct investment, but because a foreign government owns part of the private equity company with a stake in the private company. *See* Act, § 1(E)(2)(a) (defining a foreign government owned entity as one with an "indirect" beneficial ownership).
[13] *US security officials scrutinise Abu Dhabi's $3bn Fortress Takeover,* Financial Times, https://www.ft.com/content/a8f3b524-ff45-4935-96da-cc08bd32e138.
[14] Andrew Corselli, *CP to Acquire CM&Q From* Fortress, Railway Age, https://www.railwayage.com/news/cp-to-acquire-cmq-from-fortress/.

legislative intentions unmoored from any statutory text." *Baker v. Smith & Wesson, Inc.*, 40 F.4th 43, 49 (1st Cir. 2022) (quoting *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022)); *see also Villarreal v. R.J. Reynolds Tobacco Co.*, 839 F.3d 958, 970 (11th Cir. 2016) ("Elevating general notions of purpose over the plain meaning of the text is inconsistent with our judicial duty to interpret the law as written."). The Act's text does not limit its scope to local and state elections. The heart of the Act prohibits contributions, expenditures, communications, or "any other donation or disbursement of funds to influence the nomination or *election of a candidate*" by any foreign-government influenced entity. Act, § 1 (emphasis added). There are no limitations on this ban. Therefore, it applies to any election, federal, state, or local. *See FCC v. AT&T Inc.*, 562 U.S. 397, 403 (2011) ("When a statute does not define a term, we typical give the phrase its ordinary meaning.") (quoting *Johnson v. United States*, 559 U.S. 133, 138 (2010)). These words must be given effect. *See Williams v. Taylor*, 529 U.S. 362, 404 (2000) (noting the "cardinal principle . . . that courts must give effect, if possible, to every clause and word of a statute.")). Given this plain language, there is no need to venture to other subsections of Title 21-A and engraft their language onto the Act. This is particularly true because the Act's drafters evinced an ability to incorporate other portions of Title 21-A when they saw fit, but chose not to incorporate the provisions Defendants now say are integral to the Act's interpretation. *See* Act, § 1.

Defendants' foraging for statutory text that would limit the Act's application in a manner contrary to the Act's actual language yields but a meagre harvest. Defendants first pluck a phrase not from the general provisions portion of Title 21-A but from a specific chapter relating to "Campaign Reports and Finances." There, in a subchapter on "Reports for Campaigns for Office," a Section entitled "Application" notes that it applies to state and county offices and that "*the commission* does not have jurisdiction over financial activities to influence the nomination or election of candidates for federal office." 21-A M.R.S. § 1011 (emphasis added). Given that this statement is included only within the confines of application of a subchapter addressing financial reporting, reading it as a universal

12

pronouncement is unreasonable. But even if totemic significance is assigned to this phrase, it does not touch upon the jurisdiction or authority of the Attorney General, the enforcer of the Act's criminal sanctions. Act § 9. A statement about the Commission's jurisdiction does not limit the Attorney General's jurisdiction.

Closer to the Act's statutory home, Defendants also pick from the "Application" section of Chapter 13, subchapter 4, where the Act resides.[15] *See* 21-A M.R.S. § 1051. But the text of this section is an ill fit to the Act because the Act applies to more than just the activities of PACs and BQCs. *See generally*, Act. Moreover, § 1051 does not apply, and therefore cannot limit, direct contributions to federal candidates. Again, the blanket limitation Defendants seek to impose on the Act is incomplete.

Finally, in apparent recognition of the Act's text applying to federal elections, Defendants allege the Act will be limited to state, county, and municipal elections because the current Executive Director of the Commission says so. Opp'n 53–54; Wayne Decl. ¶¶ 9–10. But again, this salutary statement does not address the Attorney General's enforcement power (or other state law-enforcement officials). Nor would it bind the Commission in the future. Moreover, because the Act has criminal penalties, any deference to the Commission's interpretation would be inappropriate. The Supreme Court has noted that it has "never held that the Government's reading of a criminal statute is entitled to any deference." *United States v. Apel*, 571 U.S. 359, 369 (2014). Rather, "criminal laws are for the courts, not for the government, to construe." *Abramski v. United States*, 573 U.S. 169, 191 (2014).

Defendants' attempted alchemy to limit the Act to state and local elections does not alter the Act's text which applies to all elections, including federal elections. And to that extent, it is expressly preempted by FECA.

---

[15] It is this application section, not the application section of another subchapter, that applies to the Act, further undercutting the argument that 21-A M.R.S. § 1011 should limit the Act.

13

### 2. FECA Impliedly Preempts the Act By Regulating Exactly How Foreigners Can Participate in U.S. Elections

Defendants point to two principles which they say foreclose federal preemption: (1) that Congress included an express preemption clause and (2) there is a general presumption against preemption. Opp'n 55–56. Both arguments fail.

First, as expressly stated in a case cited by Defendants, the argument that "implied pre-emption cannot exist when Congress has chosen to include an express pre-emption clause in a statute . . . is without merit." *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995). Rather, "*[a]t best*" there is an inference that an express pre-emption clause forecloses implied pre-emption; but "it does not establish a rule."[16] *Id.* (emphasis added); *see also Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 869 (2000). No such inference is reasonable here.

Congress adopted FECA's express-preemption clause well before it passed the BCRA, which strengthened the ban on foreign nationals and principals' activities in state and local elections.[17] *See* Federal Election Campaign Act Amendments of 1974, Pub. L. No. 93-443; BCRA of 2002, Pub. L. No. 107-155, § 303. Given this legislative history, it is not reasonable to infer that, in enacting an express preemption clause in FECA, Congress intended not to preempt states from regulating how these individuals and entities can conduct electioneering activities in U.S. elections after it passed the BCRA to specifically address that issue.

Quite the opposite. Rather, when addressing issues of foreign affairs and alienage, there is a presumption *in favor* of preemption. *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 74 (1st Cir. 1999)

---

[16] The *Choi* court erroneously found there is a *presumption* of preemption is such circumstances, citing *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 517 (1992), for support. *See Choi*, 2023 WL 8803357, at *12. This finding ignores *Freightliner* and thus is in error. *Choi's* application of this false presumption undercuts its preemption analysis.

[17] "The foreign national prohibition's reach to state and local elections is exceptional in the FECA which otherwise is limited to federal elections." Federal Election Commission, Legislative Recommendations of the Federal Election Commission 2022 at 5, *available at* https://www.fec.gov/resources/cms-content/documents/legrec2022.pdf

("[A]n 'Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'") (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)). Thus, where, as with the Act, a state legislates in an area typically reserved for the federal government, preemption "will be more easily found." *Id.* at 73. Defendants labeling the Act's ban of the campaign speech of foreign-government-influenced entities a "traditional area of state regulation" does not alter the result. Opp'n 56. The proper focus is on the scope of FECA (implicating Congress's, not the state's, intent), and its express reach into state and local elections with regard to foreign nationals highlights the federal interest implicated—its power to conduct foreign relations and the status of aliens.

*Singh* underscores that FECA's regulation of foreign nationals directly flows from Congress' power over foreign affairs. There, a convicted defendant argued, much like Defendants do here, that regulation of campaign speech in state elections was the exclusive domain of the states. *See generally Singh*, 979 F.3d at 710. Thus, the defendant argued, Congress exceeded its authority in prohibiting foreign nationals from electioneering activities in state and local elections. *Id.* The Ninth Circuit rejected this argument, finding that the "federal government has the 'inherent power as sovereign to control and conduct relations with foreign nations.'" *Id.* (quoting *Arizona v. United States*, 567 U.S. 387, 395 (2012)). Thus, in the case of FECA's foreign-national prohibition, where "Congress has made a judgment on a matter of foreign affairs and national security by barring foreign nationals from contributing to our election process, it retains a broad power to legislate." *Id.* Congress, therefore, was well "within its power" to protect the nation's elections from "foreign interference." *Id. Singh* correctly found that when Congress defined the community that can participate in U.S. elections through the foreign national prohibition, it exercised its foreign affairs and national security powers. Congress thus expressly addressed a foreign affairs issue: foreign interference in U.S. elections. The Act improperly interferes with that express policy.

15

Defendants further argue that the Act does not interfere with Congressional intent with regard to the free-speech rights of domestic subsidiaries of foreign corporations. Opp'n 57–58. And yet, the FEC has found to the contrary. In promulgating regulations implementing BCRA, the FEC "found no evidence of Congressional intent to broaden the prohibition on foreign national involvement in U.S. elections to cover U.S. subsidiaries of foreign corporations." *FEC Ad. Op. 2006-15*, at 3, req. by *TransCanada*.

Ignoring this legislative history and regulatory interpretation, Defendants further assert that the Act does not conflict with a federal policy. Opp'n 56–57. On the contrary, Congress did not extend the foreign national proscriptions of the BCRA to touch foreign subsidiaries, and expressly "rejected a ban on U.S. subsidiary participation." Contribution Limitations and Prohibitions, 67 Fed. Reg. 69,928, 69,943(Nov. 19, 2002). The Act does the opposite. There is clear conflict. In an area of unique federal interest such as foreign affairs, "conflict with federal policy need not be as sharp as that which must exist for ordinary pre-emption when Congress legislates in a field which the states have traditionally occupied." *Natsios*, 181 F.3d at 74 (cleaned up). The Act's expanded regulation of foreign nationals' involvement in U.S. elections beyond FECA's scope directly conflicts with Congress' carefully drawn foreign-policy judgment. It is, accordingly, preempted.

E. **The Act Interferes With The Nation's Ability To Speak With One Voice As to Its Policy Regarding Foreign Investment In The United States**

Defendants simultaneously bemoan the brevity and decry the lack of precision in Plaintiffs' Foreign Dormant Commerce Clause argument. Opp'n 65. But their response to the argument shows they fully understand "precisely how the Act violates the dormant Foreign Commerce Clause." Opp'n 65. Defendants' suggestion that Plaintiffs waived this argument is not credible and indicates their preference for a slight-of-hand distraction from engagement on the merits.

On the merits, Defendants offer their own curt retort. They are correct that the singular focus

of Plaintiffs' Foreign Dormant Commerce Clause argument is that the Act impedes the federal government's ability to speak with one voice in foreign affairs. Opp'n 66. The First Circuit has firmly established that a state law cannot affront the federal government's ability to speak with one voice in such matters. *Natsios*, 191 F.3d at 68 ("[A] state law can violate the dormant Foreign Commerce Clause by impeding the federal government's ability to 'speak with one voice' in foreign affairs, because such state action harms 'federal uniformity in an area where federal uniformity is essential.'" (quoting *Japan Line, Ltd. v. County of Los Angeles,* 441 U.S. 434, 448-49 (1979))).

Defendants are incorrect that there is not (nor could be) a matter upon which the federal government has voiced a policy that the Act impedes. Opp'n 67. To the contrary, for decades and across presidential administrations it has consistently been the federal government's policy to treat all foreign investors no differently than domestic investors. Over forty years ago, President Reagan announced a Statement on International Investment Policy. There, he stated that "international direct investment plays a vital and expanding role in the world economy."[18] President Reagan announced that "[t]he United States welcomes foreign direct investment that flows according to market forces. The United States accords foreign investors the same fair, equitable, and non-discriminatory treatment it believes all governments should accord foreign direct investment under international law." *Id.* He affirmed that "[t]he basic tenet for treatment of investment is the national treatment principle: foreign investors should be treated no less favorably than domestic investors in like situations." *Id.*

These principles remain U.S. foreign policy today. In 2021, President Biden announced a statement on the United States' Commitment to Open Investment, reaffirming the nation's commitment to foreign investment.[19] There, President Biden affirmed "a pledge to treat all investors

---

[18] Ronald Reagan, President, Statement on International Investment Policy (Sept. 9, 1983), available at https://www.reaganlibrary.gov/archives/speech/statement-international-investment-policy.

[19] Joe Biden, President, Statement by President Joe Biden on the United States' Commitment to Open Investment (June 8, 2021), available at https://www.whitehouse.gov/briefing-room/statements-releases/2021/06/08/statement-by-president-joe-biden-on-the-united-states-commitment-to-open-investment/.

fairly and equitably under the law." *Id.* President Biden "reiterate[d] [his] administration's commitment to ensuring that the United States remains the most attractive place in the world for businesses to invest and grow." President Biden specifically noted the contributions U.S. subsidiaries of foreign-owned companies make to our nation's economy: they "employ almost 8 million Americans and help boost U.S. innovation by investing $70 billion in research and development. They contribute to all sectors of the U.S. economy and are responsible for nearly 24% of all U.S. goods exports." *Id.* Accordingly, President Biden concluded that foreign investment may raise national security concerns, which will be protected by specific review of certain investments. *Id.* Nonetheless, the United States "will also maintain a level playing field" with regard to foreign investments. *Id.*

These entrenched principles are not merely aspirational—they are incorporated into various trade treaties between the United States and foreign governments. For example, the United States-Mexico-Canada Agreement ("USMCA") (the successor to NAFTA) contains a provision establishing "national treatment," that is that each party to the USMCA "shall accord to investors of another Party treatment no less favorable than it accords, in like circumstances, to its own investors with respect to the establishment, acquisition, expansion, management, conduct, operations, and sale or other disposition of investments in its territory." USMCA art. 14.4(1), July 1, 2020, available at http://tinyurl.com/mr2hvvf7. Other, bilateral, investment treaties between the United States and foreign nations contain very similar provisions. *See, e.g.,* Treaty Between the United States of America and The Oriental Republic of Uruguay Concerning the Encouragement And Reciprocal Protection of Investment art. 3, Nov. 4, 2005, available at http://tinyurl.com/3txsfdpx; Letter of Transmittal, Treaty Between the United States of America and Ukraine Concerning the Encouragement And Reciprocal Protection of Investment, Mar. 4, 1994, at 1 available at http://tinyurl.com/r52ucrwd ("A specific tenet of U.S. policy, reflected in this Treaty, is that U.S. investment abroad and foreign investment in the United States should receive national treatment.").

18

The Act directly impedes the long-standing U.S. policy of affording foreign investors' investment in the United States the same playing field as domestic investors.[20] The Act would strip away a domestic corporation's First Amendment rights based on nothing more than a passive investment by a foreign-government investor. Maine would thus undermine federal uniformity in an area of foreign affairs, treating foreign-government investment less favorably than domestic investments. The Act would undermine the nation's ability to speak with one voice on a key foreign policy tenet announced and adhered to for over forty years that foreign investors and their investments should be treated no less favorably than domestic investors in like situations. As the Pine Tree Power Initiative underscores, it is antithetical to such entrenched policy that passive foreign government investment should be a basis upon which to muzzle a domestic corporation in a ballot question that impacts the corporation's very existence (and thus foreign investment). As such, the Act violates the Foreign Dormant Commerce Clause.

Dated: January 31, 2024                                  Respectfully submitted,

/s/Paul McDonald
Paul McDonald
John A. Woodcock III
BERNSTEIN SHUR
100 Middle Street
P.O. Box 9729
Portland, ME 04104
207-774-1200
pmcdonald@bernsteinshur.com
jwoodcock@bernsterishur.com
Counsel for Versant Power and ENMAX

---

[20] In this way, the federal interest is even more paramount that the singular Burma law that the First Circuit found state law affronted in *Natsios*. *See* 181 F.3d at 66 – 67.