**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

CENTRAL MAINE POWER COMPANY, *et al.*

      Plaintiff,                      Civil Action No. 1:23-cv-00450-NT

v.

MAINE COMMISSION ON GOVERNMENTAL     **ORAL ARGUMENT REQUESTED**
ETHICS AND ELECTION PRACTICES, *et al.*,

      Defendants.

_____

**JANE PRINGLE, KENNETH FLETCHER, BONNIE GOULD, BRENDA**
**GARRAND, AND LAWRENCE WOLD'S REPLY IN SUPPORT OF THEIR**
**MOTION FOR PRELIMINARY INJUNCTION**

## I.    ARGUMENT

**A. Contrary to State Defendants Assertions, the Initiative Directly Infringes and Deprives Electors of their Constitutionally Protected Rights Under the First Amendment of the Constitution.**

In *First Nat'l Bank v. Bellotti*, the Supreme Court concluded that ballot measures were "intimately related to the process of governing." 435 U.S. 765, 784-85 (1978).  The Court further observed that, "[i]f the First Amendment protects the right of corporations to petition legislative and administrative bodies [citations omitted], there hardly can be less reason for allowing corporate views to be presented openly to the people *when they take action in their sovereign capacity*." *Id.* at 791, n. 31 (emphasis added). Thus, *Bellotti* stands for the twin points that a State may not erect statutory barriers to speech or to speakers when it is exercising its lawmaking powers, whether by the Legislature or by the people (taking action in their sovereign capacity).

From its inception, the Maine Constitution has recognized that voters and voter participation are essential if Maine is to function as a representative democracy.  Article II provided that, when exercising their right to vote, Maine citizens become "Electors."   Me. Const., art. II.[1] Indeed, the Justices have described the right to vote as a "sacred privilege."  *Opinion of the Justices*, 54 Me. 602, 605 (1867) (separate opinion).

Plaintiffs challenge the Initiative's constitutionality individually in their capacities as citizens of Maine and the United States and in their capacities as Maine voters and "Electors" within the meaning of Article II of the Maine Constitution.  Plaintiffs' status as Electors is of particular significance with respect to the restrictions the Initiative places on each "referendum" (hereinafter "Ballot Measures") included in Section 1064(I)(1)-(5) and the sanctions the Initiative on the Electors for violating its terms. 21-A M.R.S. § 1064(8)-(9).

---

[1] For a detailed account of Article II's incorporation into the Maine Constitution and a discussion of its terms, *see* <u>The Maine Constitution</u>, M. Tinkle, (ed. 2013), pp. 65-68.

Electors have focused their constitutional challenge on the Initiative's application to Ballot Measures because, when Maine voters consider, support or oppose the "initiation or approval" (21-A M.R.S. § 1064(2)), their decisions have the force of law.[2] Thus, the power of popular sovereignty that Maine voters exercise together is indistinguishable from and of equal dignity with the lawmaking power of the Legislature. *Farris ex rel. Dorsky v. Goss,* 143 Me. 227, 230 (1948).[3] For this reason, when Ballot Measures are placed before voters, their consideration and discussion of, advocacy for or opposition to, and, ultimately their vote on Ballot Measures fall wholly within the right to petition the government within the meaning of the First Amendment.[4] *See*, *Bellotti*, 435 U.S. 765, 791, n. 31 (1978) (equating appealing to voters on a Ballot Measure with lobbying legislators on changes in laws); ECF 27, pp. 12-19.

Electors also challenge the Initiative in their individual capacities because the Initiative is not limited to those points when Ballot Measures are presented for voters' approval or rejection— it applies to the entirety of the legislative process for each Ballot Measure from the "initiation" through its "approval." 21-A M.R.S. § 1064(2). At a minimum, Electors' duties in exercising the sovereign lawmaking power on Ballot Measures include the right and obligation to inform themselves on the merits of a particular Ballot Measure. The Initiative cannot bar Electors from doing so or otherwise infringe on their constitutionally protected rights.[5]

---

[2] Electors acknowledge that their Due Process claims necessarily challenge the Initiative's application to candidate elections as well as to the Ballot Measures because the terms challenged apply to both.

[3] Amendments to the Maine Constitution (21-A M.R.S. § 1064(I)(3)) are of particular significance because, upon approval by the voters, they become part of the State's fundamental law.

[4] This applies equally to Article I, Section 15 of the Maine Constitution as well.

[5] The "direct initiative" authorized by Article IV, Part Third, Section 18 requires consideration by the Legislature and allows for consideration by the Governor before it is sent to the voters for approval or rejection. Me. Const., art. IV, pt. 3d, § 18(2). Section 1064(2)'s prohibition on attempting "to influence" the "initiation or approval" of a Ballot Measure, therefore, applies to all persons, including Maine citizens and Electors who would employ Section 1064(2) communications to influence legislators and the Governor in their consideration of a particular direct initiative proposal.

"**Initiation**" **and Exposure to Civil and Criminal Sanctions:** Despite Electors' explanation on this point (ECF 27, pp. 4-5), neither State Defendants nor amicus filers acknowledged the Initiative's comprehensive application to all aspects of the legislative process for each Ballot Measure to which the Initiative applies. Of the five statewide Ballot Measures to which the Initiative applies, two may only be originated—that is, "initiated"—by petition.[6] The remaining three may only be originated by the Legislature.[7]

The threshold for mere "initiation" of a people's veto or direct initiative is decidedly low and the procedural prerequisites are minimal. 21-A M.R.S. § 901. Thus, the "initiation" of a petition-originated Ballot Measures may happen with no advance notice to the general public and once initiated, Section 1064(2) applies to the entirety of the process through eventual approval or rejection by Maine voters at a general election. For the Plaintiff-Electors this means that, *upon the initiation* of either a direct initiative or a people's veto proposal, they are subject to the prohibited conduct set forth in Sections 1064(3) through 1064(5) (which incorporate Section 1064(2) by reference) and to the criminal and civil penalties set forth in Sections 1064(8) and 1064(9).[8]

In short, the Initiative's application to the very earliest stage of each of the five statewide Ballot Measures means at any point, and without advance notice to the general public, a Ballot Measure may be "initiated" and Section 1064(2) prohibitions will be triggered along with the further prohibitions applicable to all persons, including Electors, in Sections 1064(3) through

---

[6] See Me. Const., art. IV, pt. 3d, §§ 17-18 (people's veto, direct initiative); 21-A M.R.S. §§ 1064(I)(1)-(2); 21-A M.R.S. §1052(4-B) (defining "initiate"); see also, 21-A M.R.S. § 901, *et seq.*(setting petition procedures). ECF 27, 4

[7] Me. Const., art. X, §4 (constitutional amendment), art. IV, Pt. 3d, § 19 (conditional legislation), art. IX, § 14 (bond issue); see, 21-A M.R.S. § 1064 (3),-(5); see also, ECF 27, p. 5

[8] Similarly, the initiation of Ballot Measures that originate in the Legislature requires no advance notice to the general public and may occur at any time in a legislative session. Once "initiated," Section 1064(2) and Sections 1064(3)-(5), and the civil and criminal provisions of Section 1064(8) and 1064(9) apply in full force until the particular Ballot Measure in question has been approved or rejected by the voters.

1064(5), making the Electors subject to the Initiative's criminal and civil sanctions in Sections 1064(8) and 1064(9).

Electors have explained at length how the Initiative applies to them, including the risks of civil sanction and criminal prosecution to which they are exposed.  ECF 27, pp. 6-10.  State Defendants responded to the Electors' explanation by ignoring it and have therefore forfeited this point.  ECF 47, pp. 29-32

Intervenor Protect Maine Elections ("PME"), however, contested Electors' assertion the Initiative placed them at risk by denying that was the case and by asserting, to the contrary, Electors were "'not within the class of persons' regulated by the Act." ECF 46, p. 20, *citing*, *Nat'l Org. for Marriage v. McKee* ("*NOM I*"), 649 F.3d 34, 47-48 (1st Cir. 2011).  PME followed this assertion with the unsupported representation that "[t]he Act simply does not prohibit  receipt of [the Electors] … term 'Foreign Entity Information,'[9] but instead bars contributions and expenditures by 'foreign governments-influenced entities' and the solicitation of such contributions." ECF 46, p. 20 (internal emphasis omitted).

It is evident PME's bald and unsupported assertion falls far short of any actual justification. In fact, it does not even acknowledge that Sections 1064(3), 1064(4), and 1064(5) all apply to "[a] person", an unqualified term that clearly applies to everyone, including Plaintiff-Electors.[10]  21-A

---

[9] In their Complaint, Electors applied the term "Foreign Entity information" to communications of Foreign Government Entities covered by Section 1064(2).  See, ECF 1, at ¶ 20, Pringle,  *et al*  v. Frey, *et al*, 23-cv-453.

[10] Contrary to PME's assertion, Section 1064(3) bars "[a] person" from "knowingly accept[ing], solicit[ing], accept[ing] or receiv[ing] a contribution or donation [barred by Section 1064(2)].  21- A M.R.S. § 1064(3). Section 1064(4), omitted by PME, bars "[a] person" from "knowingly or recklessly provid[ing] substantial assistance" (with or without compensation) in either making or otherwise facilitating a "contribution or donation" barred by Section 1064(2) or making or otherwise facilitating a expenditure or disbursement barred by Section 1064(2).  Finally, Section 1064(5), also omitted by PME, bars "[a] person" "structur[ing] or attempt[ing] to structure" contributions or donations or expenditures or disbursements "to evade" Section 1064(2).

M.R.S. §§ 1064(3)-(5).

Therefore, by their plain terms, Sections 1064(3) through 1064(5) apply to all persons, including Plaintiffs in their individual capacities as Maine citizens and as Electors. These sections trigger the civil and criminal sanctions set forth in Sections 1064(8) and 1064(9), and they become immediately applicable to all persons the moment any Ballot Measure is "initiated", whether by petition or proposal introduced in the Legislature. Further, they continue to apply to all persons until such Ballot Measure is approved or rejected at general election.

Thus, PME's assertion that Electors' intent to influence others, including legislators and the Governor "is not activity proscribed by the Act" and Electors are not "within the class of persons" regulated by the Act" (EFC 46, p. 20) is patently wrong and should be rejected.

Fundamentally, Electors' claims meet the standards for Article III jurisdiction set forth in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992). Electors have shown, if enforced, the Initiative violates their First Amendment rights to petition the government (and, as Electors to be petitioned), their right to freedom of speech, their right to freedom of assembly, and the associational rights inherent on all three.[11] In addition, both Electors and the Maine Press Association have shown, if enforced, the Initiative chills the press on which Electors are, to a large extent, dependent for information the initiation and approval of Ballot Measures. And, as has been noted, enforcement of the Initiative is imminent.

Moreover, it is clear that a state initiative process manifests elements of protected expression. *Wirzburger v. Galvin,* 412 F.3d 271, 278 (1st Cir. 2005)(citing *Meyer v. Grant*, 486

---

[11] It cannot be overemphasized that the right to petition necessarily involves speech. "The right to petition allows citizens to express their ideas, hopes, and concerns to their government and their elected representatives, whereas the right to speak fosters the public exchange of ideas that is integral to a deliberative democracy as well as to the whole realm of ideas and human affairs." *Borough of Duryea v. Guarnier*i, 564 U.S. 379, 388 (2011).

U.S. 414, 422 (1988)). Section 1064(2) of the Initiative bans contributions and expenditures that attempt "to influence" the initiation or approval of Ballot Measures. As such, it is clearly "directed at speech." *Bellotti*, 435 U.S. at 785. And, as the First Circuit observed with respect to standards for injunctive relief, "[a]s the Supreme Court has explained, '[t]he loss of First Amendment freedoms, for even minimal periods of time, *unquestionably constitutes irreparable injury*.'" *Sinidicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 10-11 (1st Cir. 2012) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1972)) (emphasis added).

Electors face the imminent enforcement of the Initiative with respect to Ballot Measures that may be initiated at any time, either by petition or in the Legislature, without advance notice to the general public, at which point Electors and their First Amendment rights are subject to the Initiative's prohibitions and its civil and criminal sanctions. They have also averred their intention to engage in the very conduct the Initiative prohibits. ECF 1, at ¶ 96, Pringle, *et al* v. Frey, *et al*, 23-cv-453. Electors have demonstrated both Article III standing and irreparable injury, which easily crosses the low threshold to establish standing for a First Amendment claim. *Cushing v. McKee*, 738 F. Supp. 2d 146, 153 (D. Me. 2010).

### B. All of Electors' First Amendment Claims Necessitate Strict Scrutiny Review of the Act.

Because "there is practically universal agreement that a major purpose of [the First] Amendment was to protect the free *discussion* of governmental affairs," *Mills v. Alabama,* 384 U.S. 214, 218 (1966) (emphasis added), the receipt of speech carries with it the same importance and the same First Amendment protection as any utterance of free speech.

Core political speech includes "discussions of candidates, structures and forms of government, the manner in which government is operated or should be operated, and all such matters relating to political processes." *Cent. Me. Power Co. v. Pub. Utils. Comm'n,* 1999 ME 119,

¶ 9, 734 A.2d 1120 (quoting *Mills v. Alabama,* 384 U.S. 214, 218–19, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966)). Ballot measure initiation is "core political speech" because it not only involves, but it *requires* "interactive communication concerning political change." *Meyer v. Grant,* 486 U.S. 414, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988) (finding a prohibition on payment for the circulation of ballot-initiative petitions unconstitutional). First Amendment protection is "at its zenith" in these interactions. *Id.* at 425; *see First Nat. Bank of Boston v. Bellotti,* 435 U.S. 765, 776–777 (1978) (stating speech on income tax referendum "is at the heart of the First Amendment's protection"); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995) ("handing out leaflets in the advocacy of a politically controversial viewpoint—is the essence of First Amendment expression").

Maine voters' right to receive, consider, and share core political speech is greater still when, as Electors, they are exercising their Right to Petition the government. "The right to petition allows citizens to express their ideas, hopes, and concerns to their government and their elected representatives." *Borough of Duryea. v. Guarnieri*, 564 U.S. 379, 388 (2011).  Absent the opportunity for the citizens of Maine to have full access to communications bearing on Ballot Measures, the Electors' ability to fulfill their electoral responsibilities is frustrated and a full consideration of "ideas" and "hopes" thwarted. *Id.*  The Act is not simply a limitation on the Foreign Government Influence Entities ("FGIE"), it deprives Maine voters of a whole class of communications which they, the voters, have the right to consider, weigh, discuss, and accept or reject.

Section 1064(2) plainly outlaws core political speech because it bans communications that are the product of "any . . . donation or disbursement of funds" from an FGIE when they are "to influence" the initiation or approval of Ballot Measures. *Buckley v. Valeo*, 424 U.S. 1, 19 (1976).

Electors are banned from "solicit[ing], accept[ing], [or] receiv[ing]" speech. *See* Section 1064(3). Electors are banned from receiving speech directly from an FGIE, but are further banned from providing "substantial assistance" in the receipt of that speech or even attempting to structure a transaction to receive speech and "evade the prohibitions and requirements" of Section 1064. *See* Sections 1064(4), (5). These restrictions necessarily include information passed through intermediaries. The Section 1064 scheme encompasses all core political speech from an FGIE that is integral to the Elector's sovereign law making power.

Electors' freedom of speech claim is not, as State Defendants and amicus filers suppose, solely dependent on their contention that, under the First Amendment, they have a right to receive the communications covered by Section 1064(2). ECF 27, pp. 19-22. Inexplicably, State Defendants and PME even assert that Electors' rights are only somehow derivative of the rights of others. ECF 47, p. 34 (regarding Electors' "right to receive" argument); ECF 46, pp. 13-14.

First, Electors' right to Section 1064(2) communications arises from their rights and duties as Electors considering their position on the "initiation and approval" of Ballot Measures. And, while the right to receive necessarily presupposes a willing speaker, the complaints filed by Central Maine Power and Versant-Enmax show that each *is* a willing speaker. Moreover, even in the context of commercial speech, the Supreme Court has recognized the "right to receive" stands as a separate and independent guarantee that may be superior to the advertiser's right to speak. *Virginia State Board of Pharmacy v. Virginia Consumer Council*, 425 U.S. 748 , 763 (1976); *see also*, *Procunier v. Martinez*, 416 U.S. 366 (1974) (confirming First Amendment right of persons not imprisoned to correspond with inmates). The rights of an Elector in his or her exercise of the *sovereign lawmaking power* certainly cannot be less than that of a consumer of commercial

messages or one in correspondence with a prison inmate.[12]

The essential importance of the right to receive speech is more thoroughly explained in learned articles such as in J. Thai, <u>The Right to Receive Foreign Speech</u>, 71 Okla. L. Rev. 278-282, 309-314 (2018), and C. Mala Corbin, <u>The First Amendment Right Against Compelled Listening</u>, 89 Boston Univ. L. Rev. 939. 965-993 (2009) (detailing the right to receive speech and its clear constitutional protection).

By the same token, the Electors' freedom of the press rights are in no way derivative of the rights of the members of the press itself. As the Supreme Court has observed, the First Amendment guarantees are not so much for the benefit of the press as for the benefit of *all of us*. *Time, Inc. v. Hill*, 385 U.S. 374, 389 (1967).  If, as the Initiative intends, the press is chilled, Plaintiff-Electors, both as individuals and as Electors, are injured.

Laws violating such rights "are subject to strict scrutiny, which requires the Government to prove that the restriction [1] furthers a compelling interest and [2] is narrowly tailored to achieve that interest." *Thomas v. Collins*, 323 U.S. 516, 530 (1945); *Citizens United*, 558 U.S. at 310.

### C. *Bluman* Does Not Provide a Substantial Interest Sufficient to Justify a Prohibition on Core Political Speech Regarding Ballot Measures

The State's Response argues the Supreme Court's summary affirmance in *Bluman* somehow justifies the Act and a substantial state interest. However, a review of the three judge

---

[12] FSFP asserts that Electors' claim "closely resembles the scholars in *Kleindienst v. Mandel* who challenged the government's denied waiver of an invited academic."  408 U.S. 753 (1972).  ECF 45, p. 12.  *Kleindienst* bears no such resemblance.  *Kleindienst* concerned the Government's authority to deny the visa application of a foreign national who had been invited to an academic conference in the United States where the Government determined that, on previous visits, he had violated the terms of his visa.  *Id.* at 575-759.  In upholding the Government's decision to exclude Mandel, the claims of U.S.-based academics of a right to hear Mandel, were insufficient to overturn the Government's decision to deny him a visa.   Here, Electors are claiming that the State cannot ban Section 1064(2) communications and cannot sanction them for receiving and disseminating it, as they may choose, "to influence" the initiation and approval of Ballot Measures.

district court holding in *Bluman*, its logic, and the precedential of a weight of a Supreme Court summary affirmance makes clear it supports no such proposition. Although Electors anticipate co-plaintiffs will be thoroughly addressing State Responses misapplication of *Bluman*, Electors raise the following as additional and supplemental reasons for the inapplicability of *Bluman* in the ballot measure context and State Responses' inadequacy.

### 1. *Bluman Addressed Restrictions on Candidate Elections, Not Ballot Measures.*

"The precedential effect of a summary affirmance extends no further than the precise issues presented and necessarily decided by those actions," *Green v. City of Tucson*, 340 F.3d 891, 902 (9th Cir. 2003) (quoting *Anderson*, 460 U.S. at 784 n.5, 103 S.Ct. 1564). *Bluman* did not, and in fact could not have, reached the issue of contribution and expenditure restrictions on <u>ballot measures</u> because that was simply not an issue before the *Bluman* court.  800 F. Supp.2d 292.

### 2. *The Logic Applied in Bluman Provides No Justification for a Restriction on Ballot Measure Related Core Political Speech.*

*Bluman* gets the State no closer to a substantial interest. Implicitly recognizing this deficiency, the State's Response contorts the *Bluman* court's reasoning in hopes of transplanting the logic relating to the appearance of quid pro quo corruption over ballot measures.

"[T]he United States has a compelling interest for purposes of First Amendment analysis in limiting the participation of foreign citizens in activities of American democratic self-government, and in thereby preventing foreign influence over the U.S. political process." *Bluman v. Fed. Election Comm'n*, 800 F. Supp. 2d 281, 288 (D.D.C. 2011), *aff'd*, 565 U.S. 1104, 132 (2012). This prevention of "foreign influence" remains quid pro quo corruption in candidate *elections*. This logic is inapplicable to ballot measures

This premise is further assured by the *Bluman* courts repeated and explicit disclaimers which make unmistakably clear that the decision in no way related to "issue advocacy." *Id.* at 292.

The *Bluman* court doubled down on this disclaimer, attempting to preempt the very arguments State Defendant's now assert, stating "[Plaintiffs] similarly express concern that Congress might bar them from issue advocacy and speaking out on issues of public policy. *Our holding does not address such questions, and our holding should not be read to support such bans*." *Id.* (emphasis added).

### D.  Section 1064(2) Violates Electors Independent Rights to Free Speech and Petition

The First Amendment Right to "speech and petition are integral to the democratic process, although not necessarily in the same way." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 388 (2011); *see* ECF 27, p. 18. Despite the State's mischaracterization of Electors' asserted and independent First Amendment Rights, framing Electors as conceding their rights as all being swept into "the well-worn constitutional standards applicable to other campaign finance laws," such an analysis would be directly violative of binding jurisprudence and directly contrary to Electors' asserted claims. *See* ECF 47, p. 30; *but see* ECF 27, p. 18. "Legislative action can only find constitutional justification only by dealing with the abuse. The rights themselves must not be curtailed." *De Jonge v. State of Oregon*, 299 U.S. 353, 365 (1937).

Contrary to the State's misguided framing, in *Bellotti*, where the Supreme Court addressed a criminal statute that prohibited business entities from making contributions or expenditures to influence the outcome of a number of ballot measure categories, the Court emphasized:

> We noted only recently that "the concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment . . . ." *Buckley,* 424 U.S., at 48–49, 96 S.Ct., at 649. Moreover, the people in our democracy are entrusted with the responsibility for judging and evaluating the relative merits of conflicting arguments. They may consider, in making their judgment, the source and credibility of the advocate. But if there be any danger that the people cannot evaluate the information and arguments advanced by appellants, it is a danger contemplated by the Framers of the First Amendment. *Wood v. Georgia,* [370 U.S. 375 (1962)]. In sum, "[a]

11

restriction so destructive of the right of public discussion [as § 8], without greater or more imminent danger to the public interest than existed in this case, is incompatible with the freedoms secured by the First Amendment.

*First Nat. Bank of Bos. v. Bellotti*, 435 U.S. 765, 790–92 (1978). The "paternalistic" approach curbed by the *Bellotti* court is what proponents of the Act now seek to advance as set forth in the State's Response. *Id.* at 792 n. 31; *see Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 770 (1976).

## E. The Act Fails Narrow Tailoring as its Prohibitions Sweep Far Wider Than Any Interest its Proponents Assert

The Act's wide sweep chills Elector speech, because the standard for FGIE is unknowable and unanswered by the Defendant.

The Initiative provides that if a "foreign government" or "[a] firm, partnership, corporation, association, organization or other entity" that "[h]olds, owns, controls, or otherwise has direct or indirect beneficial ownership of 5% or more of the total equity, outstanding voting shares, membership units or other applicable ownership interests" then that entity is deemed a "foreign government influenced entity" and is thus prohibited by the Initiative. *See* §1-§1064(1)(E)(2)(a).

Electors assert this standard was unknowable, and State Defendants have confirmed this assertion. Despite vast research on the issue by all parties involved, no reliable source has been held out as a method for Electors, who sit on the outside of a business entity looking in, to reliably determine the ownership or direct or indirect control structure of an entity. Evidencing just how unanswerable this task in fact is, the State Response acknowledges co-plaintiffs' ownership structures at several points in the State Response, but, at each instance, does so citing only to *voluntary* disclosures made by those entities.

With no feasible method of determining percentage ownership of an entity, let alone the influence that may cause a contribution to be made, Electors will steer far "wide[ ] of the unlawful

zone", thus sweeping far more conduct than contemplated or ever conceivably justified by the Act. *Speiser v. Randall*, 357 U.S. 513, 526 (1958).

"If the First Amendment has any force, it prohibits Congress from fining or jailing citizens, or associations of citizens, for simply engaging in political speech." *Citizens United*, 558 U.S. at 349. The scienter threshold required for criminalization of Electors' exercise of their right to petition and speech, "knowingly" or for solicitation, "knowingly or recklessly," does nothing to limit the chilling effect the Initiative imposes. The complexity of this scheme, vagueness of its terms, and impossibility of knowing when and to what extent petitioning and speech are permitted poses a threat of litigation which, even without criminal enforcement, chills the exercise of an Electors' rights. Courts "must eschew 'the open-ended rough-and-tumble of factors,' which 'invit[es] complex argument in a trial court and a virtually inevitable appeal.'" *Federal Election Com'n v. Wisconsin Right to Life, Inc.,* 551 U.S. 449, 469 (2007) (internal citations omitted).

**F.  That Act's Standards are Arbitrary and Unknowable and Violate Due Process.**

Due process "demands … that [a] law shall not be unreasonable arbitrary, or capricious and that the means selected shall have a real and substantial relation to the object sought to be attained."  *Nebbia v. New York*, 291 U.S. 502, 510-11 (1934). With no means of predicting when an Elector may run afoul of the Initiative, a Class C crime, the Initiative is facially arbitrary and violates due process. *See Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972); *Coates v. City of Cincinnati*, 402 U.S. 611 (1971); *Thornhill v. Alabama*, 310 U.S. 88 (1940).

## II.   <u>CONCLUSION</u>

For each of the foregoing reasons and those stated in Electors' principal brief, the Court should grant Plaintiffs' request for a preliminary injunction.

Dated this 31st day of January, 2024.

Respectfully submitted,

 /s/ *Timothy C. Woodcock*
Timothy C. Woodcock, Bar #1663
P. Andrew Hamilton, Bar #2933
Jonathan Pottle, Bar # 4330
William F. Campbell, #10646

**EATON PEABODY**
80 Exchange Street
Bangor, ME 04401
(207) 947-0111

twoodcock@eatonpeabody.com
ahamilton@eatonpeabody.com
jpottle@eatonpeabody.com
bcampbell@eatonpeabody.com

*Counsel for Plaintiffs Jane Pringle, Kenneth Fletcher, Bonnie Gould, Brenda Garrand, and Lawrence Wold*

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of January, 2024, I caused the foregoing document to

be served upon all counsel of record via email.

 /s/ *Timothy C. Woodcock*