## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| CENTRAL MAINE POWER COMPANY, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Docket No. 1:23-cv-00450-NT |
| MAINE COMMISSION ON GOVERNMENTAL ETHICS AND ELECTION PRACTICES, et al., | ) ) ) ) | |
| Defendants. | ) ) | |

## ORDER ON PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION

Before me are preliminary injunction motions by Plaintiffs Central Maine Power Company (ECF No. 4), Versant Power and ENMAX Corporation (ECF No. 22), the Maine Press Association and the Maine Association of Broadcasters (ECF No. 25), and a group of Maine voters and electors (ECF No. 27), seeking to enjoin the Defendants from implementing and enforcing "An Act to Prohibit Campaign Spending by Foreign Governments" (the "**Act**") until a final judgment is entered in this matter. For the reasons stated below, the motions are **GRANTED**. Because I am granting the preliminary injunction on the issues that Central Maine Power Company's motion and Versant Power and ENMAX Corporation's motion raise, and because time is limited given that the Act is slated to go into effect on March 1, 2024, I do not address the arguments put forth by the remaining Plaintiffs.

## FACTUAL BACKGROUND

### A.    Central Maine Power Company and Versant Power

There are two large electric transmission and distribution utility companies operating in the State of Maine. Verified Compl. ("**CMP Compl.**") ¶ 26 (ECF No. 1).[1] The largest, Central Maine Power Company ("**CMP**"), was incorporated in Maine in 1905 and has remained a Maine company, operating and deriving its revenue from Maine customers. CMP Compl. ¶¶ 16–17, 26. It is run by a board of directors and its executive officers, all of whom are United States citizens. CMP Compl. ¶ 18. Currently, CMP's shares are 100% owned by another Maine corporation, CMP Group, Inc., which in turn is wholly owned by Avangrid Networks, Inc., another Maine corporation. CMP Compl. ¶¶ 20–21. Avangrid Networks, Inc. is 100% owned by Avangrid, Inc., a New York corporation whose shares of common stock are listed on the New York Stock Exchange and are publicly traded so anyone can buy them. CMP Compl. ¶¶ 22–23. Iberdrola, S.A., a publicly traded corporation headquartered in Spain, currently owns over 80% of Avangrid, Inc.'s shares. CMP Compl. ¶ 23. Other owners of Avangrid, Inc. stock are:

- The Qatar Investment Authority (the State of Qatar's sovereign wealth fund) – owning approximately 3.7% of outstanding Avangrid, Inc. shares; and

- Norges Bank (the central bank of the Kingdom of Norway) – owning approximately 0.4% of outstanding Avangrid, Inc. shares.

CMP Compl. ¶ 24. In addition, the Qatar Investment Authority holds approximately 8.7% and Norges Bank holds approximately 3.6% of outstanding Iberdrola, S.A.

---

[1]      Unless otherwise indicated, cites to ECF entries refer to Docket No. 1:23-cv-00450-NT.

shares. CMP Compl. ¶ 24. No one from the Qatar Investment Authority or Norges Bank serves as an officer or director of CMP (or CMP Group, Avangrid Networks, Inc., or Avangrid, Inc.). CMP Compl. ¶ 25. Nor is any officer or director of CMP, CMP Group, Avangrid Networks, Inc., or Avangrid, Inc. a Qatari or Norwegian national. CMP Compl. ¶ 25.

The other significant electric transmission and distribution utility company in Maine is Versant Power ("**Versant**"). Verified Compl. for Declaratory and Injunctive Relief ("**Versant Compl.**") ¶ 62 (ECF No. 1), Docket No. 1:23-cv-00451-NT. Versant is incorporated in Maine and (with its predecessors) has operated exclusively in Maine for more than ninety-nine years. Versant Compl. ¶¶ 15, 62. Versant's common stock is 100% owned by ENMAX US Holdco, Inc., which in turn is wholly owned by ENMAX Corporation. Versant Compl. ¶¶ 63–65. The City of Calgary in Alberta, Canada is the sole shareholder of ENMAX Corporation. Versant Compl. ¶ 58. Notwithstanding its ownership of the stock of ENMAX Corporation, the City of Calgary does not have any decision-making authority over, or the ability to participate in, the operations or management of ENMAX Corporation or the operations, management, or governance of Versant. Versant Compl. ¶ 66. It is expressly prohibited from such participation by orders of the Maine Public Utilities Commission ("**PUC**") and a stipulation that Versant entered with the PUC. Versant Compl. ¶¶ 66–87. No representative of the City of Calgary has ever served as an officer or director of Versant and no representative of ENMAX Corporation has ever served as an officer of Versant. Versant Compl. ¶ 88.

**B.     The Corridor Referendum**

In 2021, Maine voters faced a ballot initiative question seeking to prohibit the construction of an electric transmission line that was proposed to run through Maine from Canada and was frequently referred to as the "CMP Corridor." CMP Compl. ¶ 28. CMP engaged in political advocacy to oppose the CMP Corridor initiative. CMP Compl. ¶ 28. In addition, a corporate entity named H.Q. Energy Services (U.S.) Inc. ("**HQUS**"), a subsidiary of Hydro-Québec, made contributions, totaling over $22 million, to encourage Maine voters to reject the corridor referendum. Decl. of Jonathan Wayne ("**Wayne Decl.**") ¶¶ 13–14 (ECF No. 47-1). HQUS's massive election spending on the corridor referendum caused concern. For example, during the corridor referendum campaign, a bipartisan group of current and former Maine legislators sent a letter to the Premier of Québec and the CEO of Hydro-Québec demanding that Hydro-Québec "cease all further campaign activities in Maine and let the people of Maine vote without further meddling in our elections." Decl. of Jonathan Bolton ("**Bolton Decl.**"), Ex. B (ECF No. 47-6). And following the corridor referendum campaign, elected leaders from both major parties publicly criticized HQUS's election spending. *See* State Defs.' Combined Opp'n to the Mots. for Prelim. Relief ("**State Opp'n**") 6 (ECF No. 47) (collecting articles). This concern provoked a legislative response. In January 2021, a group of legislators introduced L.D. 194, "An Act to Prohibit Contributions, Expenditures, and Participation by Foreign Government-owned Entities to Influence Referenda." CMP Compl. ¶ 38. L.D. 194 passed by a significant margin, but the Governor vetoed it, citing concerns about L.D.

194's constitutionality. CMP Compl. ¶ 39; *see also* Bolton Decl., Ex. E (ECF No. 47-9).

### C.     The Act

Undaunted, supporters of L.D. 194 then gathered enough signatures to seek enactment of a similar law—the Act—under the direct democracy provision of the Maine Constitution. Versant Compl. ¶¶ 29–30. As required by the Maine Constitution, the Act was presented to the Legislature as L.D. 1610 for additional proceedings, and it passed, but it was again vetoed by the Governor who reiterated her constitutional concerns. Versant Compl. ¶¶ 26, 31–33. As a result, the Act was placed on the November 2023 ballot as Question 2. Versant Compl. ¶ 35.

Maine voters enacted the Act by a vote of 348,781 to 55,226—the biggest win for a citizens' initiative in either percentage or absolute terms in Maine's history. Bolton Decl., Ex. F (ECF No. 10); Maine State Legislature, Legislative History Collection, Citizen Initiated Legislation, 1911–Present, https://www.maine.gov/legis/lawlib/lldl/citizeninitiated/. The Governor proclaimed the results of the election on December 6, 2023. Bolton Decl., Ex. F. As explained in greater detail below, the Act bars foreign governments and "foreign government-influenced" entities from spending on Maine's elections. 21-A M.R.S. § 1064(1)(E), (2).[2] It bolsters that ban with additional provisions, including prohibitions on solicitation or assistance activities, disclosure requirements, and affirmative duties on the media to ensure they do not

---

[2]     For ease of reference, I use the proposed statutory citation. The Act was attached to CMP's complaint as Exhibit A (ECF No. 1-1).

publish otherwise-barred communications. *Id.* § 1064(3), (4), (6), (7). Violations of the Act are punishable by monetary penalty or imprisonment. *Id.* § 1064(8), (9).

The Act was scheduled to take effect in early January of this year and is intended to be codified at Title 21-A, Section 1064 of the Maine Revised Statutes. CMP Compl. ¶¶ 46, 48. The central provision of the Act, subsection 2, provides:

> **Campaign spending by foreign governments prohibited**. A foreign government-influenced entity may not make, directly or indirectly, a contribution, expenditure, independent expenditure, electioneering communication or any other donation or disbursement of funds to influence the nomination or election of a candidate or the initiation or approval of a referendum.

21-A M.R.S. § 1064(2). Under the Act, a "foreign government-influenced entity" is:

> (1) A foreign government; or
> (2) A firm, partnership, corporation, association, organization or other entity with respect to which a foreign government or foreign government-owned entity:
>> (a) Holds, owns, controls or otherwise has direct or indirect beneficial ownership of 5% or more of the total equity, outstanding voting shares, membership units or other applicable ownership interests; or
>> (b) Directs, dictates, controls or directly or indirectly participates in the decision-making process with regard to the activities of the firm, partnership, corporation, association, organization or other entity to influence the nomination or election of a candidate or the initiation or approval of a referendum, such as decisions concerning the making of contributions, expenditures, independent expenditures, electioneering communications or disbursements.

*Id.* § 1064(1)(E). A "foreign government-owned entity" means "any entity in which a foreign government owns or controls more than 50% of its equity or voting shares." *Id.* § 1064(1)(F). The Act also includes a disclosure provision that would require any public communication made by a foreign government-influenced entity—that is not otherwise prohibited—to "clearly and conspicuously contain the words 'Sponsored

6

by' " immediately followed by the name of the foreign government-influenced entity and a statement identifying it as a "foreign government" or a "foreign government-influenced entity." *Id.* § 1064(6).

In addition to the subsections aimed at foreign government-influenced entities, the Act contains a provision directed to "television [and] radio broadcasting station[s], provider[s] of cable or satellite television, print news outlet[s] and Internet platform[s]." *Id.* § 1064(7). Each such media-related entity must "establish due diligence policies, procedures and controls that are reasonably designed to ensure that it does not broadcast, distribute or otherwise make available to the public" any public communication that violates the Act. *Id.* § 1064(7). And, "[i]f an Internet platform discovers that it has distributed a public communication" that does violate the Act, it must "immediately remove the communication and notify the commission." *Id.* § 1064(7).

The Act imposes monetary penalties of up to $5,000 or up to double the amount expended in the prohibited action, whichever is greater, for each violation. *Id.* § 1064(8). Anyone who knowingly violates subsection 2 commits a Class C crime, *Id.* § 1064(8), which may subject the person to a term of incarceration of up to five years. 17-A M.R.S. § 1604(1)(C).

CMP and the Versant Plaintiffs have stated that they plan to engage in political speech again, but that such spending and communications are now barred under the Act. CMP Compl. ¶¶ 32–35; Versant Compl. ¶ 6.

## PROCEDURAL BACKGROUND

In mid-December 2023, four complaints were filed seeking declaratory and injunctive relief relating to the Act. CMP brought the first case against the Maine Commission on Governmental Ethics and Election Practices (the "**Commission**"), the Chairman and the four other members of the Commission, and the Attorney General of the State of Maine (collectively, the "**State**"). CMP Compl., Docket No. 1:23-cv-00450-NT. CMP alleged six counts: (1) that the Act's ban on referenda spending violates the First Amendment; (2) that the Act's ban on candidate campaigns violates the First Amendment; (3) that the Act's disclaimer requirement violates the First Amendment; (4) that the Act violates the Due Process Clause of the Fourteenth Amendment; (5) that the Act violates the free speech rights guaranteed by the Maine Constitution; and (6) that the remaining provisions in subsection 1 of the Act cannot be severed from the offending provisions. CMP Compl. ¶¶ 66–95. Along with its complaint, CMP also filed a motion for a temporary restraining order and preliminary injunction seeking to enjoin enforcement of the Act. Pl.'s Mot. for TRO and Prelim. Inj. ("**CMP PI Mot.**") (ECF No. 4).

Versant and ENMAX Corporation (together hereinafter, the "**Versant Plaintiffs**" or "**Versant**") also filed a complaint against the same Defendants. Versant Compl., Docket No. 1:23-cv-00451-NT. The Versant Plaintiffs alleged four counts: (1) that the Act violates the Supremacy Clause because it is preempted by federal election law; (2) that the Act violates the First and Fourteenth Amendments; (3) that the Act violates Article I, Section 4 of the Maine Constitution; and (4) that the Act violates the Foreign Commerce Clause. Versant Compl. ¶¶ 104–141. Like

CMP, Versant filed a motion for a temporary restraining order and preliminary injunction along with their complaint. Pls.' Mot. for TRO and Prelim. Inj. ("**Versant PI Mot.**") (ECF No. 22), *see* Docket No. 1:23-cv-00451-NT (ECF No. 4).

Plaintiffs Maine Press Association and Maine Association of Broadcasters (together, the "**Media Plaintiffs**") filed the third Act-related complaint against the Defendants. Compl. for Declaratory and Injunctive Relief ("**Media Compl.**") (ECF No. 1), Docket No. 1:23-cv-00452-NT. The Media Plaintiffs' complaint focuses on subsection 7 of the Act and alleges four counts: (1) that the Act is void for vagueness under the First and Fourteenth Amendments; (2) that the Act violates the First Amendment because it places an unconstitutional burden on news outlets; (3) that the Act violates the First Amendment because it constitutes a prior restraint; and (4) that the Act violates the First Amendment by imposing strict liability on the publication of political speech. Media Compl. ¶¶ 46–66. The Media Plaintiffs assert that they rely on revenue from advertisements, including political advertisements, but may have to stop running political advertisements they would otherwise accept to avoid "legal risk." Media Compl. ¶¶ 40, 43. With their complaint, the Media Plaintiffs filed a motion for preliminary injunction. Pls.' Mot. for Prelim. Inj. (ECF No. 25), *see* Docket No. 1:23-cv-00452-NT (ECF No. 3).

The last case was brought by Plaintiffs Jane Pringle, Kenneth Fletcher, Bonnie Gould, Brenda Garrand, and Lawrence Wold in their capacities as registered voters and electors (collectively, the "**Electors**"). Verified Compl. ("**Electors Compl.**") (ECF No. 1), Docket No. 1:23-cv-00453-NT. The Electors' complaint alleges eleven counts:

(1) that the Act violates their constitutional right to petition the government; (2) that the Act violates their First Amendment right to free speech by limiting the sources of information available to the Electors; (3) that the Act violates the Electors' constitutional right to freedom of assembly; (4) that the Act violates the constitutional right to freedom of the press; (5) that the Act violates Due Process Clause notice standards; (6) that the Act violates the Maine Constitution's right to petition the government; (7) that the Act violates the Maine Constitution's protection of freedom of speech; (8) that the Act violates the Maine Constitution's right of freedom of assembly; (9) that the Act violates the Maine Constitution's protection of freedom of the press; (10) that the Act violates the separation of powers set forth in the Maine Constitution; and (11) that the Act violates the due process rights guaranteed by the Maine Constitution. Electors Compl. ¶¶ 79–167. The Electors intend to continue to seek, acquire, consider, and share information covered by the Act. Electors Compl. ¶¶ 93–94. The Electors also filed a motion for a temporary restraining order and preliminary injunction. Pls.' Mot. for TRO and Prelim. Inj. (ECF No. 27), *see* Docket No. 1:23-cv-00453-NT (ECF No. 8).

On December 13, 2023, I held a teleconference, in which counsel in all four cases participated, to discuss the tight timing of the Plaintiffs' motions for a temporary restraining order given that the Act was to go into effect on January 5, 2024. Minute Entry (ECF No. 8). Following the conference, the State agreed to voluntarily refrain from enforcing the Act until February 29, 2024 to give the parties time to fully brief the issues. Following the conference, I entered an agreed-upon

scheduling order for the briefing. Order Granting Mot. to Amend Scheduling Order to Set New Briefing Schedule for Mots. for Prelim. Relief (ECF No. 13). At the joint request of the parties, the four cases were consolidated on January 9, 2024. Order to Consolidate Cases (ECF No. 20). The State filed their omnibus opposition to the motions for preliminary injunctions on January 12, 2024. State Opp'n (ECF No. 47). On January 31, 2024, the Plaintiffs all filed their replies. *See* ECF Nos. 51–54.[3] The matter came before me for oral argument on February 23, 2024.

## LEGAL STANDARD

In deciding whether to grant a preliminary injunction, district courts "must consider: (i) the movant's likelihood of success on the merits of its claims; (ii) whether and to what extent the movant will suffer irreparable harm if the injunction is withheld; (iii) the balance of hardships as between the parties; and (iv) the effect, if any, that an injunction (or the withholding of one) may have on the public interest." *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 9 (1st Cir. 2013). "In the First Amendment context, likelihood of success on the merits is the linchpin of the preliminary injunction analysis." *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012) (per curiam).

---

[3]      In January, I also granted permission for three groups to participate as amicus curiae. An organization called Free Speech for People filed an amicus brief in support of the State's position. Amicus Curiae Br. of Free Speech for People in Supp. of Defs.' Opp'n to Pls.' Mots. for Prelim. Inj. and TROs (ECF No. 45). Another organization called Protect Maine Elections also filed an amicus brief in support of the State. Br. of Amicus Curiae Protect Maine Elections in Supp. of Defs. (ECF No. 46). And the Reporters Committee for Freedom of the Press filed an amicus brief supporting the Media Plaintiffs' position. Amicus Curiae Br. of the Reporters Committee for Freedom of the Press (ECF No. 50).

## DISCUSSION

### I.   Preemption

In their motion for a preliminary injunction, the Versant Plaintiffs assert that the Act violates the Supremacy Clause of the United States Constitution. Versant PI Mot. 9. Versant argues that the Act is expressly preempted by the Federal Election Campaign Act ("**FECA**"), 52 U.S.C. § 30101 *et seq.*, and is also impliedly preempted by FECA because the Act conflicts with Congress's framework for regulating foreign influences in United States elections. Versant PI Mot. 9–13.

#### A.   General Preemption Principles

The Supremacy Clause of the United States Constitution provides, in relevant part, that: "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Accordingly, because federal law is the supreme law of the land, Congress "has the power to pre-empt state law." *Me. Forest Prods. Council v. Cormier*, 51 F.4th 1, 6 (1st Cir. 2022) (quoting *Arizona v. United States*, 567 U.S. 387, 399 (2012)).

Preemption may be either express or implied depending on "whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992). Implied preemption then consists of two types, conflict and field. *Capron v. Off. of Att'y Gen. of Mass.*, 944 F.3d 9, 21 (1st Cir. 2019); *see Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 52 (1st Cir. 2024) ("There are three types of preemption:

12

conflict, express, and field."). The Versant Plaintiffs maintain that all three types of preemption—express, conflict, and field—apply here.

The party asserting preemption bears the burden of proving it. *Me. Forest Prods. Council*, 51 F.4th at 6. The "ultimate task in any pre-emption case is to determine whether state regulation is consistent with the structure and purpose of the statute as a whole." *Gade*, 505 U.S. at 98.

### B.  Express Preemption

"Where a federal statute contains a clause expressly purporting to preempt state law" courts must "focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent." *Medicaid and Medicare Advantage Prods. Ass'n of P.R., Inc. v. Hernández*, 58 F.4th 5, 11 (1st Cir. 2023) (quoting *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 594 (2011)); *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993) (same).

FECA's express preemption provision states: "the provisions of this Act, and of rules prescribed under this Act, supersede and preempt any provision of State law with respect to election to Federal office." 52 U.S.C. § 30143(a); *see also* 11 C.F.R. § 108.7. FECA defines the term "Federal office" to mean "the office of President or Vice President, or of Senator or Representative in, or Delegate or Resident Commissioner to, the Congress." 52 U.S.C. § 30101(3). The Act's funding prohibition applies to "the nomination or *election of a candidate* or the initiation or approval of a referendum," 21-A M.R.S. § 1064(2) (emphasis added). It does not exclude federal elections, so on its face the Act would apply to the election of a candidate to federal office.

Despite the fact that the Act does not expressly carve out elections for federal office, the State contends that the Act falls outside FECA's preemption provision. The State contends that the Act "cannot reasonably be read—and is not read by the enforcing agencies—to regulate federal elections in any way." State's Opp'n 53 (citation omitted). In support of its claim that the Act cannot reasonably be read to encompass federal elections, the State notes that, if allowed to go into effect, the Act will be housed in the Maine Revised Statutes in a chapter and subchapter that contain definitions that would limit the scope of the Act to just state and local elections. *See* State Opp'n 53 (quoting 21-A M.R.S. §§ 1011, 1051); *see also* 21-A M.R.S. § 1001(2) (defining "election" as "any primary, general or special election for state, county or municipal offices"). But at oral argument, the Versant Plaintiffs pointed to other Maine statutory provisions that could lead to the opposite conclusion. *See, e.g.*, 21-A M.R.S. §§ 335, 354.

In support of the claim that the State's enforcing agencies do not read the Act to regulate federal elections, the State offers a declaration from the current executive director of the Commission to that effect. *See* Wayne Decl. ¶¶ 5–10. But courts "may impose a limiting construction on a statute only if it is 'readily susceptible' to such a construction," and courts will "not uphold an unconstitutional statute merely because the Government promised to use it responsibly." *United States v. Stevens*, 559 U.S. 460, 480–81 (2010) (citations omitted).

I conclude that FECA likely expressly preempts the Act insofar as the Act covers foreign spending in elections for federal office.

### C.    Implied Preemption

The next question is whether FECA impliedly preempts the Act. The Versant Plaintiffs contend that the Act is preempted by FECA under both conflict and field preemption. The State, arguing that the Act is not preempted, claims that two presumptions against preemption apply here. I consider the presumption arguments first and then go on to analyze the merits of Versant's preemption argument.

### 1.    Presumptions

First, the State argues that a presumption against preemption applies because state elections are a traditional area of state regulation. "In all pre-emption cases, and particularly in those in which Congress has 'legislated in a field which the States have traditionally occupied,' [courts] 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' " *Me. Forest Prods. Council*, 51 F.4th at 6 (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). "The presumption does not apply, though, 'when the State regulates in an area where there has been a history of significant federal presence.' " *Id.* (quoting *United States v. Locke*, 529 U.S. 89, 108 (2000)). The Versant Plaintiffs maintain that the presumption does not apply because the Act addresses issues of foreign affairs, which is an area the federal government typically reserves for itself.

Although the Act does touch upon an aspect of foreign affairs—how foreign governments may spend money in Maine campaigns—the Act's main focus is the

regulation of Maine elections,[4] and "the Framers of the Constitution intended the States to keep for themselves, as provided in the Tenth Amendment, the power to regulate elections." *Shelby Cnty., Ala. v. Holder*, 570 U.S. 529, 543 (2013); *see Minn. Chamber of Com. v. Choi*, No. 23-CV-2015 (ECT/JFD), --- F. Supp. 3d ----, 2023 WL 8803357, at *12 (D. Minn. Dec. 20, 2023) ("[S]tate elections are a traditional area of state regulation, and states' historical authority to exclude aliens from participating in their democratic political institutions includes prohibiting foreign nationals from spending money in their elections."). Accordingly, this presumption against preemption likely applies.

Second, the State maintains that, because FECA contains an express preemption clause, that provision provides a "reliable indicium of congressional intent" as to the scope of FECA's preemption and therefore shows that Congress did not intend to preempt laws regulating state and local elections. State Opp'n 54 (quoting *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 517 (1992)). In *Cipollone*, the Supreme Court stated that "Congress' enactment of a provision defining the preemptive reach of a statute implies that matters beyond that reach are not preempted." *Cipollone*, 505 U.S. at 517. But a few years later, in *Freightliner Corporation v. Myrick*, 514 U.S. 280 (1995), the Supreme Court explained that *Cipollone* did "not establish a rule" that "implied pre-emption cannot exist when Congress has chosen to include an express pre-emption clause in a statute." *Freightliner*, 514 U.S. at 287–

---

[4]     As discussed above, the State asserts that it does not interpret the Act to apply to federal elections, and I have concluded in any event that the Act is likely expressly preempted as to federal elections.

89. Instead, "[t]he fact that an express definition of the pre-emptive reach of a statute 'implies'—*i.e.,* supports a reasonable inference—that Congress did not intend to pre-empt other matters does not mean that the express clause entirely forecloses any possibility of implied pre-emption." *Id.* at 288. "At best, *Cipollone* supports an inference that an express pre-emption clause forecloses implied pre-emption." *Id.* at 289.

The *Cipollone* inference against implied preemption likely applies here. The Act contains an express preemption provision that states that FECA supersedes and preempts state law only "with respect to election to Federal office." 52 U.S.C. § 30143(1). That express language does not entirely foreclose the possibility that Congress intended FECA's exclusive reach to go beyond federal candidate elections to cover state and local elections too, but there is at least an inference that that was not Congress's intent. With the presumption and inference in mind, I turn to whether FECA impliedly preempts state regulation of foreign spending in candidate elections for state and local office and state referendum elections. Neither the Supreme Court nor the First Circuit has addressed this issue.

### 2.    **Conflict Preemption**

Conflict preemption is "where compliance with both federal and state regulations is a physical impossibility or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Gade*, 505 U.S. at 98 (internal citations and quotations omitted). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Me. Forest Prods. Council*,

51 F.4th at 6 (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000)). Thus, in order to decide the preemptive effect of FECA on the Act, I have to "juxtapose the state and federal laws, demarcate their respective scopes, and evaluate the extent to which they are in tension." *See Teper v. Miller*, 82 F.3d 989, 993 (11th Cir. 1996).

### a.   Juxtaposition of Federal and State Provisions on Foreign Involvement in Elections

Under FECA, a foreign national is prohibited from making, directly or indirectly, "a contribution or donation of money or other thing of value . . . in connection with a Federal, State, or local election." 52 U.S.C. § 30121(a). FECA defines "foreign national" as either an individual who is not a United States citizen or national, and who is not lawfully admitted for permanent residence, or "a foreign principal." 52 U.S.C. § 30121(b). The term "foreign principal" includes "the government of a foreign country" and "a partnership, association, corporation, organization, or other combination of persons organized under the laws of or having its principal place of business in a foreign country." 22 U.S.C. § 611(b).

The Maine Act provides that "[a] foreign government-influenced entity may not make, directly or indirectly, a contribution, expenditure, independent expenditure, electioneering communication or any other donation or disbursement of funds to influence the nomination or election of a candidate or the initiation or approval of a referendum." 21-A M.R.S. § 1064(2). A "foreign government-influenced entity" means:

(1) A foreign government; or

(2) A firm, partnership, corporation, association, organization or other entity with respect to which a foreign government or foreign government-owned entity[5]:

    (a) Holds, owns, controls or otherwise has direct or indirect beneficial ownership of 5% or more of the total equity, outstanding voting shares, membership units or other applicable ownership interests; or

    (b) Directs, dictates, controls or directly or indirectly participates in the decision-making process with regard to the activities of the firm, partnership, corporation, association, organization or other entity to influence the nomination or election of a candidate or the initiation or approval of a referendum, such as decisions concerning the making of contributions, expenditures, independent expenditures, electioneering communications or disbursements.

21-A M.R.S. § 1064(1)(E).

I have already found that FECA preempts regulation of foreign spending in federal candidate elections. That leaves referenda and state and local candidate elections to review for conflict preemption. Because FECA's intended scope and the rationale for regulating these two categories of elections differ, I consider them separately.

### b.    Referenda

FECA prohibits any foreign national (which includes a foreign government or a foreign corporation) from contributing or donating money "in connection with a Federal, State, or local election." 52 U.S.C. § 30121(a). Under FECA, the term "election" means "a general, special, primary, or runoff election" or "a convention or caucus of a political party which has authority to nominate a candidate." 52 U.S.C.

---

[5]      A "foreign government-owned entity" is "any entity in which a foreign government owns or controls more than 50% of its equity or voting shares." 21-A M.R.S. § 1064(1)(F).

§ 30101(1). The Supreme Court has said that FECA "regulates only candidate elections, not referenda or other issue-based ballot measures." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 356 (1995); *see also FEC v. Bluman*, 800 F. Supp. 2d 281, 284 (D.D.C. 2011) (then-Judge Kavanaugh, interpreting Section 30121's identically-worded predecessor, stated "[t]his statute . . . does not bar foreign nationals from issue advocacy—that is, speech that does not expressly advocate the election or defeat of a specific candidate."). And the Federal Election Commission ("**FEC**")[6] interprets FECA as excluding referenda. *See* MUR 7523 (Stop I-186 to Protect Mining and Jobs, et al.), at 5 n.18 (FEC Oct. 4, 2021), *available at* https://www.fec.gov/files/legal/murs/7523/7523_23.pdf (noting that there has been a "longstanding distinction between elections and ballot initiative activity" and that the FEC has advised "that ballot measure activity was 'nonelection activity' that foreign nationals may lawfully engage in so long as it is not connected to a candidate's campaign"). In fact, the FEC recently recommended "that Congress amend FECA's foreign national prohibition to include ballot initiatives, referenda and any recall elections not covered by the current version of FECA." Legis. Recommendations of the FEC 2023, at 7, *available at* https://www.fec.gov/resources/cms-content/

---

[6]    Congress created the Federal Election Commission ("**FEC**") to "administer[ ] and enforc[e]" the Federal Election Campaign Act ("**FECA**") and it delegated to the FEC "extensive rulemaking and adjudicative powers." *See Buckley v. Valeo*, 424 U.S. 1, 109–10 (1976). The Supreme Court has instructed that the FEC "is precisely the type of agency to which deference should presumptively be afforded." *FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 37 (1981); *see also Becker v. FEC*, 230 F.3d 381, 390 (1st Cir. 2000) (affording *Chevron* deference to the FEC's interpretation of several FECA statutory provisions because "[t]he FEC is the type of agency which is entitled to such deference where congressional intent is ambiguous"). *Cf. Teper v. Miller*, 82 F.3d 989, 997–98 (11th Cir. 1996) (noting tension inherent in deferring to the FEC in cases involving preemption).

documents/legrec2023.pdf.[7] Because FECA does not currently cover referenda, I conclude that it likely does not preempt the Act with respect to regulation of foreign spending on a referendum.

### c.   State and Local Candidate Elections

By contrast, FECA's prohibition on contributions by foreign nationals does extend to State and local candidate elections. FECA prohibits "foreign principals"— including foreign governments and foreign-based corporations—from "directly or indirectly" spending "in connection with a Federal, State, or local election" of a candidate. 52 U.S.C. § 30121(a). But FECA does not on its face prohibit domestic subsidiaries of foreign corporations from making donations or contributions to such elections. The Versant Plaintiffs argue that this omission "should be viewed as Congress's considered choice, not an inadvertent hole meant to be filled by state regulation." Versant PI Mot. 12. The Versant Plaintiffs assert that, because the failure to regulate domestic subsidiaries of foreign corporations was by design, the Act's prohibition on spending by United States companies with foreign ownership conflicts with Congress's intention. Versant PI Mot. 12. The State counters that the fact that FECA does not go as far as the Act in regulating foreign influence in elections is insufficient to overcome the presumption against preemption. State Opp'n 57.

---

[7]     In its recommendation, the FEC explained that it considered foreign national donations made in opposition to a Montana ballot initiative and "determined that FECA's foreign national prohibition does not reach ballot initiatives that do not appear to be linked to an office-seeking candidate at the federal, state or local level." Legis. Recommendations at 7; *see also* MUR 7523 (Stop I-186 to Protect Mining and Jobs, et al.), at 3–4, *available at* https://www.fec.gov/files/legal/murs/7523/7523_23.pdf.

The history of the foreign prohibition on spending shows that Congress has been active in this area over the last fifty years. Even before FECA was introduced in 1971, Congress had, in 1966, "amended the Foreign Agents Registration Act to prohibit foreign governments and entities from contributing to American political candidates." *United States v. Singh*, 979 F.3d 697, 709 (9th Cir. 2020) (citing Pub. L. No. 89-486, § 8, 80 Stat. 244, 248–49). When Congress amended FECA in 1974, it expanded on the existing bans by prohibiting any "foreign national"—defined as a foreign principal under the Foreign Agents Registration Act or an individual who is not a United States citizen or lawful permanent resident—from making contributions to candidates. Federal Election Campaign Act Amendments of 1974, Pub. L. No. 93–443, 88 Stat. 1263.

"But those restrictions did not eliminate the possibility of foreign citizens influencing American elections," *Bluman*, 800 F. Supp. 2d at 283, and "suspicions of foreign influence in American elections remained a pervasive concern." *Singh*, 979 F.3d at 709. The 1996 election cycle prompted the Senate Committee on Governmental Affairs to investigate foreign campaign contributions. *Id.* "The Committee found that foreign citizens had used soft-money contributions to political parties to essentially buy access to American political officials." *Bluman*, 800 F. Supp. 2d at 283. In response to the Committee's report, Congress (eventually) passed the Bipartisan Campaign Reform Act of 2002 ("**BCRA**"), which amended FECA and further limited foreign nationals' ability to participate in elections. Bipartisan Campaign Reform Act of 2002, Pub. L. No. 107-155, § 303, 116 Stat. 81, 96; *see Singh*,

979 F.3d at 709. FECA, now with the BCRA amendments, bans foreign nationals from directly or indirectly making contributions or donations to a committee of a political party or "in connection with a Federal, State, or local election." 52 U.S.C. § 30121 (formerly cited as 2 U.S.C. § 441e but editorially reclassified as 52 U.S.C. § 30121).

In support of its argument that Congress intended not to regulate certain foreign-related entities that the Act encompasses, the Versant Plaintiffs point to FEC rulemaking after BCRA amended FECA. Versant PI Mot. 10–12. The FEC had sought comments on whether FECA's use of the word " 'indirectly' should be interpreted to cover U.S. subsidiaries of foreign corporations that make non-Federal donations with corporate funds or that have a separate segregated fund that makes Federal contributions." 67 Fed. Reg. 69928, 69943 (Nov. 19, 2002). BCRA's sponsors commented that "Congress in this legislation did not address 'contributions by foreign-owned U.S. corporations, including U.S. subsidiaries of foreign corporations.' " *Id*.

At this preliminary stage, Versant has not met its burden of showing that Congress's silence on the issue of contributions made by American subsidiaries of corporations with foreign ownership in non-federal elections means that Congress intended to preempt state efforts to regulate such contributions at both the state and local level. In enacting BCRA, Congress intended to include candidate elections for state and local office in FECA's prohibitive sweep. *See Singh*, 979 F.3d at 709. And the FEC recently noted that Section 30121's reach to state and local elections is

"exceptional" given that FECA "otherwise is limited to federal elections." Legis. Recommendations at 7. But the fact that FECA covers state and local elections does not mean that the Act is in conflict.

It is true that "the United States has a compelling interest . . . in limiting the participation of foreign citizens in activities of American democratic self-government, and in thereby preventing foreign influence over the U.S. political process." *Bluman*, 800 F. Supp. 2d at 288. The State, however, has an equally strong interest in regulating its own state and local elections. And allowing the State of Maine to continue to exercise its traditional powers in the area of state and local candidate elections likely will not hinder Congress's intentions as set forth in FECA.

Further, when Congress added the Section 30121 prohibition preventing foreign nationals from contributing in federal, state, and local elections, it could also have amended the express preemption provision in Section 30143 to include state and local candidate elections along with those for federal office. But it did not.

Ultimately, whether the Act is in conflict with FECA's prohibition on foreign participation in state and local candidate elections is a close question, but I believe it is likely that Congress intended FECA's prohibition as a floor, and it did not intend to prohibit states from doing more to regulate foreign government influence on state and local elections. The Versant Plaintiffs' arguments to the contrary do not overcome the presumption and inference against preemption. Accordingly, I find that the Act is likely not impliedly preempted because it conflicts with FECA.

### 3.    Field Preemption[8]

Field preemption occurs when states try to "regulat[e] conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona*, 567 U.S. at 399. "Where Congress occupies an entire field, . . . even complementary state regulation is impermissible. Field preemption reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards." *Id.* at 401. Thus, the critical question in field preemption is whether the "federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it." *Cipollone*, 505 U.S. at 517 (quotation omitted).

The same reasons discussed above with respect to conflict preemption apply to the field preemption analysis.[9] Versant points to the fact that Section 30121 prohibits foreign spending in federal, state, and local elections in support of its field preemption argument, and it suggests that, under the federal scheme, Congress made a deliberate choice to not include domestic corporations with foreign shareholders in FECA's ban on foreign principals' spending. But, as the *Choi* court recently explained in a similar case, "Congress does not preempt state law every time it considers

---

[8]    Although the field preemption argument was not developed in Versant's motion for preliminary injunction, I address it briefly here because they alleged field preemption in their complaint and maintained at oral argument that Congress through FECA's federal scheme has occupied the field of foreign nationals' campaign spending. *See* Versant Compl. ¶¶ 107, 110.

[9]    "Indeed, field pre-emption may be understood as a species of conflict pre-emption: A state law that falls within a pre-empted field conflicts with Congress' intent (either express or plainly implied) to exclude state regulation." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 n.5 (1990).

regulating a topic but ultimately declines to do so." 2023 WL 8803357, at *12; *see P.R. Dep't of Consumer Affs. v. Isla Petroleum Corp.*, 485 U.S. 495, 503 (1988) (explaining that "deliberate federal inaction" does not "always imply pre-emption"). And I agree with the *Choi* court's observation that "when Congress regulates, it just as often creates a floor rather than a uniform rule preempting stricter state laws." 2023 WL 8803357, at *12. On the preliminary injunction record before me, that appears to be the case, and the Versant Plaintiffs have not met their burden of showing "that Congress intended federal law to occupy [the] field exclusively." *Freightliner*, 514 U.S. at 287. Therefore, Versant is not likely to succeed on their field preemption argument.

Having concluded that FECA likely preempts the Act insofar as it regulates elections for federal office, I move on to consider the First Amendment arguments only in the context of referenda and state and local candidate elections.

## II. First Amendment

Under *Citizens United v. FEC*, 558 U.S. 310, 365–66 (2010), corporations have a First Amendment right to engage in political speech, which includes certain types of campaign-related spending. Among other questions, this case asks whether domestic corporations with some foreign government ownership also have this right.[10]

---

[10]    The *Citizens United* decision dealt with the First Amendment rights of corporations generally, but it did not resolve whether these rights also apply to domestic corporations with foreign shareholders. *Citizens United v. FEC*, 558 U.S. 310, 362 (2010). The Supreme Court has since held that "foreign organizations operating abroad have no First Amendment rights." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 140 S. Ct. 2082, 2088 (2020). This subsequent authority provides some guidance, but it does not address or resolve the open questions this case presents.

### A. Facial Challenge

CMP and Versant (collectively, the "**Corporate Plaintiffs**") assert that subsection 2 of the Act is facially unconstitutional because it violates the First Amendment. In general, "facial challenges leave no room for particularized considerations and must fail as long as the challenged regulation has any legitimate application." *Gaspee Project v. Mederos*, 13 F.4th 79, 92 (1st Cir. 2021). However, First Amendment facial challenges based on overbreadth are different. They succeed if "a 'substantial number' of [the law's] applications are unconstitutional, 'judged in relation to the statute's plainly legitimate sweep.' " *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008) (quoting *New York v. Ferber*, 458 U.S. 747, 769–71 (1982)).

### B. Level of Scrutiny

The Corporate Plaintiffs maintain that subsection 2 of the Act is subject to strict scrutiny. Versant PI Mot. 14–15; Central Maine Power Company's Reply in Supp. of its Mot. for Prelim. Inj. ("**CMP Reply**") 1–2 (ECF No. 52). The State advocates for more lenient "closely drawn" scrutiny. State Opp'n 13–15. Based on my review of the parties' authorities, including *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1 (1st Cir. 2012), I conclude that strict scrutiny is the appropriate standard of review. Strict scrutiny requires that the State show that the Act (1) furthers a compelling interest; and (2) is narrowly tailored to achieve that interest. *Citizens United*, 558 U.S. at 340.

### C.     Compelling Interest

The first step of strict scrutiny analysis is to assess whether the State has articulated a compelling governmental interest. The State identifies an interest in "limiting foreign-government influence in its elections" and an interest in "limiting the appearance of such influence." State Opp'n 23. The Corporate Plaintiffs respond that the State's identified interests cannot support restrictions on spending on elections or referenda by domestic corporations with foreign government shareholders. Versant PI Mot. 16–17; CMP Reply 4–5.

Neither the Supreme Court nor the First Circuit has weighed in on the First Amendment rights of domestic corporations with some foreign government ownership to spend money on elections and referenda. The closest case on point is *Bluman v. Federal Election Commission*. The plaintiffs in *Bluman* were two foreign citizens temporarily living in the United States on work visas. 800 F. Supp. 2d at 282. They wanted to make financial contributions to candidates in federal and state elections, print flyers supporting a presidential candidate to distribute in a park, and contribute money to national political parties and political groups. *Id.* at 285. But FECA's prohibition on foreign national involvement in elections barred these activities. *Id.* at 282–83 (citing 2 U.S.C. § 441e(a)). In upholding the law, then-Judge Kavanaugh wrote that the United States "has a compelling interest for purposes of First Amendment analysis in limiting the participation of foreign citizens in activities of American democratic self-government, and in thereby preventing foreign influence over the U.S. political process." *Id.* at 288. This interest was based on the "straightforward principle" that "foreign citizens do not have a constitutional right to

participate in, and thus may be excluded from, activities of democratic self-government." *Id.* The *Bluman* court noted that its holding would extend to foreign corporations, but it did not address "the circumstances under which a corporation may be considered a foreign corporation for purposes of First Amendment analysis." *Id.* at 292 n.4. The Supreme Court summarily affirmed, 565 U.S. 1104 (2012), which makes the *Bluman* decision binding precedent. *See Hicks v. Miranda*, 422 U.S. 332, 344–45 (1975).

### 1. Interest in Limiting Foreign Government Influence in Candidate Elections

*Bluman* supports the State's claim that it has a compelling interest when it comes to limiting foreign government influence in candidate elections. *Bluman* approved limiting the participation of foreign citizens and foreign corporations "in activities of American democratic self-government" for the purpose of "preventing foreign influence over the U.S. political process." *Bluman*, 800 F. Supp. 2d at 288; *see also Bluman*, 800 F. Supp. 2d at 292 n.4 ("Our holding means, of course, that foreign corporations are likewise barred from making contributions and expenditures prohibited by 2 U.S.C. § 441e(a)."). This interest extends to the State interest here in limiting foreign government influence in candidate elections.

CMP argues that this interest is not compelling when it comes to corporations with just some foreign government ownership,[11] because, unlike the foreign nationals in *Bluman*, such entities could be Maine companies (like CMP itself) led by United

---

[11]    I use foreign government "ownership" as a shorthand for the full definition in 21-A M.R.S. § 1064(1)(E)(2)(a).

States citizens with long-term stakes in issues decided by Maine's elections. CMP PI Mot. 12. This argument essentially takes aim at the Act's 5% foreign government ownership threshold. *See* 21-A M.R.S. § 1064(1)(E)(2)(A). The argument is that 5% foreign government ownership is not foreign enough to sustain an interest in limiting the First Amendment rights of domestic corporations to participate in election activities. But whether this amount of foreign government ownership is sufficient to justify the Act is better tested on narrow tailoring, not whether a compelling interest exists in the first place.[12] *Bluman* thus likely extends to the State's articulated interest here with respect to state and local candidate elections.

### 2. Interest in Limiting Foreign Government Influence in Referenda Elections

A much closer question is whether *Bluman* can support the State's compelling interest when it comes to referenda elections. *Bluman* "does not address" and "should not be read to support" bans on "issue advocacy" or "speaking out on issues of public policy" by foreign individuals. 800 F. Supp. 2d at 292. But *Bluman* does support excluding those who are not "members of the American political community" from participating in "activities of American democratic self-government" in the interest of "preventing foreign influence over the U.S. political process." 800 F. Supp. 2d at 288, 290. When Maine citizens vote on referenda they are certainly participating in an activity of democratic self-government. *See* Me. Const. art. IV, pt. 3, § 18 (Maine

---

[12]    I recognize that the court in *Minnesota Chamber of Commerce v. Choi*, --- F. Supp. 3d ----, 2023 WL 8803357, at *6 (D. Minn. Dec. 20, 2023) evaluated "[t]he scope of the compelling interest" on prong one of the strict scrutiny test. But I will save this analysis for prong two.

citizens have the right to enact legislation directly by popular vote). At this initial stage of the case, and based on the reasoning that follows on narrow tailoring, I assume without deciding that limiting foreign government influence in referenda elections is a compelling interest.

### 3.    Interest in Limiting the Appearance of Foreign Government Influence in Elections

In addition to the interest in limiting foreign government influence in candidate and referenda elections, the State also asserts an independent interest in limiting the *appearance* of such influence. State Opp'n 20–21. For support, the State cites cases that endorse avoiding the appearance of corruption as a compelling government interest. State. Resp. 20 (citing *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 390 (2000); *Buckley v. Valeo*, 424 U.S. 1, 27 (1976)). In addition, the State points to the historic margin of victory for the Act as evidence that Maine voters do indeed perceive that foreign government influence in elections is an urgent problem. State Opp'n 21. The Corporate Plaintiffs maintain that this interest does not make sense in the context of referenda, and moreover, that the "appearance of" justification has been strictly confined to cases involving quid pro quo corruption. CMP PI Mot. 7–8; Versant PI Mot. 16–17; CMP Reply 8–9.

*Bluman*, the authority for the compelling interest in limiting foreign government influence in candidate elections, says nothing about an independent "appearance" interest. And I am not convinced that the interest in avoiding the appearance of quid pro quo corruption also means there is an interest in avoiding the

appearance of foreign government influence. Ultimately I agree with the Corporate Plaintiffs that the appearance interest is likely not compelling.

### D.    Narrow Tailoring

The Corporate Plaintiffs contend that even if there is a compelling state interest, the Act is not narrowly tailored. CMP PI Mot. 9–13; Versant PI Mot. 17–20. They primarily focus their tailoring analysis on the inclusion of entities that are 5% or more owned by foreign governments or foreign government-owned entities in the Act's definition of "foreign government-influenced entit[ies]." Versant PI Mot. 19–21; CMP PI Mot. 13; Versant Reply 8–9; CMP Reply 3–5. In the context of their facial challenge, the Corporate Plaintiffs' overbreadth argument is that too many of the Act's applications are unconstitutional as compared to the applications that are constitutionally permissible.

As explained above, subsection 2 of the Act bars campaign spending by any "foreign government-influenced entity," of which there are three types. 21-A M.R.S. § 1064(1)(E). In broad strokes they are: (1) foreign governments[13]; (2) entities that are 5% or more foreign government-owned[14]; and (3) entities with actual foreign government influence.[15]

---

[13]    21-A M.R.S. § 1064(1)(E)(1).

[14]    21-A M.R.S. § 1064(1)(E)(2)(a).

[15]    21-A M.R.S. § 1064(1)(E)(2)(b).

### 1.  Foreign Governments

Subsection 2 of the Act is likely narrowly tailored when it comes to foreign governments (the 21-A M.R.S. § 1064(1)(E)(1) category). Foreign governments are obviously not members of the American political community, and like the foreign citizens in *Bluman*, they likely can be barred from election spending in Maine. *See Bluman,* 800 F. Supp. 2d at 288. FECA already bars foreign governments from spending on candidate elections, 52 U.S.C. § 30121, but it provides no protection to Maine on its referenda elections. *See McIntyre*, 514 U.S. at 356; MUR 7523 (In re Stop I-186 to Protect Mining and Jobs et al.) at *3–4. Thus, this part of the Act is necessary to further Maine's interest in limiting foreign government influence in its elections.

### 2.  5% or More Foreign Government Owned

I reach, however, a different conclusion on the narrow tailoring question when it comes to entities with 5% or more foreign government ownership (the 21-A M.R.S. § 1064(1)(E)(2)(a) category). The Act provides that: a "foreign government-influenced entity" means: "[a] firm, partnership, corporation, association, organization or other entity with respect to which a foreign government or foreign government-owned entity: [h]olds, owns, controls or otherwise has direct or indirect beneficial ownership of 5% or more of the total equity, outstanding voting shares, membership units or other applicable ownership interests." 21-A M.R.S. § 1064(1)(E)(2)(a).

CMP's main argument is that this subsection of the Act shuts domestic corporations out of the political process based on too small a percentage of foreign government ownership, which they maintain is a faulty proxy for actual foreign government influence. CMP PI Mot. 13; *see also* Versant PI Mot. 20–21. They further

contend that this ban cannot be squared with *Citizens United*, which held that corporations have a First Amendment right to spend on campaigns. CMP PI Mot. 6.

I agree that a 5% foreign ownership threshold would prohibit a substantial amount of protected speech. I cannot reconcile the Supreme Court's holding in *Citizens United* with a law that would bar a company like CMP—incorporated in Maine, governed by a Board of Directors comprised of United States citizens and run by United States citizen executive officers who reside in Maine—from campaign spending. *See Citizens United*, 558 U.S. at 362; CMP Compl. ¶¶ 16, 18. The 5% threshold would deprive the United States citizen shareholders—potentially as much as 95% of an entity's shareholders—of their First Amendment right to engage in campaign spending. Simply put, it would be overinclusive.

The State defends the 5% threshold by pointing out that it is not random; rather, in the federal securities context, "it is the amount of ownership that federal securities law recognizes as so significant as to require a special disclosure if it occurs in a publicly traded company." State Opp'n 24; *see* 15 U.S.C. § 78m(d)(1)–(3). CMP counters that the 5% figure used by the securities laws is not a proxy for control, but rather a signal to the marketplace that a hostile takeover may be in the offing. CMP Reply at 11. *See also Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 123 (2d Cir. 2001) ("By requiring the disclosure of information by a potential takeover bidder, the [Williams] Act strikes a careful balance among the interests of the bidder, the incumbent management in defending against such bid by explaining its position, and the shareholders so that they can evaluate the bidders' intentions in deciding whether

to throw in their lot with them."). It strikes me that the 5% foreign government ownership found in Maine's Act was arbitrarily chosen.[16] Moreover, I do not see how it can survive the observation in *Citizens United* that a restriction "not limited to corporations or associations that were created in foreign countries or funded *predominantly* by foreign shareholders" would be overbroad. 558 U.S. at 362 (emphasis added); *see also Agency for Int'l Dev. v. All. for Open Soc'y Int'l*, 140 S. Ct. 2082, 2087 (2020) (foreign organizations operating abroad have no First Amendment rights, notwithstanding their affiliations with United States organizations).

Nor, at this stage, has the State offered any evidence that a foreign government or foreign government-owned entity with less than full ownership of a domestic entity has exerted influence over that entity's election spending in Maine. This evidence may come with discovery, but without it, I cannot say that this part of the law is narrowly tailored.[17]

### 3.   Actual Foreign Government Influence

Unlike the other two categories, the third category of foreign government influence—found at 21-A M.R.S. § 1064(1)(E)(2)(b)—targets entities based on

---

[16]    I note that the legislative history provided by the State shows that an earlier bill (Representative Ackley's bill from the 129th Legislature) had restricted spending only for contributors who were "at least half foreign-based." Test. of Sen. Richard Bennett Before the Joint Standing Committee on Veterans & Legal Affairs, March 15, 2021 (ECF No. 47-8 at 17). And L.D. 194, which passed but was vetoed by the Governor, set the percentage for foreign ownership at 10%. (ECF No. 47-8 at 4).

[17]    I note that simply pointing to outsized spending by entities that are 5% or more owned by a foreign government or foreign government-owned entity is not sufficient. *See Citizens United*, 558 U.S. at 349–50 (rejecting the "antidistortion rationale" for restricting corporate campaign spending).

conduct, rather than identity or ownership. It provides that a "foreign government-influenced entity" means:

> A firm, partnership, corporation, association, organization or other entity with respect to which a foreign government or foreign government-owned entity: . . . [d]irects, dictates, controls or directly or indirectly participates in the decision-making process with regard to the activities of the firm, partnership, corporation, association, organization or other entity to influence the nomination or election of a candidate or the initiation or approval of a referendum, such as decisions concerning the making of contributions, expenditures, independent expenditures, electioneering communications or disbursements.

21-A M.R.S. § 1064(1)(E)(2)(b).

At first blush, the conduct that subsection (E)(2)(b) targets—participation by foreign governments or foreign government-owned entities in decision-making on election spending—fits the state's interest in limiting foreign government influence in its elections more closely than the second category. The (E)(2)(b) subsection also bears a close resemblance to a definition found in a FECA regulation, 11 C.F.R. § 110.20(i),[18] which has been in effect for over twenty years without any significant challenge.

The Corporate Plaintiffs argue that the subsection (E)(2)(b) category is overly broad and too unclear to follow. *See* CMP PI Mot. 10–11, 13, 17; Versant PI Mot. 24–25. CMP claims, for example, that under the State's interpretation of "directly or

---

[18]    "Participation by foreign nationals in decisions involving election-related activities. A foreign national shall not direct, dictate, control, or directly or indirectly participate in the decision-making process of any person, such as a corporation, labor organization, political committee, or political organization with regard to such person's Federal or non-Federal election-related activities, such as decisions concerning the making of contributions, donations, expenditures, or disbursements in connection with elections for any Federal, State, or local office or decisions concerning the administration of a political committee." 11 C.F.R. § 110.20(i).

indirectly participates in the decision-making process" a foreign government-owned entity could send an unsolicited email to a domestic corporation with *no* foreign ownership about an election-related issue and the domestic corporation would lose its First Amendment right to spend on elections or referenda. CMP Reply 15.

At oral argument, the State rejected that broad reading of subsection (E)(2)(b), but the State referred to definitions contained in its proposed rules. The Maine Commission on Governmental Ethics and Election Practices has proposed definitions of direct and indirect "participation in a decision-making process." *See* 94-270, § 15(1)(C).[19] Besides being difficult to follow, these proposed definitions would appear to read out the requirement that the foreign government or foreign government-owned entity participate in the actual decision-making process. Instead, they make the communication of a preference sufficient to "influence" another entity. Thus, a domestic corporation could be barred from engaging in otherwise-protected speech not based on its own conduct, but based on unsolicited communications from a foreign government-owned entity even when no actual influence is shown. This category casts an overly broad net, and it is likely to stifle the speech of domestic corporations regardless of whether a member of a foreign government or foreign government-

---

[19]    The proposed rules state that "To 'directly participate in a decision-making process' means to communicate a direction or preference concerning the outcome of the decision-making process through a person who is an employee or official of a foreign government or an employee, director or member of a foreign government-owned entity." "To 'indirectly participate in the decision-making process' means to knowingly communicate a direction or preference concerning the outcome of the decision-making process using an intermediary, whether or not the intermediary has any formal affiliation with the foreign government or foreign government-owned entity." Notice/Correspondence re: Proposed Rules Implementing 21-A MRSA § 1064 (ECF No. 60).

owned entity has any actual influence over their decision-making on campaign spending.[20]  This category is likely unconstitutional.[21]

### E.   Severability

Based on this analysis, I find that a substantial number of the Act's applications are likely unconstitutional judged against the Act's plainly legitimate sweep. It is therefore likely facially invalid. Because the 5% or more foreign ownership category cannot be squared with Supreme Court precedent, and because the State's proposed interpretation of direct and indirect participation is likely overbroad, a substantial portion of the Act—two of the three foreign government-influenced entity categories—are likely unconstitutional.

Perhaps anticipating that the Act was on shaky First Amendment grounds, the State invites me to sever the Act. It maintains that I have the authority to enjoin only the unconstitutional portions or applications of the Act, while letting the constitutionally permissible portions and applications go into effect. State Opp'n 69–70. Under Maine law, if a provision or application of a law is invalid, but its "invalidity does not affect other provisions or applications which can be given effect without the invalid provision or application," the law is severable. 1 M.R.S. § 71(8); *see also Nat'l Fire Adjustment Co. v. Cioppa*, 357 F. Supp. 3d 38, 49 n.13 (D. Me. 2019). However,

---

[20]   Moreover, this definition is likely overly broad to the extent a domestic corporation would lose its First Amendment rights by discussing a topic of mutual interest with a foreign government-owned entity if that topic was the subject of a referendum.

[21]   My conclusion may change, however, if the State adopts a rule that clarifies that the foreign government or foreign government-owned entity must actually participate *in the decision-making process* regarding election spending. *Cf. OneAmerica Votes v. State*, 23 Wash. App. 2d 951, 983–84 (Wash. App. Ct. 2022) (distinguishing between debate on issue advocacy on the one hand, and decision-making on financial support to specific candidates or ballot measures on the other).

if "the provisions of a statute 'are so related in substance and object that it is impossible to determine that the legislation would have been enacted except as an entirety, if one portion offends the Constitution, the whole must fall.' " *Op. of the Justs.*, 2004 ME 54, ¶ 25, 850 A.2d 1145 (quoting *Town of Windham v. LaPointe*, 308 A.2d 286, 292 (1973)).

Given the expedited and preliminary nature of this proceeding, I decline to sever the Act at this stage. I will reserve those questions until I have the benefit of further briefing from all parties on how these changes would affect the Act's remaining provisions.

### F.    Remaining Preliminary Injunction Factors

"In the First Amendment context, the likelihood of success on the merits is the linchpin of the preliminary injunction analysis." *Fortuño*, 699 F.3d at 10. Resolution of the remaining factors in a First Amendment case necessarily flow from the initial likelihood assessment, particularly where plaintiffs are likely to succeed on their claim. The loss of First Amendment rights, even briefly, constitutes irreparable injury. *Id.* at 10–11. On the balance of hardships, the Plaintiffs' "interest in avoiding interference with their rights to free speech outweighs the [State's] interest in enforcing an unconstitutional [law]." *Cutting v. City of Portland*, No. 2:13-cv-359-GZS, 2014 WL 580155, at *10 (D. Me. Feb. 12, 2014).  And finally, the public interest could not be served by allowing enforcement of an unconstitutional bar on First Amendment-protected political speech. *Fortuño*, 699 F.3d at 15.

Accordingly, a preliminary injunction is required here. Because this is the relief sought by each Plaintiff, and preliminary resolution of Versant's preemption

claim and the Corporate Plaintiffs' First Amendment facial challenge requires an injunction, I need not reach the Corporate Plaintiffs' remaining arguments or address the arguments of the Electors or the Media Plaintiffs at this time. The Act is enjoined while this litigation proceeds.

**CONCLUSION**

For the reasons stated above, I **GRANT** the Plaintiffs' motions for preliminary injunction (ECF Nos. 4, 22, 25, 27) and **ENJOIN** enforcement of 21-A M.R.S. § 1064 until final judgment is entered in this case.


SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 29th day of February, 2024.