# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

|  |  |
|---|---|
| CENTRAL MAINE POWER COMPANY, et al.,<br><br>                Plaintiffs,<br><br>v.<br><br>MAINE COMMISSION ON GOVERNMENTAL ETHICS AND ELECTION PRACTICES, *et al.*<br><br>           Defendants. | Docket No. 1:23-cv-00450-JCN |

## CENTRAL MAINE POWER COMPANY'S
## MOTION FOR JUDGMENT ON THE PLEADINGS

NOW COMES Plaintiff Central Maine Power Company ("CMP") and hereby moves for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).

In November 2023, Maine voters approved a "An Act to Prohibit Campaign Spending by Foreign Governments and Promote an Anticorruption Amendment to the United States Constitution" (the "Act") following a "targeted" effort by the Act's proponents to silence "particular companies," including CMP. *Cent. Me. Power Co. v. Me. Comm'n on Governmental Ethics & Election Pracs.*, 144 F.4th 9, 27 (1st Cir. 2025). The Act strikes at the heart of the First Amendment by banning political speech under the threat of criminal penalties, as this Court preliminarily determined, *Cent. Me. Power Co. v. Me. Comm'n on Governmental Ethics & Election Pracs.*, 721 F. Supp. 3d 31 (D. Me. 2024), and as the Court of Appeals confirmed, *Cent. Me. Power Co.*, 144 F.4th at 31. The Court should enter judgment for CMP on all counts because of the Act's egregious and unconstitutional burden on the First Amendment right to speak on matters of public concern.

1

## BACKGROUND & PROCEDURAL HISTORY

### I.    Background.

CMP is a Maine corporation that traces its ownership back to 1899, when two Mainers bought a hydroelectric generator to provide electric services in Oakland, Maine. CMP's Verified Complaint ("Compl.") ¶ 15.[1] Today, CMP is Maine's largest utility. *Id.* ¶ 4. As one would expect of a company of its vintage, the identity of the persons who hold an equity interest in CMP has changed over the course of its 126-year history, ranging from natural persons to other companies. *Id.* ¶ 19. Events that have transpired merely since the filing of this action demonstrate as much: At the time CMP filed this lawsuit, CMP's parent's parent's parent, Avangrid, Inc., was a publicly traded corporation, whose shares traded on the New York Stock Exchange ("NYSE") and could be purchased by anyone. *Id.* ¶¶ 20-23. In a transaction that concluded at the end of 2024, however, Avangrid, Inc.'s majority shareholder, Iberdrola, S.A., purchased all remaining shares of Avangrid, Inc., took the company private, and delisted the company's shares from the NYSE. *See* Avangrid, Inc., Current Report (Form 8-K) (May 17, 2024) (detailing the agreement and plan of merger to the SEC), *available at* https://d18rn0p25nwr6d.cloudfront.net/CIK-0001634997/e5ea1fe3-235f-47f4-936f-c4e560081676.pdf; Avangrid, Inc., Current Report (Form 8-K) (Dec. 23, 2024) (disclosing the completion of the agreement and merger to the SEC),

---

[1] While for purposes of this motion the Court may rely on only those allegations admitted by the Commission in its answer, the Commission has denied essentially every one of CMP's substantive allegations, including facts that cannot reasonably be disputed (such as that CMP has expended funds in connection with Maine political campaigns, a fact of record with the Commission), as well as facts the Commission itself relied on during the preliminary injunction briefing. *Compare* Compl. ¶¶ 32-34 (facts relating to CMP's political spending); Answer ¶¶ 32-34 (claiming to lack sufficient knowledge as to CMP's political spending), *with* ECF No. 47 at 11 & 47-1 at ¶ 20 (Commission's declaration relying on CMP's political spending to justify the Act). Ultimately, however, the issues presented by this motion are purely legal and so CMP provides the instant facts for the Court's convenience to the extent they are contested.

#18693867v1

*available                                                                                                                                at*

https://www.sec.gov/Archives/edgar/data/1634997/000119312524284174/d784430d8k.htm.[2]

CMP is closely regulated by Maine law, and its activities are the subject of proposed legislation initiated both by legislators through the traditional lawmaking process and by citizens through the referendum process. Compl. ¶ 26. CMP's political activities include making contributions, expenditures, independent expenditures, and electioneering communications to influence the nomination or election of candidates or the initiation or approval of referenda. *Id.* ¶ 31.

After CMP defended itself against a series of hostile initiative campaigns, *see id.* ¶¶ 27-28, opponents of CMP began circulating petitions in support of the Act pursuant to the citizens' initiative process, *id.* ¶ 40. In December 2022, the Maine Secretary of State certified that the proponents of the Act had gathered sufficient signatures to advance it to the Maine Legislature. *Id.* ¶ 42; Commission's Answer to CMP's Verified Compl. ("Answer") ¶ 42. The Maine Legislature voted to adopt the legislation, but Governor Janet Mills vetoed its adoption, reasoning that the Act violated the First Amendment. Compl. ¶¶ 43-44; *see* Answer ¶ 43-44. Pursuant to Maine law, the Act was sent to the voters as part of the 2023 general election. Compl. ¶ 45; Answer ¶ 45. The voters approved the Act. Compl. ¶ 45; Answer ¶ 45. By operation of Maine law, the Act was scheduled take effect on January 5, 2024. Compl. ¶ 46; Answer ¶ 46. The Maine Commission on Governmental Ethics and Election Practices; its members William J. Schneider, David R. Hastings III, Sarah E. LeClaire, Dennis Marble, in their official capacities; and Attorney General Aaron

---

[2] CMP likely would be deemed subject to the Act by virtue of ownership interests held in Iberdrola, S.A. by the Kingdom of Norway and the Qatar Investment Authority. Compl. ¶¶ 24, 61-62.

Frey (collectively, the "Commission") each play a role in the enforcement of the Act.[3] Compl. ¶ 5-8; Answer ¶ 5-8.

## II.    The Act.

The Act[4] sets forth three primary provisions: (1) a ban on campaign spending by a "foreign government-influenced entity" ("FGIE"), as set forth in Paragraph 2 and buttressed by an array of supporting provisions in Paragraphs 3 through 5; (2) the requirement that an FGIE append to certain public communications a statement identifying the communication as "Sponsored by" the FGIE or a foreign government, as set forth in Paragraph 6; and (3) various restraints on media outlets that distribute public communications with respect to which an FGIE "has made an expenditure, independent expenditure, electioneering communication or disbursement," as set forth in Paragraph 7.

Paragraph 2 and its supporting provisions are in turn backstopped by severe penalties, including criminal penalties involving incarceration. Per Paragraph 8, the Commission may "assess a penalty of not more than $5,000 or double the amount of the contribution, expenditure, independent expenditure, electioneering communication, donation or disbursement involved in the violation, whichever is greater." And per Paragraph 9, violators of Paragraphs 2 through 5 may be criminally punished: "a person that knowingly violates subsections 2 through 5 commits a Class C crime." Under Maine's criminal code, Class C felonies are punishable by up to five years of incarceration and a fine of up to $20,000. *See* 17-A M.R.S. §§ 1604, 1704-1705.

---

[3] Stacey D. Neumann is also named in the Complaint as a member of the Maine Commission on Governmental Ethics and Election Practices, but she no longer serves in this role, and her seat is now vacant.

[4] The Court will find a complete version of the Act attached to CMP's complaint as Exhibit A. The Act contains two sections: Section 1, provisions of which are at issue in this litigation and which has been codified at 21-A M.R.S. § 1064, and Section 2, which is not at issue in this litigation and which has not been codified. Throughout this motion, CMP refers to relevant provisions of Section 1 of the Act by the relevant paragraphs of Section 1064 (*e.g.*, Paragraph 1, Paragraph 2, etc.).

#18693867v1

The foregoing bans, proscriptions, and penalties rest on the foundation of the Act's definitions. The Act's irreducible minimum definition, from which all of its relevant definitions and substantive provisions flow, is the definition of "foreign government," which the Act defines in Paragraph 1(D) to include:

> any person or group of persons exercising sovereign de facto or de jure political jurisdiction over any country other than the United States or over any part of such country and includes any subdivision of any such group and any group or agency to which such sovereign de facto or de jure authority or functions are directly or indirectly delegated. "Foreign government" includes any faction or body of insurgents within a country assuming to exercise governmental authority, whether or not such faction or body of insurgents has been recognized by the United States.

Building on the foregoing definition, the Act defines a "foreign government-influenced entity" ("FGIE") in Paragraph 1(E) as:

> (1) A foreign government; or

> (2) A . . . corporation . . . with respect to which a foreign government or  foreign government-owned entity:

>> (a) Holds, owns, controls or otherwise has direct or indirect beneficial ownership of 5% or more of the total . . . applicable ownership interests; or

>> (b) Directs, dictates, controls or directly or indirectly participates in the decision-making process with regard to the activities of the . . . corporation . . . to influence the nomination or election of a candidate or the initiation or approval of a referendum . . . .

An entity thus qualifies as an FGIE and must abide by the provisions of Paragraphs 2 through 5, under penalty of the enforcement mechanisms set forth in Paragraphs 8 and 9, if it is (1) itself a foreign government; (2) a corporation, including a U.S. corporation, with respect to which a foreign government or "foreign government-owned entity"[5] owns more than 5%; or (3) a corporation with respect to which a foreign government or foreign government-owned entity

---

[5] In Paragraph 1(F), the Act defines a "foreign government-owned entity" as "any entity in which a foreign government owns or controls more than 50% of its equity or voting shares."

"directs, dictates, or controls or directly or indirectly participates in" the corporation's election-related decision-making process.

### III.    Procedural History.

Following the adoption of the Act, CMP filed its Verified Complaint, asserting: the Act's ban on referenda spending violates the First Amendment (Count I); the Act's ban on campaign spending violates the First Amendment (Count II); the Act's disclaimer requirement violates the First Amendment (Count III); the Act employs unconstitutionally vague terms in violation of the Due Process Clause of the Fourteenth Amendment (Count IV); the First Amendment violations set forth in Counts I through III also give rise to violations of the Maine Constitution's free speech protections (Count V); and any permissible provisions of the Act cannot be severed from the constitutionally offensive ones, such that the entire Act must fall (Count VI). *See* ECF No. 1.

The Court consolidated CMP's challenge with three other challenges. *See* ECF No. 20. The plaintiffs in all four actions each moved for a preliminary injunction. ECF Nos. 4, 22, 25, 27. The Court granted the motions for a preliminary injunction, correctly concluding, *inter alia*, that the Act likely violated the First Amendment. *See Cent. Me. Power Co.*, 721 F. Supp. 3d at 37.

The Commission appealed the entry of the preliminary injunction. The First Circuit rejected the appeal and affirmed this Court's decision, confirming the Act likely violated the First Amendment. *See Cent. Me. Power Co.*, 144 F.4th at 28-29, 3110. The First Circuit concluded the Act failed to survive the relevant standard of scrutiny because its provisions were not adequately tailored to Maine's claimed interests. With respect to the 5% threshold in the FGIE definition, the First Circuit held that the "law is overinclusive because—as the district court pointed out—it silences U.S. corporations" like CMP "that have their own First Amendment rights." *Id.* at 26. The First Circuit further found the 5% threshold to be overly broad because it gags a U.S. corporation

based on the "mere possibility" that foreign shareholders might try to influence its decisions, even when such shareholders are "passive owners that exercise no influence or control over the corporation's political spending" and where ownership of publicly traded corporations "can fluctuate throughout the course of a day." *Id.* at 26-27. Given these features, the First Circuit found "the 5% threshold starts to look either like an end-run around *Citizens United*, aimed at silencing a large swath of corporations merely because they are corporations, or an effort to shape the ongoing debate in Maine about its two primary utility companies by silencing one side—the companies themselves." *Id.* at 27. Accordingly, the First Circuit concluded that the 5% ownership threshold "sweeps far too broadly to be narrowly tailored." *Id.*

As to the "direct or indirect participation" aspect of the FGIE definition, the First Circuit rejected the Commission's argument that the definition is constitutional because it mirrors a federal regulation implementing the Federal Election Campaign Act ("FECA"). *Id.* at 28-29 (citing 11 C.F.R. § 110.20(i)). The First Circuit noted that, although the verbs used in the regulation and the Act are "almost the same," the subjects—"'a foreign national' as opposed to a 'foreign government or foreign government-owned entity'—are not." *Id.* As such, the Act "applies to a broader swath of U.S. corporations than the federal provision and is therefore less [and insufficiently] tailored." *Id.* at 29. Because of the "different scope of the two provisions," the First Circuit found "unpersuasive Maine's argument that it is premised on the provisions' alleged similarity." *Id.* To the extent the Commission relied on its rules enacted post-injunction to argue there are permissible limitations to the scope of the definition, the First Circuit declined to consider such rules, as they were not presented to this Court. *Id.* at 29 n.10.

In sum, the First Circuit held "most of the applications of the Act's central provision, [Paragraph] 2, are likely unconstitutional due to the overly broad definitions of "'foreign

government-influenced entity.'" *Id.* at 30. And because the remaining substantive provisions are inextricably entwined with Paragraph 2, "a substantial number of the statute's applications are still likely unconstitutional as compared to the statute's plainly legitimate sweep." *Id.* Given this conclusion, the First Circuit did not specifically analyze the constitutionality of Paragraph 6. *See id.* It also left the question of whether any portion of the Act is severable to this Court. *Id.* at 31.

Following the First Circuit's decision, proceedings in this Court resumed, the Commission answered CMP's complaint, and CMP now moves for judgment on the pleadings on all counts.

## STANDARD

Pursuant to Federal Rule of Civil Procedure 12(c), a party may move for judgment on the pleadings after they have closed. A motion for judgment on the pleadings is governed by the same legal standard as a motion to dismiss for failure to state a claim under Rule 12(b)(6). *Aponte-Torres v. Univ. of P.R.*, 445 F.3d 50, 54 (1st Cir. 2006). Thus, a plaintiff is entitled to judgment when "the uncontested and properly considered facts conclusively establish the movant's entitlement to a favorable judgment." *Id.*

In making this determination, the Court considers the pleadings as a whole, including the answer. *See Id.* at 54-55. When a plaintiff moves for judgment on the pleadings, the court considers the defendant's answer and any allegations the defendant did not sufficiently deny. *See Shurtleff v. City of Bos.*, 385 F. Supp. 3d 109, 113 (D. Mass. 2019); Fed. R. Civ. P. 8(b) (setting forth the rules concerning denials). In a constitutional facial challenge such as is at issue here, however, the absence of agreed-upon facts plays little role because a "facial challenge is an attack on a statute itself as opposed to a particular application." *City of L.A. v. Patel*, 576 U.S. 409, 415 (2015); *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021) (explaining that a law is facially invalid under the First Amendment "if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep").

8

**ARGUMENT**

The protection of political speech is the primary object of the First Amendment. *See Mills v. Alabama*, 384 U.S. 214, 218 (1966); *Citizens United v. FEC*, 558 U.S. 310, 329 (2010). Indeed, political speech is "indispensable to decisionmaking in a democracy" and "this is no less true because the speech comes from a corporation rather than an individual." *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 777 (1978). Accordingly, the "First Amendment affords the broadest protection to . . . political expression in order to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995) (citation modified). Accordingly, it is "unlawful" for the government "to use its full power, including the criminal law, to command where a person may get his or her information or what distrusted source he or she may not hear." *Citizens United*, 558 U.S. at 356.

The Act violates these principles, as both this Court and the First Circuit held on a preliminary basis. The Act employs vague terms which chill core protected speech; prohibits U.S. corporations from speaking on matters of public concern under penalty of incarceration; and compels speakers to disparage themselves as shadowy foreign actors, even where they are not.

The Court should enter judgment for CMP and declare the Act invalid in its entirety.

I.      **The Court should grant judgment to CMP on Count IV: The Act is invalid in its entirety because it relies on an unconstitutionally vague definition of "foreign government" and thus impermissibly chills protected speech.**

The Act's definition of "foreign government" in Paragraph 1(D) serves as the *sine qua non* of all of the Act's relevant definitions and operative provisions, including the definition of FGIE and the prohibitions in Paragraph 2. The term is unconstitutionally vague, however, and thus renders the Act invalid in its entirety.

9

The Due Process Clause of the Fourteenth Amendment prohibits the enforcement of vague statutes. *See Frese v. Formella*, 53 F.4th 1, 6 (1st Cir. 2022). A statute is impermissibly vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). With respect to a statute's discriminatory enforcement, the question "is not whether discriminatory enforcement [actually] occurred . . . but whether the [statute] is so imprecise that discriminatory enforcement is a real possibility." *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1050 (1991). "Statutory language of such a standardless sweep allows policemen, prosecutors, and juries to pursue their personal predilections. Legislatures may not so abdicate their responsibilities for setting the standards of the criminal law." *Smith v. Goguen*, 415 U.S. 566, 575 (1974).

The vagueness doctrine applies with particular force with respect to statutes that regulate speech, "permitting plaintiffs to argue that a statute is overbroad because it is unclear whether it regulates a substantial amount of protected speech." *Williams*, 553 U.S. at 304. The Supreme Court thus has strictly limited lawmakers' ability to proscribe protected speech using vague statutory terms. *See Vill. of Hoffman Ests. v. Flipside, Hoffman Ests. Inc.*, 455 U.S. 489, 499 (1982) ("[P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply."); *Keyishian v. Bd. of Regents of the Univ. of the State of N.Y.*, 385 U.S. 589, 604 (1967) ("[G]overnment may regulate" speech "only with narrow specificity." (citation modified)). And the bar for clarity is raised higher again for statutes that threaten criminal sanctions for speech because of the significant risk such sanctions "may well cause speakers to remain silent rather than

communicate even arguably unlawful words, ideas, and images." *Reno v. ACLU*, 521 U.S. 844, 871-72 (1997); *see also Brown v. Kemp*, 86 F.4th 745, 772 (7th Cir. 2023) ("A vague regulation of expression raises special First Amendment concerns because of its obvious chilling effect on free speech. Where the regulation imposes criminal sanctions, those concerns multiply." (citation modified)).

The Act's definition of "foreign government" cannot meet these standards. Under the definition set forth in Paragraph 1(D), a "foreign government" includes a "person or groups of persons exercising sovereign de facto or de jure political jurisdiction over any country other than the United States" or simply "any part of such country." As Judge Aframe recognized, *see Cent. Me. Power Co.*, 144 F.4th at 36 (Aframe, J., concurring), such definition could be read to sweep in groups as difficult to identify as ideologically driven terrorist organizations, sophisticated organized criminal organizations, or even powerful local gangs. But the definition does not stop there, as it "includes any subdivision of any such group and any group or agency" to which such functions are delegated. *See* Paragraph 1(D). One step further still, "foreign government" also includes "any faction or body of insurgents within a country assuming to exercise governmental authority, whether or not such faction or body of insurgents has been recognized by the United States." *Id.* In other words, "foreign government" includes any group of insurgents that is *even attempting* to exercise governmental authority, even if the United States government has not recognized the group as an insurgent group.

This definition is so remarkably overbroad as to strip it of any meaningful standard. *See Williams*, 553 U.S. at 304. No person of "ordinary intelligence" possibly could determine whether a person or group of persons qualifies as a "foreign government" given the world's ever-changing political environment. The definition requires U.S. corporations, like CMP, to not only

11

constantly monitor the identity of each of its shareholders—a nearly impossible task in and of itself, *see Cent. Me. Power Co.*, 144 F.4th at 36 (Aframe, J., concurring)—but also to determine whether any such shareholder qualifies as, among other things, a group "exercising sovereign de facto … political jurisdiction" over a portion of a foreign country or operating as a "body of insurgents within a country assuming to exercise governmental authority." The substantial constitutional problems arising from the definition prompted Judge Aframe to raise the issue of its vagueness *sua sponte*: "We live in a complex world. Are the Houthis a 'foreign government' in Yemen under Maine's foreign government definition? How about MS-13 in El Salvador? Boko Haram in Nigeria? Or even kibbutzim in Israel? The hard calls are everywhere and endless." *Id.*[6] No person of ordinary intelligence could confidently make the "hard calls" required by the Act's definition of "foreign government," chilling a substantial amount of constitutionally protected speech. *Williams*, 553 U.S. at 304; *Reno*, 521 U.S. at 871-72; *Citizens United*, 558 U.S. at 329; *Cent. Me. Power Co.*, 144 F.4th at 36 (Aframe, J., concurring).

The standardless definition of "foreign government" makes "discriminatory enforcement a real possibility," *Gentile*, 501 U.S. at 1050, which is especially problematic here where the Act appears to have been "targeted at particular companies," like CMP, *Cent. Me. Power Co.*, 144 F.4th at 27. The Act's threat of criminal sanctions exacerbates these problems. *See Reno*, 521 U.S. at 871-72. Instead of risking criminal penalties because of confusion as to whether one has a

---

[6] The vagueness of the term "foreign government" was not presented to the District Court during the prior preliminary injunction proceedings and was not before the First Circuit. Accordingly, the Court should draw no negative inference from the issue's absence from the First Circuit's majority opinion. *See Cent. Me. Power Co. v. Me. Comm'n on Governmental Ethics & Election Pracs.*, 144 F.4th 9, 24-25 (1st Cir. 2025) (acknowledging the definition of "foreign government" but not analyzing its validity because "[n]o party challenge[d]" it on appeal). CMP is not limited in its arguments on remand simply because it emphasized other arguments in its preliminary injunction papers. *See Highway J. Citizens Grp. v. U.S. Dep't of Transp.*, 656 F. Supp. 2d 868, 882-83 (E.D. Wis. 2009) (explaining that a party is not limited to pursuing arguments that it did not make in its preliminary injunction briefing during later stages of the case).

requisite relationship with a "foreign government," speakers like CMP simply will remain silent. Such a result runs afoul of the First Amendment, *see id.*

That the Act may have borrowed the definition of "foreign government" from the Foreign Agents Registration Act ("FARA") does not cure its impermissible vagueness where, as here, the definition is employed in a statutory scheme that criminalizes speech. *See Cent. Me. Power Co.*, 144 F.4th at 35 (Aframe, J., concurring); *compare* 21-A M.R.S. § 1064(1)(D), *with* 22 U.S.C. §§ 611(e), 612 (civil FARA) *and* 18 U.S.C. § 951 (criminal FARA). Unlike the Act, FARA "neither limits nor interferes with freedom of speech. It does not regulate expression of ideas." *United States v. Peace Info. Ctr.*, 97 F. Supp. 255, 258, 262 (D.D.C. 1951); *Meese v. Keene*, 481 U.S. 465, 478 (1987) (explaining that FARA "neither prohibits nor censors the dissemination of advocacy materials"); *id.* at 480 n.15 ("'[T]he bill is intended to label information of foreign origin . . . . Such legislation implements rather than detracts from the prized freedoms guaranteed by the First Amendment.'" (quoting *Viereck v. United States*, 318 U.S. 236, 251 (1943) (Black, J., dissenting))). The same cannot be said of the Act, which imposes an outright ban on political speech by U.S. corporations based on passive or perceived foreign government ownership or control. *See Cent. Me. Power Co.*, 144 F.4th at 35-36 (Aframe, J., concurring). Accordingly, even if the definition of "foreign government" meets the requisite clarity requirement in the limited context presented by FARA—a question itself unresolved by the federal courts[7]—it cannot survive in the context of the speech restrictions imposed by the Act.

---

[7] There are a handful of unpublished decisions evaluating whether other FARA provisions are vague, with most noting that FARA does not implicate the First Amendment. *See, e.g.*, *United States v. Michel*, 2022 WL 4182342, at *5 (D.D.C. Sept. 13, 2022) (highlighting that a First Amendment challenge to FARA fails because it does "not penalize *speech*, but rather the lack of registration" and stating that FARA as a whole is not vague, in part due to the defendant's failure to identify which provisions he was challenging); *United States v. Abouammo*, 2022 WL 17584238, at *6 (N.D. Cal. Dec. 12, 2022) (disagreeing with the defendant's argument that the term "foreign official" is unconstitutionally vague based on the "proximity to power" test); *United States v. Lindauer*, 2004 WL 2813168, at *4 (S.D.N.Y. Dec. 6, 2004) (declining to apply the vagueness standard applicable to First Amendment challenges and holding that the

## II.    The Court should grant judgment to CMP on Counts I, II, and V: Paragraphs 2 through 5 violate the First Amendment because they do not reflect a sufficient government interest and are not adequately tailored to such an interest.

Paragraph 2, and its supporting provisions in Paragraphs 3 through 5, prohibit U.S. citizens from spending to influence (1) the initiation or approval of a referendum, or (2) the nomination or election of a candidate. These prohibitions do not advance a sufficient government interest, are not narrowly tailored to advance any such interest, and thus violate both the First Amendment and the free speech protections granted by the Maine Constitution.[8]

Where analyzing restrictions on expenditures or contributions relating to referenda, courts apply strict scrutiny, which requires the government to demonstrate the restriction is narrowly tailored to serve a compelling interest. *See Bellotti*, 435 U.S. at 786, 795; *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 11 (1st Cir. 2012). Under strict scrutiny, "the government must adopt the least restrictive means of achieving a compelling state interest." *Ams. For Prosperity Found.*, 594 U.S. at 607 (quotation marks omitted). Strict scrutiny similarly applies to limits on expenditures relating to candidate campaigns. *Cent. Me. Power Co.*, 144 F.4th at 22.

Courts apply exacting scrutiny where analyzing limits on contributions relating to candidate campaigns, *see Daggett v. Comm'n on Governmental Ethics & Election Pracs.*, 205 F.3d 445, 454 (1st Cir. 2000), under which analysis the Commission bears the burden of demonstrating that the restriction is "narrowly tailored to serve a sufficiently important governmental interest," *Gaspee Project v. Mederos*, 13 F.4th 79, 85 (1st Cir. 2021). Because "fit matters" in the First Amendment context, "exacting scrutiny requires a fit that is not necessarily perfect, but

---

term "agent" in "agent of a foreign government" is not vague); *United States v. Truong Dinh Hung*, 629 F.2d 908, 920 (4th Cir. 1980) (same with respect to "agent" in a conclusory fashion).

[8] Maine's constitutional right to the freedom of speech, as set forth in article I, § 4, "is no less restrictive than the Federal Constitution." *State v. Janisczak*, 579 A.2d 736, 740 (Me. 1990) (quotation marks omitted).

14

reasonable." *Id.* (citation modified). "[T]he strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Davis v.* FEC, 554 U.S. 724, 744 (2008).

Paragraphs 2 through 5 fail under either strict or exacting scrutiny.[9]

### A.    Maine does not have a sufficient government interest in enacting the speech restrictions imposed by Paragraphs 2 through 5.

Throughout the course of this litigation, the Commission has proffered two justifications for the Act's speech ban: (1) protecting democratic self-government from foreign government influence, and (2) preventing the appearance of such influence. Setting aside that the Commission has conjured these justifications purely for purposes of this litigation and has not identified any evidence they motivated the Act's adoption, neither suffices. *See SD Voice v. Noem*, 380 F. Supp. 3d 939, 948 (D.S.D. 2019) (questioning how the state defendants determined what the intended interest was of the voters who voted in favor of the initiative at issue).

### 1.    There is no compelling interest in banning political speech by U.S. citizens regarding referenda.

The Supreme Court "has recognized *only one* permissible ground for restricting political speech: the prevention of '*quid pro quo*' corruption or its appearance." *FEC v. Cruz*, 596 U.S. 289, 305 (2022) (emphasis added). Referenda simply do not implicate this interest: "Whatever may be the state interest or degree of that interest in regulating and limiting contributions to or expenditures of a candidate or a candidate's committees *there is no significant state or public interest* in curtailing debate and discussion of a ballot measure." *Citizens Against Rent Control/Coal. for Fair Hous. v. City of Berkeley*, 454 U.S. 290, 299 (1981) (emphasis added)

---

[9] As the First Circuit correctly observed, the supporting provisions of Paragraphs 3 through 5 are so inextricably linked with Paragraph 2 that any finding that Paragraph 2 violates the First Amendment "necessarily" renders Paragraphs 3 through 5 "unconstitutional as well." *Cent. Me. Power Co.*, 144 F.4th at 30.

(striking down a $250 limit on contributions to ballot question committees). This is because "[r]eferenda are held on issues, not candidates for public office. The risk of corruption perceived in cases involving candidate elections simply is not present in a popular vote on a public issue." *Bellotti*, 435 U.S. at 790 (citations omitted) (disallowing a ban on corporate spending on referenda). In other words, referenda do not risk the possibility of "buying" influence. *See id.* Likewise, foreign spending on referenda does not raise the risk of elected officials beholden to foreign interests.[10] *Id.*

While corporate speech in the context of referenda "may influence the outcome of the vote; this would be its purpose. But the fact that advocacy may persuade the electorate is hardly a reason to suppress it." *Id.* To the contrary, the public has a strong interest in receiving information regarding referenda regardless of its source. "The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." *Citizens United*, 558 U.S. at 339. That the information may have an actual or perceived foreign connection does not alter this principle. "[T]he people in our democracy are entrusted with the responsibility for judging and evaluating the relative merits of conflicting arguments. They may consider, in making their judgment, the source and credibility of the advocate." *Bellotti*, 435 U.S. at 791 (footnote omitted). Indeed, given "the direct participation of the people in a referendum," there is an increased need "for 'the widest possible dissemination of information from diverse and antagonistic sources.'" *Id.* at 790 n.29 (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 266 (1964)). Thus, the stated "interest in protecting democratic self-

---

[10] As the Fifth Circuit explained, "when people vote on a referendum proposal, they directly decide the pertinent political issue for themselves. Large contributions for publicity by one group or another do not influence the political decisionmakers in this case, the voters themselves except in a manner protected by the first amendment." *Let's Help Fla. v. McCrary*, 621 F.2d 195, 200 (5th Cir. 1980); *see also Mich. State Chamber of Comm. v. Austin*, 832 F.2d 947, 949 (6th Cir. 1987) (explaining that the "sole governmental interest which justifies restrictions on political contributions is the need to prevent actual or perceived *quid pro quo corruption*," which does not support limits on ballot questions).

government does not constitute a compelling interest justifying interference with political speech." *SD Voice*, 380 F. Supp. 3d at 949.

**2.    There is no sufficiently important government interest in banning political speech by U.S. citizens regarding candidate elections.**

Likewise, there is no compelling or sufficiently important governmental interest in banning political speech by U.S. citizens, like CMP, in the context of candidate elections. There may be a state interest in preventing foreign governments or foreign corporations from actually participating in candidate elections. *See Citizens United*, 558 U.S. at 362 (declining to reach whether the government has a compelling interest in preventing foreign individuals or associations from influencing the political process). But even if the Supreme Court found this interest compelling, *see Cruz*, 596 U.S. at 305 (identifying *quid pro quo* corruption and its appearance as the "only" interest supporting restrictions on political speech), the Commission cites it in an impermissible effort to silence only U.S. corporations, not foreign governments or foreign corporations.

It is beyond dispute that First Amendment protections extend to U.S. corporations. *Citizens United*, 558 U.S. at 342 (collecting cases). "Corporations and other associations, like individuals, contribute to the 'discussion, debate, and the dissemination of information and ideas' that the First Amendment seeks to foster." *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 8 (1986) (quoting *Bellotti*, 435 U.S. at 783). "There is no support for the proposition that corporations lose their First Amendment protections merely because a foreign national purchases some share or interest, no matter how small." *Minn. Chamber of Com. v. Choi*, 707 F. Supp. 3d 846, 858 (D. Minn. 2023). "And no case holds that a corporation ceases to be 'American' by virtue of any quantum of foreign ownership." *Id.*; *see also Citizens United*, 558 U.S. at 362 (indicating that the government does not have a compelling interest in prohibiting corporations from speaking unless they are funded, at a minimum, "predominantly" by foreign shareholders).

17

In support of the proffered interests of protecting democratic self-government from foreign influence or the appearance thereof, the Commission has cited *Bluman v. Federal Election Commission*, 800 F. Supp. 2d 281 (D.D.C. 2011), *aff'd*, 565 U.S. 1104 (2012). But the Commission stretches this decision far beyond its holding. *Bluman* involved a direct restriction on foreign citizens who were in the U.S. on temporary work visas from spending in the U.S. campaign process.[11] *Id.* at 282. The court held the restriction was constitutional, concluding that the government has a compelling interest in "limiting the participation of *non-Americans*" in the American political process. *Id.* at 290. *Bluman* thus stands for the unremarkable proposition that that the government has an interest "in limiting the participation of *foreign citizens* in activities of American democratic self-government." *Id.* at 288 (emphasis added).[12] Whatever the precedential value of Bluman may be,[13] the Act limits the speech rights of U.S. corporations, not foreign corporations. "*Bluman* does not support the regulation of this sort of secondhand foreign influence on the American political process." *Cent. Me. Power Co.*, 144 F.4th at 34 (Aframe, J., concurring); *see also Thompson v. Hebdon*, 7 F.4th 811, 827 n.7 (9th Cir. 2021) (explaining that the distinction "between United States citizens and foreign nationals" "was the very basis for the *Bluman* court's holding" (quotation marks omitted)). Accordingly, "even if there were such a compelling interest, it would only extend to 'corporations or associations that were created in foreign countries or

---

[11] *Bluman* dealt solely with candidate elections and carefully distinguished referenda. *Bluman v. FEC*, 800 F. Supp. 2d 281, 291 (D.D.C. 2011) (observing that the risk of undue influence could be "greater in the context of candidate elections than it is in the case of ballot initiatives"). Accordingly, any reliance on *Bluman* to support the ban on spending in connection with referenda is misplaced.

[12] Indeed, *Bluman* recognized that "American corporations … are … members of the American political community" and expressly declined to analyze "the circumstances under which a corporation may be considered a *foreign* corporation for purposes of First Amendment analysis." *Id.* 290, 292 n.4; *see also Minn. Chamber of Com. v. Choi*, 765 F. Supp. 3d 821, 850 (D. Minn. 2025) (relying on *Bluman* for same principle).

[13] Because the Commission relies on *Bluman* in a new context, the Supreme Court's summary affirmance of *Bluman* is irrelevant. A summary affirmance does "not control later lower court cases involving significantly dissimilar facts." *Auburn Police Union v. Carpenter*, 8 F.3d 886, 894 (1st Cir. 1993).

funded predominantly by foreign shareholders.'" *Cent. Me. Power Co.*, 144 F.4th at 34 (Aframe, J., concurring) (quoting *Citizens United*, 558 U.S. at 362).

Likewise, the Commission's proffered interest in avoiding the "appearance of influence" stretches the law far beyond *Buckley v. Valeo*, 424 U.S. 1, 27 (1976). The "appearance" interest is limited to the appearance of *quid pro quo* corruption, not the mere appearance of "influence." *Cruz*, 596 U.S. at 305. The Supreme Court has been clear that "[r]eliance on a generic favoritism or influence theory . . . is at odds with standard First Amendment analyses because it is unbounded and susceptible to no limiting principle." *Citizens United*, 558 U.S. at 359 (quotation marks omitted). "To be sure, the line between *quid pro quo* corruption and general influence may seem vague at times, but the distinction must be respected in order to safeguard basic First Amendment rights." *Cruz*, 596 U.S. at 308. Banning certain U.S. citizens from speaking based on the potential for perceived foreign "influence" thus operates as an improper end-run around *Citizens United* and is "susceptible to no limiting principle." *Citizens United*, 558 U.S. at 359 (quotation marks omitted). Ultimately, this claimed interest simply does not square with either *Cruz*, which focused on *quid pro quo* corruption or its appearance, or *Citizens United*, which focused on foreign direction or control (not mere influence) by rejecting the regulation of U.S. companies not "predominantly" owned by a foreign entity. 558 U.S. at 359, 362.

**B.    Paragraphs 2 through 5 are not appropriately tailored to the Commission's claimed governmental interests.**

Even if the Commission were able to establish a sufficient interest, which it cannot, the means by which the Act seeks to achieve these interests are ill tailored. If the Act intended to protect democratic self-governance from foreign government influence, then it would have "target[ed] and eliminate[ed] no more than the exact source of the 'evil' it seeks to remedy"— namely the activities of foreign governments, not U.S. corporations. *See Frisby v. Schultz*, 487

19

U.S. 474, 485 (1988). For instance, the Act simply could have banned foreign governments from becoming meaningfully involved in Maine elections. Instead, the Act forbids U.S. citizens, like CMP, from engaging in constitutionally protected speech "based on the mere possibility that foreign shareholders might try to influence its decisions on political speech, even where those foreign shareholders may be passive owners that exercise no influence or control over the corporation's political spending." *Cent. Me. Power Co.*, 144 F.4th at 26.

### 1.    The 5% ownership threshold is overbroad.

The First Circuit resolved the constitutionality of the 5% ownership threshold, and its conclusion controls here: the 5% ownership threshold "sweeps far too broadly to be narrowly tailored." *Cent. Me. Power Co.*, 144 F.4th at 27. It silences U.S. corporations, like CMP, based on passive minority ownership, leaving their ability to speak subject to the vicissitudes of the stock market, which will likely cause an impermissible chilling effect on protected speech. *Id.* at 25-27 ("The Act does not set any particular moment in time for determining the level of foreign ownership, which—for publicly traded corporations—can fluctuate throughout the course of a day."); *see id.* (noting that "the 5% threshold starts to look either like an end-run around *Citizens United*, aimed at silencing a large swath of corporations merely because they are corporations, or an effort to shape the ongoing debate in Maine about its two primary utility companies by silencing one side"). Paragraphs 2 through 5 are overbroad to the extent they rest on the 5% threshold.

### 2.    The "directly or indirectly participates" threshold is overbroad.

As the First Circuit preliminarily held, the "directly or indirectly participates" threshold is also overbroad. *Cent. Me. Power Co.*, 144 F.4th at 29.

The Court should begin its consideration of this issue by focusing on the plain language of the Act. In Paragraph 1(E)(2)(b), the Act defines FGIE to include a corporation with respect to which a foreign government or foreign government-owned entity "[d]irects, dictates, controls or

directly or indirectly participates in," the corporation's decision-making process as it pertains to electioneering. Were the Act appropriately tailored to further the purported state interests of eliminating foreign influence or the appearance thereof—interests which are insufficient—then at a minimum it would have stopped at the phrase "[d]irects, dictates, [or] controls," which is more narrowly tailored to stopping a foreign actor from causing a U.S. corporation to engage in certain electioneering activities than "[d]irects, dictates, [or] controls" *plus* "directly or indirectly participates." The Act thus goes too far when it sweeps in mere participation, even where such participation does not amount to any measure of influence. *Contrast Participate*, Merriam Webster, https://www.merriam-webster.com/dictionary/participate (last visited Nov. 20, 2025) (defining "participate" as "to take part" or "to have a part or share in something"), *with Influence*, Merriam Webster, https://www.merriam-webster.com/dictionary/influence (last visited Nov. 20, 2025) (defining "influence" as "the power or capacity to cause an effect in indirect or intangible ways"). That a foreign government or foreign government-owned entity may "participate" in a corporation's decision-making process—by, for example, offering unsolicited comments—does not mean that it impacted the actions or decisions of the corporation.

The Commission's own rulemaking efforts demonstrate that the concept of "participate" is so loose as to sweep in a broad range of purely passive acts by foreign actors that could not possibly amount to meaningful influence. After the adoption of the Act, the Commission drafted and released for public comment a set of proposed rules to govern the Act's implementation. *See* ECF No. 60. In accordance with what the Commission rightly understood to fall within the breadth of the term "participate," the Commission defined the terms "direct participation" and "indirect participation" to include the mere passive receipt of an unsolicited communication from a foreign actor, regardless of whether the corporation took any action as a result. *See* ECF No. 60-1 at 1-2.

#18693867v1

The Commission thoroughly relied on these proposed rules in its opposition to CMP's motion for a preliminary injunction. *See* ECF No. 47 at 42, 59, 66; *see also* ECF No. 47-1 at ¶ 28 (declaration of the Executive Director of the Commission noting that the proposed rule would "provide additional guidance on the definition of a 'foreign government influenced entity,'" including "what constitutes direct or indirect participation"). In its decision granting CMP's motion for a preliminary injunction, however, the Court reasoned that the proposed rule appeared to entirely "read out the requirement that the foreign government or foreign government-owned entity participate in the actual decision-making process." *Cent. Me. Power Co.*, 721 F. Supp. 3d at 55 & n.19. Indeed, the definition "cast[] an overly broad net, and it [was] likely to stifle the speech of domestic corporations." *Id*. at 55.

Having failed to defend the Act on the basis of the proposed rules it drafted in the normal course, the Commission went back to the drawing board to develop a new set of rules (the "Rules") tailored to its litigation position and which attempt to employ a putatively narrower definition of "participate." *See* 94-270 C.M.R. ch. 1, § 16(1)(L) (2024). The First Circuit stymied the Commission by refusing to consider the Rules, *Cent. Me. Power Co.*, 144 F.4th at 29 n.10, but the Commission may seek to rely on them again here.[14] The Court should decline the invitation and instead should focus its inquiry on the Act's plain language. "[T]he first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *United States v. Stevens*, 559 U.S. 460, 474 (2010) (quotation marks omitted). While courts consider "any limiting construction [of a statute] that a state court or enforcement agency has proffered," *Vill. of Hoffman Ests.*, 455 U.S. at 494

---

[14] The Commission may seek to do so notwithstanding that, by their plain terms, the Rules have not yet taken effect. *See* 94-270 C.M.R. ch. 1, § 16(9) (2024) (Rules do not become effective until *after* this Court removes or modifies the existing preliminary injunction).

#18693867v1

n.5, the Court should not do so with respect to Rules the Commission prepared for litigation purposes, *see Kisor v. Wilkie*, 588 U.S. 558, 579 (2019) (no deference is owed to an enforcement agency's "convenient litigating position or *post hoc* rationalization advanced to defend past agency action against attack" (citation modified)); *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988) ("Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate.").

The Commission's original proposed rules accurately reflected the breadth of the term "participate," and the Commission cannot now conceal the overbreadth of that term by substituting a Rule adopted for litigation purposes, nor should the Court allow the Commission to continually refresh its defense of the Act on the basis of an endless series of new and improved rules. *Cf. Free Speech Coal., Inc. v. Att'y Gen. of the U.S.*, 677 F.3d 519, 539 (3d Cir. 2012) ("It is axiomatic that regulations cannot supersede a federal statute."); *Humane Soc'y of the U.S. v. U.S. Postal Serv.*, 609 F. Supp. 2d 85, 96 (D.D.C. 2009) ("Not only is the USPS position unsupported by regulations and by case law, but it is undermined by the pre-litigation actions of USPS, which speak louder than its post-litigation words."). The Commission should "defend the statute on its own terms" but ultimately cannot do so. *Cent. Me. Power Co.* 144 F.4th at 29.

Even if the Court were to rely on the Commission's new definition of "participate," however, that definition still fails to cure the term's overbreadth. The Rules now define "participate" to include "deliberat[ing]" on a decision regarding campaign spending. 94-270 C.M.R. ch. 1, § 16(1)(L). But deliberation again does not equate to influence or control. It could encompass purely passive participation, such as listening, or more active participation, like proffering an opinion. In neither case does the foreign actor cause the U.S. corporation to take any steps with respect to electioneering. Under the Rules, a U.S. corporation is banned from even

23

asking the opinion of a representative of a foreign actor, depriving the corporation of its right to hear speech on matters of public concern. *Citizens United*, 558 U.S. at 339 ("The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it."). Such a prohibition is not sufficiently tailored to advance any state interest in limiting foreign control over elections.

***

Throughout this litigation, the Commission has defended the "directly or indirectly participates" definition by arguing it "mirrors a federal regulation implementing FECA." *Cent. Me. Power Co.*, 144 F.4th at 28. But as the First Circuit observed, the Commission's reliance on the alleged similarities between the Act's language and the federal regulation, 11 C.F.R. § 110.20(i), is "unpersuasive" because the Act applies to a larger swath of U.S. corporations than the FECA regulation. *Id.*

The Court need not go further than comparing the Act to FECA, its implementing regulations, and the Federal Election Commission's ("FEC") enforcement of the same. Title 52 U.S.C. § 30121(a) makes it unlawful for a "foreign national" to engage in certain spending-related activities in connection with U.S. elections. A "foreign national" is defined as a foreign principal under FARA, 22 U.S.C. § 611(b), as well as an "individual who is *not* a citizen of the United States or a national of the United States" or "who is not lawfully admitted for permanent residence." 52 U.S.C. § 30121(b) (emphasis added). Notably, it expressly excludes U.S. corporations from the definition.

FECA's implementing regulations provide:

> A foreign national shall not direct, dictate, control, or directly or indirectly participate in the decision-making process of any person, such as a corporation . . . with regard to such person's . . . election-related activities, such as decisions

24

concerning the making of contributions, donations, expenditures, or disbursements . . . or decisions concerning the administration of a political committee.

11 C.F.R. § 110.20(i).

Although there is some overlap between the language in the Act and regulation, "the subjects of the two provisions—'a foreign national' as opposed to 'a foreign government or foreign government-owed entity'" are materially different. *Cent. Me. Power Co.*, 144 F.4th at 28-29. FECA defines "foreign national" in a manner that expressly excludes U.S. corporations from the prohibition. The Act, however, "encompasses entities at least 50% owned by a foreign government—even if those entities are U.S. corporations." *Id.* Moreover, the FEC has made clear that the foregoing statutory and regulatory prohibitions exclude domestic subsidiaries of foreign corporations whose contributions or expenditures were derived from funds generated by U.S. operations and whose decisions were made by U.S. citizens. *See* FEC Advisory Op. No. 2006-15, at 2-3 (May 19, 2006) (referencing the "long line of advisory opinions" expressly affirming a U.S. subsidiary's ability to participate in U.S. elections so long as certain conditions are met (quotation marks omitted)). According to the FEC, requiring that political disbursements derive solely from U.S. operations "ensures that the foreign parent corporation is not indirectly making or subsidizing the domestic subsidiary's donations and disbursements in connection with State or local elections." *Id.* at 5. Neither the Act nor the Rules include any such limitation.

In sum, when comparing the relevant definitions, the Act restricts "a broader swath of U.S. corporations than the federal provision and is therefore less tailored." *Cent. Me. Power Co.*, 144 F.4th at 29. Accordingly, to the extent the Commission suggests that the Act can be saved by the language's similarities to federal law, that argument is "unpersuasive." *Id.*

#18693867v1

### 3.    Paragraphs 2 through 5 are underinclusive.

Paragraphs 2 through 5 are also fatally underinclusive because they do not attempt to regulate the most prevalent means of influencing policy outcomes, namely, lobbying.[15] "Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 802 (2011). While the vast majority of Maine laws are adopted through the regular legislative process, the Act does not preclude FGIEs from participating in that process by engaging in speech in the halls of the Maine state house or the Governor's mansion. *See Bellotti*, 435 U.S. at 793 & n.31 ("The underinclusiveness of the statute is self-evident. Corporate expenditures with respect to a referendum are prohibited, while corporate activity with respect to the passage or defeat of legislation is permitted, even though corporations may engage in lobbying more often than they take positions on ballot questions submitted to voters." (citation omitted)). "[A] law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction on truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited." *Reed v. Town of Gilbert*, 576 U.S. 155, 172 (2015) (quotation marks omitted). The Act shields one part of the legislative process from "influence"—such as it is—by foreign governments, but not the most substantial. *See id*.

\*\*\*

"[M]ost of the applications of the Act's central provision, [Paragraph] 2" violate the First Amendment "due to the overly broad definitions" of FGIE and the underinclusiveness of its scope.

---

[15] The Act also fails to restrict speech based on a company's exposure to foreign creditors or revenue sources, and fails to address actual foreign government interference, such as social media bots. *See Justice Department Leads Efforts Among Federal, International, and Private Sector to Disrupt Covert Russian Government-Operated Social Media Bot Farm*, DOJ Press Release No. 24-850 (July 9, 2024) *available at* https://www.justice.gov/archives/opa/pr/justice-department-leads-efforts-among-federal-international-and-private-sector-partners.

#18693867v1

*Cent. Me. Power Co.*, 144 F.4th at 30. Accordingly, Paragraph 2, and its supporting provisions in Paragraphs 3 through 5, are facially invalid.

    **III.**    **The Court should grant judgment to CMP on Counts III and V: Paragraph 6 violates the First Amendment and Maine's constitutional counterpart because it compels U.S. citizens to append a pejorative label to speech concerning matters of public concern.**

Paragraph 6 of the Act requires U.S. companies qualifying as FGIEs to label themselves as a "foreign government-influenced entity" when disseminating public communications regarding matters of public policy, regardless of any actual influence by a foreign government. In so doing, Paragraph 6 violates the First Amendment and the Maine Constitution.[16]

The Court should apply strict scrutiny to Paragraph 6. Although disclaimer requirements that simply require a speaker to disclose facts are subject to exacting scrutiny because they are less burdensome, *see Gaspee Project*, 13 F.4th at 85, Paragraph 6 requires no ordinary disclaimer. Paragraph 6 compels U.S. companies to convey a government message—namely, that the company is suspect because it has some relation to a foreign government, no matter how attenuated or that the foreign government has no actual influence or control. *See Nat'l Inst. of Fam. & Life Advocs. (NIFLA) v. Becerra*, 585 U.S. 755, 766 (2018) (concluding that the requirement that licensed clinics provide a government-drafted script about the availability of state-sponsored services was a content-based regulation of speech); *id.* at 771 (regulating the contents of speech poses "the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information" (quotation marks omitted)). Paragraph 6 thus serves as a content-based regulation of speech because it *compels* speech and merits strict scrutiny. *See id.* at 766 ("By compelling individuals to speak a particular message, such notices alter the content

---

[16] *See supra* n.9.

of their speech." (citation modified)); *id.* (applying strict scrutiny to content-based speech restrictions).

But the requirement fails even under exacting scrutiny because the Commission does not have a substantial interest in requiring companies to adopt a pejorative label. Regulations of political speech can be justified only by anti-corruption interests. *Cruz*, 596 U.S. at 305. Communications regarding public policy simply do not risk *quid pro quo* corruption. Speech relating to public policy is just that—speech. The people of Maine are capable of listening to speech, assessing its persuasive value, and making an informed judgment about its content. *See Bellotti*, 435 U.S. at 790-91. While seeking to inform the electorate has served as justification for disclaimers in other contexts, *Gaspee Project*, 13 F.4th at 86-88, this interest does not justify Paragraph 6 for the simple reason that Paragraph 6 does not apply to electioneering communications, which Paragraph 2 completely prohibits. Instead, Paragraph 6 applies only to communications regarding public policy issues outside the election context. In short, Paragraph 6 does not regulate communications with—much less inform—any "electorate" as such.

And Paragraph 6 is not narrowly tailored to any claimed interest because it is overinclusive. Paragraph 6 does not target only those companies actually influenced by a foreign government. Instead, Paragraph 6 relies on various proxies for and definitions of influence, such as the 5% and the "directly or indirectly participates" thresholds, which, as discussed above, are overbroad. Accordingly, the disclaimer required by Paragraph 6 may be completely false with respect to U.S. corporations that are not actually the subject of any foreign control, regardless of any percentage of foreign ownership or the degree of any participation of foreign actors in corporate decision-making. Although the Commission's Rules graciously allow a speaker to clarify that its purported status as an FGIE derives from Maine law, rather than any actual assessment of foreign control,

the Commission here relies on circular logic: "Speaker X is an FGIE because the Act says Speaker X is an FGIE." *See* 94-270 C.M.R. ch. 1, § 16(7)(B). But the Act cannot be used to justify the Act. Nor is the misleading message ameliorated because the speaker could explain why the label is inaccurate. A private entity cannot be compelled to convey a message and thereby be "forced either to appear to agree . . . or to respond." *See Pac. Gas & Elec. Co.*, 475 U.S. at 15; *see id.* at 16 (explaining that the government cannot "require speakers to affirm in one breath that which they deny in the next").

Paragraph 6 forces U.S. corporations to convey a government message that cannot survive strict or exacting scrutiny. For these reasons, Paragraph 6 is invalid.

## IV.    The Court should grant judgment to CMP on Count VI: The Act's unconstitutional provisions cannot be severed from its remaining terms.

The Court should invalidate the entire Act because its numerous unconstitutional provisions, once pruned, leave the legislation denuded of all of its integral terms.[17]

Under Maine law, a statutory provision found to be invalid can be severed from the rest of the statute *only if* the remaining valid provisions "'can be given effect' without the invalid provision, and the invalid provision is not such an integral part of the statute that the Legislature would only have enacted the statute as a whole." *Op. of the Justs.*, 2004 ME 54, ¶ 23, 850 A.2d 1145; 1 M.R.S. § 71(8) (generally providing that a statute is severable if it "can be given effect without the invalid provision or application"). Thus, to determine whether any part of the Act can survive, this Court must consider "(1) whether the invalid provisions are so integral to the initiated bill that the entire act would have to be struck down, and (2) whether, individually, the remaining

---

[17] If the Court finds the Act's definition of "foreign government" to be unconstitutionally vague, as CMP urges, then any severability analysis would be either unnecessary or a mere formality. The term "foreign government" is the linchpin of the entire Act, such that no aspect of Section 1 of the Act can operate without it. *See supra* n.4 (noting that CMP challenges only Section 1 of the Act, and not Section 2).

#18693867v1

provisions can function and be given effect absent the invalid provisions." *Op. of the Justs.*, 2004 ME 54, ¶ 24, 850 A.2d 1145.

Here, the unconstitutional elements of the Act—even beyond the vague definition of "foreign government"—are "so integral to the initiated bill that the entire act would have to be struck down." *Id.* ¶ 24. The Act's "central provision" in Paragraph 2, *Cent. Me. Power Co.*, 144 F.4th at 30, and all of its supporting provisions in Paragraphs 3 through 5, must fall together for reasons the First Circuit correctly identified. *See supra* n.9. And removing the entirety of Paragraphs 6 and 7 from the Act[18] knocks out the remaining substantive legs of the stool. The few "remaining provisions" of the Act—the definitions in Paragraph 1 and the enforcement and administrative provisions in Paragraphs 8 through 11—simply cannot function alone. *See Ross v. Hanson*, 227 A.2d 606, 611 (Me. 1967) ("We are satisfied that the Legislature did not intend that the 1965 Act, 'subject to the Personnel Law' should stand with the tenure provision invalid. We need not consider the Act piecemeal; hence the 1965 Act in toto must go."); *Appeal of Sleeper*, 147 Me. 302, 314, 87 A.2d 115, 121 (1952) (holding that the unconstitutional sections at issue were not severable because the Maine Legislature "repeal[ed] the old sections only if the new sections took their place.").

In sum, the Act's unconstitutional Paragraphs are "so integral" to the Act's application that the Act cannot operate without them, while the remaining provisions cannot operate alone.

## CONCLUSION

The Court should grant judgment to CMP on each count of its Verified Complaint.[19]

---

[18] The Maine Press Association and the Maine Association of Broadcasters have challenged Paragraph 7.

[19] CMP seeks its attorney's fees in this matter pursuant to 42 U.S.C. § 1988(b). *See* Compl. ¶¶ 71, 76, 81, 86, 95. In the event the Court grants judgment for CMP, CMP respectfully requests that the Court enter an order setting a future course of proceedings to determine the appropriate fee award.

#18693867v1

Dated:  November 21, 2025

/s/  Nolan L. Reichl
Nolan L. Reichl
Katherine E. Cleary
PIERCE ATWOOD LLP
Merrill's Wharf
254 Commercial Street
Portland, ME 04101
Tel: (207) 791-1100
Fax: (207) 791-1350
nreichl@pierceatwood.com
kcleary@pieceatwood.com

*Attorneys for Plaintiff*
*Central Maine Power Company*

## CERTIFICATE OF SERVICE

I hereby certify that on November 21, 2025, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send the notification of such filing to all counsel of record.

DATED: November 21, 2025          */s/ Nolan L. Reichl*
                                  Nolan L. Reichl
                                  PIERCE ATWOOD LLP
                                  254 Commercial Street
                                  Portland, ME 04101
                                  207-791-1100
                                  nreichl@pierceatwood.com

                                  *Attorneys for Plaintiff*
                                  *Central Maine Power Co.*

#18693867v1