# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | |
|---|---|
| CENTRAL MAINE POWER COMPANY, et al., | |
| Plaintiffs, | Docket No. 1:23-cv-00450-JN |
| v. | |
| MAINE COMMISSION ON GOVERNMENTAL ETHICS AND ELECTION PRACTICES, *et al.* | |
| Defendants. | |

**PLAINTIFF VERSANT POWER'S MOTION FOR JUDGMENT ON THE PLEADINGS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(C) WITH INCORPORATED MEMORANDUM OF LAW**

**Preliminary Statement**

Plaintiff Versant Power is one of two major electric utilities in Maine. Recently, Versant's very existence was on the Maine ballot. In November 2023, Maine voters decided "Question 3": Whether to create an entity to acquire, by eminent domain, the assets of Maine's investor-owned electric utilities, including Versant (the "Pine Tree Power Initiative"). Versant had no choice but to speak on this political issue—its viability depended on the informed political judgment of Maine's voters. Overwhelmingly, voters rejected Question 3.

That same ballot presented another referendum question. "Question 2" concerned whether to adopt "An Act to Prohibit Campaign Spending by Foreign Governments and Promote an Anticorruption Amendment to the U.S. Constitution" (the "Act"). The Act prohibits Versant (and Maine's other major electric utility Central Maine Power Company ("CMP")) from speaking to Maine voters through political speech—just as they did in successfully defeating Question 3. It achieves this result by creating a new political creature: A "foreign-government influenced entity." That label would apply to Versant, a 100-year-old American company. In short, the Act silences one side of the debate in hot political questions concerning Maine's electric utilities. And it would serve to muzzle other so-labelled entities from speaking in Maine elections when they believe their interests could be impacted at the ballot box.

The Constitution prohibits such silencing. "[W]here as here the . . . suppression of speech suggests an attempt to give one side of a debatable public question an advantage in expressing its views to the people, the First Amendment is plainly offended." *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 785 – 86 (1978). It should thus be of little surprise then that this court and a panel of judges in the First Circuit have concluded that the Act is likely unconstitutional. *Cent. Me. Power Co. v. Me. Comm. on Gov'tl Ethics and Election Practices*, 144 F.4th 9 (1st Cir. 2025). A sister district

court has also concluded that a similar law is unconstitutional. *Minn. Chamber of Com. v. Choi,* 765 F. Supp. 3d 821 (D. Minn. 2025).

The Act's prohibition of political speech offends the First Amendment in several fundamental and independent ways. First, the State has no legitimate interest in preventing a U.S.-based entity with First Amendment rights from being influenced by a foreign government before making an independent decision on whether to offer political speech. Second, Defendants have failed to show that the interest they assert, preventing foreign-government influence, is a legitimate one, based on evidence supporting that interest. Third, even if the State could show a legitimate governmental interest, the lynchpin of the Act, its definition of "foreign government," is too vague to meet the precise standards the First Amendment requires. Fourth, and finally, the Act's tests for defining when a private entity is "foreign government influenced," and thus prohibited from a wide range of political speech, are vastly overbroad.

What has been granted as preliminary relief must now be made permanent: Pursuant to Federal Rule of Civil Procedure 12(c), this Court should grant Versant judgment on Counts II and III of its Verified Complaint declaring the Act violative of the First Amendment and permanently enjoining enforcement of the Act.

### Background

1.  **Versant And ENMAX's Corporate Structure And Relationship**

Two major electrical utility companies serve Maine and have been doing so since the early 1900s. Versant is one. No. 1:23-cv-00451, ECF No. 1 at 3.[1] Versant is a Maine corporation and it and its predecessors have operated exclusively in Maine for over 100 years. *Id.* at 11.

---

[1] As the docket reflects, four separate actions were consolidated in this action. ECF No. 21. Filings made before that consolidation order are cited to their originating action number.

In 2020, an indirect subsidiary of Defendant ENMAX Corporation purchased all the common stock of Emera Maine. *Id* at 12. Emera then changed its name to Versant. *Id.* The City of Calgary (the "City") is the sole shareholder of ENMAX. *Id.* at 11. ENMAX's acquisition of Versant was subject to regulatory approval by Maine's Public Utilities Commission (the "PUC"). *Id.* at 12. Because of the proposed ownership structure and to address concerns regarding local control, ENMAX, among others including the Public Advocate, entered into a stipulation that placed limitations on the operations, management, and governance of ENMAX and Emera Maine to ensure the City had no ability whatsoever to participate in the operations or management of ENMAX or the operations, management, or government of Emera. *Id.* at 12 – 13. This stipulation and its related agreements remain in full force and effect. *Id.* at 16.

2.    **Versant And ENMAX's Past And Future Political Speech**

Versant has engaged in lawful political expression in Maine, making contributions or expenditures in connection with federal, state, or local elections of candidates. *Id.* at 17. Versant has also contributed, both by in-kind contributions and cash, to a ballot-question committee, Maine Energy Progress ("MEP"). *Id.* Though federal law prohibits alien corporations from spending money in candidate elections, it does not prohibit spending on ballot initiatives. *Id.* Accordingly, ENMAX contributed to MEP like Versant. *Id.*

MEP was formed to oppose and defeat the Pine Tree Power Initiative. *Id.* The Initiative was placed on the November 2023 ballot as Question 3, which immediately followed the Act, Question 2. *Id.* Maine's voters rejected the Pine Tree Power Initiative. *Id.* But had it passed, an entity would have been formed to acquire, by eminent domain, the assets of Versant and CMP. *Id.* Versant and ENMAX's ability to express their political opposition to the Initiative was critical to preserving and protecting the very existence of their property rights. *Id.* at 17-18. The City has

never had any influence on Versant's political spending decisions, including its spending in response to the Pine Tree Power Initiative. *Id.* And if Pine Tree Power's proponents try a government take-over by ballot initiative again, as they say they will, Versant would, unless prohibited by the law, respond by committing campaign spending to again defeat any such initiative. *Id.*

### 3.    The Act

Although Maine's voters rejected Question 3, they overwhelmingly voted in favor of Question 2, approving the Act. Order Granting Preliminary Injunction, ECF No. 61 ("PI Order") at 5. However, before being placed on the ballot, the Act had to be considered by the legislature—the Maine Constitution requires that the legislature must first consider any law put before the voters. *Id.* Thus, the Act was presented to the legislature as L.D. 1610, and it passed by a majority. *Id.* The governor, however, vetoed the law voicing her concern that it violated the First Amendment. *Id.* The Act was then placed on the November 2023 ballot and approved by the voters. *Id.*

The Act defines a new political actor, a foreign-government influenced entity, which it then prohibits from engaging in a wide swath political speech.[2] *See generally,* Act. The Act defines a foreign government-influenced entity to include a "foreign government,"[3] a "foreign

---

[2] The Act proscribes a foreign government influenced entity from a wide range of campaign spending and communication in Maine. As set out in § 2 of the Act, such an entity may not directly or indirectly make "a contribution, expenditure, independent expenditure, electioneering communication, or any other donation or disbursement of funds to influence the nomination or election of a candidate or the initiation or approval of a referendum." For shorthand throughout, these activities are often referred to simply as "political" speech.

[3] A foreign government includes "any person or group of persons exercising sovereign *de facto* or *de jure* political jurisdiction over any country other than the United States or over any part of such country and includes any subdivision of any such group and any group or agency to which such sovereign *de facto* or *de jure* authority or functions are directly or indirectly delegated." Act § (1)(D).

government-owned entity,"[4] and any entity in which a foreign government or foreign government-owned entity:

> (i)  Holds, owns, controls or otherwise has direct or indirect beneficial ownership of 5% or more of the total equity, outstanding voting shares, membership units or other applicable ownership interests; or

> (ii)  Directs, dictates, controls or directly or indirectly participates in the decision-making process with regard to entity's activities to influence the nomination or election of a candidate or the initiation or approval of a referendum

Act § (1)(E).[5]

The heart of the Act is Subsection (2). Subsection 2 bans a foreign government-influenced entity from making, "directly or indirectly … any donation or disbursement of funds to influence the nomination or election of a candidate or the initiation or approval of a referendum." Act § (2).[6] Subsection (6) of the Act imposes an obligation upon each foreign government-influenced entity to affix a designated label to any other public communications made to influence (i) "government policy" or (ii) the "political or public interest regarding the political or public interest of or government relations with a foreign country or foreign political party." Act § (6). The mandated branding "must clearly and conspicuously contain the words 'Sponsored by' immediately followed by the name of the foreign government-influenced entity that made the disbursement and a statement identifying that foreign government-influenced entity as a 'foreign government' or a 'foreign government-influenced entity.'" Act § (6).

---

[4] A "foreign government-owned entity" is "any entity in which a foreign government owns or controls more than 50% of its equity or voting shares." Act § (1)(F).

[5] The Act is reproduced at ECF No. 1-1. For ease of reference, the Act will simply be cited to herein as "Act" rather than by its full statutory nomenclature.

[6] The Act adopts existing definitions of "contribution" and "expenditure" found at Title 21-A, Act §§ (1)(A) & (C).

The Act empowers the Maine Commission on Governmental Ethics and Election Practices (the "Commission") to impose a penalty for violations of the greater of $5,000 or double the amount of the donation or disbursement. Act § (8). A person who knowingly violates subsections (2) through (5) of the Act commits a Class C crime, which is punishable by up to five years' imprisonment. 17-A M.R.S. § 1604(1)(C); Act § (9).

**4.      Procedural History**

**A.      The District Court Proceedings**

In December 2023, before the Act took effect, several plaintiffs separately filed complaints and moved for preliminary relief, arguing the Act was unconstitutional and should be enjoined. ECF Nos. 1, 22, 25 & 27.  CMP brought the first complaint against the Commission, the members of the Commission, and the Maine Attorney General (collectively, "Defendants").  ECF No. 1. CMP alleged that the Act facially violated the First Amendment.  *See generally*, *Id.* 14 – 21.  That same day, Versant and ENMAX did the same, alleging that the Act violated the First Amendment, both facially and as applied to Versant.[7]   No.1:23-cv-00451, ECF No. 1.   The Maine Press Association and Maine Association of Broadcasters (collectively, the "Media Plaintiffs") filed a complaint against the Defendants, claiming that  Section 7 of the Act violated their First Amendment rights. *See* PI Order at 9.  Finally, five individual Maine voters acting in their capacities as Electors under the Maine Constitution filed suit alleging that the Act violated a slew of rights afforded to them under both the Maine and U.S. Constitutions.  No.1:23-cv-453, ECF No. 1.

---

[7] ENMAX moved for preliminary injunctive relief along with Versant, but not on First Amendment grounds because ENMAX is a business corporation organized and existing under the laws of the Province of Alberta, Canada, with a principal place of business located in Calgary, Alberta and, therefore, does not have rights under the First Amendment. Since this Motion is based entirely on First Amendment grounds, ENMAX is not a movant herein.

This court granted the preliminary-injunction motions and enjoined enforcement of the Act, determining that Versant and CMP were likely to succeed in their claims that the Act facially violated the First Amendment. PI Order at 39 – 40.

This court's review of relevant authorities, including *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1 (1st Cir. 2012), led it to apply strict scrutiny to the Act. PI Order. 27. Relying on a case limiting foreign nationals' involvement in candidate elections, *Bluman v. F.E.C*, 800 F. Supp. 2d 281 (D.D.C. 2011), this court found Defendants had advanced a compelling governmental interest—limiting foreign interference in elections. PI Order at 30. But this court rejected the Defendants' other proffered compelling governmental interest. The court found no authority supporting a compelling interest in avoiding the "appearance of" foreign-government influence. *Id.* at 31 – 32.

This court then analyzed whether the three types of "foreign-government influenced" entities were narrowly tailored to further a compelling governmental interest of limiting foreign influence in campaigns. As to foreign governments, this court found the Act was narrowly tailored. *Id.* 33. Not so, however, as to entities with a 5% or more foreign-government ownership interest. *Id.* 33 – 35. This court found that threshold "would prohibit a substantial amount of protected speech." *Id.* 34. And a law that barred campaign spending by domestic corporations directed and managed by U.S. citizens was incompatible with *Citizens United v. F.E.C*, 558 U.S. 310 (2010)—up to 95% of U.S. shareholders would thus be deprived of their First Amendment right to engage in campaign spending. *Id.* "Simply put, it would be overinclusive." *Id.*

This court did not find any adequate justification for the 5% threshold, particularly when the Defendants offered no evidence that a foreign government-influenced "entity with less than full government ownership of a domestic entity has exerted influence over that entity's election

spending in Maine." *Id.* This court also ruled that the Act's ostensibly conduct-based definition of foreign government-influenced entity, Act § E(2)(b) (the "Participation Definition"), swept too broadly and would likely stifle the speech of domestic corporations without any actual foreign-government influence. *Id.* 37 – 38. In so doing, the court considered rules proposed by the Commission defining direct and indirect "participation in a decision making process" concerning election spending. *Id.* at 37. The court found the rules "difficult to follow" but, in any event, *broadened* the Participation Definition so that receipt of an unsolicited communication from a foreign-government entity could serve to silence campaign speech, regardless of any influence whatsoever. *Id.*

### B.     The First Circuit's Affirmance

#### i.     The Majority Opinion

Defendants appealed and the circuit court affirmed. The panel majority (Montecalvo & Howard, JJ.) first addressed the applicable level of scrutiny. The circuit court[8] reasoned that the Act's restrictions on contributions "must withstand exacting scrutiny and its remaining burdens on political speech must withstand strict scrutiny."[9] 144 F.4th at 22 (citations omitted). This distinction, however, made little practical difference. In applying strict scrutiny, the court examined whether the Act "serves the compelling state interests in a narrowly tailored manner." *Id.* at 23 (cleaned up). Whereas examining the Act's contribution restrictions under exacting scrutiny requires a showing that they are "narrowly tailored to serve a sufficiently important

---

[8] For ease of reference, unless otherwise noted, references to the First Circuit's decision are to the majority and not the concurrence.

[9] The majority opinion, however, creates ambiguity on whether it affirmatively decided that the Act's contribution restrictions were subject to exacting scrutiny. Two paragraphs later, the opinion suggests that it had not decided that issue. "[W]e think it unnecessary to decide that strict scrutiny should apply to the Act's contribution limits, which would fail even exacting scrutiny." 144 F.4th at 23. The distinction may be academic; although the circuit court noted that it applied both exacting and strict scrutiny, "our analysis of fit looks largely the same." *Id.* And, in any event, the opinion is unambiguous that the Act did not meet exacting scrutiny.

governmental interest." *Id.* Although these scrutiny standards differ, the court noted that they largely collapsed into a single analysis: "although we apply exacting scrutiny to the Act's restrictions on contributions and strict scrutiny to the remainder of the Act's restrictions, our analysis of the fit looks largely the same." *Id.*

The court then applied this analysis to the three definitions of foreign-government-influenced entity. *First,* the circuit noted that the district court held that the ban on "foreign governments" as defined by the Act was likely constitutional. Without analysis, the court took no issue with this ruling. *Id.*

*Second,* the circuit court examined the 5% foreign-government-ownership threshold for determining a foreign-government-influenced entity. *Id.* The court agreed that the "5% foreign ownership threshold for triggering the Act's prohibition on a wide range of political speech is likely not narrowly tailored to the stated compelling interests in foreign influence or its appearance." *Id.* at 26. As to the Act's ban on contributions, the 5% threshold was similarly "likely not closely drawn to match its sufficiently important state interests." *Id.* The circuit court easily reached this conclusion, noting that the Act "silences U.S. corporations that have their own First Amendment rights … ." *Id.* Restricting a U.S. corporation from speaking "based on the mere possibility that foreign shareholders might try to influence its decisions on political speech, even where those foreign shareholders may be passive owners that exercise no influence or control over the corporation's political spending," was simply overbroad. *Id.*

A recent example underscored this conclusion. CMP and its affiliates had recently spent money to defeat two ballot questions in which CMP had an unquestioned interest: the first sought to revoke a previously issued permit for a project on which CMP had already spent $450 million; the second was the Pine Tree Power Initiative, which could have authorized seizure of CMP's

assets. *Id.* At that time, Qatar's sovereign-wealth fund indirectly owned over 5% of CMP. But one could hardly contend that Qatar's indirect investment in CMP had any influence on CMP's political-spending decisions on these ballot initiatives. Rather, "the record suggests that CMP's spending was motivated by its desire to protect the company's own interests, rather than the independent interests of Qatar." *Id.*

Against this backdrop, "the 5% threshold starts to look either like an end-run around *Citizens United*, aimed at silencing a large swath of corporations, simply because they are corporations, or an effort to shape the ongoing debate in Maine about its two primary utility companies by silencing one side—the companies themselves." *Id.* at 27. Moreover, the 5% threshold could have a chilling effect. Publicly traded corporations' ownership changes daily, injecting uncertainty as to when corporations are foreign government influenced and thus subject to the Act's prohibitions. *Id.* Rather than trying to accurately monitor whether the 5% threshold at the risk of incurring significant criminal penalties, a corporation might decide simply to remain silent.

*Third*, the circuit court addressed the Participation Definition, which is based on what is ostensibly labeled as "participation" (either direct or indirect) in the "decision-making process with regard to the activities of the [organization] or other entity to influence the nomination or election of a candidate or the initiation or approval of a referendum, such as decisions concerning the making of contributions, expenditures, independent expenditures, electioneering communications or disbursements." Act § 1(E)(2)(b). The circuit court rejected Defendants' argument that it should consider rules the Commission adopted *after* the district court had enjoined the Act. *Cent. Me. Power Co.*, 144 F.4th at 29 n.10. The circuit court also rejected Defendants' defense of the Participation Definition solely on the basis of language of a federal regulation

10

proscribing election activities for foreign nationals. *Id.* at 28 – 29. That federal regulation concerned a different subject, "'a foreign national[,]' as opposed to 'a foreign government or foreign government-owned entity.'" *Id.* Defendants had failed "to defend the statute on its own terms, other than its alleged similarity to a federal regulation" which the circuit court "dismissed . . . as unpersuasive." *Id.* 29. The court thus was concerned that the "'actual participation' definition applies to too broad a swath of speakers with First Amendment rights to be narrowly tailored." *Id.* And in the context of contributions, the Participation Definition was "not narrowly tailored to match a sufficiently important state interest." *Id.*

Finding that "most of the applications of the Act's central provision, subsection 2, are likely unconstitutional due to the overly broad definitions of 'foreign government-influenced entity'" the circuit court rejected Defendants' argument the Act's overbreadth was not substantial relative to its plainly legitimate sweep. *Id.* at 30. The court rejected the notion that it could pluck a new percentage greater than 5% to save the Act because doing so would run afoul of the limitation that courts do not "rewrite a law to conform it to constitutional requirements." *Id.* (citing *United States v. Stevens*, 559 U.S. 460, 481 (2010)). Ending its First Amendment analysis, the circuit court reserved the question of severability "for the district court to decide in the first instance." *Id.* at 31.

### ii.    The Concurrence

Judge Aframe wrote a separate concurrence addressing two issues: (1) his view that Defendants' asserted governmental interests were inadequate and (2) that the Act's definition of foreign government presented a vagueness issue.

**Insufficient Interest.**    Judge Aframe concluded that Defendants' interest in limiting "foreign government influence" or "the appearance of such influence" was not a compelling or

sufficiently important government interest. *Id.* at 32. On the contrary, the First Amendment dictates that "the only compelling or important interest in this realm is to prevent actual participation by foreign persons and entities in the American political process, *i.e.,* activities intimately related to the process of democratic self-government, or the appearance of such participation." *Id.* (internal citations and quotation marks omitted). Judge Aframe would have concluded that none of the Act's restrictions at issue matched this far more limited government interest. *Id.*

Judge Aframe's analysis began with the principle that "political speech does not lose First Amendment protection 'simply because its source is a corporation.'" *Id.* (quoting *Citizens United,* 558 U.S. 310 at 342). Yet, the Act bans, "among other things American corporate political speech that is influenced or appears to be influenced by a 'foreign government' or 'foreign government-owned entity.'" *Cent. Me. Power Co.,* 144 F.4th at 32. Thus, the Act limits the Maine political speech of an American organization "because foreign sources may supply some of the information that helps to shape an American company's speech choices." *Id.* at 32 – 33. This presents "a serious constitutional problem." *Id.*

The Act targeted not only foreign speech, but American speech—that of organizations that might have been "influenced" by foreign-government speech. *Id.* And "such targeting of an American speaker's right to engage in core political speech is anathema to the First Amendment." *Id.* The First Amendment recognizes "the rights to receive information and to speak one's ideas." *Id.* (citing *Sorrell v. IMS Health Inc.,* 564 U.S. 552, 557 (2011)). Accordingly, Judge Aframe would have rejected "out of hand the interest Maine appears to assert in silencing an American speaker on political matters." *Id.*

This, in Judge Aframe's view, did not mean that governments were powerless to restrict

foreign-government speech in elections. *Bluman,* read correctly, limited the participation of foreign citizens in the activities of American democratic self government. *Id.* at 34 – 35. "*Bluman* involved a *direct* restriction on a foreign citizen making a political contribution or independent spending in a political campaign." *Id.* (citing *Bluman* 800 F. Supp. 2d at 288 (emphasis added). Thus, *Bluman* "holds only that the government may forbid foreign persons or entities from actually participating in the American political process." *Id.*    But Defendants' argument wrongfully extended *Bluman's* reasoning to authorize "the government to prevent an American company *itself* speaking because it consults or has some other contact with a foreign government before it decides what to say." *Id.* (emphasis in original).

*Bluman's* limits were confirmed in *Citizens United.*  There, the Supreme Court stated that even if there were a compelling governmental interest in preventing foreign influence of the American political process via American corporations, such an interest would extend only to "corporations or associations that were created in foreign countries or funded predominately by foreign shareholders." *Citizens United*, 558 U.S. at 362.  *Citizen United* thus suggests that "any government interest in restricting corporate political speech would be limited to situations where the foreign corporations were *themselves* speaking or where the American company was predominately funded by foreign shareholders such that these shareholders in effect controlled or appeared to control the company's speech." *Cent. Me. Power Co.*, 144 F.4th at 34.  Defendants' asserted interest—that it may restrict an American company from speaking whenever it appears that a foreign government might have had some influence over the company was "far broader" than the interests articulated in *Bluman* and *Citizens United.  Id.* At bottom, "absent foreign-government control, it is the American company that ultimately decides what to say." *Id.*  And "[t]hat decision by the American speaker is protected by the First Amendment."  Accordingly,

13

Judge Aframe concluded that while he agreed that the Act was unconstitutional even under the majority's finding of compelling or important interests, he would have determined that the interests were neither compelling nor important. *Id.*

*Vagueness.* Judge Aframe separately addressed an issue of vagueness which pervaded the Act—the definition of "foreign government." Judge Aframe noted that "[e]ach method by which an American company becomes a 'foreign government-influenced entity' leads back to the law's definition of foreign government." The Act defines foreign government as follows:

> "Foreign government" includes any person or group of persons exercising sovereign de facto or de jure political jurisdiction over any country other than the United States or over any part of such country and includes any subdivision of any such group and any group or agency to which such sovereign de facto or de jure authority or functions are directly or indirectly delegated. "Foreign government" includes any faction or body of insurgents within a country assuming to exercise governmental authority, whether or not such faction or body of insurgents has been recognized by the United States.

Act § (1)(D). This definition is taken from a federal statute, the Foreign Agents Registration Act (FARA). *Cent. Me. Power Co.*, 144 F.4th at 35 (citing 22 U.S.C. § 611(e)). Judge Aframe noted that although courts have found FARA constitutional, its definition of foreign government means something very different in the context of the Act. Defining a group or authority as a foreign government could determine whether an American organization can engage in political speech. *Cent. Me. Power Co.*, 144 F.4th at 35.

Because the Act's definition of foreign government implicates the First Amendment, it must be "sufficiently clear to provide American companies with adequate notice of when they must desist from otherwise protected speech." *Id.* This is particularly true when violation of the Act constitutes a crime. In the First Amendment context, the government may regulate an area only with "narrow specificity." *Cent. Me. Power Co.*, 144 4th at 37 (quoting *Keyishian v. Bd. of Regents of Univ. of N.Y.*, 385 U.S. 589, 604 (1967)).

14

The Act's definition of foreign government is the polar opposite of such "narrow specificity—it is "exceedingly broad." *Cent. Me. Power Co.*, 144 F.4th at 36. The definition upon which the Act pivots requires an American company to monitor and assess the power of a "'group,' 'subdivision of … such group,' or 'body of insurgents' has within any part of any country at any time." *Id.* This would be a "tall task for the State Department" and "impossible for a business or media group confidently to make such judgments in constantly changing political environments." *Id.* a

Accordingly, Judge Aframe determined that the Act's definition of foreign government— "the linchpin provision of Maine's law"—is "sufficiently vague that 'people of common intelligence must necessarily guess at its meaning and differ as to its application.'" *Id.* (quoting *Baggett v. Bullitt*, 377 U.S. 360, 367 (1964)). Facing such a vague law, a company otherwise inclined to speak on a Maine political issue may voluntarily stay silent, concluding that the risk of criminal penalties is too great. *Cent. Me. Power Co.*, 144 F.4th at 37.

## Legal Standards

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). Such a motion "bears a strong family resemblance to a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)." *Kando v. R.I. State Bd. of Elections*, 880 F.3d 53, 58 (1st Cir. 2018). Indeed, a court's analysis is effectively the same when confronting both motions. *Aponte-Torres v. Univ. of P.R.*, 445 F.3d 50, 54 (1st Cir. 2006). Under the familiar 12(b)(6) standard, the court views the facts contained in the pleadings in the light most favorable to the non-moving party and grants all reasonable inferences to that party. *Id.* A court may grant a Rule 12(c) motion if the uncontested facts conclusively establish

the movant's entitlement to judgment.  *Id.*; *Martinez v. Sun Life Assurance Co. of Canada*, 948 F.3d 62, 68 (1st Cir. 2020).

**Argument**

1.    <u>**The Act Does Not Advance A Legitimate Governmental Interest**</u>

    **A. There is no legitimate interest in censoring American organizations because of perceived foreign-government influence on their independent political speech.**

    The Act fails the First Amendment test out of the starting gate.  There is no interest, either compelling or important, in limiting foreign government influence on an American organization's decision, made by American citizens, to speak on political issues.  As Judge Aframe correctly concluded, the only recognized governmental interest in this area is to prevent *actual participation* (or its appearance) of a foreigner, a foreign entity, or foreign government, in the American political process.  *Cent. Me. Power Co.*, 144 F.4th at 32.  The Act's objective in rooting out foreign-government "influence" over an American speaker's political speech is not constitutionally permissible. *See Buckley v. Valeo*, 424 U.S. 1, 14 (1976) ("The First Amendment affords the broadest protection to such political expression in order to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people.")

    No decisional authority supports the conclusion that stanching mere foreign influence on American-made political speech decisions is a legitimate governmental objective.  Rather, *Bluman* and *Citizens United* support only the limited interest in preventing *actual* foreign participation in the American political process.  Merely influencing American corporations that call the shots on such political speech is not legitimately subject to government censoring—what the American speaker chooses to listen to is protected by the First Amendment.  *See, Lamont v. Postmaster General of U.S.*, 381 U.S. 301, 309 (1965) ("[T]he right to receive publications is such a fundamental right.  The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to

16

receive and consider them. It would be a barren marketplace of ideas that had only sellers and no buyers.") (Brennan, J. concurring).

Neither *Bluman* nor *Citizens United*, individually or collectively, can bear the weight of the governmental interest Defendants place on them. At their furthest reach, they support only the limited proposition that excluding foreign persons or entities *themselves* from the American political process is a legitimate governmental interest.

**Bluman.** Judge Aframe correctly construed *Bluman's* limitations.[10]   As he succinctly reasoned, *Bluman* involved "a *direct* restriction on a foreign citizen making a political contribution or independent spending in a political campaign." *Id.* at 35.   Thus, *Bluman* held only that the government may restrict "foreign persons or entities from actually participating in the American political process." *Id.*   The Act's sweeping prohibitions on American political speech does not support an interest in silencing American political speech based on alleged foreign-government influence.   "*Bluman* does not support the regulation of this sort of secondhand foreign influence on the American political process." *Id.*

The District Court in *Minnesota Chamber of Com. v. Choi,* 765 F. Supp. 3d 821, 850 (D. Minn. 2025) also correctly recognized the limits of *Bluman's* holding.   There, the court noted "because *Bluman* concerned individuals, the court had 'no occasion to analyze the circumstances under which a corporation may be considered a *foreign* corporation for purposes of the First Amendment analysis." (quoting *Bluman,* 800 F. Supp. 2d at 292 n.4).   Rather, "[a]s *Bluman* explained, 'American corporations . . . [are] members of the American political community." *Id.* (quoting *Bluman*, 800 F. Supp. 2d at 290).   Based on *Bluman's* holding that foreign nationals may be prohibited from

---

[10] The majority did not interpret *Bluman* because it assumed, without deciding, that Defendants' proposed interests were compelling. *Cent. Me. Power Co.*, 144 F.4th at 24 n.5.

directly or indirectly participating in election spending, "it does not follow that a foreign shareholder indirectly participates in our national political process by simply possessing shares." *Id.*

**Citizens United.**  "[P]olitical speech does not lose First Amendment protection simply because its source is a corporation." *Citizens United*, 558 U.S. at 342.  The *Citizens United* court did not reach the question of whether the government "has a compelling interest in preventing foreign individuals or associations from influencing our Nation's political process." *Id.*  It had no need to do so because the campaign-finance law at issue was "not limited to corporations or associations that were *created* in foreign countries or *funded predominantly* by foreign shareholders." *Id.* (emphasis added).  Thus, the law was found to be overly broad and unconstitutional even assuming a compelling interest. *Id.*  Nevertheless, the court did declare that "any government interest in restricting corporate political speech would be limited to situations where the foreign corporations were *themselves* speaking or whether the American company was predominately funded by foreign shareholders such that these shareholders in effect controlled or appeared to control the company's speech." *Cent. Me. Power Co.*, 144 F.3th at 34.

*Bluman* and *Citizens United* are "in line" insofar as they recognize the narrow interest of preventing actual foreign participation in the American political process, not mere foreign influence over an American political speaker. *Id.*  Neither case supports finding a governmental interest in silencing an American speaker because it may have been "influenced," positively or negatively, as to whether or how to speak out on a political issue.  Simply put, the government has no interest in silencing the voice of an American political speaker because they may have been influenced by non-American thought. *Stanley v. Georgia,* 394 U.S. 557, 564 (1969) (The "right to receive information and ideas, regardless of their social worth, is fundamental to our free society")

18

(cleaned up); *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 11 (1st Cir. 2012) ("When Government seeks to use its full power, including the criminal law, to command where a person may get his or her information or what distrusted source he or she may not hear, it uses censorship to control thought. This is unlawful. The First Amendment confirms the freedom to think for ourselves."); *Cent. Me. Power Co.*, 144 F.4th at 33 ("Allowing Maine to silence an American speaker because it does not like a source of information which may have influenced that speaker does not square with the basic First Amendment principles recognizing rights to receive information and speak one's ideas.").

Viewing these abstract principles in practical terms underscores this conclusion. As noted above, the First Circuit was persuaded by CMP's illustration that it did not need passive-minority-investor Qatar to tell it how to defend its own interests in the two recent Maine ballot initiatives implicating its core interests—its very existence and, separately, nearly half a billion dollars in project investment. 144 F.4th at 26. Just so.

But further consider a different scenario, in which a foreign-government investor *does* possess specialized knowledge or views of a political issue gaining traction in Maine. In today's world political movements know no borders: A police killing in Minnesota can spark a world-wide political movement; yellow vests donned in Paris in protest can catch on the world over. Suppose a new political movement starts in a European government-investor's country, finds its way to Maine, gains traction, and ultimately winds up as a referendum on the ballot box. That foreign-government investor with stakes in companies worldwide could have found that movement to impact its investments in Europe and learned lessons worthy of consideration by another investment—an American-controlled corporation with interests in Maine. As that American company confronts those same political issues, hearing that experienced, global perspective and

19

considering it before making an independent judgment on political speech cannot, under the First Amendment, serve to silence the American speaker from the political debate. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 577 (2011) (the "fear that people would make bad decisions if given truthful information cannot justify content-based burdens on speech") (cleaned up).

This court should "reject out of hand the interest Maine appears to assert in silencing an American speaker on political matters." *See Cent. Me. Power Co.*, 144 F.th at 33.

**B. Question 2 does not serve a legitimate government objective.**

When the Government restricts speech, it "must prove at the outset that it is in fact pursuing a legitimate objective." *F.E.C. v. Cruz*, 596 U.S. 298, 305 (2022). To do so, it must do more than "simply posit the existence of the disease sought to be cured. It must instead point to 'record evidence or legislative findings' demonstrating the need to address a special problem." *Id.* (quoting *Colo. Republican Fed. Campaign Comm. v. F.E.C.*, 518 U.S. 604, 618 (1996)). Mere suspicion or belief are insufficient grounds on which to curtail speech—actual proof of the alleged problem is a precondition to the proposed legislative remedy

In granting Plaintiffs' motion for a preliminary injunction, this court concluded that Defendants had failed to offer "evidence that a foreign government or foreign government-owned entity with less than full ownership of a domestic entity [has] exerted influence over that entity's election spending in Maine." *Cent. Me. Co.,* 721 F. Supp. 3d at 53. This finding alone warrants declaring the Act unconstitutional. *See Cruz*, 596 U.S. at 305. After two rounds of extensive briefing before this court and the First Circuit, the closest Defendants come to unearthing such evidence is speculating how an American organization *might* be improperly influenced by a foreign-government owner. But that does not suffice. Conjecture cannot carry the First Amendment burden. *McCutcheon v. F.E.C.*, 572 U.S.185, 210 (2014). Silencing an American speaker from

20

debate on political issues cannot be justified on suppositions and speculation. The void of evidence showing that any foreign government has attempted to influence a Maine (or any other) election via a trojan horse—a non-controlling stake in an American company or organization— underscores Defendants' failure to meet its burden that it is "pursuing a legitimate objective."[11] Their failure to do is independently fatal to the Act. *See Cruz*, 596 U.S. at 313.

## 2.    The Act's Definition of "Foreign Government" Is Impermissibly Vague.

Assuming, for argument's sake, that the Act does pursue a legitimate governmental interest or objective, it is unconstitutional for a different reason. As Judge Aframe concluded, the Act's definition of foreign government is too vague to pass muster under the First Amendment. That term is nested within the definitions of both foreign government-owned entity and foreign government influenced entity, which in turn makes them constitutionally vague as well.

A law limiting speech, particularly when coupled with the imposition of criminal penalties, requires precision. "Close examination of the specificity of the statutory limitation is required where, as here, the legislation imposes criminal penalties in an area permeated by First Amendment interests." *Buckley*, 424 U.S. at 40 – 41. "The test is whether the language of [the law] affords the "precision of the regulation that must be the touchstone in an area so closely touching our most precious freedoms." *Id.*

The Act's vague definition of foreign government "fails to mark the boundary between permissible and impermissible speech." *See id; see also Keyishian,* 385 U.S. at 603 – 04. The Act's definition is worth repeating:

---

[11] Indeed, as the First Circuit recognized, the signs point to the Act's pursuit of illegitimate objectives: either "silencing a large swath of corporations merely because they are corporations, or an effort to shape the ongoing debate in Maine about its two primary utility companies by silencing one side—the companies themselves." *Cent. Me. Power Co.*, 144 F.4th at 27.

"Foreign government" includes any person or group of persons exercising sovereign de facto or de jure political jurisdiction over any country other than the United States or over any part of such country and includes any subdivision of any such group and any group or agency to which such sovereign de facto or de jure authority or functions are directly or indirectly delegated. "Foreign government" includes any faction or body of insurgents within a country assuming to exercise governmental authority, whether or not such faction or body of insurgents has been recognized by the United States.

Act § 1064(D).

Judge Aframe provided examples of the "hard calls" in determining the meaning and application of "'de facto . . . political jurisdiction' exercised by a 'group' or 'any subdivision of any such group' over 'any part of [any] country' other than the United States." *Cent. Me. Power Co.*, 144 F.4th at 36. And his observation that such "hard calls" are "everywhere and endless" is also borne out by recent events. *Id.* In an increasingly changing world, determining who has de facto or de jure control of a territory can be nearly impossible. Who, for instance, in Gaza would meet the definition of foreign government: Isreal, Hamas, the Palestinian Authority, all of the above, or no one? And turning to a different side of the world, China claims de jure control over Tiawan. Are Tiawan-based companies, under this definition, to be construed as a foreign government influenced because China (a) claims de jure control of Tiawan and (b) commands state control of its business enterprises?

Another section of the definition of foreign government is equally problematic. What constitutes "any group or agency to which such sovereign de facto or de jure authority or functions are directly or indirectly delegated"? Would an independent-government contractor for a foreign government meet this definition thus sweeping in major foreign-government contractors like Airbus? Is the BBC an "agency" to which "de facto or de jure authority or functions are directly or indirectly delegated"? Whatever the answers, it should not be left to an entity that would otherwise have the right to offer political speech in Maine to make such determinations with clarity

or risk civil and criminal penalties.  Faced with this dilemma, as Judge Aframe concluded, "a company otherwise wishing to participate in a Maine election would likely abstain from political speech entirely—especially given the criminal penalties that may attach from an inaccurate evaluation of the political situation in a faraway place at any given time." *Cent. Me. Power Co.*, 144 F.4th at 36 – 37.

The definition of foreign government is the opposite of the precision required for a valid restriction of speech.  It is vague and raises countless questions that a speaker with First Amendment rights should not have wrestle with before offering its voice on Maine political issues. This court should find the Act is wholly unconstitutional because the definition upon which it turns lacks specificity required by the First Amendment.  *See Reno v. ACLU*, 521 U.S. 844, 871 – 72 (1997); *Keyishian*, 385 U.S. at 603 – 04.

### 3.    The Act Is Overbroad

Assuming Defendants have set forth a legitimate governmental interest in preventing foreign government influence over elections (and they have not) the Act's sweeping definition of what makes an entity[12] "foreign government influenced" are not sufficiently tailored to that interest.  *First,* the 5% threshold is facially overbroad.  *Second,* while at first glance the Act's Participation Definition may appear more finely tuned, modest scrutiny reveals this definition to lack any clear limitations.  Both definitions fail both strict and exacting scrutiny.

### A.  The 5% Ownership Threshold Is Vastly Overbroad.

The First Circuit's determination that defining a foreign government-influenced entity by a 5% ownership interest is overbroad is conclusive.  *Cent. Me. Power Co.*, 144 F.4th at 26.   Simply

---

[12] A "foreign government-influenced entity" also means "a foreign government" as defined by the Act.  Act § 1(E).  That definition is problematic for the reasons stated above.

stated, there can be no justification for the 5% threshold. Defendants have not, and cannot, show "why the 5% threshold—as opposed to 100% or 50%, or any other number—is narrowly tailored to its interests in preventing foreign influence in its elections." *Id.* . Accordingly, prohibiting an American entity from speaking "based on the mere possibility that foreign shareholders might try to influence its decisions on political speech, even where those foreign shareholders may be passive owners that exercise no influence or control over the corporation's political spending" is decidedly overbroad. *Id.* (citing *Choi,* 765 F. Supp. 3d at 852; *Cruz,* 596 U.S. at 307).

A passive foreign-government owner may not exert any influence over election spending whatsoever. Or it might be prohibited from doing so—it could own a 5% equity interest, but in non-voting stock and have no say in the corporation's affairs at all. Given its breadth, the 5% threshold, as the First Circuit noted, appears to have broader objectives than rooting out perceived foreign-government influence: Either silencing (i) corporations "because they are corporations" or (ii) Maine's two utility companies in future political debates in Maine. *Id.* "Neither is permissible under the First Amendment." *Id.*

The 5% ownership threshold is facially overbroad and fails both strict and exacting scrutiny.

### B. The Act's alternative Participation Definition for determining foreign-government influence is similarly overbroad.

The Act sets out an alternative and independent test, the Participation Definition, for whether an entity is "foreign government influenced." An entity may be so "influenced" by, among other things, "direct or indirect participation in the decision making process with regard to the activities of the [the entity] to influence the nomination or election of a candidate or the initiation or approval of a referendum, such as decisions concerning the making of contributions,

expenditures, independent expenditures, electioneering communications or disbursements."  Act § 1(E)(2)(B).

This definition is entirely unclear.  There are no firm boundaries defining what constitutes "participation" (direct or indirect) or how broadly to construe "decisions concerning the making of [political expenditures]."  *See id.*  A restriction on free speech must not be so unclear. Rather, it "must eschew the open-ended rough-and-tumble of factors which invites complex argument in the trial court and a virtually inevitable appeal."  *F.E.C v. Wisc. Right to Life Inc.*, 551 U.S. 449, 45 (2007) ("*WRTL*").  A standard must be devised that allows for little, if any, discovery and "allows parties to resolve disputes quickly without chilling speech."  *Id.*   Lacking clear lines, the Act's Participation Definition for determining if an entity is foreign government influenced invites debate and cannot be strictly followed raising the prospect of chilling speech.

In apparent recognition that the definition of "participate" as it is used in the Act does not provide the required clarity, the Commission drafted two editions of rules which attempt to further define that term.  These rules only deepen the fog.  The Commission's first shot at rule drafting resulted in an airball.  Those proposed rules defined participation so broadly that mere receipt of an unsolicited communication could result in an entity "participating" in the decision-making process regarding election spending.  *Cent. Me. Power Co.*, 721 F. Supp. 3d at 54 – 55.

The Commission's second shot similarly misses the basket.  The Commission now defines "participation" as used in the Act as follows:

> To "participate" in a decision-making process with regard to the activities of a firm, partnership, corporation, association, organization or other entity to influence the nomination or election of a candidate or the initiation or approval of a referendum, means, with the invitation, consent, or acquiescence of the firm, partnership, corporation, association, organization, or other entity, to deliberate or vote on a decision of that firm, partnership, corporation, association, organization or other entity concerning donations and disbursements to influence the nomination or election of a candidate or the initiation or approval of a referendum.

25

94-270 C.M.R. ch. 1, § 16(L).  Although this definition addresses the unsolicited-communication issue this court identified, it raises a host of others.  If a foreign-government shareholder votes on a resolution calling for greater transparency in a corporation's political spending, does that resolution "concern donations and disbursements to influence the nomination or election of a candidate or the initiation or approval of a referendum"?  What if that shareholder participates in a discussion at the annual meeting about establishing a separate board committee to approve all political spending?  What if, while a vote on a shareholder resolution concerning political spending is pending, a foreign-government shareholder is unilaterally contacted by another institutional investor that advocates forming a voting block on that resolution?  If the corporation's enterprise-risk-management analysis reveals potential political risks and responses thereto, including political spending, would discussion on such risk analysis meet this definition?

Furthermore, the exclusion's attempted fix directed at one corporate-governance activity underscores that multiple other foreign-government shareholder activities occurring prior to or outside the actual deliberation or vote on a specific item of political spending are not exempt; *e.g.,* participating in an earnings call where past political spending is discussed; chiming in at an investors' meeting discussing the same topic; deliberating on an assessment of corporate risks where political risks are identified, their potential impacts discussed, and political spending is one potential risk-mitigation strategy; and attending a shareholder meeting where the question of political spending is discussed.  Under the Act, a foreign-government shareholder's simple involvement such routine corporate affairs, even at minimal levels of ownership, would silence that corporation's voice in political issues.  Facing the prospect that any such routine corporate activity involving any foreign-government shareholder at any ownership level could potentially

result in civil and criminal penalties if the corporation voiced political speech, a corporation may reasonably choose to stand silent.

There is more. The Rule's definition of "participation" has exclusions which only further muddy the waters. After Plaintiffs pointed out that "participation" could simply mean voting on a shareholder resolution (No. 1:23-cv-00451, ECF No. 4 at 25), the Commission attempted to fix the problem (along with the unsolicited communication issue) in the second edition of rules which excluded these activities from the definition of "participation." Under these now-adopted rules, "Participation does not include":

> making, deliberating on, or voting on a shareholder resolution concerning donations and disbursements to influence the nomination or election of a candidate or the initiation or approval of a referendum if the person making, deliberating on, or voting on the resolution holds, owns, controls or otherwise has direct or indirect beneficial ownership of less than 5% of the total equity, outstanding voting shares, membership units or other applicable ownership interests;

94-270 C.M.R. ch. 1, § 16(L)(1). This exclusion compounds the overbreadth associated with the 5% test: A 4% shareholder can vote on a shareholder resolution about campaign spending without consequence, but a 5% shareholder doing the same act results in prohibiting the corporation from political speech.

The Act's alternative Participation Definition, as further defined by its accompanying rules, suffers from the same ill as the 5% threshold—it is overly broad. As the above examples highlight, the Act prohibits a wide range of activities, from simply participating in routine corporate governance to decisions about which internal processes should govern the consideration and approval of political spending. The Act thus does much more than prohibit *actual* participation in a concrete decision to make political contributions and expenditures, it prohibits any foreign-government shareholder from having even the most passive involvement in

27

corporate affairs that may touch on political spending. The First Circuit's conclusion as to the 5% threshold is equally applicable to the Participation Definition, "The prohibition is overly broad, silencing a U.S. corporation based on the mere possibility that foreign shareholders might try to influence its decisions on political speech, even where those foreign shareholders may be passive owners that exercise no influence or control over the corporation's political spending." *Cent. Me. Power Co.*, 144 F.4th at 27. This conclusion is underscored by considering the Rule's use of the 5% threshold to create an exemption from participation. 94-270 C.M.R. ch. 1, § 16(L)(1).

And the Participation Definition suffers from an additional ill not present in the bright-line 5% test: it is so vague it will inevitably chill speech. *See Citizens United*, 558 U.S. at 324. The questions raised above concerning the broad scope of the Participation Definition are likely the tip of the iceberg. If the Act were to go into force, a host of impacted entities would have to assess—with real consequences—whether myriad actions taken by their shareholders constitute their "deliberating" "concerning" election spending in Maine, thus transforming that entity into one that is foreign government influenced. *See* 94-270 C.M.R. ch. 1, § 16(L). And faced with close questions, and uncertainty over which actions fall within the Participation Definition, the Act will chill lawful speech. *See Cent. Me. Power Co.*, 144 F.4th at 27. "Where statutes have an overbroad sweep, just as where they are vague, 'the hazard of loss or substantial impairment of those precious [First Amendment] rights may be critical' since those covered by the statute are bound to limit their behavior to that which is unquestionably safe." *Keyishian v. Brd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 609 (1967). Given the haze in the Act's Participation Definition, entities are likely to conclude that the only "unquestionably safe" behavior is not to offer political speech at all. The overbreadth and vagueness of the Participation Definition combine to silence volumes of speech otherwise protected by the First Amendment. *See WRTL*, 551 U.S. at 492 – 93. ("There

28

is a fundamental and inescapable problem with all these various tests. Each of them . . . is impermissibly vague and thus ineffective to vindicate the fundamental First Amendment rights of the large section of society to which [the law] applies.")

Just like the 5% threshold test, the Participation Definition for determining a foreign government influenced entity is not "narrowly tailored to a compelling interest." *Cent. Me. Power Co.,* 144 F.4th at 19. And, in the context of contributions, it is "not closely drawn to support a sufficiently important interest." *See id.* at 20.

### C. Because the Act's means of defining a private entity as "foreign-government influenced" are overbroad, the majority of the Act's prohibitions on political speech are unconstitutional.

Because the means of defining a private entity as foreign government influenced are overbroad, most of the Act's prohibitions on political speech are unconstitutional. *See Cent. Me. Power Co.*, 144 F.4th at 30. And moving beyond subsection 2, "most of the substantive provisions of the Act are entwined with that provision." *Id.* Because the Act is structured "around subsection 2's constitutionally problematic ban . . . the overwhelming majority of applications of these other subsections are necessarily unconstitutional as well." *Id.*

### 4.    The Act Cannot Be Severed.

Defendants argued both before this court and circuit court that the Act should be severed under Maine law. *Cent. Me. Power Co.*, 144 F.4th at 30 – 31. Maine law provides that if a law is unconstitutional but its "invalidity does not affect other provisions or applications which can be given effect without the invalid provision or application" the court must sever such non-offending sections. 1 M.R.S. § 71(8). But, if "the provisions of a statute 'are so related in substance and object that it is impossible to determine that the legislation would have been enacted except as an

entirety, if one portion offends the Constitution, the whole must fall.' " *Op. of the Justs.*, 2004 ME 54, ¶ 25, 850 A.2d 1145 (quoting *Town of Windham v. LaPointe*, 308 A.2d 286, 292 (Me. 1973)).

For at least three independent reasons, the Act is entirely unconstitutional and the court need not engage in the severability analysis: (1) there is no legitimate governmental interest in preventing American entities with First Amendment rights to be "influenced" by foreign governments before independently voicing their own political speech; (2) Defendants have not shown with record evidence they are pursuing a legitimate objective; and (3) the definition of foreign government is impermissibly vague. Setting these fatal flaws aside, the Act's definitions for determining whether a private entity is foreign government influenced are unconstitutionally overbroad which makes its prohibition provision—subsection 2—likewise overbroad. And subsection 2 permeates the remaining sections of the Act. *Cent. Me. Power Co.*, 144 F.4th at 30. Cutting out the heart of the Act necessarily means no part of it can survive. *See Op. of the Justs.*, 2004 ME 54, ¶ 25, 850 A.2d 1145. For these multiple reasons, the Act is not susceptible to severing.

## Conclusion

A common grade-school puzzle is to find out "What's wrong with this Picture?" Looking at an image, the viewer tries to spot what is wrong with it. The longer one looks, the more problems are revealed because the scene is riddled with errors and impossibilities. The Act is similar. The Act First Amendment problems are both quickly apparent and further revealed upon greater scrutiny of the Act's indefinite language and vague rules. Ultimately, examination reveals that the only conclusion that can be reached is that the Act suffers from multiple, independent fatal First Amendment infirmities. This court should accordingly find the Act unconstitutional and grant Versant a judgment in its favor on its First Amendment claims, Counts II and III.

Dated: November 21, 2025                    Respectfully submitted,

                                            /s/ *Paul McDonald*
                                            Paul McDonald
                                            John A. Woodcock III
                                            BERNSTEIN SHUR
                                            100 Middle Street
                                            P.O. Box 9729
                                            Portland, ME 04104
                                            207-774-1200
                                            pmcdonald@bernsteinshur.com
                                            jwoodcock@bernsterishur.com

                                            Counsel for Versant Power