UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| CENTRAL MAINE POWER COMPANY, et al., | ) | |
| Plaintiffs | ) | |
| v. | ) | 1:23-cv-00450-JCN |
| MAINE COMMISSION ON GOVERNMENTAL ETHICS AND ELECTION PRACTICES, et al., | ) | |
| Defendants | ) | |

**ORDER ON MOTIONS FOR JUDGMENT ON THE PLEADINGS**

In this group of consolidated cases, Plaintiffs—power companies, media associations, and voters—seek to prevent Defendants—state government actors—from enforcing a state statute—21-A M.R.S. § 1064 (hereinafter "the Act")—which prohibits entities from spending money on state elections when deemed to be influenced by a foreign government. (Complaints, 1:23-cv-00450-JCN, ECF No. 1; 1:23-cv-00451-NT, ECF No. 1; 1:23-cv-00452-NT, ECF No. 1; 1:23-cv-00453-NT, ECF No. 1.) The Court issued a preliminary injunction preventing enforcement of the statute. (Preliminary Injunction Order, ECF No. 61.) The First Circuit affirmed. *Central Maine Power Co. v. Maine Commission on Governmental Ethics & Election Practices*, 144 F.4th 9 (1st Cir. 2025). Plaintiffs now ask the Court to enter judgment on the pleadings. (Motions for Judgment on the Pleadings, ECF Nos. 97–99, 103.)

Following a review of the pleadings and after consideration of the parties' written and oral arguments, the Court grants in part Plaintiffs' motions for judgment on the

pleadings because it finds two parts of the statute fail the First Amendment's narrow tailoring analysis. The Court, however, cannot conclude based on the pleadings alone that other provisions of the Act are unconstitutional and because the offending provisions are potentially severable, the Court denies the motions for judgment on the pleadings as to the other claims and issues.

## BACKGROUND[1]

In 2023, Maine voters passed a ballot initiative regulating the involvement of any "foreign government-influenced entity" (hereinafter "FGIE") in Maine's electoral and political processes. The principal provision of the Act prohibits FGIEs from making contributions or expenditures to influence candidate elections or referenda. 21-A M.R.S. § 1064(2), (hereinafter "the election spending provision").[2] The Act authorizes a civil enforcement penalty of up to $5,000 or double the amount of the involved contribution or expenditure, whichever is greater, *id.* § 1064(8), and violations of the election spending provision or several subsidiary enforcement provisions[3] are punishable as class C crimes, *id.* § 1064(9).

---

[1] The Court does not reiterate the full summary of the factual allegations and procedural history because the Court and the First Circuit previously summarized the most relevant parts of the complaints, including the legislative history of the Act.

[2] In the election context, a contribution generally refers to a donation to a candidate or political committee, while an expenditure generally refers to the costs of distributing a speaker's message, such as printing or purchasing time at a venue or on mass media. *See generally*, *Buckley v. Valeo*, 424 U.S. 1, 19–21 (1976) (contrasting the expressive content of contributions and expenditures).

[3] The Act also prohibits a person from (1) knowingly receiving a contribution that violates the election spending provision, *id.* § 1064(3), (2) knowingly or recklessly providing substantial assistance in the making or receiving of a contribution or expenditure that violates the election spending provision, *id.* § 1064(4), and (3) structuring or attempting to structure a contribution or expenditure to evade the prohibitions of the Act, *id.* § 1064(5).

The Act includes two other regulations punishable by a civil fine. The Act prohibits public communications that influence the formulation, adoption, or amendment of any state or local government policy unless the public communication states that it was sponsored by an FGIE. *Id.* § 1064(6) (hereinafter "the disclaimer provision"). The Act also requires media entities to establish due diligence policies, procedures, and controls that are reasonably designed to ensure they do not distribute a prohibited communication, and internet platforms must take down prohibited communications if discovered after posting, *id.* § 1064(7) (hereinafter "the due diligence provision").

The Act defines an FGIE as (1) a foreign government, *id.* § 1064(1)(E)(1), (2) an entity with five percent or more of its shares owned by a foreign government or another entity in which a foreign government owns or controls a majority of shares, *id.* §§ 1064(1)(F), (1)(E)(2)(a) (hereinafter "the five percent ownership definition"), or (3) an entity whose decision-making process regarding election contributions or expenditures involves direction, dictation, control, or participation from a foreign government or an entity in which a foreign government owns or controls a majority of shares, *id.* §§ 1064(1)(F), (1)(E)(2)(b) (hereinafter "the decision-making process definition").

Plaintiffs commenced this action challenging the constitutionality of Act. On Plaintiffs' motions for a preliminary injunction, the Court found the Act likely violated the First Amendment, and granted a preliminary injunction against enforcement of the Act.

(Preliminary Injunction Order at 1.)[4] Because it acted under a compressed schedule before the Act would have taken effect, and because it granted the preliminary relief requested by all the plaintiffs, the Court did not address the independent claims asserted by the media plaintiffs or voter plaintiffs, and the Court did not determine whether the unconstitutional provisions could be severed from the rest of the Act. (*Id.* at 1, 38–39.) Defendants appealed; the First Circuit affirmed. *CMP*, 144 F.4th at 14.

Through motions for judgment on the pleadings, Plaintiffs ask the Court to enjoin enforcement of the Act permanently.

## LEGAL STANDARDS

The proper time to file a motion for judgment on the pleadings is "[a]fter the pleadings are closed." Fed. R. Civ. P. 12(c). "'[T]he pleadings are closed for the purpose of Rule 12(c) once a complaint and answer have been filed.'" *McGuigan v. Conte*, 629 F. Supp. 2d 76, 80 (D. Mass. 2009) (quoting *Doe v. United States*, 419 F.3d 1058, 1061 (9th Cir. 2005)). "The standard for resolving a motion for judgment on the pleadings under Rule 12(c) is identical to that applicable to a motion to dismiss brought under Federal Civil Procedure Rule 12(b)(6), except that a Rule 12(c) motion implicates the allegations of all the pleadings, rather than only those of the complaint." *Sebago Land Developers, Inc. v. Crum & Forster Specialty Insurance Co.,* 749 F. Supp. 3d 177, 186 (D. Me. 2024).

[4] Plaintiff Versant also raised preemption claims at the preliminary injunction stage, but the preemption issues are not discussed further in this order because Plaintiff Versant only seeks judgment on the pleadings regarding its First Amendment claims.

When a defendant brings a Rule 12(c) motion, therefore, a federal court assumes the truth of all "well-pleaded, nonconclusory factual allegation[s]," and asks "whether it states a claim to relief that is plausible on its face," meaning there is "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 680 (2009). When a plaintiff brings a Rule 12(c) motion, a federal court conducts the same inquiry but does not consider "any facts the parties dispute" such as "any allegations in the complaint denied in the answer." *McCurdy v. Cumberland County, Maine*, No. 2:23-cv-00223-LEW, 2024 WL 490837, at *1 (D. Me. Feb. 8, 2024).

## Discussion

### A. First Amendment Framework

The relevant portion of the First Amendment, applicable to the states through the Fourteenth Amendment, prohibits the government from "abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble. . . ." U.S. Const. amend. I. Varying levels of protection apply to different speakers, types of speech, and settings. For example, citizens in the United States have full First Amendment protection, while "foreign citizens outside U.S. territory do not possess rights under the U.S. Constitution." *Agency for International Development v. Alliance for Open Society International, Inc.*, 591 U.S. 430, 433 (2020). Others, such as noncitizen visitors, have some constitutional rights but may have diminished protections for certain kinds of speech. *See Bluman v. FEC*, 800 F. Supp. 2d 281 (D.D.C. 2011). For speakers with full First Amendment liberties, speech and expressive activities are generally protected except for a few types, "including

obscenity, defamation, fraud, incitement, and speech integral to criminal conduct," which have historically been understood to be unprotected. *United States v. Stevens*, 559 U.S. 460, 460 (2010).

When the government burdens a private actor's ability to engage in protected speech in a privately-owned space or in a government-owned space traditionally used as a public forum or designated by the government as a public forum, courts typically "distinguish between two types of restrictions on protected speech: content-based laws and content-neutral laws." *Free Speech Coalition, Inc. v. Paxton*, 606 U.S. 461, 471 (2025); *Roussel v. Mayo*, No. 1:22-cv-00285-SDN, 2025 WL 2239300, at *8 (D. Me. Aug. 6, 2025) (noting similar scrutiny for public fora and private spaces). Content-neutral laws burdening speech incidentally, such as "time, place, or manner" restrictions, are "justified without reference to the content of the regulated speech" and are subject to intermediate scrutiny, meaning they are constitutional if "they are narrowly tailored to serve a significant governmental interest, and . . . leave open ample alternative channels for communication of the information." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). "A speech restriction is sufficiently narrowly tailored" to survive intermediate scrutiny "so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Signs for Jesus v. Town of Pembroke, NH*, 977 F.3d 93, 106 (1st Cir. 2020).

"Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional" and subject to strict scrutiny, meaning that such restrictions "may be justified only if the government proves that they are narrowly

tailored to serve compelling state interests." *Reed v. Town of Gilbert, Arizona*, 576 U.S. 155, 163 (2015). "Narrow tailoring in the strict scrutiny context requires the statute to be the least restrictive means among available, effective alternatives." *Rideout v. Gardner*, 838 F.3d 65, 71 (1st Cir. 2016) (internal quotation marks omitted).

When the government burdens a private actor's ability to speak in a limited public forum (i.e., a government-owned space open for public speech but reserved for specific purposes), a content-based restriction is permissible if it is "reasonable in light of the purposes served by the forum," but a viewpoint-based restriction (i.e. a rule that "targets not subject matter, but particular views taken by speakers on a subject,") is impermissible. *Rosenberger v. Rector & Visitors of University of Virginia*, 515 U.S. 819, 829 (1995); *see also*, *Iancu v. Brunetti*, 588 U.S. 388, 393 (if a restriction "is viewpoint-based, it is unconstitutional"). A viewpoint-based rule is only permissible when "the government speaks for itself," rather than when the speaker is a private actor. *Shurtleff v. City of Boston, Massachusetts*, 596 U.S. 243, 247 (2022).

In the context of elections more specifically, restrictions on expenditures are generally unconstitutional unless the government can satisfy strict scrutiny. *Citizens United v. FEC*, 558 U.S. 310, 339 (2010). A restriction on contributions ordinarily "is not subject to strict scrutiny but instead passes muster if it satisfies" what is known as "exacting scrutiny," which imposes "the lesser demand of being closely drawn to match a sufficiently important interest." *CMP*, 144 F.4th at 20 (quotation marks omitted). Exacting scrutiny "require[s] a fit that is not necessarily perfect, but reasonable," and "represents not necessarily the single best disposition but one whose scope is in proportion to the interest

served[.]" *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595, 609 (2021) (internal quotation marks omitted); *see also*, *National Republican Senatorial Committee v. FEC*, 146 S. Ct. 2404, 2420 (2026) (hereinafter "*NRSC*") (the restriction must be "necessary" to serve the asserted interest and cannot be "disproportionate" to it).[5]

The Supreme Court has upheld contribution limitations in some cases based on the important interest in preventing corruption and the appearance of corruption, *see Buckley v. Valeo*, 424 U.S. 1, 27 (1976). The anticorruption interest has been "limited to quid pro quo corruption," has not been extended to preventing "[i]ngratiation and access," and has not been recognized as compelling for purposes of satisfying strict scrutiny to support independent expenditure limitations. *Citizens United*, 558 U.S. at 357, 359–360.

In most contexts, when a plaintiff mounts a "typical facial attack" on a statute (i.e., when the challenge is not based on the particular facts of an actual enforcement action) the

[5] The Supreme Court has long scrutinized expenditures and contributions differently because restrictions on expenditures have essentially the same effect as direct restrictions on speech:

> A restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached. This is because virtually every means of communicating ideas in today's mass society requires the expenditure of money.

*Buckley*, 424 U.S. at 19. Contributions, in contrast, have lesser expressive content and greater problems:

> A limitation on the amount of money a person may give to a candidate or campaign organization thus involves little direct restraint on his political communication, for it permits the symbolic expression of support evidenced by a contribution but does not in any way infringe the contributor's freedom to discuss candidates and issues. While contributions may result in political expression if spent by a candidate or an association to present views to the voters, the transformation of contributions into political debate involves speech by someone other than the contributor."

*Id.* at 21.

plaintiff must "establish that no set of circumstances exists under which [the statute] would be valid . . . or that the statute lacks any plainly legitimate sweep," but in the First Amendment context, "a law may [also] be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Stevens*, 559 U.S. at 472–73 (quotation marks omitted).

**B. The Five Percent Ownership Definition**

Plaintiffs' primary argument at the preliminary injunction stage concerned the breadth of the five percent ownership definition of an FGIE. Although the First Circuit assumed that Maine has a compelling interest in limiting foreign government influence in the state's elections, *CMP*, 144 F.4th at 23, and although there was no dispute that there was some plainly legitimate sweep to the Act (including as applied to foreign governments), *id.* at 24–25, the five percent ownership definition failed the narrow tailoring inquiry, *id.* at 30. The provision is overly broad because the Supreme Court teaches that corporations and other "associations of citizens" generally should not be "treated differently under the First Amendment simply because such associations are not natural persons," *Citizens United*, 558 U.S. at 342–43, 349 (quotation marks omitted), and because the five percent ownership definition "silenc[es] a U.S. corporation based on the mere possibility that foreign shareholders might try to influence its decisions on political speech, even where those foreign shareholders may be passive owners that exercise no influence or control over the corporation's political spending," *CMP*, 144 F.4th at 26.

The only argument that Defendants and Amici make in response to the First Circuit's reasoning that the five percent ownership definition likely renders the Act

unconstitutional is that because *Citizens United* and other Supreme Court cases recognize that corporations are associations of natural persons, the corporations' constitutional protections derive from the citizenship of their shareholders, and the question of whether the corporations are associations of U.S. citizens requires discovery and a trial. (Amicus Brief at 3–9, ECF No. 111.) Although some of the plaintiff corporations refer to themselves here as Americans or U.S. citizens, that is not necessarily the logic employed by the Supreme Court. Rather than saying that corporations are citizens, the Supreme Court has extended constitutional protections to associations of human citizens and thus treats them like human citizens for some purposes because laws governing associations of citizens can burden the rights of the citizens, such as the right to assemble or associate and the right to speak freely. *See Citizens United*, 558 U.S. at 342 (collecting cases recognizing that "First Amendment protection extends to corporations" and treating them like citizens); *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 707 (2014) ("protecting the free-exercise rights of corporations like [plaintiffs] protects the religious liberty of the humans who own and control those companies"). Amicus, therefore, argues that a corporation owned in part by a foreign government is not "American" or a "U.S. Citizen" simply because of its employees or its history of activities in the United States, and a corporation created by owners who were citizens can lose its First Amendment protections if it allows its shares to be purchased by noncitizens or foreign governments, even if the corporation still employs Americans. (Amicus Brief at 9–10.)

The argument might have some appeal at least near the upper limit (e.g., where a foreign government owns all or nearly all shares or enough to control the decisions of a

corporate entity). *See id.* at 8 (arguing that an association's rights depend on the citizenship of its owners because under a contrary rule, foreign governments could buy all or most of a company incorporated in the United States and use the control over the board of directors to pour unlimited money into U.S. elections). The argument, however, breaks down at the lower limit (e.g., where a foreign government has a minimal investment and role in a corporate entity). There can be little doubt that the First Circuit implicitly rejected the Amicus argument as applied to an ownership threshold as low as five percent. *CMP*, 144 F.4th at 22 (applying the basic approach of *Citizen's United* and noting that the district court had "reason[ed] that no case holds that a corporation ceases to be American by virtue of any quantum of foreign ownership") (quotation marks omitted). The Court need not address here the questions that would be raised by a specific ownership threshold when the ownership percentages are greater. *See Citizen Unite*d, 558 U.S. at 362 (not reaching issues raised by "corporations or associations that were created in foreign countries or funded predominately by foreign shareholders"); *CMP*, 144 F.4th at 9 ("This case falls in the middle of the spectrum and calls on us to consider at which point a domestic corporation has sufficient foreign ownership or control that the First Amendment analysis changes").

Because the protections of the First Amendment apply to entities deemed to be FGIEs merely because of the five percent ownership provision, § 1064(1)(E)(2)(A), and given that Defendants no longer dispute that the Act fails the narrow tailoring requirements and is thus overbroad with that provision in place, the Court must address the question of severability that was previously deferred. For the reasons explained below in Part D, the Court cannot conclude on the pleadings alone that the five percent ownership definition is

not severable. Accordingly, the Court sets aside the five percent ownership provision when analyzing the remainder of the statute.

### C. The Remainder of the Act

#### 1. The State's Interest

Defendants assert an interest in preventing foreign influence over Maine's political process. They rely on *Bluman v. FEC*, 800 F. Supp. 2d 281 (D. D.C. 2011), which upheld a federal statute barring citizens of foreign countries (except lawful permanent residents of the U.S.) from making independent expenditures advocating for or against U.S. candidates and from making contributions to U.S. candidates or parties. *Id.* at 284.

As the court in *Bluman* persuasively explained, because it is a fundamental aspect of a democratic political community that individuals and groups outside the community lack a "right to participate in, and thus may be excluded from, activities of democratic self-government," the government has "a compelling interest for purposes of First Amendment analysis in limiting the participation of foreign citizens in activities of American democratic self-government." *Id.* at 288.[6] Further, because attempting "to influence how voters will cast their ballots in the elections" qualifies as a core activity of democratic self-government, there is a compelling interest in preventing foreigners from participating in those "campaign activities," (i.e. "spending money to influence voters and finance

[6] Because the Supreme Court summarily affirmed the decision on appeal, *Bluman v. FEC*, 565 U.S. 1104 (2012), there was previously some dispute about whether or the extent to which the affirmance makes the lower court's opinion binding precedent. Because the Court independently concludes that "*Bluman* articulates a proper understanding of the contours of the government's permissible interest in restricting foreign participation in American elections," *CMP*, 144 F.4th at 33 (Aframe, J., concurring), it is not necessary to resolve that dispute.

campaigns"), *id.* at 288–89, and appearing to participate in such activities, *CMP*, 144 F.4th at 32 (concluding that the "only" relevant interest is "to prevent actual participation . . . or the appearance of such participation") (Aframe, J., concurring).[7]

Plaintiffs' primary argument is that no such interest can support the Act's restrictions because the Supreme Court has said several times in recent years that it "now recognizes only one legitimate governmental interest" for campaign finance restrictions: "preventing corruption or the appearance of corruption,"—and by "corruption" the Supreme Court refers only to "quid pro quo corruption." *NRSC*, 146 S. Ct. at 2418 (quoting *McCutcheon*, 572 U.S. at 206); *see also*, *FEC v. Cruz*, 596 U.S. 289, 305 (2022). The argument is unconvincing.

First, in context, the statements were merely summarizing the historical fact that the Supreme Court previously recognized other interests but has since rejected several of them. For example, as summarized in *Cruz*, since 2010 when *Citizen's United* overruled *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990), the Supreme Court has

[7] Because the facts of *Bluman* did not prompt a discussion of the appearance of participation in campaign activities, Judge Torresen previously expressed some doubt about whether the appearance of foreign government participation was a compelling interest. After further guidance from the First Circuit, and after further consideration of that issue, the Court concludes that the appearance of improper foreign participation in American democratic self-government is also part of the interest in preventing actual foreign participation in democratic self-government. The Supreme Court has long recognized that "the avoidance of the appearance of improper influence is also critical if confidence in the system of representative Government is not to be eroded to a disastrous extent." *Buckley*, 424 U.S. at 27 (quotation marks omitted). The Supreme Court continues to speak in the same breath about actual corruption and the appearance thereof, *see, e.g.*, *McCutcheon*, 572 U.S. at 206 (labeling the interest in "preventing corruption or the appearance of corruption" as "one" governmental interest); *NRSC*, 146 S. Ct. at 2418 (same), and the underlying rationale regarding the impacts on the government's legitimacy is also the same, *see First National Bank of Boston v. Bellotti*, 435 U.S. 765, 789 (1978) (noting a rationale behind anticorruption interest is the "[p]reservation of the individual citizen's confidence in government").

consistently "denied attempts to reduce the amount of money in politics, to level electoral opportunities by equalizing candidate resources, and to limit the general influence a contributor may have over an elected official." *Cruz*, 596 U.S. at 305. The "only one" statements in *McCutcheon*, *Cruz*, and *NRSC* relied on an observation in *FEC v. National Conservative Political Action Committee*, 470 U.S. 480, 496–97 (1985), that corruption prevention was the only interest "thus far identified" capable of supporting campaign finance restrictions. In context, therefore, the statements in *McCutcheon*, *Cruz*, and *NRSC* at most establish that any other asserted interest is unlikely to succeed because the Supreme Court has rejected several others and only one has been endorsed. The statements do not establish that the Supreme Court has conclusively foreclosed the possibility that another valid interest might be identified based on different facts.

Second, the quoted language upon which Plaintiffs rely was from cases addressing executive or legislative elections and participation in the American democratic political process by actors that were undisputedly within the American political community. In other words, the statutes in those cases targeted speech by American citizens or associations of American citizens about American elections. The Supreme Court's statements regarding the restraints on legislative efforts to restrict such political speech must be read as applying in that context. *See Dopp v. Pritzker*, 38 F.3d 1239, 1245 (1st Cir. 1994) (noting that "words contained in judicial opinions 'are to be read in light of the facts of the case under discussion'") (quoting *Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944)); *see also*, *Cohens v. State of Virginia*, 19 U.S. 264, 399 (1821) (discussing the maxim that "general expressions, in every opinion, are to be taken in connection with the

case in which those expressions are used"); *see also*, *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 434 (2015) (recognizing a different interest beyond preventing quid pro quo corruption for restrictions on judicial campaign spending and noting that "precedents applying the First Amendment to political elections have little bearing on the issues here").

Third, Plaintiffs have not argued and the lower court's reasoning in *Bluman* does not suggest that the state interest in *Bluman* was preventing quid pro quo corruption. The Supreme Court presumably relied on some other interest when it summarily affirmed the decision upholding the constitutionality of the statute at issue in *Bluman*. There is no suggestion that the two word phrase in *McCutcheon*, *Cruz*, and *NRSC* was intended to overrule, without any comment, the Supreme Court's decision in *Bluman*, and a sub silentio overruling is particularly unlikely given that the author of *NRSC* also authored *Bluman*. Furthermore, every justice joined at least one opinion in *Citizens United* implying or assuming the government can restrict campaign speech by foreign individuals or companies predominantly owned by foreign individuals,[8] and the decisions in *McCutcheon*, *Cruz*, and *NRSC* applied and elaborated on *Citizens United* rather than cast doubt on it.

Finally, the First Circuit was aware of the statements in *McCutcheon* and *Cruz* when it reviewed this Court's preliminary injunction decision, but neither the main opinion nor the concurring opinion suggested that the statements in *McCutcheon* or *Cruz* foreclosed

[8] *See Citizen United*, 558 U.S. at 362 (majority opinion); *id.* at 373 (concurring opinion joining majority in full), *id.* at 387 (concurring opinion joining majority in full), *id.* at 422–23 (concurring opinion) ; *id.* at 480 (concurring opinion joining relevant portions of the majority opinion).

the interest recognized in *Bluman*. Opinions from other courts issued after *McCutcheon* have likewise considered a valid interest in protecting the integrity of elections from improper foreign influence. *See Washington Post v. McManus*, 944 F.3d 506, 520 (4th Cir. 2019).

The Court thus concludes that the State has a compelling interest in limiting participation and the appearance of participation by foreign governments in activities intimately related to the process of the state's democratic self-government, including the spending of money to influence voters or finance campaigns.

**2. Vagueness of the Definition of Foreign Government**

The Act defines a foreign government as:

> . . . any person or group of persons exercising sovereign de facto or de jure political jurisdiction over any country other than the United States or over any part of such country and includes any subdivision of any such group and any group or agency to which such sovereign de facto or de jure authority or functions are directly or indirectly delegated. "Foreign government" includes any faction or body of insurgents within a country assuming to exercise governmental authority, whether or not such faction or body of insurgents has been recognized by the United States.

21-A § 1064(1)(D). The definition mirrors the definition in a federal statute, the Foreign Agents Registration Act. 22 U.S.C. § 611(e).

Plaintiffs argue the remainder of the statute is unconstitutional because the definition is impermissibly vague. Under the Due Process Clauses of the Fifth and Fourteenth Amendments, "[a] statute is impermissibly vague if (1) 'it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits' or (2) 'it authorizes or even encourages arbitrary and discriminatory

enforcement.'" *March v. Frey*, 458 F. Supp. 3d 16, 39 (D. Me. 2020) (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)). However, legislatures need not attempt to achieve "semantic certainty," *Draper v. Healey*, 827 F.3d 1, 4 (1st Cir. 2016), because "words are rough-hewn tools, not surgically precise instruments." *URI Student Senate v. Town of Narragansett*, 631 F.3d 1, 14 (1st Cir. 2011). "[W]hen a statute interferes with the right of free speech or of association, a more stringent vagueness test should apply. . . . But perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 19 (2010) (quotation marks omitted).[9]

Plaintiffs' vagueness argument, which references some concerns raised in the First Circuit's concurring opinion, are not without merit as the definition can reasonably be characterized as broad. "[B]ut the mere fact that a statute is broad does not, on its own, establish that it is vague." *United States v. Coleman*, 149 F.4th 1, 57 (1st Cir. 2025). There are many groups universally recognized as exercising sovereign jurisdiction over territory outside the United States. For instance, the other member states of the United Nations represent specific and nondebatable examples of governments of foreign countries that an

[9] When a plaintiff challenges a law that implicates First Amendment interests, the injuries generating a due process vagueness claim and a First Amendment overbreadth claim are often "similar" and "overlapping" even though "the analysis takes place under distinct tests." *Doe v. Hopkinton Public Schools*, 19 F.4th 493, 509 (1st Cir. 2021). Whereas "a plaintiff who engages in some conduct that is clearly proscribed cannot complain" through a Fifth Amendment due process claim about "the vagueness of the law as applied to the conduct of others," courts have "relaxed that requirement" when the challenged law implicates speech interests because First Amendment doctrine "permit[s] plaintiffs to argue that a statute is overbroad because it is unclear whether it regulates a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 304 (2008) (quotations marks and modifications omitted).

ordinary person would understand to be covered by the Act. Further, for a vast majority of the other countries, there are governments of political subdivisions to which the Act just as clearly applies.

Although Plaintiffs and the First Circuit concurrence raise examples that might be harder to classify, there is nothing in the pleadings that would allow the Court to conclude that the groups cited as examples have been or are likely to engage in future election spending in Maine or have sufficient ownership to control Maine corporations' election spending in Maine (as would be required under a severed version of the Act, *see infra* Part D). Likewise, neither the pleadings nor the parties' arguments suggest that the statute is an attempt to confer the kind of discretion that invites arbitrary or discriminatory enforcement. The possibility that there might be some situations in the future where the Act's applicability might require closer scrutiny does not render the Act unconstitutionally vague even under the more stringent version of the vagueness doctrine that applies in the First Amendment context. *See Duhe v. City of Little Rock*, 902 F.3d 858, 863–64 (8th Cir. 2018) (noting that, even in the First Amendment context, a statute is not vague "solely because close cases may exist under its requirements").

Plaintiffs contend that there are significant speech-chilling consequences of the Act's ambiguity because it is difficult to track whether they have maintained the requisite relationship with qualifying individuals and groups outside the U.S. That argument is most relevant to an assessment of the degree of the burden that results from the Act rather than demonstrating a lack of clarity regarding the Act's coverage. Notably, severance of the five percent ownership definition and the participation definition, *see infra* part D, would

mitigate the consequences of any imprecision. Furthermore, without any record evidence to the contrary at this stage of the proceedings, the Court discerns no need for entities to track frequent or relatively insignificant stock market transactions among a large number of actors because entities with First Amendment protections who are considering whether to spend on election communications in Maine need only know who has sufficient ownership to control its decisions. Considering only the undisputed portions of the pleadings and without a developed factual record, the Court is not persuaded that the concerns reflected by the examples Plaintiffs cite in support of their vagueness challenge (e.g., whether the Act applies to factions within recognized countries or companies controlled by such factions) will be generated at all or frequently enough for the Act to be facially invalid under the vagueness doctrine of the due process clause or the overbreadth doctrine of the First Amendment.

Accordingly, at this stage of the proceedings, Plaintiffs are not entitled to relief on their vagueness claims.

**3. Tailoring of the Decision-making Process Definition**

Plaintiffs argue that the substantive restrictions of the Act fail the applicable scrutiny due to the breadth of the word "participates" within the third definition of an FGIE. Under the decision-making process definition, an entity qualifies as an FGIE if a foreign government (or another company majority owned by a foreign government) "[d]irects, dictates, controls or directly or indirectly participates in the decision-making process with regard to the activities of the . . . entity to influence the nomination or election of a candidate or the initiation or approval of a referendum, such as decisions concerning the

making of contributions, expenditures, independent expenditures, electioneering communications or disbursements." 21-A M.R.S.A § 1064(1)(E)(2)(b).

The Court previously determined that the decision-making process definition presented a closer fit to the State's interest than the five percent ownership definition, but because the State adopted rules that found the requisite participation by a foreign government based on the mere communication of a preference, such as by sending an unsolicited communication, the Court determined that the provision rendered the Act overbroad. (Preliminary Injunction Order at 36–38; First Proposed Rules, ECF No. 60-1.) The First Circuit reached a similar conclusion. *CMP*, 144 F.4th at 29.

Because this Court's prior decision was influenced by the Commission's prior proposed interpretive regulations, the Court noted that the outcome might be different under rules that clarified that the definition only applied when a foreign government's role in the entity's decision-making process to spend in Maine's elections was more significant. (Preliminary Injunction Order at 38 n.21.) As the First Circuit reviewed only the district court's decision, its conclusion was also necessarily based on the proposed regulations at the time of the preliminary injunction decision. *CMP*, 14 F.4th at 29 n.10.

Defendants contend that a different conclusion is warranted because the Commission has since adopted different rules. Under the new rules, "direct" participation means participation through an official or employee of a foreign government or a company majority owned by a foreign government, and "indirect" participation means participation using an intermediary, regardless of whether the intermediary has any formal affiliation with the foreign government or majority owned company. 94-270 C.M.R. ch. 1, §

16(1)(C), (H). To "participate" in an entity's decision-making process concerning campaign spending is to "deliberate or vote on a decision of [the entity] concerning" campaign spending "with the invitation, consent, or acquiescence of the [entity.]" *Id.* § 16(1)(L). The rule also specifies that "participation" does not include merely (1) "making, deliberating on, or voting on a shareholder resolution concerning" campaign spending as long as the voter owns less than five percent of the entity, (2) "sending an unsolicited communication regarding a decision-making process"; or (3) "participating in an entity's decision-making process for general budget decisions" such as setting overall maximum limits on political spending. *Id.*

Plaintiffs urge the Court not to allow Defendants to use regulations that are currently paused to narrow an overbroad statute. Further, Plaintiffs contend that even if the Court considers the new regulations, the breadth of the conduct that qualifies as participation by a foreign government (or its majority owned company) is such that the Act's restrictions are not narrowly tailored to the State's legitimate interest.

The Court is not persuaded by Plaintiffs' first argument. Even at the pleading stage, there is no dispute that the regulations were lawfully adopted and are binding under Maine law absent injunctive relief from the Court. Although application of the regulations is paused by this Court's preliminary injunction, without an injunction, the regulations would be effective. An assessment of the impact of the regulations on the Act, therefore, is appropriate.

A review of that impact reveals that Plaintiffs' second argument has merit. The regulations do not entirely cure the previously identified deficiencies. Under even the

narrower definitions in the regulations, an entity owned almost entirely (or perhaps even entirely) by U.S. citizens would be silenced simply because a foreign government or its majority owned company was involved in the entity's deliberations with the invitation, consent, or acquiescence of the entity. In this way, the participation-related language in the decision-making process definition of an FGIE continues to restrict the decisions of an entity predominantly or entirely owned and controlled by U.S. shareholders to spend money to influence voters or fund campaigns because the entity has some minimal or voluntary association with a foreign government, rather than simply restricting a foreign government's decisions to influence voters or fund campaigns. The participation terms, therefore, pursue goals beyond the limits of the State's sufficiently important and compelling interest, and the Act's substantive restrictions accordingly fail the First Amendment's requirement of narrow tailoring to the State's interest. *See CMP*, 144 F.4th at 34 (Aframe, J., concurring) (rejecting as a misreading of *Bluman* the State's interpretation "as authorizing the government to prevent an American company from itself speaking because it consults or has some other contact with a foreign government before it decides what to say").

The participation-related regulations also suffer from a similar deficiency because one portion incorporates a five percent ownership threshold. Because the very same shareholder voting conduct can be deemed participation or not participation depending on whether the foreign government owns slightly more or slightly less than five percent of the entity at a specific point in time, the rules do not remove the additional burden of closely

tracking transactions like stock market trades. The additional burden further demonstrates that the Act's restrictions are not narrowly tailored to the state's interest.

The remainder of the decision-making process definition does not suffer from the same flaws. The Court sees no real argument that the State lacks an interest in restricting an entity's campaign activities when a foreign government has directed, dictated, or controlled the entity's election spending decisions (either itself or through another company it necessarily controls through its majority ownership share), and it does not appear that Plaintiffs attempt to make that argument. (*See e.g.,* Plaintiff CMP's Motion at 21 (reasoning that if the Act was appropriately tailored to the state interest in eliminating the use of foreign money to influence voters or finance campaigns, "then at a minimum it would have stopped at the phrase '[d]irects, dictates, [or] controls,' which is more narrowly tailored to stopping a foreign actor from causing a U.S. corporation to engage in certain electioneering activities than '[d]irects, dictates, [or] controls' plus 'directly or indirectly participates'")).

The ability of a state to restrict an entity's speech when it has been directed, dictated, or controlled by a foreign government is consistent with *Bluman* and *Citizens United*. The *Citizens United* Court assumed that there was a compelling interest sufficient to limit political speech from a corporation "predominantly" funded by foreign actors, which, in context, is more naturally interpreted to capture the idea of a sufficient plurality of ownership in the corporation to control the corporation rather than any ownership stake exceeding fifty percent. *See Predominant*, Oxford English Dictionary, https://www.oed.com/dictionary/predominant_adj (defining the word to include "[h]aving

ascendancy, supremacy, or prevailing influence over others" and "the main, most abundant, or strongest element"); *Predominantly*, Oxford English Dictionary, https://www.oed.com/dictionary/predominantly_adv (defining the word as including the synonyms "primarily, largely, chiefly"); *CMP*, 144 F.4th at 34 (Aframe, J., concurring) (interpreting the language about corporations "funded predominantly" by foreign shareholders as "suggest[ing] that any government interest in restricting corporate political speech would be limited to situations where the foreign corporations were themselves speaking or where the American company was . . . in effect controlled or appeared to [be] control[led]" by the foreign shareholders). Because corporations can have complex structures for ownership shares, including multiple classes of stock and arrangements that separate to varying degrees the right to profit from voting rights, a definition that focused only on the numerical ownership share—as opposed to the practical effects of the ownership interests—would be difficult to apply and easy to circumvent.

A less restrictive approach (e.g., a statutory scope covering only foreign governments themselves and omitting corporations controlled by foreign governments) would be easy to circumvent and thus would not be effective because it would permit foreign governments to use domestic or international corporations to participate in American self-governance. Foreign governments lacking First Amendment protections could use their resources to purchase enough shares of a corporation (or many small corporations) with some American shareholders to effectively control their decisions to spend money in U.S. elections and thus improperly participate in internal democratic governance.

In sum, the participation terms in the decision-making process definition render the Act overly broad and are thus invalid, but because no party seriously challenges the rest of the decision-making process definition of an FGIE, and because the other terms are narrowly tailored to the state's compelling interest, for the reasons discussed below in Part D, at this stage of the case, the Court cannot conclude that the participation terms are not severable from the rest of the statute. The Court, therefore, will analyze the remaining provisions of the Act with the words "or directly or indirectly participates in" removed from the third definition of an FGIE.

**4. Tailoring of the Disclaimer Provision**

Rather than an outright ban like the Act imposes for FGIEs spending on election communications, the disclaimer provision permits public communication seeking to alter a government policy but requires a statement that the message was sponsored by an FGIE as defined under Maine law. In the context of political speech, disclosure and disclaimer requirements are typically subject to exacting scrutiny, which means they "must be narrowly tailored to serve a sufficiently important governmental interest." *Gaspee Project v. Mederos*, 13 F.4th 79, 85 (1st Cir. 2021). Exacting scrutiny "require[s] a fit that is not necessarily perfect, but reasonable," and "represents not necessarily the single best disposition but one whose scope is in proportion to the interest served[.]" *Americans for Prosperity*, 594 U.S. at 609 (internal quotation marks omitted).[10]

[10] Exacting scrutiny is typically required because reporting and disclosure requirements "can seriously infringe on privacy of association and belief guaranteed by the First Amendment," but they usually do not warrant strict scrutiny because they impose "no ceiling" on political speech or association. *Buckley*, 424 U.S. at 64; *see also*, *Gaspee Project*, 13 F.4th at 86 ("Unlike limits on expenditures (which place a brake on political speech), disclosure regimes do not limit political speech at all. A disclosure regime is, therefore,

Plaintiffs raise two arguments as the bases of their challenge: (1) there is an insufficient interest in limiting foreign government spending to alter state or local government policy, and (2) the Act is overinclusive because it is inaccurate as applied to entities that are not actually influenced by foreign governments.

As discussed above, states have a compelling interest in excluding foreign governments from activities intimately associated with democratic self-government, including spending money to influence voters and fund campaigns. *Bluman*, 800 F. Supp. 2d at 288–89. Although *Bluman* did not consider spending to influence policy outside a candidate or ballot election, the Court discerns no reason that the same compelling interest in preventing foreign governments from attempting to influence voters would not extend to spending to influence policy. While courts have at times distinguished between the interests supporting candidate elections, ballot referenda, and advocacy of policy changes outside the context of a specific election because there are different risks of quid pro quo corruption for each, because preventing quid pro quo corruption is not the relevant state

---

a less restrictive alternative to more comprehensive regulations of speech") (internal quotation marks omitted).

In support of their argument for a higher level of scrutiny, Plaintiffs quote one line in the First Circuit's opinion stating that "[t]he Act's restrictions on contributions must withstand exacting scrutiny . . . and its remaining burdens on political speech must withstand strict scrutiny." *CMP*, 144 F.4th at 22. Taken in context, the statement likely referred to the other restrictions in subsection 2 (*i.e.* the expenditure restrictions) and the other subsidiary enforcement provisions which themselves incorporate the subsection 2 bans on contributions and expenditures. The First Circuit did not discuss at length the disclaimer requirement or the due diligence requirement and did not mention the usual tests for disclosure and disclaimer rules or recordkeeping and reporting rules. The First Circuit only addressed subsection 6 and 7 briefly in a separate part of the opinion from the statement in question, and the First Circuit concluded the Act was overbroad even assuming the disclaimer and due diligence provisions were constitutional. *CMP*, 144 F.4th at 30. Therefore, the Court does not interpret the statement from the *CMP* panel as intending to depart from the typical standards in cases like *Gaspee Project* and the line of Supreme Court cases following *Buckley*.

interest in this case, there is no obvious reason that the interest identified in *Bluman* should not extend to foreign government spending to alter state or local government policies.

In other words, spending on public communications designed to alter government policy "is at least as (and probably far more) closely related to democratic self-government than serving as a probation officer or public schoolteacher," which roles the Supreme Court previously found to be sufficiently related to democratic self-governance to exclude foreign actors. *Id.* at 288–89. The Court, therefore, concludes that states have a sufficiently important government interest in preventing or at least informing recipients about foreign governments' efforts to alter state and local government policy. *See Gaspee Project*, 13 F.4th at 87 ("[T]here is an equally compelling interest in identifying the speakers behind politically oriented messages. This is especially true in the age of new media, given the proliferation of speakers in the marketplace of ideas") (quotation marks and citation omitted). Because (under the narrowed version of the statute without the five percent ownership definition and the participation terms) the disclaimer provision of the statute works only to inform recipients of public communications about the foreign government source and control behind the communications and does not ban the communications, the disclaimer requirement is proportionate to sufficiently important state interests.

Plaintiffs also contend that the Act does not require the disclosure of truthful and uncontroversial information regarding the source of a communication but instead compels a speaker to include an unjustified or unduly burdensome unfavorable, undesired, or untruthful message. *See, e.g.*, *National Institute of Family and Life Advocates v. Becerra*, 585 U.S. 755, 777 (2018). This argument presumes that entities spending on public

communications to alter government policies will have to state they are foreign government influenced even though they are not, such as if a foreign government merely communicates with an entity or maintains a small passive ownership interest. The argument could have merit as applied to an entity deemed an FGIE merely based on the five percent ownership definition or the participation terms of the decision-making process definition; the argument is not persuasive as applied to an entity deemed an FGIE with the offending language removed from the definition. That is, because the potentially severed version of the Act *(see infra* Part D) applies only to foreign governments themselves and entities in which the foreign governments had enough of an ownership interest (and uses that interest) to control the entity's campaign spending decision, the required disclaimer is truthful and on its face does not appear to be any more controversial, burdensome, or unjustified than other political disclaimer requirements that courts have upheld and relied upon to invalidate more burdensome campaign finance laws. Plaintiffs, therefore, are not entitled to judgment on the pleadings on their First Amendment claims based on their arguments related to the disclaimer provision, § 1064(6).

**5. Tailoring of the Due Diligence Provision**

Subsection seven requires media entities to establish due diligence policies, procedures, and controls that are reasonably designed to ensure that they do not distribute prohibited communications, and internet platforms must take down prohibited communications if discovered after posting. The media plaintiffs argue the provision impermissibly burdens their First Amendment rights because it would require considerable time and resources to investigate whether each prospective political advertiser qualifies as

an FGIE. Defendants argue the provision does not require an expensive investigation and represents a minimal burden on media entities because the due diligence policies need not be perfect. Plaintiffs focus on the word "ensures," while Defendants focus on the phrase "reasonably designed."

On its face, the provision is susceptible to an expansive interpretation requiring more investigation than has previously been imposed on media entities, which would create serious doubt regarding the constitutionality of the provision. The binding rules the Commission adopted, however, simplify the analysis. *See Rock Against Racism*, 491 U.S. at 795–96 ("Administrative interpretation and implementation of a regulation are, of course, highly relevant to our analysis, for, in evaluating a facial challenge to a state law, a federal court must consider any limiting construction that a state court or enforcement agency has proffered") (quotation marks and modifications omitted).

The rules clarify that the due diligence requirement applies only to sales of public communications and not reproductions in news stories or commentary, 94-270 C.M.R. ch. 1, § 16(8)(A), the rules specify that media providers are not required to investigate their advertisers or monitor public comments for reports that an advertiser is an FGIE, *id.* § 16(8)(D), and the rules contain a safe harbor that provides an example of a policy that will qualify as reasonably designed to prevent the publishing of prohibited communications, *id.* § 16(8)(B)(1)–(5). Under the safe harbor rule, a media entity needs only: (1) a policy against knowingly selling a prohibited communication, (2) a policy requiring an advertiser to certify that it is not an FGIE by a checkbox or other such form, and (3) a policy to preserve records of the certification for two years. *Id.*

On its face, the due diligence provision does not appear to significantly limit the amount of political speech a media provider can host. The burden on media entity's ability to speak appears to be minimal. Subsection 7, therefore, is subject to exacting scrutiny, rather than strict scrutiny. *See Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182, 202 (1999) (noting that the Supreme Court has inquired whether "recordkeeping, reporting, and disclosure provisions" are substantially related to important governmental interests); *Citizens United*, 558 U.S. at 369–71 (explaining the rationale for giving more leeway for disclosure rules than bans or caps).

Because states have a compelling interest in preventing foreign governments from spending on public communications to influence elections and state and local policy, the same interest is sufficient to support restrictions on the other side of the transaction. If a state has a compelling interest in preventing the purchasing of a kind of advertisement distribution, there is no reason to conclude that a state lacks a similar interest in preventing the selling of the distribution of the same advertisements.[11] Not only does the due diligence provision help to enforce the prohibition on foreign government participation in democratic

[11] Plaintiffs cite *Bartnicki v. Vopper*, 532 U.S. 514 (2001), but the case is not particularly helpful to Plaintiffs. *Bartnicki* involved an attempt to prohibit the publication of information on a matter of public concern that a publisher obtained lawfully from a third party but was unlawfully intercepted by the third party. *Id.* at 525. The Supreme Court discussed two government interests: removing an incentive for parties to intercept private conversations and minimizing the harm to persons whose conversations have been illegally intercepted. *Id.* at 529. The Supreme Court found those interests insufficient to support restricting the speech of the innocent third party recipient because there are only rare circumstances where "a law suppressing one party's speech may be justified by an interest in deterring criminal conduct by another," but the Supreme Court assumed that those interests justified the prohibition against the interceptor's own use of the illegally obtained information. *Id.* Because the question here is whether the law can impose duties and penalties on the seller of the ads, and because the knowing seller is more comparable to the interceptor than the innocent third party recipient, the situation in this case is more comparable to the second example in *Bartnicki*.

self-government, the preservation and reporting aspects of the policy requirements are in service of the State's important interest in "identifying the speakers behind politically oriented messages," which is especially important "in the age of new media, given the proliferation of speakers in the marketplace of ideas." *Gaspee Project*, 13 F.4th at 87. The more difficult inquiry is whether the media policy requirements are narrowly tailored. As Plaintiffs argue, as compared to a ban on FGIEs buying ads, a broader system of regulation is required to ban FGIEs from buying ads with an information gathering and reporting obligation on the media entities that are selling ads.

As discussed above, the question even under strict scrutiny is whether the state has adopted the least restrictive means among the effective alternatives, and to survive exacting scrutiny, a state is not required to employ the least restrictive means; the state need only choose requirements that are in proportion to the interests. The Media Plaintiffs contend the imposition of restrictions on media entities distributing advertisements rather than limiting the restrictions to prospective advertisers is unprecedented. Other states, however, have done so, and federal law has also placed similar or arguably more onerous duties on some third party media providers selling campaign advertisements. *See, e.g.*, 47 C.F.R. §§ 73.1943, 76.1701, 25.701(d) (federal regulations imposing record retention and disclosure obligations on third party broadcasters, satellite, and cable providers); *United States v. Edge Broadcasting Co.*, 509 U.S. 418, 428 (1993) (upholding restrictions on broadcasters regarding distributing gambling advertisements in a state where gambling was banned). The nature of the purchasers of the ads is also a relevant consideration. The State has a greater need and can thus be expected to adopt additional enforcement measures when

seeking to restrict foreign government influence because of the difficulties inherent in jurisdictional limits and the challenge in detecting the nature of foreign government efforts. *See Buckley*, 424 U.S. at 67–68 (finding it significant that "recordkeeping, reporting, and disclosure requirements are an essential means of gathering the data necessary to detect violations of the contribution limitations" contained in other provisions).

The burden on media entities, as clarified in the regulations, would appear distinguishable from more onerous and less tailored media duties that have been invalidated in at least one case. In *Washington Post v. McManus*, 944 F.3d 506 (4th Cir. 2019), the Fourth Circuit upheld an injunction against a Maryland law requiring platforms that host political ads to (1) post within forty-eight hours of purchase in a searchable format in a clearly identifiable location on the platform the ad purchaser's name, the ad purchaser's contact information, the identity of the treasurer of the political committee or the individuals exercising control over the ad purchaser, and the total amount paid for the ad, and retain the post for one year after the election; and (2) collect, retain, and turn over to regulators upon request within forty-eight hours the candidate or issue to which the ad relates and whether the ad supports or opposes the candidate or issue, the dates and times that the ad was first disseminated and last disseminated, a digital copy of the content of ad, an approximate description of the geographic locations where the ad was disseminated, an approximate description of the audience that received or was targeted to receive the ad, and the total number of impressions generated by the ad. *Id.* at 514. The Fourth Circuit distinguished federal regulations on broadcasters, cable, and satellite providers and found the law to offend the First Amendment because it required third party internet platforms to

engage in a significant amount of compelled speech, *id.* at 519–20, and when the extensive record keeping and disclosure duties were applied to internet media platforms rather than advertisers, it significantly reduced or eliminated the incentive to engage in the hosting of political speech because the degree of "unhealthy entanglement" with regulators and the "compliance costs" were so much greater for political ads than nonpolitical ads, *id.* at 517–19.

Assuming the Fourth Circuit's reasoning is sound,[12] because the duties here (as clarified under current regulations) appear to be less onerous than those the Fourth Circuit considered, the Maine statute arguably does not generate the concerns that the Fourth Circuit identified. The pleadings alone do not establish that compliance would be sufficiently burdensome to sustain a First Amendment challenge as the degree of the burden includes factual issues that might require a more developed record to assess.[13]

Finally, Plaintiffs argue that the take down requirement for internet platforms represents an impermissible prior restraint. "The term prior restraint is used to describe administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550 (1993) (quotation marks omitted). Courts have "steadfastly preserved"

[12] Other courts have upheld laws that appear to be more burdensome than the Maine law and more similar to the Maryland law the Fourth Circuit considered. *See, e.g.*, *State v. Meta Platforms, Inc.*, 590 P.3d 1099 (Wash. 2026).

[13] The Court's analysis of the relative burden on the media entities is based on the parties' pleadings under the standard that governs the Court's assessment of the motions for judgment on the pleadings. The Court's denial of the Media Plaintiffs' motion does not foreclose the Media Plaintiffs or Defendants from presenting evidence in future dispositive motion practice or at trial regarding issues like the extent of the burden.

the "time-honored distinction" between specific government orders barring particular speech in the future and the burdens that might result from the imposition of penalties for past speech. *Id.* at 553–54. The Act does not involve government review of public communications or orders before publication (or after discovery but before a potential take down); rather, the Act merely imposes a general standard with potential penalties for those who violate the standard. The Court, therefore, is not persuaded that the Act constitutes an impermissible prior restraint.

For the reasons discussed above, the pleadings alone do not establish that the due diligence provision of the Act, § 1064(7), violates the First Amendment.

**6. Applicability to the Elector Plaintiffs**

The Elector Plaintiffs raise multiple interrelated arguments, but they do not materially alter the analyses above. For simplicity, of those arguments that differ from those raised by other plaintiffs, the Court addresses the two most prominent: (1) the Act allegedly violates their First Amendment rights by inhibiting their receipt of the prohibited communications; and (2) the Act allegedly restricts their ability to debate and advocate with their fellow citizens and with other government officials.

The first argument is based on the correct premise that both speakers and listeners can assert the protection of the First Amendment. The concept can be significant when deciding issues like standing to sue, and courts have often considered the interests of recipients when examining the burdens of the act. The Elector Plaintiffs, however, have not shown that the standards and the level of scrutiny typically differ in a fundamental way based on the interest in receiving communications. *See Virginia State Bd. of Pharmacy v.*

*Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 757 (1976) (noting that "[i]f there is a right to advertise, there is a reciprocal right to receive the advertising, and it may be asserted by these appellees," and proceeding to scrutinize the interests and means for the speech restrictions); *N.A.A.C.P., Los Angeles Branch v. Jones*, 131 F.3d 1317, 1322 (9th Cir. 1997) ("voter plaintiffs, as recipients of campaign speech, have no greater rights than the candidates to have candidates publish statements in the Sample Ballot"). The campaign expenditures and contributions are not examples of where recipients' rights materially alter the analysis.[14]

The second argument fails because most of the provisions do not apply to electors. An elector cannot be an FGIE (i.e., as potentially severed, a foreign government, an entity majority owned by a foreign government, or an entity whose spending decision is controlled by a foreign government or a majority owned entity), and a citizen acting merely as an elector is not a media entity. The Act does not prohibit Maine citizens from voluntarily seeking input from foreign governments before casting their votes, nor does it criminalize the possession of prohibited communications or the sharing of information derived therefrom.

The only provisions that could apply directly to the Elector Plaintiffs are the subsidiary enforcement provisions in subsections 3 through 5. To the extent that the Elector Plaintiffs' argument could be construed to challenge those provisions, and to the

[14] The Court notes, for example, that most candidates would have a strong interest in receiving greater contributions. Also, courts like the one in *Bluman* were undoubtedly aware of the reciprocal nature of speech protections yet upheld laws burdening citizen's right to receive political speech from foreign citizens.

extent that those provisions are subject to First Amendment scrutiny, at least at this stage of the proceedings, Plaintiffs have not established that the provisions are constitutionally impermissible.

**D. Severability**

Maine law contains a presumption that statutes are severable. 1 M.R.S. § 71(8). "[I]f a provision of a statute is invalid, that provision is severable from the remainder of the statute as long as the rest of the statute can be given effect without the invalid provision, and the invalid provision is not such an integral part of the statute that the Legislature would only have enacted the statute as a whole." *Opinion of the Justices*, 2004 ME 54, ¶ 23, 850 A.2d 1145, 1151–52. Plaintiffs argue that any offending provisions are not severable.

Plaintiffs' severability arguments rest on the centrality of subsection 2, the expenditure and contribution restrictions for FGIEs. Although several of the other enforcement provisions rely upon or incorporate subsection 2, that fact does not answer the question of severability of one of three subdefinitions of the FGIE term and other language within another subdefinition of the FGIE term. With the five percent ownership definition and the participation terms removed, it appears that each of the substantive restrictions can be given effect and applied to a narrower set of FGIEs. For example, the Court previously held that the contribution and expenditure limitations were valid as to foreign governments (the first definition of an FGIE), and the First Circuit noted that no party had challenged that conclusion. *CMP*, 144 F.4th at 25. Nor has any party challenged the validity of

silencing foreign governments under the First Amendment either.[15] In the preceding sections, the Court has analyzed the constitutionality of the other challenged provisions while setting aside § 1064(1)(E)(2)(A) and the words "or directly or indirectly participates in" within § 1064(1)(E)(2)(b). At the pleading stage, with those portions of the statute removed, the Court cannot conclude that Plaintiffs are entitled to a judgment declaring other definitions and provisions of the Act violate the Constitution.

To the extent Plaintiffs contend that the law does not permit the Court to sever select words or phrases from the Act, the Court notes that Plaintiffs cite no authority under Maine law limiting severability to whole sections, subsections, or paragraphs within statutes. The Maine Law Court has often referred more generically to any "portion" of a statute, which suggests that even individual offending words can be severed if the other criteria are met. *See Kittery Retail Ventures, LLC v. Town of Kittery*, 2004 ME 65, ¶ 18, 856 A.2d 1183, 1190 (noting that "an invalid portion" of a statute will only void the entire statute when it "is such an integral portion" of the entire statute so that a court can conclude the enacting body would have only enacted the legislation as a whole). Laws within the state have sometimes included severability clauses that explicitly permit severance of "any . . . phrase . . . declared invalid," *see Begin v. Inhabitants of Town of Sabattus*, 409 A.2d 1269, 1274 (Me. 1979), and Maine courts have evidently never discouraged fine-grained analyses of the words of laws or their severability, *see, e.g.*, *City of Lewiston v. Androscoggin County*, No. AUBSC-CV-15-118, 2016 WL 8201671, at *9 n.5 (Me. Super. Nov. 20, 2016)

[15] Plaintiffs' challenge to the definition of a foreign government on vagueness grounds is a separate issue.

(applying a similar severability rule to excise three words within a county charter that conflicted with a state statute). Courts in other jurisdictions have inquired whether there are "sections, subsections, sentences, clauses, *phrases or words*" that are capable of being severed. *Rhode Island Med. Soc. v. Whitehouse*, 239 F.3d 104, 106 (1st Cir. 2001) (emphasis supplied); *see also*, *Stenson*, 2001 WL 1033614, at *6 (severing two words from within a political advertising provision).

Plaintiffs also have not established through the pleadings that the electorate would not have enacted the remainder of the statute even if the covered FGIEs were limited to foreign governments and those entities where a foreign government exercises actual control over the election spending decision. The rest of the statute can logically be applied to a smaller set of entities and election spending.

In sum, the restrictions of the Act cannot be applied consistently with the First Amendment to many entities deemed to be FGIEs merely through the definition in subsection (1)(E)(2)(A) or through the participation terms of subsection (1)(E)(2)(b), but Maine law permits courts to sever terms that offend the overbreadth doctrine of the First Amendment. *See, e.g.*, *Connection Distributing Co. v. Holder*, 557 F.3d 321, 342 (6th Cir. 2009) (noting that when a court finds an overbreadth problem it can either "enjoin the unconstitutional applications of the law while preserving the other valid applications" or "invalidate the entire statute unless it could sever an offending portion of the text from the rest of the statute"); *Stenson v. McLaughlin*, No. CIV. 00-514-JD, 2001 WL 1033614, at *7 (D.N.H. Aug. 24, 2001) (severing political advertising provisions that created overbreadth). As the First Circuit noted, Defendants have raised "colorable arguments

concerning the Act's severability under state law." *CMP*, 144 F.4th at 31. The arguments continue to have some merit. Accordingly, the Court cannot conclude based solely on the pleadings that the "five percent" and "participation" provisions of the Act cannot be severed.[16]

## CONCLUSION

Following a review of the pleadings and after consideration of the parties' arguments, for the reasons explained above, the Court grants judgment in favor of Plaintiffs on their constitutional challenge to the Act's five percent ownership provision (21-A M.R.S. § 1064(1)(E)(2)(a)) and the participation term ("or directly or indirectly participates in") within the decision-making process definition (21-A M.R.S.A § 1064(1)(E)(2)(b)). The Court otherwise denies Plaintiffs' motions. The preliminary injunction remains in effect.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 30th day of September, 2026.

---

[16] The Court does not make a final determination on severability because although the Court has determined that Plaintiffs are not entitled to relief on all their claims at the pleading stage, Plaintiffs could conceivably prevail on one or more additional claims with a more developed record. Any such finding might be relevant to the Court's severability analysis. In future stages of the litigation and on a more developed record, if any of the remaining provisions are found to have constitutional infirmities, the Court expects that the parties will address the extent to which the severability analysis is impacted, if at all, by the cumulative effect of all the problematic provisions.